Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

## I.      Qualifications of Witness with List of All Publications within Last Ten Years

My name is John C. Villines; I have earned the following board certifications issued by ASIS International (ASIS): CPP (Security Management); PCI (Professional Certified Investigator); and PSP (Physical Security Specialist). I am designated by the International Society of Crime Prevention Practitioners as an "International Crime Prevention Specialist," and certified by the National Crime Prevention Association as a "National Crime Prevention Specialist" (Level II; Advanced Certification). My professional experience includes certification as an instructor for law enforcement, security personnel and investigators. Much of my professional research has been dedicated to topics associated with security management and policies and procedures as they relate to commercial properties, including convenience stores. Similarly, I studied related topics from an academic perspective when I obtained a Master of Science in Security Management and when I served as a Research Associate and Adjunct Instructor at the Georgia Police Academy.

Academically, I have completed post-graduate study in Statistics and Quantitative Methods (Harvard University) and various other courses related to Crime Analysis and Crime Prevention. I developed the Crime Prevention Specialist curriculum for the State of Georgia, which included the development and teaching of a curriculum used to train police and private sector crime prevention personnel in the fundamentals of crime prevention related to a variety of environments, including convenience stores. Please see attached CV (Exhibit A) for list of publications and additional qualifications.

Based upon my review of materials relevant to this case, and having relied upon a body of knowledge and experience relative to such an assessment, I have reached the following conclusions and opinions, as supported by attached exhibits (listed below), which are derived to a reasonable degree of professional probability, and which I reserve the right to amend and supplement.

## II.      Statement of Opinions to be Expressed and the Basis

### Crime Prevention Principles

This section summarizes the current state of crime prevention theory and peer-reviewed, published research on the efficacy of crime prevention methods; published standards and guidelines of the security and crime prevention industry; and widely-accepted methodologies utilized by security and crime prevention professionals to evaluate and mitigate security risks at a given location.

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

*Crime prevention* is defined as "the anticipation, recognition and appraisal of a crime risk and the initiation of some action to remove or reduce it" (National Crime Prevention Institute).[1] This report functions with that definition by addressing its two major elements. The first component – "appraisal of a crime risk" speaks to the issue of *foreseeability*, which is specifically addressed in the ASIS International *General Risk Assessment Guidelines*. Those guidelines recommend evaluating the following sources for crime-related events:

- Local police crime statistics and calls for service at the site and the immediate vicinity for a three-to-five year period
- Uniform Crime Reports published by the U.S. Department of Justice for the municipality
- The enterprise's internal records of prior reported criminal activity
- Demographic/social condition data providing information about economic conditions, population densities, transience of the population, unemployment rates, etc.
- Prior criminal and civil complaints brought against the enterprise
- Intelligence from local, state, or federal law enforcement agencies regarding threats or conditions that may affect the enterprise
- Professional groups and associations that share data and other information about industry-specific problems or trends in criminal activity
- Other environmental factors such as climate, site accessibility, and presence of "crime magnets"[2]

As that guideline observes, "Probability of loss is not based upon mathematical certainty, it is consideration of the likelihood that a loss risk event may occur in the future, based upon historical data at the site, the history of like events at similar enterprises, the nature of the neighborhood, the immediate vicinity, overall geographical location, political and social conditions, and changes in the economy, as well as other factors that may affect probability."[3] In the absence of "mathematical certainty," security professionals use a number of widely accepted methods to establish foreseeability based on the factors named above.[4] This report relies on a review of prior similar criminal activity, along with review of additional factors such as the nature of the site and apparent security vulnerabilities at that site, to establish the types of incidents that are reasonably foreseeable, which is to say, those incidents which a reasonable person would consider likely to occur at a particular site if no changes are made to the security posture of that site.

This site-specific focus addresses the criminological concept of place, which is an essential element in the second component of the definition of crime prevention noted above:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

"initiation of some action to remove or reduce" crime. "Routine Activity Theory" describes three elements which need to converge in time and space (i.e. at a particular place): a likely offender, a suitable target, and the absence of a capable guardian.[5] John Eck applies Routine Activity Theory in a manner particularly suited to the process of assessing the adequacy and vulnerability of a crime prevention program. Eck presents his approach with two concentric triangles, and it is often referred to as the "Crime Triangle" or the "Problem Analysis Triangle." Marcus Felson summarizes Eck's concentric crime triangles thusly:

> "The *inside triangle* has three elements that must converge for a normal crime to occur: the potential offender, the crime target, and the place or setting for the crime. For a crime problem to occur, the offender needs to find a target in a suitable place."[6]

> "The *outside triangle* depicts three sorts of supervisors: the handler, the guardian, and the place manager. The handler supervises the offender, the guardian supervises the target and the manager supervises the crime setting. Their absences make crime feasible. A crime occurs when the offender escapes handlers, finds targets free from guardians in settings not watched by managers."[7]

These principles are often integrated with "Rational Choice Theory" to help understand practices likely to reduce crime. As one criminologist explains, in Rational Choice Theory, "individual actors try to realize their goals to the highest degree taking into account the constraints (or opportunities). In other words, individuals try to maximize their utility."[8] The elements of that utility are, in RCT, addressed through three propositions:

- *preference proposition*: individual preferences (or goals) are conditions of behaviors which are instrumental in satisfying the respective preferences;
- *constraints proposition*: any phenomena that increase or decrease the possibilities of satisfying individual preferences (that is, constraints or opportunities) by performing individual actions are conditions for performing these actions;
- *utility maximization proposition*: individuals choose those actions that satisfy their preferences to the highest extent, taking into account the constraints (or opportunities) imposed on (or open to) them."[9]

Put more broadly, Rational Choice Theory is built on the concept that the offender's decision to perpetrate a crime is based on their likelihood of accomplishing their goals, and the likelihood of encountering constraints limiting access to those or other, pre-existing goals. As a simple example, a person whose goal is to obtain money, but who also wishes to retain their freedom, is

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

more likely to offend somewhere that they expect to find unprotected money, and where they do not expect to be caught, arrested, and incarcerated. Significantly, Rational Choice Theory is not predicated on fully reasonable behavior on the part of the offender, but rather on "limited" or "bounded" rationality based on the immediate likelihood of obtaining their goals and/or encountering constraints.[10]

Collectively, Routine Activity Theory, the Crime Triangle, and Rational Choice Theory are all widely-accepted criminological concepts. They are addressed in more detail in several seminal texts, including: Ronald Clarke and Marcus Felson's book, *Routine Activity and Rational Choice* (1993); two books edited by Dr. Clarke, *Situational Crime Prevention: Successful Case Studies* (2ed) (1997) and *Rational Choice and Situational Crime Prevention* (1997); and, *Explaining Criminals and Crime: Essays in Contemporary Theory*, edited by Paternoster and Bachman, (2000). In addition, these theories underlie the work on crime prevention – conducted by Ronald Clarke and John Eck – published by the United Stated Department of Justice.[11] They are also a significant component of the Congressionally-mandated study, *Preventing Crime: What Works, What Doesn't, and What's Promising*.[12]

Together, these concepts underline a set of practices generally referred to as "Situational Crime Prevention." Established and expanded over decades by Dr. Clarke, situational crime prevention methods fall into five general categories:

- Increase the Effort needed to commit a crime
- Increase the Risks of committing a crime
- Reduce the Rewards for committing a crime
- Reduce the Provocations for committing a crime
- Remove Excuses for committing a crime[13]

One key practice that significantly supports the first two of these sets of practices is the establishment of capable guardianship. As Harvard criminologist Daniel Nagin explains, "Capable guardians are persons whose presence discourages a motivated offender from victimizing a criminal opportunity. Capable guardians include persons with no official crime control authority who nonetheless are personally willing to intervene or to summon those with the authority to intervene. The police themselves also serve as capable guardians in their conventional patrol and monitoring functions."[14]  In a 1995 book chapter entitled "Those Who Discourage Crime," prominent criminologist Marcus Felson describes capable guardians as those who supervise suitable targets and serve to prevent crime "by simple presence,"[15] and states that place managers are, broadly, "those who control or monitor places," which may include management-level and staff-level employees.[16] Felson explains that, "In general, crime is most

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

readily discouraged when people have personal and assigned responsibility and a clear focus on places or settings."[17]

Capable guardianship can be established through the deployment of private security and public law enforcement personnel, through the use of physical security measures, and by giving employees and other "place managers" a visible presence and the capability to maintain active surveillance.[18] Specifically, Clarke and Eck note that, "In addition to their primary function, some employees also perform a surveillance role."[19]

Along with establishing capable guardianship, another key element of situational crime prevention is "opportunity blocking," a strategy which has proven to be highly effective in preventing crime at places, as reported by the National Institute of Justice in 1996.[20] Published scientific research, reported in the above-referenced Congressionally-mandated study, supports this assertion, stating: "blocking crime opportunities at places can reduce crime...over 90 percent of the interventions reported evidence of crime reduction following the installation of an opportunity blocking tactic."[21]

Opportunity blocking can include hardening targets with physical security measures, controlling access, and deflecting offenders.[22] The effectiveness of these techniques in preventing crime at places is well-established. It is important to note, however, that the primary resource for implementation of opportunity blocking tactics is typically the entity or entities in charge of the place, as opposed to the users of the place or even public law enforcement (with the latter responsible for a variety of public safety-related issues throughout the entire surrounding area). Put simply, management that does not deter criminal opportunity enables criminal activity, by the absence of a capable guardian or other sufficient deterrence measures. This is a direct reflection of the importance of place management, one element of the Crime Triangle noted above.[23]

In determining where and to what degree to implement these and other situational crime prevention measures, place managers and security professionals consider the foreseeability of criminal activity at a specific place. One component of analyzing foreseeability is looking at prior criminal activity at a site and in the surrounding area. Of relevance is not simply the types of prior criminal acts, but the "opportunity structure" of those acts. For instance, a 1988 article published in the widely respected *Journal of Quantitative Criminology* noted that the opportunities associated with the property crime of residential burglary are very similar to those associated with residential rape, though the former is a property crime and the latter is a violent crime.[24] Similarly, the opportunities associated with the property crime of breaking into a vehicle or theft of a vehicle in a parking lot can reasonably be correlated with the opportunities

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

associated with crimes of assault or robbery in that same parking lot. The essential variable in considering the relevance of these prior events, and whether they provide predictive value of future events, is whether the opportunity structures are similar.

### Defendant's Failures Relevant to the Instant Case

NFPA 730 *Guide for Premises Security*, 2014 Edition, was approved as an American National Standard on December 2, 2013[25] with the primary goals of providing "an environment for the occupants inside or near a building that is reasonably safe from security threats" as well as "reasonable safeguards for protection of property from security threats."[26] NFPA 730 states that "Implementing the goals of this guide should require a security plan,"[27] and specifically advises that a "retail establishment should have a security management plan."[28] The guide states that as part of that security plan, a security vulnerability assessment (SVA) – defined as a "systematic and methodical process for examining ways an adversary might exploit an organization's security vulnerabilities to produce an undesired outcome"[29] – should be conducted for a retail establishment[30] by a qualified, certified professional.[31] Because the landscape of security risks is dynamic, "The review and update of the SVA should be based on the level of risk, threats, crime, and change of conditions within the organization."[32] The SVA and the security plan serve as the basis for implementing procedures and controls for the premises;[33] for the decision to provide security personnel;[34] and for conducting security patrols.[35]

The ASIS International *Protection of Assets* manual – widely regarded as perhaps the most authoritative and comprehensive published treatment of security management topics – explains the critical importance of assessment to the provision of adequate security as follows:

> "The protection of assets is not an exact science. What works in one situation may have disastrous results in another. Asset owners and security professionals alike must analyze specific situations or environments; recognize needs, issues and resources; and draw conclusions regarding the most appropriate protection strategies and applications."[36]

Defendant QuikTrip Corporation ("Defendant QuikTrip") acknowledges the relevance of criminal activity in the surrounding area to the security needs of a property in its "Security Guards" policy, which states that "It may become necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent."[37] However, there is no indication in the evidence reviewed that Defendant QuikTrip took reasonable proactive steps to fulfill this voluntary guideline by making itself

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

aware of the "chance of crime" in the area of the subject QuikTrip store (#797) at 4050 Buford Highway, Atlanta, Georgia. Instead, this policy appears to leave evaluation of risk to the subjective discretion of non-security personnel, beginning with the store manager:

> "If a Store Manager believes he/she has the need for a security guard, he/she should contact his/her Store Supervisor. The Store Supervisor will then discuss the needs of the store with the Store Manager. If at that time it is decided there is a need for security, the Store Supervisor will take a proposal to the Division Manager, who will make the final decision."[38]

The activation of this process requires on-site personnel to observe risk factors and security vulnerabilities and to proactively volunteer that information up the management chain. The *Risk Assessment Standard* – published by ASIS International and The Risk and Insurance Management Society and approved by the American National Standards Institute – advises that "Confidence in the risk assessment process is dependent on an impartial evaluation of the risk sources and management practices" and states that assessors "should be impartial[.]"[39] This standard explains that "[t]hreats to impartiality include… c) Familiarity – threats that arise from being too familiar with the processes and/or persons being assessed to obtain unbiased evidence and conclusions; d) Habituation – threats that arise from complacency or over-familiarity with the context of operating conditions; [and] e) Cognitive-bias – threats that arise from individuals creating their own subjective reality through their preconceived perception of the input…"[40] It is reasonable to expect that the observations of on-site personnel – and their willingness to communicate those observations – could readily be influenced by any or all of the above factors. As such, predicating the performance of any assessment upon voluntary communication from on-site personnel introduces inherent unreliability into the process, and is inconsistent with published standards and guidelines.

In the instant case, the evidence reviewed indicates that on-site staff members employed at the subject QuikTrip were not provided with relevant training regarding a reasonable methodology to guide them in making informed observations regarding the security posture of the store. Anthony Bolling (night assistant)[41] and Rhamses Peralta-Reyes (relief assistant)[42] testify that they have no training on security or crime deterrence,[43,44] and store manager Gregg Romero[45] gives no indication that he received any security-related training beyond what appears in Defendant QuikTrip's policies and procedures.[46] The failure to either provide the personnel entrusted to assess security needs with the necessary training to make such an evaluation – or to retain a qualified security professional to formally make that evaluation – is inconsistent with published industry standards and guidelines. Furthermore, it is inconsistent with the Defendant's stated priorities regarding employee and customer safety, as articulated in QuikTrip's policies:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

- "QuikTrip's primary concern is the safety of its customers and employees."[47]
- "You and your customers are the most important concern of QT. Nothing is more valuable."[48]
- "The store security system is designed to provide protection for both employees and customers."[49]

There existed an established security vulnerability at the property, specifically the proximity of multiple clubs,[50] and the evidence reviewed indicates that employees were aware of the vulnerability, but the Defendant did not evaluate or address that vulnerability in a manner consistent with the above principles or their own policies. The relationship between alcohol consumption and the risk of violent crime is well-established in published standards, guidelines, and peer-reviewed published research, including *Assaults in and Around Bars* (Department of Justice, 2006) and *Alcohol Outlets as Attractors of Violence and Disorder* (National Institute of Justice, 2008). Relevant citations include:

- "The proliferation of bars in many communities has led to increases in assaults in and around bars."[51]
- "The density of on-premise [alcohol] outlets is a significant predictor of aggravated assault."[52]
- "The research conducted over the last few decades has suggested that drinking establishments, particularly bars, attract clientele more likely to include motivated or potential offenders."[53]

To use the language of Defendant QuikTrip's "Security Guards" policy, an area with several establishments that serve alcohol in close proximity to each other could reasonably be described as an area where "the chance of crime is prevalent," and evidence indicates that patrons of those establishments frequented the subject QuikTrip as a routine activity. Mr. Reyes testifies that it is "an every-night thing" for sometimes-intoxicated customers leaving the strip club Follies between 3:00 a.m. and 4:00 a.m. to come into the subject QuikTrip and buy food.[54] Defendant deployed off-duty law enforcement officers to provide security on Friday and Saturday – which deponents testify were the nights with the highest volume of customers coming in from clubs[55,56,57] – but did not engage in ongoing formal assessment of threats and vulnerabilities to determine the requirements for guardianship at the site on other days of the week. Known prior incidents of violent crime at the site, including two "shoot outs" in the parking lot in 2014 (elaborated below), should have alerted Defendant that such ongoing evaluation was warranted. An appropriate needs-based analysis – taking into consideration both qualitative and quantitative factors – would have identified a different pattern of risk than that which was identified by informal observation, as addressed below.

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

Defendant's own criteria for considering the deployment of security personnel – evaluating and responding to the "chance of crime" in the area – inherently requires awareness of those factors which affect a "chance of crime." The reasonable methodology for accomplishing that objective would have included: requesting and reviewing data regarding reported criminal activity on the property and in the surrounding area in the course of conducting a site-specific SVA; creating a site-specific written security plan; implementing physical security measures, policies, and procedures consistent with assessed need; regularly re-assessing to determine whether the measures implemented are or remain effective; and regularly updating the site-specific SVA and site-specific written security plan to detect and respond to changing risk.

Defendant QuikTrip's failure to conduct a site-specific security vulnerability assessment and create a site-specific written security plan[58] is inconsistent with the published industry standards and guidelines cited herein.

### Defendant's Awareness of Prior Incidents

The evidence reviewed indicates that Defendant QuikTrip was aware of multiple reported incidents of violent criminal activity which occurred in the parking lot in the three years prior to the murder on December 29, 2016, including:

- October 1, 2016 – Security Alert-Assault – Police officers requested surveillance video for a murder investigation. In an internal report, an employee writes: "The police officer informed me that there was a taxi driver driving a blue Toyota Prius that was on our property at 9:21 PM with a gun pointed to her head. She screamed from her vehicle 'somebody help me' then left the store by 9:22 PM and was murdered sometime after leaving our property."[59]
- November 9, 2014 – Shots Fired – Shoot out between two vehicles. Nine suspects detained, assault rifles and handguns found.[60,61]
- April 6, 2014 – Aggravated Assault – Shoot out between parties in two vehicles in parking lot of subject QuikTrip. Police report narrative states that shots fired were initially called in by a security officer at Follies nightclub, and indicates the totality of the incident spanned multiple locations, including the Mansion nightclub (where two victims stated they were shot) and Queen of Sheba restaurant.[62,63]

These police report narratives, indicative of the observations of responding law enforcement officer(s), provide documentation of Defendant's notice of the dangerous and violent conditions at the property and in the surrounding area. A larger, quantitative analysis of reported incidents

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

of criminal activity with predictive value in the subject incident (time period: January 1, 2012 through December 29, 2016; radius: up to ½ mile from the site) reveals noteworthy trends:

- Of the 20 violent incidents which occurred outside in the above time period, 15 occurred between the dates of January 1, 2015 and December 29, 2016.
- Of the 14 gun-related incidents which occurred outside in the above time period, 11 occurred between the dates of January 1, 2015 and December 29, 2016.

In this time period in which it appears that significant violent outdoor activity increased in the area (January 1, 2015 through December 29, 2016):

- the one-hour periods with the highest incidence of reported criminal activity were: 3:00 a.m. to 4:00 a.m. (20% of counted incidents), followed by 2:00 a.m. to 3:00 a.m. and 3:00 p.m. to 4:00 p.m. (13.33% of counted incidents each);
- the days of the week with the highest incidence of reported criminal activity were: Saturday (33%), Thursday (20%), Tuesday (20%), and Sunday (13%); and
- the months with the highest incidence of reported criminal activity were: August (27%), October (20%), and December (13%).

It is important to note that, consistent with this pattern, the event which is the subject of this case was a violent, outdoor incident which occurred on a Thursday in December at approximately 3:24 a.m.

Gathering and reviewing the aforementioned, relevant data on prior criminal activity would also have informed Defendant of a specific prior incident that was indicative of a need to revise and/or reinforce internal policies and procedures. On December 13, 2015, police officers arrested two females engaged in a fight out front of the subject QuikTrip. In narrative, the reporting officer notes that he heard "a loud commotion across the street" while concluding a traffic stop at Buford Highway/Dering Circle.[64] Despite this indication that the sound of the conflict was sufficient to draw the attention of an officer off-property, no internal report was noted for this incident in the evidence reviewed. From this it is reasonable to conclude that Defendant QuikTrip's employees either did not observe the violent conflict (which would further reinforce shortcomings in guardianship), or they did not report the incident internally (which would indicate non-compliance with both company policy and established guidelines, for example, "Once the company has established guidelines regarding which types of incidents must be written up, all such incidents should be reported to a central point"[65]).

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

*Statement of Opinion*

The qualitative analysis of documented criminal activity at or near the site, to include those incidents known to Defendant Quick Trip and those reported in the narratives of police incident reports, along with the quantitative analysis of patterns of reported criminal activity at or near the site, can be reasonably stated to rise to Defendant Quick Trip's own standard of a "chance of crime." In addition, a review of that data indicates that it is reasonable to anticipate the specific possibility of violent criminal activity at or near the site, and that, based on the analysis above, it is also reasonable to anticipate that violent, criminal activity would happen during that hour of the morning, on that day of the week, during that time of the year.

## **Preventability Analysis**

Daniel Nagin advises that "improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the… outcomes that represent failure from the offender's perspective."[66] In the instant case, improved guardianship of the parking lot (beginning with and as informed by a systematic, evidence-based assessment of the risks) could have been achieved with improved employee observation and response, off-duty law enforcement presence, or both.

The evidence reviewed indicates that – when they accepted the responsibility of exercising guardianship of the parking lot – Defendant QuikTrip's employees had a practice of reporting and reacting to circumstances substantially similar to those which preceded the subject shooting when they observed those circumstances to be taking place. It does not appear, however, that Mr. Reyes – who was working at the subject QuikTrip at the time of the incident[67] – accepted such a responsibility; in fact, he testifies that at the time of the subject shooting he had no responsibilities for patrolling or securing the parking lot.[68]

Examples of similar, reported circumstances where Defendant's employees performed their guardianship and place management functions include:

- December 14, 2016 – Panhandling – Employee pressed panic alarm and "reported a panhandler in front of the store bothering customers. He has been asked to leave but refused to comply. The suspect left before police arrived."[69]
- November 27, 2016 – Disorderly Conduct – Employee pressed panic alarm "because she had a couple people arguing out front. Another customer stepped in to mediate the argument… No police needed."[70]

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

- November 21, 2016 – Disorderly Conduct – Employee pressed panic alarm to report an incident wherein suspect and victims argued at gas pumps. "Suspect… pulled the gas nozzle out of the victims car sprayed the car." Employee reported this incident after suspect and victims had already left property; no police dispatched.[71]
- October 24, 2016 – Disorderly Conduct – Employee pressed panic alarm reported two subjects arguing in parking lot; police dispatched.[72]

Relative to the instant case, Mr. Reyes appears to indicate in testimony that, had he observed all the events preceding the shooting, he would have hit his panic alarm.[73] However, Mr. Reyes testifies that he neither saw the assailants in the parking lot after they left the store[74] nor knew there was a group of individuals outside when the victim exited the store,[75] and he testifies that his first notice that there was something amiss was when he heard gunshots.[76] Additionally, Mr. Reyes' testimony indicates that the other two employees working at the time[77,78] were also not positioned to fulfill a place management function – he states that at the time of the shooting, the part-time clerk was in the back of the store,[79] while the QA employee was cleaning the ice cream machine in the kitchen.[80]

Mr. Romero's attested understanding of what Mr. Reyes saw and did at the time of the subject incident is not consistent with the above testimony from Mr. Reyes. Mr. Romero testifies that Mr. Reyes monitored the people involved and made sure the incident did not escalate, and states, "I would have done the exact same thing."[81] Mr. Romero subsequently reasserts that Mr. Reyes "was paying attention closely to make sure [the situation] did not escalate into anything[,]" and he agrees that is exactly what Mr. Reyes was supposed to do.[82] Mr. Romero testifies further that if Mr. Reyes could not watch people in the parking lot, he would expect Mr. Reyes to have his clerk keep an eye on them, or to hit the alarm button.[83] The actions described by Mr. Romero would have been consistent with exercising capable guardianship; however, Mr. Reyes does not corroborate Mr. Romero's account, and the employee's behaviors as recorded in video surveillance in the several minutes preceding the subject incident do not appear consistent with a state of close attentiveness to activity outside of the store.[84]

Testimony of multiple law enforcement officers reinforces the value that capable guardianship and effective place management could have had in the instant case. Sgt. Gaetano Antinozzi of the Chamblee Police Department, who was on duty at the time of the murder on December 29, 2016, testifies that he pulled into the parking lot of the subject QuikTrip and observed two or three people involved in a conversation that "looked animated and… negative." He testifies that as he was pulling into position to get a better view, he heard three gun shots.[85] Quintin Heard, a friend of victim Andrew Spencer[86] and witness to the subject incident,[87] testifies as follows regarding Sgt. Antinozzi's arrival on the property just before the shooting:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

"At that moment was when I seen Chamblee PD pull into the parking lot, and they entered from the Buford Highway side of the street. So Red Shoes would have his face towards me, back towards Buford Highway, and didn't see the police officer nor did the driver, and I don't think that the gentleman that was with him saw them either. I automatically relaxed because I was assuming that someone had called the police or they were just doing a regular routine in that area because of knowing what Follies is."[88]

Sgt. Antinozzi testifies further that if an off-duty had been present at the time, that person would have been obligated to intervene.[89] Sgt. Chris Bothwell and Investigator Alex Chang of the DeKalb County Sheriff's Office – both of whom have worked extra-duty shifts at the subject QuikTrip for several years[90,91] – provide testimony that is consistent with Sgt. Antinozzi's statement. Sgt. Bothwell states that if he observed an argument or a negative confrontation, he would approach and investigate, and he agrees that on prior occasions he has done so and it has de-escalated the situation.[92] Similarly, Investigator Chang testifies that if he saw a negative confrontation occurring between two persons outside, "we go out there, mainly it's going to be a deterrent, so they leave or, if they don't, of course I approach both of them… If it's something minor, just make sure they leave separate ways. To be on the safe side, I take the less aggressive, tell them to leave first, possibly wait 15 minutes and have the next subject leave… that seems to work most of the time. No one wants to go to jail."[93] Had an extra-duty law enforcement officer been visibly deployed and monitoring the parking lot, the interactions that preceded the murder would, more likely than not, have prompted intervention – or been deterred from occurring at all.

*Statement of Opinion*

The presence of an appropriately trained and deployed capable guardian in the exterior common areas of the subject QuikTrip on Thursday, December 29, 2016 in the hour of 3:00 a.m. would, more likely than not, have deterred or prevented the murder of Andrew Spencer.

## Summary and Opinion

I am aware that the failures referenced herein are significant deficiencies and reflect a lack of conformity with widely accepted industry practices and published guidelines, as noted above. Based upon this information and my review of materials relevant to this case, and having relied upon a body of knowledge and experience relative to such an assessment, I have reached the

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

following conclusions and opinions, which are derived to a reasonable degree of professional probability, and which I reserve the right to amend and supplement.

1. Defendant QuikTrip failed to comply with published industry standards and guidelines and with relevant methodologies for assessing and mitigating risk, including:
   a. Failure to conduct a security vulnerability assessment (SVA) or comparable methodical, evidence-based assessment of the subject QuikTrip;
   b. Failure to create a site-specific written security plan for the subject QuikTrip;
   c. Failure to evaluate the effectiveness of existing security measures on an ongoing basis; and,
   d. Failure to select, implement, and/or deploy security countermeasures consistent with assessed needs.

2. Defendant QuikTrip failed to comply with their voluntary guideline which recognized the correlation between the risk or "chance of crime" in an area and the security needs of the property.

3. The qualitative analysis of documented criminal activity at or near the site, to include those incidents known to Defendant Quick Trip and those reported in the narratives of police incident reports, along with the quantitative analysis of patterns of reported criminal activity at or near the site, can be reasonably stated to rise to Defendant Quick Trip's own standard of a "chance of crime." In addition, a review of that data indicates that it is reasonable to anticipate the specific possibility of violent criminal activity at or near the site, and that, based on the analysis above, it is also reasonable to anticipate that violent, criminal activity would happen during that hour of the morning, on that day of the week, during that time of the year.

4. The presence of an appropriately trained and deployed capable guardian in the exterior common areas of the subject QuikTrip on Thursday, December 29, 2016 in the hour of 3:00 a.m. would, more likely than not, have deterred or prevented the murder of Andrew Spencer.

## III.    Data or Other Information Considered in Forming Opinions

Please see Endnotes and attached Exhibits:
- Exhibit B – List of Materials Received
- Exhibit C – Works Cited

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

### IV.    Exhibits to be Used as a Summary of or Support for the Opinions

In addition to Endnotes and Exhibits B and C please see:
- Exhibit D – Opinion Support
- Exhibit E – Annotations
- Exhibit F – Horizontal Analysis
- Exhibits G-1 and G-2 – Data Analysis and Spreadsheet Key

No other Exhibits have been identified at this time.

### V.    List of Cases in which Expert has Testified at Trial or Deposition in Previous Four Years

Please see attached Exhibit H.

### VI.    Compensation

My rate of compensation for providing consulting services and/or expert testimony is four hundred dollars ($400) per hour, billed against an initial retainer of $4000; additionally, a minimum of $2000 is billed for testimony at trial or in deposition.

Respectfully submitted,

_____
John C. Villines

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

## **Endnotes**

[1] Dixon, R.W. *Practice of Crime Prevention, Vol. 1 – Understanding Crime Prevention*. National Crime Prevention Institute, 1978.

[2] ASIS International. *General Security Risk Assessment Guideline*. Alexandria, VA: ASIS International, 2003. p. 12

[3] ASIS International. *General Security Risk Assessment Guideline*. Alexandria, VA: ASIS International, 2003. p. 13

[4] Kennedy, Daniel B. "Forensic Security and the Law." In *The Handbook of Security*. 1st ed. Martin Gill, Ed. New York: Palgrave Macmillan, 2006. pp 118-145.

[5] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 87

[6] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 91

[7] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 91

[8] Opp, Karl-Deiter. "'Limited Rationality' and Crime." In *Rational Choice and Situational Crime Prevention*. Graeme Newnan, Ronald V. Clarke, and Shlomo Shoham, Eds. New York: Ashgate Publishing, 1997.

[9] Opp, Karl-Deiter. "'Limited Rationality' and Crime." In *Rational Choice and Situational Crime Prevention*. Graeme Newnan, Ronald V. Clarke, and Shlomo Shoham, Eds. New York: Ashgate Publishing, 1997.

[10] Cornish, Derek B. and Ronald V. Clarke. "The Rational Choice Perspective." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. pp. 50-51

[11] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005.

[12] Eck, John E. "Preventing Crime at Places." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998. p. 7-1 – 7-77.

[13] Cornish, Derek and Ronald V. Clarke. "Opportunities, Precipitators, and Criminal Decisions: A Reply to Wortleys's Critique of Situational Crime Prevention." In *Theory for Situational Crime Prevention*. M. Smith and D.B. Cornish, Eds. Crime Prevention Studies, vol 16. Monsey, NY: Criminal Justice Press, 2003. p. 90

[14] Nagin, Daniel S. "Deterrence in the Twenty-First Century," *Crime and Justice,* Vol. 42, 2013. p. 43

[15] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. pp. 53-54

[16] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. pp. 54-55

[17] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. p. 64

[18] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 14

[19] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 78

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

[20] Weisburd, David. "Reorienting Crime Prevention Research and Policy: From the Causes of Criminality to the Context of Crime." Washington, DC: National Institute of Justice, 1996.

[21] Sherman, Lawrence W. "Preventing Crime: An Overview." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998.

[22] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 76

[23] See, for instance, Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 32

[24] Warr, M. "Rape, Burglary, and Opportunity." Journal of Quantitative Criminology, Vol. 4, No. 3, 1988.

[25] NFPA 730 *Guide for Premises Security*, 2014 Edition. 730-1

[26] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.1.1

[27] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.1.2

[28] NFPA 730, *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.1

[29] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 3 Definitions, Section 3.3.41

[30] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.2

[31] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 5 Security Planning, Section 5.3.2

[32] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.4.2

[33] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.2.2

[34] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.2.1.4.1

[35] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.2.1.4.3

[36] ASIS International. "Security Management: Basis For Enterprise Assets Protection 4.1.3 Historical Perspectives." *Protection of Assets*. Alexandria, VA: ASIS International, 2012.

[37] Plaintiff's Exhibit 27; Policy ST5-06-009 Security Guards, Revised July 2010; Bates QT000029

[38] Plaintiff's Exhibit 27; Policy ST5-06-009 Security Guards, Revised July 2010; Bates QT000029

[39] ASIS International and The Risk and Insurance Management Society, Inc. *Risk Assessment Standard*. ANSI/ASIS/RIMS RA.1-2015. Alexandria, VA: ASIS International, 2015. p. 9

[40] ASIS International and The Risk and Insurance Management Society, Inc. *Risk Assessment Standard*. ANSI/ASIS/RIMS RA.1-2015. Alexandria, VA: ASIS International, 2015. p. 9

[41] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 9-10

[42] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 12-13

[43] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 20-21

[44] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 41

[45] Deposition Testimony of Gregg Romero, September 28, 2017, pp. 12, 52

[46] Deposition Testimony of Gregg Romero, September 28, 2017, p. 31

[47] Plaintiff's Exhibit 28; Policy 2-01-002 Fights on QuikTrip Property, Updated June 2016; Bates QT000023

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

---

[48] Plaintiff's Exhibit 33; Store Security Procedures CD Guide dated June 22, 2016; Bates QT000100

[49] Plaintiff's Exhibit 31; Policy ST5-04-007 Store Security System, Revised October 17, 2016; Bates QT000006

[50] Deposition Testimony of Gregg Romero, September 28, 2017, p. 33

[51] Scott, Michael S. & Kelly Dedel. *Assaults in and Around Bars*, 2nd Ed. Washington, DC: Office of Community Oriented Policing Services, US Department of Justice. August 2006. p. 1

[52] Roman, Catherina Gouvis, Shannon E. Reid, Avinash S. Bhati, & Bogdan Tereshchenko. *Alcohol Outlets as Attractors of Violence and Disorder.* Washington, DC: The Urban Institute; prepared for The National Institute of Justice, 2008. p. IV

[53] Roman, Catherina Gouvis, Shannon E. Reid, Avinash S. Bhati, & Bogdan Tereshchenko. *Alcohol Outlets as Attractors of Violence and Disorder.* Washington, DC: The Urban Institute; prepared for The National Institute of Justice, 2008. p. 104

[54] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 47

[55] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 49-51

[56] Deposition Testimony of Gregg Romero, September 28, 2017, pp. 32-33

[57] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 13-14

[58] Defendant QuikTrip Corporation's Responses to Plaintiffs' Interrogatories, p. 8, No. 12

[59] Store 797 Incident Report dated October 1, 2016; Bates stamp QT000036

[60] Chamblee Police Department Incident Report, Case #14-08852

[61] Store 797 Incident Report dated November 9, 2014; Bates stamp QT000038

[62] Chamblee Police Department Incident Report, Case #14-02297

[63] Store 797 Incident Report dated April 6, 2014; Bates stamp QT000039

[64] Chamblee Police Department Incident Report, Case #15-10516

[65] ASIS International. "Security Management: 5.7 Systematic Incident Reporting." Protection of Assets. Alexandria, VA: ASIS International, 2012.

[66] Nagin, Daniel S. "Deterrence in the Twenty-First Century," *Crime and Justice,* Vol. 42 (2013), p. 44

[67] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 14, 16

[68] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 76, 134

[69] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000050

[70] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000049

[71] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000049

[72] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000048

[73] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 104-105

[74] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 79

[75] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 24

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

---

[76] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 21, 24-25

[77] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 16

[78] Plaintiff's Exhibit 12; QuikTrip Damage to Property form dated December 29, 2016; Bates stamps QT 000088 to QT 000090

[79] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 25-26

[80] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 17-18

[81] Deposition Testimony of Gregg Romero, September 28, 2017, p. 41

[82] Deposition Testimony of Gregg Romero, September 28, 2017, p. 43

[83] Deposition Testimony of Gregg Romero, September 28, 2017, p. 147

[84] 0797-lcheatha-POS1_2-20161229-0200-20161229-0300.ave, approximately 3:21:35 AM to 03:24:20 AM

[85] Deposition Testimony of Sergeant Gaetano Antinozzi, November 14, 2017, p. 16

[86] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, pp. 13-14

[87] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, pp. 20, 42

[88] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, p. 57

[89] Deposition Testimony of Sergeant Gaetano Antinozzi, November 14, 2017, p. 47

[90] Deposition Testimony of Sergeant Christopher Bothwell, November 27, 2017, p. 7

[91] Deposition Testimony of Investigator Alex Chang, November 27, 2017, p. 7

[92] Deposition Testimony of Sergeant Christopher Bothwell, November 27, 2017, pp. 15, 24-25

[93] Deposition Testimony of Investigator Alex Chang, November 27, 2017, pp. 17-18

Exhibit A

## Biography and *Curriculum Vitae* of John C. Villines

John Villines has dedicated his adult life to security management and crime prevention, having maintained a professional license in Georgia for more than 30 years. He has been retained in hundreds of cases since 1982, testifying in Federal and State Courts as an expert in security management and crime prevention.

In 2017 he was selected to serve on the ASIS International 2018 Commission on Standards and Guidelines; overseeing the preparation of ANSI and ISO-recognized standards and guidelines used by security practitioners and agencies worldwide.

His academic background includes:
- Bachelor of Science in Urban Studies, with a field of concentration in criminal justice;
- Master of Science in Security Management; and
- Post-graduate course work in Quantitative Methods at Harvard

Professional Designations include:
- ASIS International Board Certifications
  - CPP: Certified Protection Professional (Security Management)
  - PCI: Professional Certified Investigator (Investigations)
  - PSP: Physical Security Professional (Physical Security)
- International Crime Prevention Specialist (ICPS) - International Society of Crime Prevention Practitioners
- National Crime Prevention Specialist (NCPS, Level II; Advanced Certification) -  National Crime Prevention Association

Appointed by Governor Perdue to serve on the Georgia Board of Private Detective and Security Agencies in 2003, he was elected as Chair of that Board from 2004 to 2007 and again in 2010; he was reappointed to the Board by Governor Nathan Deal and served without interruption until resigning in good standing August 31, 2017.

A POST-certified instructor for advanced and specialized training of police officers, he also maintains current board certification as an instructor for security and investigations.  Mr. Villines developed the Crime Prevention Specialist training program for the State of Georgia and authored a chapter in the text used by the International Society of Crime Prevention Practitioners.

His professional affiliations include
- The American Society of Criminology
- Academy of Criminal Justice Sciences
- Association of Threat Assessment Professionals
- International Society of Crime Prevention Practitioners
- International Association of Crime Analysts

Mr. Villines has provided services to private industry, law firms, the United States Government, law enforcement agencies, community organizations and others.

John C. Villines, MS, CPP, PCI, PSP, ICPS, NCPS
770.451.0000  *www.jcvinc.com*  jcv@jcvinc.com

## Professional History

**Founder and Director of John C. Villines LLC**

The original business was formed in 1979 to provide crime prevention assessments, consulting services, training and investigations for government entities, shopping centers, retail businesses and other commercial operations.  It began as a part-time venture, while Mr. Villines continued to work in security management for others (as referenced below).  It evolved into a more comprehensive, full-time operation - providing a wider range of services, including:  expert testimony; crime prevention analysis; CPTED (Crime Prevention Through Environmental Design) consultations; training seminars; risk, threat and vulnerability assessments; and other specialized investigative and consulting services.  The client base has expanded to include governmental agencies at the local, state and federal levels; Fortune 100 corporations; multi-national companies; financial services institutions; educational facilities; and other businesses and individuals.

**Founder, Center for Safe Youth LLC**

Formerly a Division of the above-referenced entity, CSY was formed as an independent agency in 2004.  The CSY mission is to help families in crisis, including the location and recovery of runaways, missing and abducted children (domestic and international), and interventions for adolescents struggling with addictions or behavioral problems.

**Early Career**

Mr. Villines began his security career in 1973 at Phipps Plaza (Atlanta, GA). From 1973 until 1987 he was bi-vocational, working full-time and part-time in the security field while putting himself through school.   During that period he also earned certification as an instructor for law enforcement, security personnel and investigators and completed an internship at the Georgia Police Academy as a Research Associate.  While at Phipps Plaza, he progressed quickly from the position of Patrol Officer to Supervisor, then to Director of Training and Chief of Security (1977), ultimately becoming Director of Security Operations (approximately 1980).   In 1985 he left Phipps Plaza, having been recruited by Hudgens Management Company to be Operations Manager, with responsibility for managing the security and maintenance operations at multiple shopping centers. He held that position until approximately January, 1987, at which time he became committed full-time to his own company, which included contract security guard services, investigations, and consulting for commercial properties.  Additionally, throughout his career he has provided training on a variety of topics (including personal safety, crime prevention, loss prevention, and security management) for law enforcement, private sector entities and communities.

## Designations

- **Certified Protection Professional (CPP)** - ASIS International
- **Professional Certified Investigator (PCI)** - ASIS International
- **Physical Security Professional (PSP)** - ASIS International
- **International Crime Prevention Specialist (ICPS) -** International Society of Crime Prevention Practitioners
- **National Crime Prevention Specialist (NCPS**, Level II; Advanced Certification) -  National Crime Prevention Association

John C. Villines, MS, CPP, PCI, PSP, ICPS, NCPS
770.451.0000  *www.jcvinc.com*  jcv@jcvinc.com

## Education

| | |
|---|---|
| 2011 | Harvard University; Statistics and Quantitative Methods (Summer/2011) |
| 2009 | Crime Analysis; Georgia Police Academy (presented by Alpha Group Learning Center) |
| 2008 | Master of Science; Security Management; graduated with *4.0 GPA*, Bellevue University |
| 2007 | Research Methods in Criminal Justice; Alpha Group Learning Center |
| 1982-85 | Georgia State University; attended College of Law part-time |
| | *1985 Jessup Team member (International Law Moot Court Competition)* |
| | *member, Executive Board, International Law Society* |
| 1982 | Georgia State University Bachelor of Science; Urban Studies (Field of Concentration: Criminal Justice), *Dean's List* |
| 1979 | National Crime Prevention Institute; Crime Prevention |

## Hundreds of assignments for private sector, law enforcement, government entities, and individuals:

- United States Department of Justice
- United States Department of Defense
- State of Georgia
- American Red Cross
- Columbia Pictures
- Deloitte and Touche
- Mitsubishi Electronics
- Chesapeake and Potomac Telephone Company
- Arts Alliance of Atlanta
- Tom Cruise, Sir Richard Attenborough and others

## Key Professional Accomplishments

- Chair, Georgia Board of Private Detective and Security Agencies
- Appointed by Governor of Georgia to serve on Georgia Board of Private Detective and Security Agencies
- Board-certified instructor for Private Investigators and Security Personnel
- Board-certified instructor for continuing education credit for Private Investigations
- POST-certified instructor:  advanced and specialized training for law enforcement in Georgia
- Developed the *Crime Prevention Specialist* course for State of Georgia, used to train crime prevention personnel in private and public sector organizations throughout the State in the various theories and practice of preventing crime
- Former Regional Director of the Georgia Crime Prevention Association
- Provided personal safety planning in conjunction with United States Secret Service for Presidential visits
- Participant: 1998 review/revision of licensing exam for Security Licensing, Georgia State Examining Board
- Featured in articles by the *Wall Street Journal* and other national media outlets
- Owned and operated a licensed contract security company, providing guard services for commercial properties

John C. Villines, MS, CPP, PCI, PSP, ICPS, NCPS
770.451.0000 *www.jcvinc.com* jcv@jcvinc.com

## Notable Publications

- "Expert Witness Testimony" – Section in book edited by John J. Fay: <u>Key Terms and Concepts for Investigation</u>
- "Training…Asset or Risk" – *Security Magazine* (October, 2010)
- "Personal Safety Training Curriculum" – Chapter in book published by International Society of Crime Prevention Practitioners (2005)
- *The Shopping Center Security Newsletter* – Editor (~1986)
- "Crime Prevention Specialist" - Georgia Police Academy (~1982)
- "Personal Safety Self-Evaluation Instrument" (~1982)
- "Blend Security Expertise With Client Needs" – *Security World* (~1980)
- "The Six Million Dollar Security Officer" – *Shopping Center World* (~1980)

## Key Professional Memberships

- The American Society of Criminology
- Academy of Criminal Justice Sciences
- Association of Threat Assessment Professionals
- International Society of Crime Prevention Practitioners
- International Association of Crime Analysts
- Atlanta Crime Commission High-tech Crime Task Force
- Justice Research and Statistics Association

## More than seventy-five seminars conducted for a variety of clients, including:

- International Security Conference
- Georgia State University
- Georgia Police Academy
- ASIS International
- American Red Cross
- Worldspan
- Childress Klein Properties
- Johnson and Johnson Pharmaceuticals
- Georgia Power
- Trammell Crow Properties
- Independent Educational Consultants Association
- Deloitte and Touche
- SecureWorld Expo
- University of Georgia

## Seminars presented on various topics, including:

- Advanced Investigations for Police
- Security Officer Training
- Risk Analysis
- Negligence, Liability and Security
- Emergency Planning and Procedures
- Personal Safety
- Crime Prevention for Businesses
- Rape Prevention
- Legal Aspects of Private Security
- Training Employees to Prevent Crime
- Training Employees to Prevent Loss
- Interviews and Interrogations
- Crime Prevention for Communities
- Liaison between Police and Private Security
- Use of Force
- Bomb Security Planning
- Special Weapons and Tactics
- Unarmed Self Defense
- Computer Facility Security
- Security Specialist
- Driver Safety
- Advanced Patrol Techniques
- Duties and Functions of a Security Officer
- Firearms

John C. Villines, MS, CPP, PCI, PSP, ICPS, NCPS
770.451.0000  www.jcvinc.com  jcv@jcvinc.com

Retained as an investigator, expert and/or consultant in hundreds of cases with topics including:

- crime prevention
- premises liability
- policies and procedures
- security negligence
- investigations
- retail operations
- access control
- crime analysis

- use of force
- personnel selection, training and supervision
- robbery prevention
- risk management
- personal safety
- motor vehicle theft
- lighting
- wrongful death

Venues have included:

- multi-use commercial properties
- hotels and motels
- various retail businesses
- financial institutions
- parking lots
- restaurants
- office buildings
- public utilities

- education facilities
- transportation services
- residential communities
- convenience stores
- Local, State, and Federal properties
- malls and shopping centers
- nuclear storage
- computer facilities

Diplomas received from the Georgia Police Academy:

- Law for Police
- Managing Criminal Investigations
- Crime Prevention
- Organizing & Managing the Major Case
- Terrorism & Hostage Negotiations
- POST Instructor Training
- POST Firearms Instructor
- Evidence & Courtroom Testimony

Other past and present affiliations include:

- Georgia Crime Prevention Association (Regional Director)
- Odyssey Family Counseling Center (Board of Directors)
- Employer Support for the Guard and Reserve (Georgia Committee)
- Georgia Association of Criminal Justice Educators
- Atlanta METROPOL
- Atlanta MetroTech (High Tech Crime Task Force)
- Fulton County Sheriff's Office, Regular Deputy Sheriff, term ended 1984
- American Society for Industrial Security International (Education Committee)
- International Council of Shopping Centers

Exhibit B

**The Estate of Andrew Thomas Spencer v. Quiktrip Corp., et al.**
**Attorney: Elizabeth Rose, Pete Law & Mike Moran, Law & Moran**
**Elizabeth@lawmoran.com**

### MATERIALS RECEIVED

- Contract & retainer (rec'd 2017 08 02)
- Pleadings & Discovery
  - Consent Stipulation and Order Regarding Production and Confidentiality of Documents (rec'd 2017 11 09)
  - Complaint (rec'd 2017 11 17)
    - Exhibit A – Letters of Administration
  - Documents produced by QT 8.23.17 (rec'd 2017 11 17)
    - Customer Incident Report (QT 000001-000004)
    - Claims Information (QT0000005)
    - Policies & Procedures (QT000006-000035)
    - Internal Incident Reports (QT000036-000040)
    - CAD Search Results (QT000041-000115)
    - Chamblee PD CFS Log (QT000116-000127)
    - Chamblee PD CFS (QT000128)
    - Chamblee PD Incident Reports (QT000129-000146)
    - Photographs
  - Policies & Procedures (bates stamped ) (rec'd 2017 11 17)
  - Produced by QuikTrip (bates stamped) (rec'd 2017 11 17)
    - Directory of All Training Guides
  - Policies & Procedures – Shiftwalk/Upkeep/DAW Procedure CD Guide (rec'd 2017 11 17) (bates stamped QT000091-000094)
  - Defendant Quiktrip Corporation's Responses to Plaintiffs' Request for Admissions (rec'd 2018 01 08)
  - Defendant Quiktrip Corporation's Responses to Plaintiffs' Interrogatories (rec'd 2018 01 08)
- Chamblee Police Dept. Incident Report for Instant Case (rec'd 2017 11 17)
- Depositions
  - Antinozzi, Gaetano (rec'd 2017 12 20)
    - Exhibits (rec'd 2017 12 21)
      - 18 – Chamblee PD Incident Report for Instant Case
      - 48 – Chamblee PD Incident Report for Simple Battery 12/3/14
      - 68 – Site Plan
      - 69 – Chamblee PD Incident Report for Entering an Auto 1/7/15
  - Bolling, Anthony (rec'd 2017 11 17)
    - Exhibits
      - 37 – Customer Activity Report from 4/30/15-12/31/16
      - 39 – Internal Incident Report for 11/9/14
      - 42 – Internal Incident Report for 4/6/14
      - 49 – Chamblee PD Supplemental Report for 11/9/14

**The Estate of Andrew Thomas Spencer v. Quiktrip Corp., et al.**
**Attorney: Elizabeth Rose, Pete Law & Mike Moran, Law & Moran**
**Elizabeth@lawmoran.com**

- 65 – Site Plan
- 67 – Chamblee PD Statement Form for Anthony Bolling
- Bothwell, Chris (rec'd 2017 01 02)
- Chang, Alex (rec'd 2017 01 02)
- Ford, Ernesto (rec'd 2017 12 20)
- Heard, Quinton (rec'd 2017 11 17)
  - Exhibits
    - 16-17 – Photographs
    - 61 – Surveillance still
    - 62 – Photograph
    - 63 – AJC article
    - 64 – Site plan
- Reyes, Rhamses (rec'd 2017 11 17)
  - Exhibits
    - 11 – not provided
    - 12 – Internal incident report
    - 13 – Site plan
    - 14-17 – Photographs
    - 18 – Chamblee Police Dept. Incident Report for Instant Case
    - 19 – Aerial Photo
    - 20-26 – Aerial photos & photos of QT
    - 27 – Policy – Security Guards
    - 28 – Policy – Fights on Quiktrip Property
    - 29 – WT – Alarms – When Employees Should Use
    - 30 – Policy – Security in the Workplace
    - 31 – Policy – Store Security System
    - 32 – CD Guide for Store Security System
    - 33 – CD Guide for Store Security Procedures
    - 34 – Policy – Safety Procedures and Injuries
    - 35 – Accident – Facility Emergencies
    - 36 – Customer Incident Report
    - 37 – Customer Activity Report from 4/30/15-12/31/16
- Richmond, Antonio Jr (rec'd 2017 11 17)
  - Exhibits
    - 65 – Site Plan
    - 66 – Video surveillance still
- Romero, Gregg (rec'd 2017 11 17)
  - Exhibits
    - 27 – Policy – Security Guards
    - 28 – Policy – Fights on Quiktrip Property
    - 29 – Alarms – When Employees Should Use

**The Estate of Andrew Thomas Spencer v. Quiktrip Corp., et al.**
**Attorney: Elizabeth Rose, Pete Law & Mike Moran, Law & Moran**
**Elizabeth@lawmoran.com**

- 30 – Policy – Security in the Workplace
- 31 – Policy – Store Security System
- 32 – CD Guide for Store Security System
- 33 – CD Guide for Store Security Procedures
- 34 – Policy – Safety Procedures and Injuries
- 38 – Internal Incident Report for 10/1/16
- 39 – Internal Incident Report for 11/9/14
- 40 – Internal Incident Report for 10/9/14
- 41 – Internal Incident Report for 5/31/14
- 42 – Internal Incident Report for 4/6/14
- 43 – Chamblee PD Incident Report for 12/19/16 (possession of heroin)
- 44 – Chamblee PD Incident Report for 3/12/16 (forgery)
- 45 – Chamblee PD Incident Report for 12/13/15 (disorderly conduct)
- 46 – Chamblee PD Incident Report for 11/21/15 (battery)
- 47 – Chamblee PD Incident Report for 3/5/15 (simple assault)
- 48 – not provided
- 49 – Chamblee PD Supplemental Report for 11/9/14
- 50 – Chamblee PD Incident Report for 10/9/14 (emotionally disturbed person)
- 52 – Chamblee PD Incident Report for 4/6/14 (agg assault)
- 60 – Chamblee PD Incident Report for 4/12/16 (agg assault / reckless conduct)

- Quiktrip Site Plan (rec'd 2017 11 17)
- State of Georgia vs. Jose Alzarez file (rec'd 2017 11 17)
- Internal Incident Reports (rec'd 2017 11 17)
  - Dated 4/6/14 (QT 000039)
  - Dated 4/19/14 (QT 000065)
  - Dated 5/31/14 (QT 000066)
  - Dated 10/1/16 (QT 000036-000037)
  - Dated 10/9/14 (QT 000067)
  - Dated 11/9/14 (QT 000038)
  - Dated 11/21/15 (QT 000040)
  - Dated 12/29/16 (QT 000088-000090) (instant case)
- Chamblee Police Dept. Incident Reports for instant case address & other addresses (bates stamped 000001-00787) (rec'd 2017 11 17)
- Chamblee PD Statement Form from 4/6/14 for shooting at QT (rec'd 2017 11 17)
- Repair Records for Lighting (rec'd 2017 11 17)
- Video Surveillance (10 videos) (rec'd 2017 08 01)

Exhibit C

Exhibit C: Works Cited

* ASIS International. *General Security Risk Assessment Guideline*. Alexandria, VA: ASIS International, 2003.

ASIS International. *Protection of Assets*. Alexandria, VA: ASIS International, 2012.

* ASIS International and The Risk and Insurance Management Society, Inc. *Risk Assessment Standard*. ANSI/ASIS/RIMS RA.1-2015. Alexandria, VA: ASIS International, 2015.

* Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005.

Cornish, Derek and Ronald V. Clarke. "Opportunities, Precipitators, and Criminal Decisions: A Reply to Wortleys's Critique of Situational Crime Prevention." In *Theory for Situational Crime Prevention*. M. Smith and D.B. Cornish, Eds. Crime Prevention Studies, vol 16. Monsey, NY: Criminal Justice Press, 2003.

Cornish, Derek B. and Ronald V. Clarke. "The Rational Choice Perspective." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017.

Dixon, R.W. *Practice of Crime Prevention, Vol. 1 – Understanding Crime Prevention*. National Crime Prevention Institute, 1978.

* Eck, John E. "Preventing Crime at Places." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998.

Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017.

* Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995.

Kennedy, Daniel B. "Forensic Security and the Law." In *The Handbook of Security*. 1st ed. Martin Gill, Ed. New York: Palgrave Macmillan, 2006.

* Nagin, Daniel S. "Deterrence in the Twenty-First Century." *Crime and Justice*, Vol. 42, 2013.

* NFPA 730 *Guide for Premises Security*, 2014 Edition.

Opp, Karl-Deiter. "'Limited Rationality' and Crime." In *Rational Choice and Situational Crime Prevention*. Graeme Newnan, Ronald V. Clarke, and Shlomo Shoham, Eds. New York: Ashgate Publishing, 1997.

* Roman, Catherina Gouvis, Shannon E. Reid, Avinash S. Bhati, & Bogdan Tereshchenko. *Alcohol Outlets as Attractors of Violence and Disorder*. Washington, DC: The Urban Institute; prepared for The National Institute of Justice, 2008.

* Scott, Michael S. & Kelly Dedel. *Assaults in and Around Bars*, 2nd Ed. Washington, DC: Office of Community Oriented Policing Services, US Department of Justice. August 2006.

* Sherman, Lawrence W. "Preventing Crime: An Overview." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998.

Exhibit C: Works Cited

* Warr, M. "Rape, Burglary, and Opportunity." *Journal of Quantitative Criminology*, Vol. 4, No. 3, 1988.

* Weisburd, David. "Reorienting Crime Prevention Research and Policy: From the Causes of Criminality to the Context of Crime." Washington, D.C.: National Institute of Justice, 1996.

* *Digital copies available*

Exhibit D

Exhibit D: Opinion Support

**Defendant's Failures Relevant to the Instant Case**

25. NFPA 730, 2014 Edition approved as American National Standard on December 2, 2013 (NFPA 730 2014, 730-1)
26. NFPA 730 primary goals: providing "an environment for the occupants inside or near a building that is reasonably safe from security threats" as well as "reasonable safeguards for protection of property from security threats." (NFPA 730 2014, 4.1.1)
27. "Implementing the goals of this guide should require a security plan." (NFPA 730 2014, 4.1.2)
28. "A retail establishment should have a security management plan." (NFPA 730 2014, 18.1.2.1)
29. SVA defined as a "systematic and methodical process for examining ways an adversary might exploit an organization's security vulnerabilities to produce an undesired outcome" (NFPA 730 2014, 3.3.41)
30. "A security vulnerability assessment (SVA) should be conducted as part of the security plan for a retail establishment." (NFPA 730 2014, 18.1.2.2)
31. "SVA provider personnel qualified to conduct the SVA should be certified by a nationally recognized certification organization in security or crime prevention." (NFPA 730 2014, 5.3.2)
32. "The review and update of the SVA should be based on the level of risk, threats, crime, and change of conditions within the organization." (NFPA 730 2014, 4.4.2)
33. "The [retail] facility should implement procedures and controls in accordance with the risks identified by the SVA." (NFPA 730 2014, 18.1.2.2.2)
34. "The decision to provide security personnel should be based on the SVA." (NFPA 730 2014, 18.2.1.4.1)
35. "Security patrols should be conducted in accordance with the facility security plan." (NFPA 730 2014, 18.2.1.4.3)

36. "The protection of assets is not an exact science. What works in one situation may have disastrous results in another. Asset owners and security professionals alike must analyze specific situations or environments; recognize needs, issues and resources; and draw conclusions regarding the most appropriate protection strategies and applications." (ASIS Protection of Assets, 4.1.3)

37. Exhibit 27 – Security Guards policy document (QT 000029 to QT 000030)
    a. Policy Established: May 1985; Revised: July 2010
    b. "It may become necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent." (Ex 27 001) (QT00029)
38. "If a Store Manager believes he/she has the need for a security guard, he /she should contact his /her Store Supervisor. The Store Supervisor will then discuss the needs of the store with the Store Manager. If at that time it is decided there is a need for security, the

Exhibit D: Opinion Support

Store Supervisor will take a proposal to the Division Manager, who will make the final decision." (Ex 27 001) (QT00029)

39. "Confidence in the risk assessment process is dependent on an impartial evaluation of the risk sources and management practices." (ANSI/ASIS/RIMS RA.1-2015)
   a. "Assessors should be impartial…" (ANSI/ASIS/RIMS RA.1-2015)
40. "Threats to impartiality include: … c) Familiarity – threats that arise from being too familiar with the processes and/or persons being assessed to obtain unbiased evidence and conclusions; d) Habituation – threats that arise from complacency or over-familiarity with the context of operating conditions; [and] e) Cognitive-bias – threats that arise from individuals creating their own subjective reality through their preconceived perception of the input…" (ANSI/ASIS/RIMS RA.1-2015)
41. Night assistant 1994-Present – Bolling testifies he was the acting manager during the night shift. He testifies he's held that position since 1994. (Bolling 009)
   a. Bolling testifies he currently works at 4050 Buford Highway QT and has been there for 3-4 years. (Bolling 010)
42. Reyes testifies he's worked for QT for four years, starting Aug 08 2013. (Reyes 012)
   a. Reyes testifies he is currently a relief assistant. He testifies night and relief assistant are the first level of management. (Reyes 013)
43. Bolling testifies QT does not perform any annual training or retraining. (Bolling 020)
   a. Bolling testifies there are store meetings approximately every six weeks where store issues are discussed, including customer service, inventory. He testifies they don't really ever talk about safety. He testifies there's been no discussion of crime deterrence. (Bolling 020-21)
44. Reyes testifies he had no training on security. "…just training on when to push my remote alarm." He testifies he had no training on security issues designed at or any responsibility for deterring criminal actions from occurring against the customers. (Reyes 041)
45. Romero testifies he currently manages QuikTrip Store 797, the store in question. He testifies he has held the position for approximately two years at time of deposition. (Romero 012)
   a. Romero testifies he started at Store 797 in Oct 2015. (Romero 052)
46. Romero testifies he received training at QuikTrip regarding the policies and procedures for the belt alarm and what to do regarding QuikTrip's security policies and procedures. (Romero 031)
47. Exhibit 28 – Fights on QuikTrip Property policy document
   a. (QT 000023)
   b. Policy Established: October 1985; Revised: June 2016
   c. "It is possible for a fight to occur in a store or on any QuikTrip property. QuikTrip's primary concern is the safety of its customers and employees." (Ex 28 001)
48. Exhibit 33 – Store Security Procedures policy document (QT 000100 to QT 000103)
   a. Date: Jun 22 2016

Exhibit D: Opinion Support

      b. "Tense situations do occur in stores from time to time. If an emergency happens we want you to know what to do. You and your customers are the most important concern of QT. Nothing is more valuable. Don't put yourself or customers at risk." (Ex 33 001)

49. Exhibit 31 – Store Security System policy document (QT 000006 to QT 000007)
      a. Policy Established: Feb 1987; Revised: Oct 17 2016
      b. "The store security system is designed to provide protection for both employees and customers."

50. Romero agrees there are a lot of clubs around the store in question. (Romero 033)
51. "The proliferation of bars in many communities has led to increases in assaults in and around bars." (Assaults in and Around Bars, DOJ 2006)
52. "The density of on-premise [alcohol] outlets is a significant predictor of aggravated assault." (Alcohol Outlets as Attractors of Violence and Disorder, NIJ 2008)
53. "The research conducted over the last few decades has suggested that drinking establishments, particularly bars, attract clientele more likely to include motivated or potential offenders." (Alcohol Outlets as Attractors of Violence and Disorder, NIJ 2008)

54. Reyes testifies the store gets a diverse crowd. He testifies they are between Follies and Plaza Fiesta "which is mainly Hispanic." He testifies around 3:00 to 4:00 is when people begin leaving Follies and come into QT to buy food as "an every-night thing." He agrees some of the people from Follies come in intoxicated. (Reyes 047)
      a. Reyes agrees Follies is a nightclub / strip club. (Reyes 047)
55. Reyes testifies there is a guard at the store in question on the weekends. He agrees that was in place prior to the incident and is still in place. He testifies the guard is there for crowd control and leaves at approximately 5:30 am on Saturday and Sunday morning. (Reyes 049-51)
56. Romero testifies there was no security guard at the QuikTrip on the night in question. He testifies there was one there on Fridays and Saturdays. He testifies he doesn't know why that was implemented and testifies it was in place when he started at Store 797. (Romero 032-33)
      a. Romero testifies the security guard was to handle the traffic flow and keep people from loitering when they exit the clubs at 3:00 or 4:00 am. (Romero 033)
57. Bolling testifies on Friday and Saturday night a security guard is posted at the QT. (Bolling 013-14)

58. Response to No. 8: "There was no specific written security plan for this store on December 29, 2016." (QT Resp to ROGs 012)

## Defendant's Awareness of Prior Incidents

59. Store 797 Incident Report dated October 1, 2016; Bates stamp QT000036
60. Chamblee Police Department Incident Report, Case #14-08852

Exhibit D: Opinion Support

61. Store 797 Incident Report dated November 9, 2014; Bates stamp QT000038
62. Chamblee Police Department Incident Report, Case #14-02297
63. Store 797 Incident Report dated April 6, 2014; Bates stamp QT000039
64. Chamblee Police Department Incident Report, Case #15-10516
65. "Once the company has established guidelines regarding which types of incidents must be written up, all such incidents should be reported to a central point." (Protection of Assets, 2012)

**Preventability Analysis**

66. "…improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the… outcomes that represent failure from the offender's perspective." (Nagin, 2013)

67. Reyes agrees he was working Dec 29 2016 ATOI. (Reyes 014)
    a.  Reyes agrees he was the senior management person on duty ATOI. (Reyes 016)
68. Reyes testifies he had no responsibilities for patrolling or securing the parking lot ATOI. (Reyes 134)
    a.  Reyes testifies he had no duty to patrol the parking lot or check for people. He agrees there are areas of the parking lot he can't see. He testifies there are no parking lot patrols to his knowledge. (Reyes 076)

69. December 14, 2016 – Panhandling – Employee pressed panic alarm and "reported a panhandler in front of the store bothering customers. He has been asked to leave but refused to comply. The suspect left before police arrived." (Customer Activity Report / QT000050)
70. November 27, 2016 – Disorderly Conduct – Employee pressed panic alarm "because she had a couple people arguing out front. Another customer stepped in to mediate the argument… No police needed." (Customer Activity Report / QT000049)
71. November 21, 2016 – Disorderly Conduct – Employee pressed panic alarm to report an incident wherein suspect and victims argued at gas pumps. "Suspect… pulled the gas nozzle out of the victims car sprayed the car." Employee reported this incident after suspect and victims had already left property; no police dispatched. (Customer Activity Report / QT000049)
72. October 24, 2016 – Disorderly Conduct – Employee pressed panic alarm reported two subjects arguing in parking lot; police dispatched. (Customer Activity Report / QT000048)

73. 3:23:54 – [Shooter confronts victim per Atty. Law]. (Reyes 104)
    a.  Reyes agrees he has no idea any of this is going on. He testifies he would have had to see the entire thing going on to hit his panic button. He testifies "just based on looking out the window, seeing people walk to the pump, I wouldn't have known what's going on." (Reyes 105)
74. Reyes testifies he didn't see the assailants were in the parking lot after they left the store. (Reyes 079)

Exhibit D: Opinion Support

75. Reyes testifies he didn't know there was a group of individuals outside when the victim exited the store. (Reyes 024)

76. Reyes testifies he first learned someone was shot when he heard a gunshot and there was a hole in the window. He agrees that was his first notice that there was something amiss. (Reyes 021)

   a. Reyes testifies he recalls being at the register helping a customer, hearing gunshots, seeing the glass breaking, and diving to the ground. He agrees that was his first notice there was any kind of altercation. (Reyes 024-25)

77. Reyes testifies a part time clerk named Alex and the QA employee Brian who cleans the machines were also working ATOI. (Reyes 016)

78. Exhibit 12 – QuikTrip Damage to Property Form for Dec 29 2016 (QT 000088 to QT 000090)

   a. Employees on Duty: Rhamses Peartalta, Alexander Mogensen, Brian Reid
   b. Incident Time: 3:24 am
   c. "I was on checkstand on point register when I heard gun shots. When it was all over I noticed a hole on the dlass [sic, glass?] above the front doors." (Ex 12 003) (QT 000090)

79. Reyes testifies Alex was in the back of the store ATOI. He testifies Alex told him that the gunshots were his first notice of the incident as well. (Reyes 025-26)

80. Reyes testifies the QA employee is only there to clean equipment and not help run the store. He testifies Brian was cleaning the ice cream machine in the kitchen ATOI. (Reyes 017-18)

81. Romero testifies Rhamses watched the people involved in the incident and made sure it didn't escalate. "And I would have done the same exact thing." (Romero 041)

82. Romero agrees that if Reyes did not pay attention to the situation, that would have been a mistake on his part; "but he paid attention." (Romero 044) [consistent with Reyes?]

83. Romero testifies if Rhamses couldn't watch people in the parking lot then he would expect Rhamses to have his clerk keep an eye on them or hit the [alarm] button. (Romero 147)

84. See Surveillance Video, POS1_2, approx. 3:21:35 AM to 3:24:20 AM

85. Antinozzi testifies he saw two people and a possible third person, involved in a negative conversation. "It wasn't a fight immediately, but it looked animated and it … was negative." He testifies he didn't want to "just drive up on it" and pulled around the pumps to put the QT on his left and the pumps on his right to get a better view. He testifies as he was thinking about doing that he heard three gunshots. (Antinozzi 016)

86. Heard testifies he knew the victim for 10 years. (Heard 013)

   a. Heard testifies he called the victim Velate and states that's what the victim's friends called him. (Heard 014)

87. Heard agrees he and the victim were at Follies the night of the incident. (Heard 020)

   a. Heard testifies they went directly to QT from Follies. He testifies he drove Terrence's vehicle, with only the victim also in the car. (Heard 042)

Exhibit D: Opinion Support

88. "At that moment was when I seen Chamblee PD pull into the parking lot, and they entered from the Buford Highway side of the street. So Red Shoes would have his face towards me, back towards Buford Highway, and didn't see the police officer nor did the driver, and I don't think that the gentleman that was with him saw them either. I automatically relaxed because I was assuming that someone had called the police or they were just doing a regular routine in that area because of knowing what Follies is." (Heard 057)

89. Antinozzi testifies if an off duty officer were present ATOI that person would have been obligated to intervene. (Antinozzi 047)

90. Bothwell testifies he has worked at the DeKalb County Sheriff's Office since Jun 1996. He testifies his current rank is sergeant of field division services. (Bothwell 007)
    a. Bothwell testifies he has worked as a security guard at QT for approximately 6-7 years. (Bothwell 007)

91. Chang testifies he began working for the sheriff's office in 2003. He testifies he currently holds the rank of investigator, and has held that rank for five years [2012 through time of depo?]. (Chang 007)
    a. Chang testifies he has worked as a security officer for QT for the past 3-4 years. (Chang 007)

92. "If I observed an argument, I will ask what's going on and then I would tell them to leave promptly." (Bothwell 015)
    a. Bothwell testifies if he observed a negative confrontation he would observe and investigate. He agrees he's done that on prior occasions and that's de-escalated the situation. (Bothwell 024-25)

93. Chang states if he saw a negative confrontation occurring between two persons outside, he would go outside. "…we go out there, mainly it's going to be a deterrent, so they leave or, if they don't, of course I approach both of them… If it's something minor, just make sure they leave separate ways. To be on the safe side, I take the less aggressive, tell them to leave first, possibly wait 15 minutes and have the next subject leave… that seems to work most of the time. No one wants to go to jail." (Chang 017-18)

Exhibit E

Executive Summary

## Spencer v. QuikTrip: Executive Summary

- **Retention:** Plaintiff, July 2017
- **# Pages of Material Reviewed:** 1900+
- **Date:** Dec 29 2016    **Time:** 03:24 (approx.)        **Day of Week:** Thursday
- **Incident Type:** Murder (Firearm)
- **Incident Location:** QuikTrip, 4050 Buford Hwy, Atlanta, Georgia 30341
- **Property Details:** 16 gas pumps
- **Brief Summary of Incident:** Victim (invitee) encountered assailant's group (shooter and three in his company) in store. Assailant's exited store. Assailant went to a vehicle, changed his outer layer of clothing, and returned to front sidewalk / parking lot area. Victim and one of his companions exited store. Assailant instigated interaction (characterized as "negative" / "aggressive") with victim and companion. Assailant shot victim and attempted to shoot victim's companion.
- **Plaintiff:** Yvette Adele Sanders – victim's mother
  - **Victim:** Andrew Spencer (deceased)
- **Defendant:** QuikTrip Corporation
- **Security ATOI:** Extra-duty LEOs scheduled to work Friday and Saturday nights
- **QuikTrip Management Personnel**
  - Marc Milburn – Division manager
  - Jesse Marshall – Store supervisor
  - Gregg Romero – Store manager (#797)
- **QuikTrip Store #797 Employees on Duty ATOI**
  - Rhamses Peralta-Reyes – Relief assistant
  - Brian Reid – QA employee
  - Alexander Mogensen – Part time clerk
- **Assailants:** Per Captain Ernesto Ford, Leroy Copney and Jilani Bakhari were arrested and charged with felony murder.

## Spencer v. QuikTrip Case Reference Notes

Date and Approximate Time of the Incident: Thursday, Dec 29 2016, approx. 03:24

Sunrise/Sunset on Date of Incident:  0742 / 1738

Location of the Incident: QuikTrip, 4050 Buford Hwy, Atlanta, GA 30341

Incident Type:  Murder (Firearm)

Retention:  Retained July 2017 as Plaintiff's Expert by Ms. Rose of Law & Moran

Complaint Alleges: While on premises as invitee, victim Spencer purchased food, then exited store and was approached in the parking lot by two males who were unknown to victim; one male asked something to the effect of whether victim was in a gang, then shot victim in the chest; victim died as a result; Defs knew / should have known customers / invitees were subjected to crime on premises; negligently provided security; knew / should have known of specific crimes [see Other Notes for list]; victim exercised ordinary care; failure to exercise ordinary care to keep premises safe; subject premises was negligently maintained / inspected / secured / patrolled / managed, actual / constructive knowledge of need for same; knowledge of prior gang loitering / confrontations on property / in high-crime area of premises; actual / constructive knowledge of criminal activity on / in area of premises; criminal activity permitted to exist / remain; failure to warn; failure to maintain adequate patrols / security / policies / lighting / security devices; allowed criminals to loiter on premises; failure to inspect / patrol / protect / appropriately monitor parking lot / approaches; failure to act as similarly situated businesses; failure to maintain / inspect / secure / patrol / manage premises; knew / should have known / had actual / constructive knowledge of dangerous / hazardous conditions; failure to properly train / supervise employees in regard to maintenance / safety of premises; failure to properly retain / entrust / hire / train / supervise employees; failure to ensure business policies / systems / security were adequately followed / implemented; failure to take action to remove individuals who were loitering in parking lot; failure to provide adequate lighting / other appropriate security measures; failure to remediate very long history of crime at property / in area; knew / should have known store was in high-crime area with foreseeable risk of harm to customers; failure to maintain policy / procedure / system of investigating / reporting / warning of dangerous condition; negligent representation to invitees that property was properly maintained / safe; failure to provide adequate security protection / personnel; failure to act to deter / correct / warn of prior criminal activity / loitering / trespassing / dangerous condition; failure to take appropriate action to remedy / reduce danger; creating a nuisance.

Key Entities:

**D**     QuikTrip Corporation – Lessee and operator
        BJS QT, LLC – Ownership entity

**Key Names:**
(names in **bold** have depositions / names in *italics* have statements)
☑ = Reviewed

☑ **Antinozzi, Gaetano** – Sergeant, Chamblee PD, first officer on scene

Bakhari, Jilani – assailant

☑ **Bolling, Anthony** – night assistant, QuikTrip [not working ATOI]

☑ **Bothwell, Chris** – Sergeant, DeKalb County Sheriff's Office; Security officer on Friday and Saturday nights at QuikTrip in question

Burgges, Tiffany – friend of victim; victim was attending Burgges' birthday party on night of incident per Heard depo

☑ **Chang, Alex** – Investigator, DeKalb County Sheriff's Office; security guard, QuikTrip

Clark, Det. Andrew – investigating detective, Chamblee PD

Copney, Leroy – assailant, shooter

Cushenan, Sgt. Alex – investigating detective [now a Sgt.], Chamblee PD

☑ **Ford, Captain Ernesto** – Commander, CID; PIO for Chamblee PD

Gatlin, Ofc. – on scene after incident, Chamblee PD

Guzman, Doug – QT employee

Hall, Craig – QT supervisor

☑ **Heard, Quintin** – Witness, friend of victim

Hodges, Evans – first assistant manager, QuikTrip Store 797 ATOI

Knight, Greg – QuikTrip Store 797 employee

Marshall, Jesse – store supervisor for Store 797, QuikTrip

Milburn, Marc – division manager, Atlanta, QuikTrip

Mogensen, Alex – part time clerk, QuikTrip, working ATOI [no longer with company]

Ngo, Sgt. Tong – on scene after incident, Chamblee PD

Oberker, Summer – employee in QT Atlanta office

Ola, Major [FNU] – DeKalb County Sheriff's Office off duty security coordinator

☑ **Peralta-Reyes, Rhamses** – relief assistant, QuikTrip

Polanco, Ofc. – on scene after incident, Chamblee PD; prepared initial incident report

Reid, Brian – QA employee for QuikTrip, working ATOI

☑ **Richmond, Antonio** – Witness

Richmond, Terrence – friend of victim

☑ **Romero, Gregg** – store manager, QuikTrip Store 797 [not on site ATOI]

Runion, Cindy – store supervisor [approx. 2013-2014]

Sanders, Yvette Adelle – Plaintiff; mother of victim, administratrix of victim's estate

Spencer, Andrew Thomas – Victim, deceased

Taylor, Armond – night clerk, QT Store 797

Thornton, Kevin – division manager, QT

Tran, Det. Loc – investigating detective, Chamblee PD

White, Jason – personnel manager, QT


Other Notes
- Complaint alleges Defendants knew / should have known of the following specific prior incidents:
    - Oct 01 2016 – Robbery and shooting originating in parking lot
    - Mar 12 2016 – Shooting in parking lot area
    - Nov 09 2014 – Shooting in parking lot area involving assault rifles
    - Apr 06 2014 – Shooting in parking lot area

Instant Case Report
- [Incident Report (Chamblee PD).pdf]
- Chamblee PD Incident Report, Case #16-10989 (Instant Case 001)
- Event (Instant Case 001)
    - Incident Type: Murder / Felony Murder
    - Premise Type: Service Station
    - Weapon Type: Firearm
    - Date Report: Dec 29 2016 03:25:00
    - Incident Location: 4050 Buford Hwy, Atlanta GA 30341
    - Stranger to Stranger: U
- Victim: Andrew Thomas Spencer (Instant Case 001)
- Witness: Quintin Marcus Heard (Instant Case 002)
- Witness: Richmond Antonio (Instant Case 002)
- Initial Report Narrative – Officer Polanco Jann
    - Officer responded to incident location Dec 29 2016 approx. 0350 hours "in reference to a person shot." Officer observed "black male wearing a plaged red long sleeve shirt, dark pant, and boots lying on the ground with what appeared to be a gunshot wound to his chest." (Instant Case 003)
    - "There were two witnesses at the scene that stated a verbal altercation ensued at Follies before it was continued at the QuikTrip at above location between the victim and an unknown subject." (Instant Case 003)
    - Witness Heard stated "he was coming out of the QuikTrip along with the victim when a male standing between a [white?] and gray car started shooting toward them. He stated he took off running toward the inside of the QuikTrip while the victim remained outside. Mr. Heard stated he heard approximately four to five shots when he was running inside." (Instant Case 003)

- o "Mr. Heard stated he observed a gray Maseratti and white BMW… [fleeing] the scene in a high rate of speed after the shooting." (Instant Case 003)
  - o Victim pronounced dead at the scene at approx. 0340 hours. (Instant Case 003)
- Statement Form – Quintin M. Heard [Handwritten] (Instant Case 005)
  - o "Upon exit of the Quiktrip, [Velate?] exited the store the man wearing red puma's" [no further]
- Statement Form – Antonio Richmond [Handwritten] (Instant Case 006)
  - o "Verbal altercation prior to walking into the gas station; after leaving the gas station convenience store, the grey Maserati pulled around, chased him and shot 5 times."
- Supplemental Narrative dated Jan 03 2017 indicates Mr. Heard identified suspects Leroy Copney and Jilani Ade Bakhari in photo lineups. (Instant Case 008)
- Supplemental Narrative – Officer Antinozzi Guy (Instant Case 012)
  - o [Dec 29 2016] approx. 0324 hours, Officer "entered the Quick Trip [sic] at 4050 Buford Highway from the entrance closest to Plaza Fiesta. I observed a group of males in and around the area between the front door and the gas pumps. They appeared to be in a confrontation. I continued along the easterly side of the gas pumps with the intention of scanning the activity of the subjects. I heard four gunshots. I saw a white vehicle pull out of the lot using the south exit. I got behind the vehicle thinking it was involved. I called out shots fired on the radio."
    - ▪ Officer states he pulled over the white vehicle, and states "The vehicle did not then appear to be involved."
  - o "I returned to the Quick Trip [sic] and found the victim on the ground near the Plaza Fiesta side. I observed massive trauma to his upper left chest. He was not breathing and did not have a pulse."

## Exhibits
- Photos Exhibits: Ex 14, 16, 17, 23-26, 61, 62, 66

## Diagrams and Aerial Photos
- Aerial Photos of property: Ex 19-22
- Marked Diagrams of QT: Ex 64, 65, 68
- Exhibit 13 – Diagram of QuikTrip store 797 dated Feb 12 2013
  - o [Ex. 13.pdf] (QT 000052)

## Written Policies and Procedures
- Exhibit 27 – **Security Guards policy document**
  - o [Ex. 27.pdf]
  - o (QT 000029 to QT 000030)
  - o Policy Established: May 1985
  - o Revised: July 2010
  - o "Security guards may be hired from time to time to provide a safe, workable environment for all customers and employees… Any issues with security guards should be brought to the attention of your Supervisor." (Ex 27 001)

- o "**It may become necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent**. **If a Store Manager believes he/she has the need for a security guard, he /she should contact his /her Store Supervisor. The Store Supervisor will then discuss the needs of the store with the Store Manager. If at that time it is decided there is a need for security, the Store Supervisor will take a proposal to the Division Manager, who will make the final decision**." (Ex 27 001)
  - o "QuikTrip will strive to utilize only commissioned police officers…" (Ex 27 001)
  - o "The security guard is to be in full dress uniform, including badge and sidearm. The security guard's primary responsibility will be ensuring the employees and customers of the store are safe and the items in the store remain secure. The security guard will do this through regular patrols of the perimeter of the location as well as overseeing the operation inside the store. Store employees do <u>not</u> have the authority to give specific orders to security guards; broad instructions regarding security will be given by the Store Supervisor or Division Manager…" (Ex 27 001)
- Exhibit 28 – **Fights on QuikTrip Property policy document**
  - o [Ex. 28.pdf]
  - o (QT 000023)
  - o Policy Established: October 1985
  - o Revised: June 2016
  - o "It is possible for a fight to occur in a store or on any QuikTrip property. **QuikTrip's primary concern is the safety of its customers and employees**." (Ex 28 001)
  - o "<u>Do not become physically or verbally involved i</u>n the fight…" (Ex 28 001)
  - o "<u>If the fight is outside the store or facility, call the police immediately</u>. Don't wait to see if the fight stops. The duty of the police is to stop the fight and protect the employee and persons fighting." (Ex 28 001)
  - o "<u>Do not announce a call</u> to the police; simply pick up the phone and dial the number… The immediate Supervisor should be notified after the police are called…" (Ex 28 001)
  - o "**Anytime an employee feels they are in an unsafe situation, they should activate either the personal alarm or the checkstand alarms… The employee should activate the alarm for fights at the store… The employee may use the store telephone to summon police if the fight is outside the store**." (Ex 28 001)
  - o "When the alarm is activated, Corporate Security will immediately receive audio transmission, and, within 15-45 seconds, video transmission. If the employee is in the checkstand they should say, 'there is a fight in the store,' so that security personnel know there is a fight and not a robbery in progress." (Ex 28 001)
- Exhibit 29 – **When Employees should use alarms policy document**
  - o [Ex. 29.pdf]
  - o (QT000010)
  - o New: Jul 15 2015
  - o "Activate Alarm"
    - ▪ Any fight on QT property

- Personal Threat to QT Employee / Customer
- "Suspicious Loitering (Concern for Safety of Customers / Employees) – Includes Aggressive Panhandling, Solicitation or Trespassing"
- Assault or Battery of Customer, Employee
- Any Fatality on QT Property
- Any Injury Resulting in Loss of Life, Limb or Eye Sight – or Threat Thereof
- Store Swamped with Mob of People Either Inside or Outside
- Robberies (Use of Intimidation or Force to Steal Cash, Merchandise or Private property from Employees or Customers)
- Employee or Customer Abducted
- Suspicion of Possession, Use or Distribution of Drugs on QT Property

- Exhibit 30 – **Security in the Workplace policy document**
  - [Ex. 30.pdf]
  - (QT 000028)
  - Policy Established: May 1995
  - Revised: Jun 09 2014
  - "…**QuikTrip will take necessary steps to protect its employees and customers from injuries caused by individuals whom the company knows pose a risk of harm to others**…"
  - "…All QuikTrip employees should inform their supervisors of concerns about security in the workplace…"
  - "…Employees must immediately report any and all incidents of threats or violent behavior. Store employees should report to their Division Personnel Manager…"

- Exhibit 31 – **Store Security System policy document**
  - [Ex. 31.pdf]
  - (QT 000006 to QT 000007)
  - Policy Established: Feb 1987
  - Revised: Oct 17 2016
  - "**The store security system is designed to provide protection for both employees and customers**. Proper operation of the system is critical for the safety and security of the customers and Store Team… For the safety of store personnel, all employees on a shift are to wear a remote transmitter… Anyone working outside is required to wear a remote transmitter…" (Ex 31 001)
  - "The store alarm system is constantly supervised by the Central Station Monitor in the Corporate office. Store Security monitors each camera connected to the DVR system along with the DVR System…" (Ex 31 001)
  - "The main purpose of the video system is to discourage robbers and shoplifters from stealing from the store, which promotes a safer environment for both customers, and employees…" (Ex 31 001)
  - "…Videos showing accidents must be sent to the claims department…" (Ex 31 001)
  - "The FS Techs and FS Supervisor are the only employees who have access to the DVR in stores. No other employees may attempt to unlock the cabinet where the DVR is kept. In the event of a robbery, the Store Supervisor / TM / Manager will burn the recording and turn it over to the police with copyright labels affixed…

Video requests involving criminal activity must be requested by a law enforcement agency…" (Ex 31 002)

- Exhibit 32 – **Store Security System policy document**
  - [Ex. 32.pdf]
  - (QT 000008 to QT 000009)
  - Date: Aug 12 2016
  - "QT Corporate Security Department monitors the cameras, the alarms and DVR systems 24 hours per day, 7 days a week." (Ex 32 001)
  - "**Store security system is designed to prevent robberies, not catch robbers**." (Ex 32 001)
  - Personal Dual Button Alarm (Ex 32 001)
    - "Activates video and audio system when triggered"
  - "Activating any alarm instantly sends a video picture to Corporate Security. The Security Monitor can view the Store CheckStand and Sales Floor cameras. At the same time the Store PC automatically dials Corporate Security. You can make a voice announcement, if it is safe to do so, by speaking loudly and clearly once an alarm has been activated. It takes up to 45 seconds for the line to connect with Corporate Security. Once this happens the Security Monitor will be able to hear what is being said in the Store. Depending on what the Security Monitor sees and hears, they will either call the Police or call the Store." (Ex 32 002)
  - "Before going outside to empty trash look at the CheckStand Monitor to be sure no one is loitering in that area. If there are two or more Store Team Members on duty have one watch the Outside Camera Monitor to see that you are safe." (Ex 32 002)
- Exhibit 33 – **Store Security Procedures policy document**
  - [Ex. 33.pdf]
  - (QT 000100 to QT 000103)
  - Date: Jun 22 2016
  - "**Tense situations do occur in stores from time to time. If an emergency happens we want you to know what to do. You and your customers are the most important concern of QT. Nothing is more valuable. Don't put yourself or customers at risk**." (Ex 33 001)
  - Violent Fatality or Injury in a Store (Ex 33 002)
    - Within 10 minutes
      - Push alarm button; call 911
      - Close and lock store. Ask customers to stay to talk with police. Cover areas that the perpetrator may have touched with newspaper to protect potential fingerprints.
      - Call supervisor and manager. Supervisor will tell you whether to reopen store
      - Provide any medical help possible
    - Within 1 hour
      - Complete robbery, accident reports and / or any other paperwork and forward to appropriate parties.
      - Report Status to Corporate Store Security
      - Ongoing – work with police as requested to solve crime

- o Outside Activities (Ex 33 002-3)
  - ▪ Wear the remote alarm
  - ▪ Do NOT take chances
- o Inside Activities (Ex 33 003)
  - ▪ Wear the remote alarm
  - ▪ Greet each customer coming into the store
  - ▪ **Customers love attention, potential robbers hate it**.
  - ▪ **Robbers don't want to be identified. Look each customer in the eye**.
  - ▪ **Watch for people that loiter** – that seems to be waiting for you to be alone. By calling the police and notifying them of any loiterers you may scare them off.
  - ▪ **Pay attention to customers who wear garments which seem out of character for the weather. They may conceal a weapon**.
- o Robberies (Ex 33 003-4)
  - ▪ "…Your safety and that of other QuikTrip Team Members is too important to be left to chance. You and QuikTrip can often prevent robberies by doing things that discourage robbers. **Prevention is definitely the best cure**…"
- o After a Robbery (Ex 33 004)
  - ▪ "Complete the Robbery Report Form ST5-04-002. While waiting for police and your Store Supervisor, write down everything you can about the robber's description…"
- o **Fights on QuikTrip Property** – Policy ST5-04-001 (Ex 33 004)
  - ▪ "**Your job is to keep yourself and customers safe**."

- Exhibit 34 – **Safety Procedures and Injuries policy document**
  - o [Ex. 34.pdf]
  - o (QT 000017 to QT 000018)
  - o Policy Established: May 1985
  - o Revised: Nov 2015
  - o "…If an employee sees unsafe conditions … he/she is responsible to take immediate action and notify the appropriate employee, Facility Support department, or Supervisor…" (Ex 34 001)
  - o Personal Security (Ex 34 001)
    - ▪ "Store employees cannot take trash out while working alone on the overnight shift. If an employee goes outside the store after dark, they must take a remote alarm with them…"
  - o Solicitors / Loiterers (Ex 34 001)
    - ▪ "An employee is permitted to use the gas microphone or to go outside on the sidewalk to politely ask solicitors or loiterers to leave the premises… If the employee is uncomfortable doing this, they should contact law enforcement to ask the solicitor or loiterer to leave…"
  - o Safety Walk (Ex 34 001)
    - ▪ "As specified the Store Manager completes the Store Safety / Facility Walk as directed by the Store Safety / Facility Walk WorkTab."

- Exhibit 35 – **Accident / Facility Emergencies policy document**
  - [Ex. 35.pdf]
  - (QT 000021 to QT 000022)
  - Updated Dec 11 2015
  - Customer / Employee Accident – Fatality (Ex 35 001)
    - 1. Do whatever you can to help. Company policy is to help anyone in medical need.
    - 3. Call 911 or other emergency numbers if serious. Notify Supervisor / Store Manager.
    - 7. After help arrives complete Accident Packet and print.
    - 8. Submit Customer Incident Report within 1 hour of incident.
  - Store Damage (Ex 35 001)
    - If the store has structural damage or if violent injury or fatality, close and lock store.
      - 5. Complete Damage to QT Property Accident Form on QuikNet

## Internal and Police IRs, Incident Notifications

- Exhibit 12 – QuikTrip Damage to Property Form for Dec 29 2016
  - [Ex. 12.pdf]
  - Employees on Duty: Rhamses Peartalta, Alexander Mogensen, Brian Reid
  - Incident Time: 3:24 am
  - "I was on checkstand on point register when I heard gun shots. When it was all over I noticed a hole on the dlass [sic, glass?] above the front doors." (Ex 12 003) (QT 000090)
- Exhibit 18 – Instant Case Report
  - [Ex. 18.pdf]
- Exhibit 36 – Customer Incident Report [Blank Form]
  - [Ex. 36.pdf]
  - (QT 000001 to QT 000004)
  - Updated Mar 17 2015
- Exhibit 37 – Customer Activity Report
  - [Ex. 37.pdf]
  - (QT 000041 to QT 000051)
  - [All activity for QuikTrip #797 for Apr 30 2015 thru Dec 31 2016]
  - Jun 11 2015 15:47– "…Some kind of altercation happened completely outside the store and police happened to show up. Cindy Runion (store supervisor) was already at the store…" (Ex 37 001)
  - Jun 26 2015 13:50– "…very drunk customer in the parking lot and needs police to take care of him…"
  - Jul 17 2015  6:07 – Loitering (Ex 37 001)
  - Sep 11 2015 4:08 – Customer reports stolen vehicle. (Ex 37 001)
  - Nov 21 2015 19:08 – Assault on a customer. "…big group of people came into the store and were acting like they were looking for someone. The group then started pointing at the customer…confront the customer…punching the customer…" Subject threatened employee and jumped over checkstand to chase employee. (Ex 37 002) (QT 000040)

- Dec 01 2015 21:06 – "…He thought two customers were going to get into a fight… one left. He said do not call police." (Ex 37 002)
- Dec 05 2015 22:37 – Aggressive panhandler (Ex 37 002)
- Dec 15 2015 6:25 – W/F asking for money and on the ban list. "Dispatched police." (Ex 37 002)
- Dec 21 2015 17:35 – Panhandler. "… he left when he saw him hit is [sic] alarm." (Ex 37 002)
- Feb 28 2016 16:27 – Panhandler. "…suspect left the property while I was on the phone with Ricardo. The police were not called…" (Ex 37 003)
- Mar 12 2016 16:25 – Repeat panhandler yelling at employees. "He left while I was speaking with Ricardo. No other calls made." (Ex 37 003)
- Mar 20 2016 3:04 – Possible fight. "…people out at the gas pump arguing and possibly throwing punches… the security guard talked to the suspects…" [Police not contacted.] (Ex 37 004)
- Mar 21 2016 22:27 – Intoxicated male threatening employee. Subject left in police vehicle. (Ex 37 004)
- Apr 22 2016 3:19 – "Alex activated his panic alarm for an altercation between two customers. Their argument was only verbal, and the two left the property without the need for police." (Ex 37 005)
- May 09 2016 22:40 – Panhandlers. Police officer removed them from the property. (Ex 37 005)
- May 16 2016 20:39 – Shoplifting. Police not called. (Ex 37 005)
- Jul 12 2016 15:37 – Panhandler. (Ex 37 006)
- Aug 08 2016 10:00 – Panhandler. (Ex 37 006)
- Sep 28 2016 14:25 – Panhandler. (Ex 37 007)
- **Oct 01 2016 23:51 – "The police officer informed me that there was a taxi driver… that was on our property at 9:21 pm with a gun pointed to her head. She screamed from her vehicle 'somebody help me' then left the store by 9:22 pm and was murdered sometime after leaving our property… No one at the store was made aware of this incident until police arrive requesting video…"** (Ex 37 007-8)
- Oct 24 2016 18:06 – Argument. Police dispatched and spoke to suspects. (Ex 37 008)
- Nov 02 2016 21:27 – "Evan pressed his panic alarm because a guy had been on the lot for over 6 hours. I called and had police dispatched…" (Ex 37 008)
- Nov 21 2016 20:17 – "Greg pressed his panic alarm to report an incident that happened earlier that night. No police are needed, suspect and victim left the property… 8:04:20 pm shows the start and end of the event. The victims cut the suspects car to a gas pump…Suspect…pulled the gas nozzle out of the victims car sprayed the car…argued for a while and both left the property…" (Ex 37 009)
- Nov 26 2016 19:34 – Panhandler. (Ex 37 009)
- Nov 27 2016 16:23 – "…couple people arguing out front…Suspect #1 was leaving as I was getting off the phone… No police needed…" (Ex 37 009)
- Dec 14 2016 16:52 – Panhandler. Left before police arrived. ((Ex 37 010)
- Dec 29 2016 3:24 – [Incident in question? Information redacted] (Ex 37 010-11)
- Exhibit 38 – Workflow Notification

- o [Ex. 38.pdf]
- o (QT 000036 to QT 000037)
- o [Oct 01 2016 Homicide; same notes as from (Ex 37 007-8)]
- o Alarm Received: Oct 01 2016 @ 9:55 PM
- o Employee & Position: Greg 2A
- o Supervisor: Josh Gracek TM
- Exhibit 39 – Incident Notification Email
  - o [Ex. 39.pdf]
  - o (QT 000038)
  - o Nov 09 2014 3:49 AM
  - o "…I called the store and spoke with Tony, he said there were shots fired in the parking lot. Police were sent to the store and were already on scene when I called the store. As far as he knows no one was hurt. I called and informed Theresa Baber…"
- Exhibit 40 – Incident Notification Email
  - o [Ex. 40.pdf]
  - o (QT 000067)
  - o Oct 09 2014 5:58 PM
  - o "I called RJ who said a white male security guard … walked into the restroom and had 2 guns on him. A customer notified the employee of this gentlemen [sic] had 2 guns. The police were called and arrested him. Cynthia Reunion [sic] was called …"
- Exhibit 41 – Incident Notification Email
  - o [Ex. 41.pdf]
  - o (QT 000066)
  - o May 31 2014 3:43 AM
  - o "A/V showed a lot of people in the store, but seemed normal operation. I contacted Crystal who said **there was a fight in the store but the security guard kicked those involved out of the store and they had left the property**. The guard also contacted police who were on the way. I contacted Jay Fuston…"
- Exhibit 42 – Incident Notification Email
  - o [Ex. 42.pdf]
  - o (QT 000039)
  - o Apr 06 2014 4:02 AM
  - o "…I contacted dipatch [sic] to get police out to the store. I called the store back and spoke with Tony. He said he heard shots fired right outside the store. He heard 3 shots fired at first and saw someone shooting between pumps 4 and 5 towards pump 16. Then he heard about 7 more shots fired… I notified Weekend Duty Jessie Marshall…"
- Exhibit 43 – Police Report 16-10746
  - o [Ex. 43.pdf]
  - o QuikTrip
  - o Dec 19 2016 13:46
  - o VGCSA – Possession of Heroin
- Exhibit 44 – Police Report 16-02070
  - o [Ex. 44.pdf]

- o QuikTrip
- o Mar 12 2016 3:33 to 4:47
- o Forgery
- o Officer responded to call for backup for shots fired. Officer detained a B/M fleeing from the scene who had a fake ID.
- Exhibit 45 – Police Report 15-10516
  - o [Ex. 45.pdf]
  - o Dec 13 2015 3:19
  - o QuikTrip
  - o Disorderly Conduct
  - o 2050 Buford Highway [Different QT?]
  - o Two Female Subjs engaged in mutual combat.
- Exhibit 46 – Police Report 15-09964
  - o [Ex. 46.pdf]
  - o Nov 21 2015 19:13 to 22:07
  - o Battery
  - o Victim reports a B/M punched him in the jaw inside the store. Officer spoke with the Asst. Mgr. on duty, Mr. Bernal.
- Exhibit 47 – Police Report 15-01735
  - o [Ex. 47.pdf]
  - o Simple Assault
  - o Mar 05 2015 16:53 to 16:58
  - o QuikTrip
  - o Victim reports having a verbal altercation with subject over a handicapped space.
- Exhibit 48 – Police Report 14-09404
  - o [Ex. 48.pdf]
  - o Dec 03 2014 22:44
  - o Simple Battery – Family Violence
  - o QuikTrip
  - o Suspect reports his GF, Ms. Torres, went to Follies and got into a verbal altercation. Suspect reports Torres was kicked out of Follies and they went to the QT. Torres states suspect struck her. [Domestic].
- Exhibit 49 – Police Report 14-08852
  - o [Ex. 49.pdf]
  - o Nov 09 2014 3:48
  - o Officer responded to shots fired. Suspects were detained with a loaded Smith & Wesson M&P 15 assault rifle with two magazines taped together facing opposite directions.
  - o Witnesses reported hearing shots fired "but did not see anything or know what had occurred."
- Exhibit 50 – Police Report 14-08002
  - o [Ex. 50.pdf]
  - o Oct 09 2014 18:39 to 19:00
  - o QuikTrip
  - o Emotionally Disturbed Person

- o Complainant, QT employee, reported subject was in bathroom stall hitting his head on the stall door and noticed a firearm on the floor.
  - o Officer recognized subject as a security guard at Follies, Zachariah Robert Jansen. "I suspected he may be having a PSTD [sic] episode…"
- Exhibit 52 – Police Report 14-02297
  - o [Ex. 52.pdf]
  - o Aggravated Assault
  - o Apr 06 2014 4:30
  - o Security guard at 4075 Buford Highway [Follies Strip Club] reported hearing gun shots, and pinpointed location as 4050 Buford Highway [QuikTrip]. Witness reports seeing a vehicle with a window shattered and two vehicles leave at a high rate of speed. Officer reports finding seven 9mm casings near front entrance to the store and several .40 caliber shell casings near gas pump 5. Statement obtained from store clerk.
  - o Officer spoke with subject with a GSW at Northside hospital who reported hearing an argument at the QT when she entered and then gun shots starting when she exited the store.
- Exhibit 60 – Police Report 16-03046
  - o [Ex. 60.pdf]
  - o Aggravated Assault
  - o Apr 12 2016 12:41 to 12:45
  - o 4166 Buford Hwy, Plaza Fiesta
  - o Witnesses report a vehicle driving up to subject and driver produced a firearm and shot at subject. Officer reports subject can be seen in video pointing his own firearm at the vehicle.
- Exhibit 63 – AJC.com Article dated Dec 30 2016
  - o [Ex. 63.pdf]
  - o "Eerie conversation haunts girlfriend of victim in deadly gas station shooting."
  - o "Spencer, 30, had just left Follies strip club with friend Quintin Heard when they stopped at the QuikTrip in the 4000 block of Buford Highway for gas. A man at the gas station hot dog stand didn't know where the buns were, Heard told The Atlanta Journal-Constitution. Spencer got in front of the man to assist him. 'And the guy, I guess, took it the wrong way,' Heard said. The man waited for Heard and Spencer outside the gas station and later fired shots at them, Heard said. Police said the shooter and an accomplice the sped off in a gray or green Maserati Quattroporte. " (Ex 63 001-2)
  - o "A Chamblee police officer heard the gunshots, Capt. Ernesto Ford said. But he followed the wrong car from the scene. When he realized that car was not involved in the shooting, the officer returned to QuikTrip and found Spencer 'with massive trauma to his upper chest,' Ford said." (Ex 63 002)
  - o "Spencer went by the name 'Velate.'" (Ex 63 002)
- Exhibit 67 – Chamblee PD Case No. 14-02297, Statement of Anthony Bolling
  - o Date: Apr 06 2014; Time 0445
  - o [Handwritten]
  - o "I saw a 20 to 30 yr old hispanic [sic] or light skinned black male who I believed to be wearing skinny jeans and a t shirt aiming a gun firing it from between pump

4 + 5 towards pump 16. After I ducked down behind the counter I heard several more gunshots in front of the store."
- Exhibit 69 – Police Incident Report 15-00161
  - [Ex. 69.pdf]
  - Jan 07 2015 7:10 to 7:12
  - Entering Auto
  - QuikTrip
  - Victim reports parking her vehicle in parking lot of QT and states upon returning to her vehicle approximately 10 minutes later items were missing. Officer contacted QT manager and obtained video. [No sign of forced entry]

## Pleadings and Responses
### Def QT Responses to ROGs
- Document Title: Defendant QuikTrip Corporation's Responses to Plaintiffs' Interrogatories
- Response to No. 1 states that QuikTrip "managed and fully occupied the subject QuikTrip" ATOI, and states that "BJS QT, LLC owned the property, and leased the entire premises to QuikTrip." (QT Resp to ROGs 002-3)
  - "QuikTrip has fully occupied and managed the premises since the property was leased to it on April 28, 2003. The original owner of the property was RAM Buford LLC, which assigned the lease to BJS QT, LLC on November 14, 2006." (QT Resp to ROGs 003)
- Response to No. 8: "There was no specific written security plan for this store on December 29, 2016." (QT Resp to ROGs 012)
- Response to No. 13: "Upon information and belief, Mr. Spencer went to a birthday party at the Follies nightclub where he may have exchanged words or had an altercation with the criminal suspects. After leaving the nightclub, Mr. Spencer went to the subject QuikTrip, where he exchanged words with the criminal suspects. A criminal shooter shot Mr. Spencer in the parking lot/gas pump area of the QuikTrip. Leroy Copney and Jilani Ade Bakhari are suspected of being the criminal shooter and accomplice involved in this incident." (QT Resp to ROGs 017-18)
- Response to No. 22: "…surveillance cameras were functioning at the time of this incident." (QT Resp to ROGs 025)
- Response to No. 24 refers to the following individuals who were employees ATOI: "store supervisor Jessie Marshall, store manager Gregg Romero and division manager Mike Milburn." (QT Resp to ROGs 028)

### Def QT Responses to RFAs
- Document Title: Defendant QuikTrip Corporation's Responses to Plaintiffs' Request for Admissions
- Response to No. 13: "QuikTrip admits that based upon knowledge known to date, Andrew Spencer was an invitee at the subject QuikTrip." [request specifies 'On December 29, 2016] (QT Resp to RFAs 006)
- No. 16: 'Prior to and including December 29, 2016, Defendant had actual knowledge of a shooting at the subject QuikTrip occurring on or about April 6, 2014.'

- o Response: "Denied. QuikTrip employees reported hearing shots fired in front of the store on that date and called the police. No one was injured to QuikTrip's knowledge." (QT Resp to RFAs 007)
- Response to No. 18: "QuikTrip admits it knew of an assault/battery between customers inside the QuikTrip store on November 21, 2015." (QT Resp to RFAs 008)
- Response to No. 19: Defendant denies that it had 'actual knowledge of a shooting at the subject QuikTrip occurring on or about March 12, 2016.' (QT Resp to RFAs 008)
- No. 20: 'Prior to and including December 29, 2016, Defendant had actual knowledge of a robbery and shooting originating at the subject QuikTrip occurring on or about October 1, 2016.'
  - o Response: "Denied. QuikTrip was contacted by police officers seeking surveillance video relating to a taxi driver that drove onto the QuikTrip premises for approximately one minute and then left the premises. No one got out of the vehicle or had any interaction with store employees. QuikTrip was informed that the police were investigating a murder investigation and the driver of that taxi was murdered sometime later that evening." (QT Resp to RFAs 008)

## Discovery and Other Documents Produced

- Additional Policies and Procedures
  - o [Additional Policies and Procedures bates 91-94.pdf]
  - o (QT 000091 to QT 000094)
  - o Shiftwalk/ Upkeep/ DAW Procedure
  - o Date: Jun 22 2016
  - o "The manager and assistant managers do Shiftwalks per the Shiftwalk & Upkeep policy. **Any employee can complete an Upkeep Walk and they are to be completed every 30 minutes** so we meet the expectations of QT and our customers. DAW tasks are assigned to shifts by the Store Manager and delegated to employees by the Manager or Assistant on each shift." (Add P&P 001)
  - o "A Shiftwalk must be completed by the Manager or Assistant and not delegated to clerks… Shiftwalk tasks should be prioritized by safety issues first, then by other tasks that most affect the customer… Afternoon and night Shiftwalks are scheduled to take 45-minutes to complete…" (Add P&P 002)

- Docs Produced by QT Aug 23 2017
  - o [Docs Produced by QT with Bates 8.23.17.pdf]
  - o [Policy documents. See Bates marked Exhibits for QT 000001 to QT 0000146 above]
  - o Lock Store (QT Production 013) (QT 000013)
    - ▪ "Store is to be locked when… Robbery [;] Major injury or fatality to customer or employee [;] Abduction of customer or employee [;] Unsafe store conditions…"
  - o General Housekeeping and Safety (QT Production 015) (QT 000015)
    - ▪ "While performing Shift change duties each Store Team Member is responsible for observing and correcting any unsafe situations. Specifically, Store Team Members should look for (but not be limited to) the following: [Inside] DVR camera angles correct…"

- "Make sure store facilities are safe for customers as well as store team…" (QT Production 016) (QT 000016)
  - o Shoplifters (QT Production 019-20) (QT 000019 to QT 000020)
    - "At QuikTrip we do a number of things to **prevent** shoplifting, not **catch** shoplifters."
    - "Customers love attention, shoplifters hate it."
    - "At busy times, narrow your scope… Watch people in areas of high risk."
    - "At night use front windows like mirrors."
    - Shoplift actions (QT Production 019) (QT 000019)
      - "Most shoplifters broadcast their intent. [;] They linger in areas where they want to steal something."
    - "…It has always been QT's position that Store Team Members should call police if they believe they are in danger of physical harm." (QT Production 020) (QT 000020)
  - o Robberies (QT Production 024) (QT 000024)
    - "Although everything possible is done to prevent robberies, they may occur in QuikTrip stores. In all instances, the safety of the customer and employees is the primary concern – not the money or merchandise."
  - o Accidents – Handling and Reporting Injury / Property Damage  (QT Production 031) (QT 000031)
    - Customer Injury  (QT Production 031) (QT 000031)
      - "Assist customer immediately. Do whatever you can to help and provide any reasonable help needed…"
      - "Get help if required. Call 911 or other emergency numbers if serious or life threatening..."
      - "If injury is life threatening, report injury to your Store Manager or Supervisor and immediately call the General Liability Dept.… if after hours call HELP desk to report injury…" (QT Production 032) (QT 000032)
      - "Make sure no immediate danger exists that could cause further injury or injury to other customers…" (QT Production 032) (QT 000032)
  - o CAD Search Results (QT Production 041-115) (QT 000041 to QT 000115)
  - o CFS Log (QT Production 116-128) (QT 000116 to QT 000128)
  - o Police Reports (QT Production 129-130) (QT 000129 to QT 000130) [Appear to involve Bakhari and Copney]
  - o Unit Response Times for Person Shot incident Dec 29 2016 [Incident in question]. (QT Production 142) (QT 000142)
    - "PUMP #2 IS WHERE THE MASERATI WAS GETTING GAS…SHELLCASINGS LOC" (QT Production 144) (QT 000144)
    - Dec 29 2016 6:11:55 (QT Production 144) (QT 000144)
      - "units 10-8 from qt and its now back open"
  - o Photos (QT Production 147-163) (QT 000147 to QT 000163)

- QT Policies and Procedures
  - o [Policies and Procedures.pdf]

- o [QT 000001 to QT 000035] [See above]

- QT Production from Sep 25 2017
  - o [Produced by QT 9.25.17.pdf]
  - o "Directory of All Training Guides" (QT 92517 001-20) (QT 000068 to QT 000087)
    - ▪ Conflict Management (QT 92517 003) (QT 000070)
    - ▪ Safety (QT 92517 018) (QT 000085)
    - ▪ Store Safety Basics [;] Store Security Procedures [;] Store Security System (QT 92517 019) (QT 000086)
    - ▪ Wristwatch Personal Safety Alarm Safety Device – Test (QT 92517 020) (QT 000087)

- Robberies PP
  - o [Robbery PP pg 2.pdf]
  - o (QT 000024a)
  - o "Complete the Robbery Report form as soon as possible so you can provide the most accurate description…"

## Criminal Case [for prior incident Nov 09 2014]
- Jose Alvarez File
  - o [Jose Alvarez File (11.9.14 shooting).pdf]
  - o The State vs. Jose Alvarez
  - o May 02 2016
  - o "Defendant is to serve a sentence of 12 months consisting of 2 days in confinement, credit for 2 days already served, and the remainder on Probation." (Alvarez 002)
  - o "…avoid injurious and vicious habits-especially alcohol intoxication and narcotics and other dangerous drugs… avoid persons or places of disreputable or harmful character…" (Alvarez 002)
  - o "…RECKLESS CONDUCT … on or about [Nov 09 2014]… firing a weapon in a crowded public area…" [See Exhibits 39 and 49] (Alvarez 004)
  - o "…the above named accused, between [Nov 09 2014] 3:00:00AM and [Nov 09 2014] 4;00:00AM at 4050 Buford HWY, ATLANTA, GA, 303029, DEKALB COUNTY, did commit the offense of Reckless Conduct (Misdemeanor)… accused did endanger the bodily safety of another person by discharging a rifle into the air at a crowded gas station… Off-duty dep working at station and gave description of veh. Found rifle in car and matched to shell casings at scene. Det did gun powder residue on everyone in veh. Sent to crime lab. Came back to this def." (Alvarez 010)

## Lighting Records
- Lighting Repair Records
  - o [Repair Records_0797_Lighting.xls]
  - o [All lighting repair requests for May 2015 to Dec 2016 appear to have been completed / marked Task Closed]

Internal Incident Reports
- [See Exhibits 38-42]
- Apr 19 2014 – Naked man in bathroom
  - [797 4-19-2014 – naked.pdf]
  - "Corey hit his panic alarm…said there was a naked man in his bathroom. He asked me not to call police because he was calling the weekend duty supervisor. I called Chad Fields… said… he would relay the information to Jonathan Shaw. Monitored video until police arrived…"
- Nov 21 2015 – Assault on a Customer
  - [797-11-21-15 security alert.pdf]
  - 7:08 pm
  - "…did not see any employees in the check stand and I saw customers picking up papers off the floor and everyone was looking outside… I went ahead and called police right away because this scene did not look normal. The police informed me they were on the phone with the employee and that it was an assault in progress…"
  - "…Ricardo … informed me that there was an assault on a customer and possibly them… Ricardo said when the customer that was assaulted walked in, he walked in through a big group of people. Then customer then went to the bathroom, grabbed some beer, and then went to pay. While the customer was paying, that big group of people came into the store and were [sic] acting like they were looking for someone. The group then started pointing at the customer buying the beer. The group then confronted the customer. There were 3 individuals in the group that did most of the activity… says things in Spanish along the lines of 'you don't know how to say excuse me.' This was referring to when the customer walked through them to get into the store. At this point, Ricardo was telling the group they had to go and he was reaching towards the phone. The guy in the orange shirt then starts punching the customer. The customer gets away. Ricardo picks up the phone and that is when the guy in the camo shirt threatens Ricardo and then jumps over the counter and chases Ricardo out of the check stand. The group then leaves… wet floor sign thrown toward Ricardo. Ricardo then calls police…"
- Customer Activity Report [See Ex 37]
  - [Customer Activity Report 4-30-15 through 12-31-16.pdf]
- Damage to property report for Dec 29 2016 [See Ex 12]
  - [QT Damage to Property Report QT88-90.pdf]

Video Surveillance
- [Times approximate]
- POS1_2
  - 03:15:30 AM – [Shooter] enters, holds door for three other males
  - 03:20:45 AM – [Victim] enters
  - 03:21:35 AM – [Shooter] exits
  - 03:22:15 AM – [Victim] approaches counter
  - 03:23:15 AM – [Victim] exits

- - o 03:24:20 AM – Multiple individuals inside store dive to the ground
- Front Entry
    - o 03:21:35 AM – [Shooter] exits, walks across parking lot
    - o 03:22:30 AM – [Shooter] walks back across parking lot towards front door
    - o 03:22:45 AM to 03:24:00 AM – [Shooter] pacing in area of front door, front sidewalk, parking spaces immediately in front of store
    - o 03:24:00 AM to 03:24:10 AM – Several males, including [Shooter] and [Victim], walk out of frame bottom right; two males remain visible, appearing to watch in that direction
    - o 03:24:20 AM – Two males watching drop low / turn / run towards store
- Monitor
    - o 03:23:20 AM – [Victim] exits
    - o 03:24:20 AM – Individuals inside store dive to the ground / away from door
- Parking Left
    - o 03:24:25 AM – [Victim] enters frame right, running
    - o 03:24:27 AM to 03:24:29 AM – [Victim] appears to be struck by gunfire, falls to the ground

Deposition: Antinozzi, Sgt. Gaetano "Guy"
Role ATOI: Sergeant, Chamblee PD
Date: Nov 14 2017

Key Persons Named in this Deposition
- Clark, Det. Andrew – investigating detective, Chamblee PD
- Cushenan, Sgt. Alex – investigating detective [now a Sgt.] , Chamblee PD
- Ford, Captain Ernesto – on scene after incident, Chamblee PD
- Gatlin, Ofc. - on scene after incident, Chamblee PD
- Ngo, Sgt. Tong – on scene after incident, Chamblee PD
- Polanco, Ofc.  - on scene after incident, Chamblee PD; prepared initial incident report
- Tran, Det. Loc – investigating detective, Chamblee PD

Qualifications, Training, and Role of the Deposed
- Discussion of background. (Antinozzi 005-6)
  - Antinozzi testifies he is a sergeant with the A Team patrol at the Chamblee PD. He testifies he has worked there for 4 years. (Antinozzi 005)
- **Antinozzi testifies he was working as watch commander the night of the incident, with responsibility over all the patrol and part time officers**. (Antinozzi 007-8)
  - Antinozzi testifies when working as watch commander he is often the first backup officer on scene. He testifies his primary responsibility is to make sure everyone is safe and covering the city. (Antinozzi 008)

Description of Events
- Antinozzi testifies he was working as watch commander the night of the incident, with responsibility over all the patrol and part time officers. (Antinozzi 007-8)
  - Antinozzi testifies he was in patrol unit 74 the night of the incident. (Antinozzi 008-9)
  - Antinozzi testifies his shift was 6:30-7:00 pm to 7:00 am. (Antinozzi 011)
- Antinozzi testifies Detective Clark showed him one view of the QuikTrip video of the incident later that morning. (Antinozzi 010)
  - Antinozzi testifies he originally said he was at the first set of pumps when he heard the gunshots and testifies he saw in the video he was at the second set. He testifies the video also shows him pulling away and the Maserati pulling behind him. (Antinozzi 011)
- **Antinozzi testifies the incident occurred at approximately 4:00am**. He testifies if he's working overnight he usually gets gas at that time and usually at a QT. (Antinozzi 015)
  - **Antinozzi testifies he was traveling south on Buford Highway and went past Plaza Fiesta and Follies and pulled into the first QT entrance, the most northerly off Buford Highway. He testifies as he pulled in he scanned to see what was going on out of habit and then went next to the second set of pumps.** (Antinozzi 015-16)
- **Antinozzi testifies he saw two people and a possible third person, involved in a negative conversation. "It wasn't a fight immediately, but it looked animated and it**

**… was negative." He testifies he didn't want to "just drive up on it" and pulled around the pumps to put the QT on his left and the pumps on his right to get a better view. He testifies as he was thinking about doing that he heard three gunshots**. (Antinozzi 016)

- o Antinozzi testifies he can't identify any of the people that were involved in the conversation he saw. (Antinozzi 024)
- o Antinozzi testifies he never saw a firearm ATOI. (Antinozzi 025)
- o Antinozzi testifies on seeing the confrontation between the individuals in the parking lot he was alerted right away that it appeared to be a negative confrontation. (Antinozzi 046-47)
- o Antinozzi testifies if he had received a radio call about a fight at the QT he would still have approached tactically. (Antinozzi 047)
- o "…**if any alert police officer had seen … what I saw, they would have recognized it as … a negative confrontation that they should have at least investigated**." (Antinozzi 048)
- o Antinozzi agrees it was seconds from the time he saw the confrontation to the time he heard gunshots. He testifies he has no idea how long the confrontation had been going on before he entered the parking lot. (Antinozzi 050)

- **Antinozzi testifies after hearing the shots he laid down in his vehicle and drove straight. He testifies as he did he saw a white car pull off from the front of the QT. "…my instinct was the car was involved. I got behind the car… called out shots fired. I didn't know anyone had been hit yet, so I didn't call out a Signal 50…"** (Antinozzi 017)
  - o Antinozzi testifies when he pulled behind the white car on Buford Highway they saw the blue lights and stopped and became compliant. "I thought, they're not involved. I made a U-turn, went back north… I don't think I went a hundred yards…" (Antinozzi 017)
  - o **Exhibit 68** – copy of exhibit 13, diagram of QT. Antinozzi complies with request to mark it with an arrow where he pulled in and an X where he ended up. (Antinozzi 019-20)
    - ▪ Antinozzi complies with request to mark exhibit 68 with a Y where he was when heard the gunshots. He testifies he was not stopped at a pump at that time. (Antinozzi 021)
    - ▪ Antinozzi complies with request to mark Exhibit 68 with a Z where the victim was on the ground. (Antinozzi 028)
  - o Antinozzi testifies Signal 50 is a person shot. (Antinozzi 025)
- Antinozzi testifies he returned to QT, pulled past the pumps, and saw one man standing and another on the ground. (Antinozzi 018)
  - o Antinozzi testifies he saw hot dog parts on the ground. **"…the man that was talking to me… all I could get out of it was it was an argument that began over the hot dogs…"** (Antinozzi 018)
  - o Antinozzi testifies the assailant was driving a distinctive vehicle, a silver or gold Maserati. (Antinozzi 019)
    - ▪ Antinozzi testifies he never saw the Maserati before reviewing the video. (Antinozzi 022-23)

- Antinozzi testifies uniform patrol officers Gatlin and Polanco arrived at the QT after him. (Antinozzi 025)
- Antinozzi testifies Detective Loc Tran arrived first from CID, then Detective Andrew Clark, Sergeant Tong Ngo, and Captain Ernesto Ford. (Antinozzi 030-31)
- **Exhibit 18** – Chamblee PD Incident Report. (Antinozzi 031-32)
  - Antinozzi testifies the statement in the report narrative that the altercation began at Follies and continued at the QT came from Ofc. Polanco. (Antinozzi 033)
- Antinozzi testifies after the incident he gathered that one group came from Follies and another came from SL Lounge. (Antinozzi 038)
- Antinozzi testifies he did not interview any QT employees. (Antinozzi 039)
- Antinozzi testifies there was no indication of gang involvement in the incident while he was there. (Antinozzi 040)

Relevant Information about the Assailant
- Antinozzi testifies he never personally identified the assailant. (Antinozzi 024)

Prior / Alternate Security Measures
- Antinozzi testifies DeKalb County police work at Plaza Fiesta next door to the QT. (Antinozzi 014)
- Antinozzi testifies the QT usually has a security guard from DeKalb sheriff's office on duty on Friday and Saturday. (Antinozzi 043)
- **Antinozzi testifies if an off duty officer were present ATOI that person would have been obligated to intervene.** (Antinozzi 047)

Other Relevant Information about the Site
- Antinozzi testifies Brookhaven police use the QT in question "a lot." (Antinozzi 013)
  - Antinozzi testifies the QT is on the Brookhaven city line. (Antinozzi 015)
- Antinozzi testifies Chamblee PD has primary jurisdiction at the property. He testifies the DeKalb County Sheriff's Office can work there because they have statewide jurisdiction. "…the problem is anything they do, they would probably call us to do the report." (Antinozzi 014)

Prior Crime
- Antinozzi testifies he had responded to crimes at the QT in question prior to the incident in question. (Antinozzi 011)
  - Antinozzi testifies he recalls suspicious person calls at the QT. (Antinozzi 012)
  - Antinozzi testifies a sheriff's deputy called on a Friday or Saturday night for assistance with fights and "a lot of people involved." He testifies it was multiple disorderly conducts. (Antinozzi 012-13)
- Antinozzi testifies a Brookhaven officer located a motorcycle with a tag that came back as stolen. He states the [suspect?] ran and [Chamblee PD?] assisted in locating the person. (Antinozzi 013)
- Antinozzi testifies he's responded to property crimes at Plaza Fiesta. (Antinozzi 041)

- Antinozzi testifies he was involved with human trafficking investigations and states a number of the cases had a Follies connection. (Antinozzi 042)
- Antinozzi testifies in Nov 2014 there was an incident with gunfire that began at the store in question and went south on Buford Highway. (Antinozzi 042-43)
  - Antinozzi testifies the shooting occurred on Buford Highway and not at the QT. (Antinozzi 050-51)
- Antinozzi testifies there was a shooting incident at the Mansion Elan parking lot in 2014. (Antinozzi 044)
- Antinozzi testifies on an unknown date in 2014-2015 there was a drive by shooting at Follies involving suspects who got mad at the Follies security officers and drove north on Buford Highway and put rounds into the Pep Boys next to [Follies?]. (Antinozzi 045)
- **Exhibit 48** – Incident report. Dec 03 2014. Simple Battery. Antinozzi testifies he does not recall the incident. (Antinozzi 051)
- **Exhibit 69 –** Incident report. Jan 07 2015. Entering Auto. Antinozzi testifies he doesn't recall the incident. (Antinozzi 053)

## Assessments Performed

- Antinozzi testifies he has never been asked to perform a security threat assessment for the store in question or to drive by and check on the store at certain times. (Antinozzi 045-46)

## Patterns and Key Points

- Antinozzi testifies he was working as watch commander the night of the incident. He testifies the incident occurred at approximately 4:00am and states he was pulling into the QuikTrip to get gas for this patrol vehicle when he saw a negative confrontation occurring between 2-3 individuals. He testifies he planned to tactically approach in his vehicle to investigate the situation when he heard gunshots. He testifies he went in pursuit of a white vehicle that quickly left the parking lot and determined when the vehicle occupants were compliant and pulled over that they were not involved in the shooting. He testifies he returned to the QuikTrip where he found the victim on the ground, deceased.
- Antinozzi testifies from speaking with a witness [Quentin Heard?], the dispute in some way involved hot dogs. He testifies he gathered from information he learned after the fact that the two groups involved had come from Follies and the SL Lounge respectively.

**Deposition:** Bolling, Anthony "Tony"
**Role ATOI:** night assistant, QuikTrip [not working ATOI]
**Date:** Nov 02 2017

### Key Persons Named in this Deposition
- Guzman, Doug – QT employee
- Hall, Craig – QT supervisor
- Marshall, Jesse – supervisor, QT
- Oberker, Summer – employee in QT Atlanta office
- Romero, Gregg – store manager, QT Store 797
- Runion, Cindy – store supervisor [approx. 2013-2014]
- Taylor, Armond – night clerk, QT Store 797
- Thornton, Kevin – division manager, QT
- White, Jason – personnel manager, QT

### Qualifications, Training, and Role of the Deposed
- Discussion of background. (Bolling 006-19)
  - Bolling testifies he served in the Army for 4.5 years and was honorably discharged. (Bolling 007-8)
  - Bolling testifies he started working for QT in Sep 1993. (Bolling 008)
    - Overnight Clerk – 6 months. (Bolling 009)
    - Night assistant 1994-Present – Bolling testifies he was the acting manager during the night shift. He testifies he's held that position since 1994. (Bolling 009)
      - Bolling testifies as night assistant his duties include preparing the store for the morning shift and cleaning the store. (Bolling 015)
    - **Bolling testifies he currently works at 4050 Buford Highway QT and has been there for 3-4 years**. (Bolling 010)
      - Bolling testifies he holds a personal alcohol license that the city of Chamblee requires to sell alcohol and states that's why he was transferred to the store in question. (Bolling 011-12)
      - Bolling testifies he typically works 10:00 pm to 7:00 am. He testifies he typically works Friday night to Tuesday night and has Wednesday and Thursday off. (Bolling 012)
      - Bolling testifies he did not receive new training on being transferred to the QT in question. (Bolling 019)
- Bolling testifies he was arrested for theft by deception in 1999. He testifies he pled guilty. (Bolling 016)
  - Bolling testifies he was guilty of a DUI in 2014. (Bolling 017)

### Relevant Information about the Assailant
- Bolling testifies Ofc. Chang told him the assailant in the incident in question was apprehended. (Bolling 081)

## Security Measures In-Place at the Site at the Time of the Incident

- Bolling agrees he's supposed to wear his panic alarm at all times during his shift. (Bolling 022)
- Bolling testifies there's no monitor near the register where he can see feed from the cameras in the store. He testifies while working night shift there's no way for him to see any of the camera feeds. He testifies he guesses they're monitored in the OK office.  He testifies his understanding is they're monitored only when he hits the panic button. (Bolling 078-79)

## Prior / Alternate Security Measures

- Bolling testifies on Friday and Saturday night a security guard is posted at the QT. (Bolling 013-14)
    - Bolling testifies the officers who work at the QT are Officer Chris Boswell, Officer Chang, and Officer Echols. (Bolling 014)
    - Bolling testifies on Friday and Saturday nights there are two employees working plus the security guard. (Bolling 033)
    - Bolling testifies the purpose of the security guard is to look out for the employees and to perform crowd control. He testifies they work both inside and outside. He testifies when making rounds outside, the guard "pretty much" stays in front of the building. (Bolling 033)
    - Bolling agrees the guards are armed and in police uniform. (Bolling 051)
- **Bolling testifies he asked for a security guard on other nights of the week due to the size of the crowds 2-3 weeks after he first started at the store. He testifies when he first started the guard was only one night a week and they added an additional night.** (Bolling 036)
    - Bolling testifies he made his request for an extra to his manager, Gretchen [LNU], and the store supervisor, Cindy Runion. (Bolling 037)
    - **Bolling testifies he hasn't asked for a guard for other nights beyond Friday and Saturday because it's not that busy.** (Bolling 037-38)
- Bolling testifies the QT down the street on Buford Highway also has a security guard Fridays and Saturdays and agrees it's also off duty DeKalb County sheriff officers. (Bolling 038)
- Bolling testifies the Covington Highway QT had a security officer all nights except Sunday. (Bolling 038)

## Organizational Response to the Incident

- Bolling testifies someone in management informed him about the incident in question that day or the next morning when he came in to work. He states the manager told him someone was shot near the pumps. (Bolling 042)

## Other Relevant Information about the Site

- Bolling agrees the store is busier in the morning than at night. (Bolling 015)
    - Bolling testifies Saturday is the busiest night and gets especially busy at approximately 3am when the clubs close. (Bolling 016)

- o **Bolling testifies at 3am on nights other than Friday or Saturday, there are typically 5-10 customers in the store and 3-4 cars in the parking lot. He agrees 20 cars in the lot or 20 customers in the store would be "really busy" for that time.** (Bolling 032)
  - ▪ Bolling testifies on a Friday or Saturday night when the clubs get out typically there are 20-30 people will be in the store and the pumps and lot will be full with approximately 25 vehicles at 3am. (Bolling 032-33)
- o Bolling testifies it might be "a little bit" busier when school is out for the holidays. (Bolling 075)
- o Bolling agrees when the clubs are busy in the area around the QT, the QT is usually busier around 3:00 and 4:00 am. (Bolling 075)
- Bolling testifies he's never complained to QT about feeling unsafe at the store. (Bolling 035)

## Training of Personnel
- Bolling testifies QT does not perform any annual training or retraining. (Bolling 020)
- Bolling testifies there are store meetings approximately every six weeks where store issues are discussed, including customer service, inventory. He testifies they don't really ever talk about safety. He testifies there's been no discussion of crime deterrence. (Bolling 020-21)
- Bolling agrees he's been trained on what to do if someone is loitering. He testifies he uses his belt clip alarm.  (Bolling 022)

## Policies, Procedures, and Practices
- Bolling testifies he goes outside into the parking lot to sweep and get fresh air. (Bolling 034)
- Bolling testifies the QT employees from FS [facilities maintenance] come on Wednesday or Thursday when he's not working. (Bolling 075)

## Organizational Approach to Security
- Bolling agrees if a violent crime occurs at the property he wants to know. He agrees if someone shoots a gun on QT's premises it's dangerous. (Bolling 070)
  - o Bolling testifies he doesn't know what QT could do to deter crime in the parking lot. (Bolling 071)
  - o Bolling testifies he would want to know about violent crime to know what's going on and would store it in his mind. (Bolling 078)
- **Bolling testifies someone would have to loiter for over an hour for him to trigger his alarm. He testifies he would ask the individual why they were standing outside first after 15-20 minutes.** (Bolling 023)
  - o Bolling testifies he's never pushed his panic button for loitering or called 911 for someone loitering in front of the store. (Bolling 024)
- **Bolling testifies if a fight occurs inside the store he will push his panic button. He testifies if it's outside the store, it depends on the severity. He testifies if it's pushing and shoving in the parking lot he won't hit the button.** He testifies he wouldn't call that a fight. (Bolling 024-25)

- o **Bolling testifies he wasn't trained to push the button if he saw someone shoving someone else.** He agrees he's trained just to let it be and stay inside. (Bolling 025)
- o Bolling testifies if a verbal altercation occurred inside the store he would say something to those involved to take it somewhere else. He agrees he would get involved as an initial step. He testifies if they took the verbal altercation to the front of the store, he would tell them to move away. He agrees if it became physical he would push the alarm button. (Bolling 026-27)
- **Bolling testifies his security role as the night assistant for the store and parking lot is to notify the authorities if something goes wrong. He testifies he does "not really" have a responsibility to monitor the parking lot. He testifies it's impossible for him to make sure customers are going to be safe if they pull into the parking lot.** (Bolling 045-47)
  - o "…So once they get outside, once they're outside of the store, it's wide open space…" (Bolling 048)
  - o Bolling testifies "pretty much" every time someone asks for gas he has to look outside the store. (Bolling 049)
  - o Bolling testifies he can see all the gas pumps from the register. (Bolling 049)
- Bolling testifies if he see something the guard doesn't see or sees someone hanging around, he might say to the guard to tell the person to leave the property. (Bolling 050)
- Bolling testifies to his knowledge QT has never made any changes to security following a criminal incident. (Bolling 072)
  - o **Bolling testifies he doesn't think having a security guard will stop or prevent crime from happening on a lot. He testifies "maybe" crime would be less likely if a guard was in the lot.** (Bolling 072)
  - o Bolling agrees loitering "could be" a safety concern. (Bolling 073)

## Written Security Policies & Procedures
- Bolling testifies QT's policy on when to call the police is if he feels personally threatened. He agrees he's been instructed to call 911 if he's concerned about a customer's safety. (Bolling 028-29)

## Internal Reporting and Logs
- Bolling testifies "we don't talk about crime at our store. We only talk about things that happen at other stores… I kind of have a rule I don't speak on those things at my store." (Bolling 040)
- Exhibit 37 – Alarm activity report. (Bolling 076)

## Prior Crime
- Bolling agrees he has seen verbal altercations in the store and agrees on all occasions he told the participants to move on. (Bolling 028)
- Bolling testifies he activated his panic alarm when a shooting occurred at the store in 2014. (Bolling 030)

- Bolling testifies he activated his panic alarm at another store on Buford Highway because there were too many people in the store. He testifies this hasn't happened at the store in question. (Bolling 031)
- Bolling testifies he learned from Gregg Romero at QT that someone's car was stolen at the store sometime in 2016. He testifies Romero showed him the video of the incident. (Bolling 043-44)
- Bolling testifies none of the guards have discussed crime at or around the QT with him. (Bolling 050-51)
- Bolling testifies he hasn't seen people he believed to be gang affiliated hanging out at the QT. (Bolling 052)
- Apr 06 2014 – Shots fired at QT. Bolling agrees he remembers it and states he saw someone fire shots from pump 4-5 toward pump 16. (Bolling 052-53)
  - Bolling testifies he believes this incident was the reason he asked for an additional night of security. He testifies he was asking because it was "real crowded" anyway. (Bolling 054)
  - Bolling testifies he's not sure if there was a guard working during the Apr 06 2014 incident and states the incident occurred at approximately 2:00 – 3:00 [am]. He agrees it was crowded and agrees it was people coming from the clubs. He testifies he didn't hear that a woman was shot. (Bolling 055)
  - Bolling testifies he spoke with the store manager Gretchen and the morning assistant about the incident. (Bolling 057)
  - **Exhibit 67** – Bolling's statement to the police. Bolling agrees he wrote it while the incident was fresh in his mind. (Bolling 058-59)
  - Bolling testifies he thinks they kept the store open after the incident Apr 06 2014. "We try to keep the store open no matter what's going on…" (Bolling 059)
  - **Exhibit 65 –** Diagram of QT Parking lot. Bolling testifies pumps 4 and 5 are where it says E-Stop. (Bolling 060)
  - **Bolling testifies there were no changes to security after the Apr 06 2014 incident. He testifies there was no meeting to discuss the shooting and no training about what to do in the event there is a shooting**. (Bolling 061)
  - **Exhibit 42** – Incident Report for Apr 06 2014. (Bolling 061)
  - Bolling testifies Armond Taylor was working ATOI on Apr 06 2014. (Bolling 063)
  - Bolling testifies no one came to the store after the shooting Apr 06 2014 other than the police. (Bolling 065)
- Nov 09 2014 – Shooting. Bolling testifies he doesn't recall. (Bolling 066)
  - **Exhibit 39** – Incident Report. Bolling testifies he could be the Tony referred to. (Bolling 067)
  - **Exhibit 49** – Police report for Nov 09 2014 incident. Bolling testifies he has no recollection of the incident. (Bolling 068-69)
- **Mar 12 2016** – Shooting. Bolling testifies he can't recall it. (Bolling 080)
- **Oct 01 2016** – Female threatened with firearm. Bolling testifies no one told him about it. (Bolling 080)

## Other Relevant Information

- Bolling testifies on one occasion he asked a customer to leave, the customer refused, and he called 911. He testifies the individual was "talking crazy." He testifies this occurred three weeks prior to deposition. (Bolling 029-30)
- Bolling testifies he didn't discuss the incident in question with Alex. (Bolling 080)

## Patterns and Key Points

- Bolling testifies he works at the store in question as a night assistant. He testifies he was not working the night of the incident.
- Bolling testifies it's impossible for him to make sure the customers are safe in the parking lot. He testifies that crime possibly would be less likely if there was a guard in the lot.
- Bolling testifies during the store meetings they do not discuss crime deterrence.

Deposition: Bothwell, Christopher Frank
Role ATOI: sergeant, DeKalb County Sheriff's Office; security guard, QuikTrip [not on duty ATOI]
Date: Nov 27 2017

## Key Persons Named in this Deposition
- Bolling, Anthony – night assistant, QT

## Qualifications, Training, and Role of the Deposed
- Discussion of background. (Bothwell 005-7)
  - Bothwell testifies he has worked at the DeKalb County Sheriff's Office since Jun 1996. He testifies his current rank is sergeant of field division services. (Bothwell 007)
- **Bothwell testifies he has worked as a security guard at QT for approximately 6-7 years**. (Bothwell 007)
  - Bothwell testifies he hasn't received any training about what he's supposed to do as a security guard for QT. "I just use my law enforcement training." (Bothwell 017)

## Description of Events
- Bothwell testifies he heard about the incident in question from the news. He testifies it didn't happen on a Friday or Saturday night when he was there so he had no knowledge of what happened. (Bothwell 030)

## Prior / Alternate Security Measures
- Bothwell testifies he worked as a security officer at QT on Fridays and / or Saturdays. He testifies in the past year he has been there on the end of month Friday and Saturday. (Bothwell 007)
  - Bothwell testifies when he first started at QT as security, he only worked one day a week there. (Bothwell 008)
  - Bothwell testifies when working security he is in uniform with his complete gear, including firearm. (Bothwell 010)
  - **Bothwell testifies his security shift at QT is typically 11pm to 6am**. (Bothwell 010)
  - "I would stand by the counter. I stand up front. I walk around the store. I make sure there is no one that's in the bathroom that's loitering, sleeping. I'll go outside, make sure everything is okay. I walk around the back of the store near the Dumpster. I'll come back. So generally it's just a redundant thing. You just provide security, make sure there is no issues, no problems. If there is, you'll handle it accordingly to what happens." Bothwell testifies there's no specific time when he's in the parking lot. "It's whenever." He agrees he's making rounds as he feels necessary. (Bothwell 012-13)
    - "…you're there to observe everything to make sure that cars don't park at the pumps unnecessarily alone. If they're not getting gas, they need to move the vehicles. People sometime, for whatever reason, like to park at

the pump and leave their vehicle and jump in someone else's car. So you just basically for observation, make sure everything go good. **A clerk may tell you, assistant may tell you that vehicle's on pump whatever, been there too long. Then you go out there and have the car moved**." (Bothwell 013)

- ▪ "…**my job is to make sure the store doesn't get too crowded, crowd control. And then observe outside, make sure it doesn't, you know, get too busy.**" Bothwell testifies he is also there for security purposes including shoplifting prevention, "things of that nature." (Bothwell 013-14)
- ▪ Bothwell testifies it's possible his presence could deter crime. He testifies "if it's going to happen, it's going to happen anywhere, outside, inside, off the premises or whatever."  (Bothwell 014-15)
- ▪ Bothwell testifies if he observed an argument he would ask what's going on and would tell them to leave promptly. **He agrees part of his responsibility is to monitor the QT parking lot**. (Bothwell 015)
  - o Bothwell testifies when he's on the premises it's a collaboration between himself and the employees to monitor the parking lot. (Bothwell 026)
- • Bothwell testifies he does not wear a store panic button. (Bothwell 023)
  - o Bothwell agrees he has direct access to DeKalb County Sheriff's Office if he needs backup. (Bothwell 023)

## Key Locations Mentioned

- • "There is some clubs, different types of clubs on that strip down there. And once it gets – the clubs let out, folks like to congregate, talk, meet women, whatever." (Bothwell 013)
- • Bothwell testifies immediately in the area of the QT are the Mansion nightclub, Follies strip club, family fairs, and Plaza Fiesta. "There is a lot of things in the area." (Bothwell 020)

## Other Relevant Information about the Site

- • Bothwell testifies he guesses the reason a security guard is placed at the property is because it's busy. He testifies the level of activity varies from week to week. He agrees when the clubs are busier, QT is busier. (Bothwell 019-20)
  - o Bothwell testifies at approximately 3am on Friday and Saturday a majority of the QT patrons are coming from the clubs. (Bothwell 027)
- • Bothwell agrees he can see all the gas pumps from the check stand. (Bothwell 024)

## Policies, Procedures, and Practices

- • Bothwell testifies he was hired as security at QT through the liaison officer, Major Ola. He testifies there was no application or interview. (Bothwell 009)

## Organizational Approach to Security

- • Bothwell testifies if an incident occurred at the QT he would handle it himself. (Bothwell 010)

- o "I guess my presence could deter crime if that was to happen, yeah." (Bothwell 022)
- Bothwell testifies if he sees someone loitering he makes contact and instructs them to leave if they are not going to be a customer. He testifies he doesn't have a specific time threshold for loitering. (Bothwell 023-24)
  - o Bothwell testifies if someone is hanging out in the store for more than 20-30 minutes it's loitering. (Bothwell 031)
  - o Bothwell testifies he observes until his suspicion is aroused. (Bothwell 032)
- Bothwell testifies if he observed a negative confrontation he would observe and investigate. He agrees he's done that on prior occasions and that's de-escalated the situation. (Bothwell 024-25)
  - o "…But if they was going – if they was going to fight, they was going to fight regardless." (Bothwell 025)

## Supervision of Personnel
- Bothwell testifies he did not receive any instruction from the store supervisor or division manager. He testifies only Major Ola told him what to do. "Walk around the property, stand there, make sure the store is – stand up front, walk around, do security checks, make sure cars are not parked on the property abandoned. But crowd control, stuff like that." (Bothwell 019)
  - o Bothwell testifies the store employees may tell him to remove someone loitering from the property or to tell a vehicle to move from the pumps. "…they will tell me if I need to interject with something." (Bothwell 022)

## Written Security Policies & Procedures
- **Bothwell testifies he hasn't read the QT written policy for security guards. He testifies he wasn't aware one existed.** (Bothwell 017)
  - o Bothwell agrees on reviewing Exhibit 27 that part of his purpose is to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent. He agrees his primary responsibility is to ensure the employees and customers of the store are safe and the items in the store remain secure. (Bothwell 018-19)
  - o Bothwell agrees he performed regular patrols of the location perimeter and oversaw the operation inside the store. (Bothwell 019)
- **Bothwell testifies he's not aware of any QT company policies relating to fights on the premises.** (Bothwell 017)

## Internal Reporting and Logs
- **Bothwell testifies he does not keep any log of his activities while working his security shift and testifies there is no daily activity report**. He testifies there is a sign in sheet for payroll purposes. (Bothwell 011)
- Bothwell testifies if an incident occurred he would complete a DeKalb sheriff's report that would go directly to his supervisors. He testifies he would leave it for the manager to see. (Bothwell 021)
- Bothwell testifies he hasn't discussed crime with the store employees. (Bothwell 030)

## Prior Crime

- **Bothwell testifies he can recall an incident of a verbal altercation outside the store door. He testifies he walked out to de-escalate the situation. He agrees after he intervened the individuals went on their way without a physical altercation**. (Bothwell 016)
- Bothwell testifies he's completed one sheriff's report in the 6-7 years at QT. He testifies it was for a male subject that came in cursing, belligerent, drinking sodas and refusing to pay. (Bothwell 021)
- Bothwell testifies he cannot remember a specific instance of "just fighting" in the seven years he's worked at QT. He testifies it may have happened once. (Bothwell 025-26)
    - Bothwell testifies he's intervened in less than ten verbal altercations. (Bothwell 026)
- Bothwell testifies he has no independent knowledge of crime on the premises. He testifies QT hasn't told him and he hasn't asked. "…I could research it, but I never felt the need to. It's unimportant to me." (Bothwell 027)
- Bothwell testifies the incident in question is the first shooting at this QT he's heard of. (Bothwell 028-29)

## Other Relevant Information

- Bothwell testifies he primarily sees Tony [Bolling?] when he works at QT. (Bothwell 023)

## Patterns and Key Points

- Bothwell testifies he is a sergeant in the DeKalb County Sheriff's Office and works off-duty Friday and Saturday nights at the QuikTrip in question, from 11pm – 6am. He testifies the incident in question did not occur on a Friday or Saturday and so he was not working ATOI.
- Bothwell testifies he does not maintain a daily activity log or provide any other regular report while is he working at the QuikTrip.
- Bothwell testifies his responsibilities include monitoring the parking lot at the QuikTrip and testifies if he sees verbal altercations or other negative interactions he observes and investigates and will intercede to de-escalate the situation.

**Deposition:** Chang, Alex
**Role ATOI:** Investigator, DeKalb County Sheriff's Office; security guard, QuikTrip
**Date:** Nov 27 2017

## Key Persons Named in this Deposition
- Bolling, Anthony – Night Assistant, QT
- Bothwell, Sgt. Chris – DeKalb County Sheriff's Office; off duty security officer at QT
- Ola, Major [FNU] – security coordinator for off duty officers
- Romero, Gregg – store manager, QT
- Spencer, Andrew – victim, deceased

## Qualifications, Training, and Role of the Deposed
- Discussion of background. (Chang 004-6)
  - **Chang testifies he began working for the sheriff's office in 2003. He testifies he currently holds the rank of investigator, and has held that rank for five years [2012 through time of depo?].** (Chang 007)
- **Chang testifies he has worked as a security officer for QT for the past 3-4 years.** (Chang 007)
  - Chang testifies he has not received any training from QuikTrip. (Chang 015)
- Chang testifies he became involved with the incident when it was handed over to the fugitive investigators, Investigators Maldinado and Wilkerson. He testifies he only looked for the assailant. (Chang 022)

## Description of Events
- Chang testifies he learned about the incident in question from the news. (Chang 021)
- Chang testifies he watched the full video of the incident, inside and outside. (Chang 022)
  - Chang testifies he didn't see any aggression in the video and would not have walked outside to investigate if he had been there. He testifies he did not see the guy circling around the victim. (Chang 023)
    - Chang testifies if he had seen a negative interaction occurring in the parking lot it's possible he would have investigated. (Chang 028)
  - Chang testifies he would describe it as a "dead night" for how busy the store was ATOI. (Chang 023)
  - Chang testifies he did not watch all angles of the video. He testifies he doesn't know if he had been there that night whether he would have noticed any sort of negative confrontation. (Chang 024)

## Prior / Alternate Security Measures
- Chang agrees while working at QT he is in full uniform and armed. He testifies he works from 10:30 pm to 5:30 am on Saturday nights. (Chang 009)
  - Chang testifies he alternates Saturday nights with Sergeant Bothwell. (Chang 010)
  - **Chang testifies he was told his primary function as a security guard was inside. He testifies they also do outside parking lot. He testifies inside the**

**store he acts as a deterrent for shoplifting, prevention of armed robbery, and provides officer presence. He agrees he's a deterrent for crime.** (Chang 011)
- Chang testifies Major Ola instructed him they were there to be a deterrent and to act as law enforcement if needed. (Chang 015)
- Chang testifies an armed and uniformed police officer provides a visual deterrent to criminal activity. He testifies a security guard does not. (Chang 024)

o Chang testifies he goes outside every hour or less. He testifies it depends on where it's most populated. "…got people hanging outside, then we walk outside and basically park and patrol and tell them to leave." (Chang 011)
- Chang agrees from where he's standing inside he can see out in the parking lot. (Chang 012)

o Chang testifies if he takes a break it's inside the store. (Chang 012)

o **Chang testifies if there is any criminal action going on, the security officers will step in and deal with it, and call the local jurisdiction if they need to.** (Chang 012)

o **Chang agrees from where he typically stands [in the store?] he can see all the pumps.** (Chang 028)

- **Chang testifies if he saw a negative confrontation occurring between two persons outside, he would go outside. He testifies if the individuals didn't leave he would approach them and investigate. He testifies if it was minor he would make sure they left in separate ways. "…that seems to work most of the time. No one wants to go to jail."** (Chang 017-18)
  o Chang agrees if he saw someone pacing in front of the entrance he would investigate. (Chang 018)

- Chang testifies if someone was loitering in the parking lot he would tell them to leave. He testifies he would determine if it was loitering based on what he observes and customer complaints. (Chang 018)

- Chang testifies he has also worked on Friday nights at the other QT on Buford Highway and the one in Cliff Valley. (Chang 009-10)

## Other Relevant Information about the Site

- Chang testifies the City of Chamblee PD would be first responders to the QT, not the sheriff's office. (Chang 014)
  o Chang testifies if there was an incident he would contact Chamblee PD. (Chang 017)

- Chang testifies summer is the busiest at the QT. He testifies it is busier around the holidays depending on the holiday. (Chang 019)
  o Chang testifies the QT is busier on the weekends when the clubs are busy. He testifies if Follies had a busy night the QT would not become busier at 3am like it would if Mansion was open. (Chang 019)
  o Chang testifies if there were 15 customers in the store and 15-20 cars in the lot that would be moderately busy. He testifies busy is when there are 20-25 people inside and there is no parking outside. (Chang 019-20)

- Chang testifies he's not aware of gang activity in the area. (Chang 021)

## Policies, Procedures, and Practices

- Chang testifies he learned about the security officer position through Major Ola. (Chang 008)
  - Chang testifies he did not have to interview for the security officer position. He testifies he had worked with Major Ola for approximately 8 years. (Chang 008)
- Chang testifies there are generally two store employees working when he's at the QT. (Chang 020)

## Organizational Approach to Security

- Chang agrees in his experience as a security guard he thinks his presence deters crime. (Chang 018)
  - Chang agrees not all criminals are deterrable. (Chang 028-29)
- **Chang testifies before going out to the QT he checks the radio to see if any celebrity is out promoting a club and gets the details on what's going on.** He testifies it's not something QT informed him of and it's something he did on his own. (Chang 027)
- Chang testifies his understanding of why the QT has a security guard is because of the weekend traffic and because of all the clubs. (Chang 028)

## Supervision of Personnel

- Chang testifies Major Ola is his main contact if he has any payroll issues or complaints. (Chang 009)
- Chang testifies he does not give instruction to the QT employees. He testifies the employees will put information on suspected shoplifters and robbers in their book for him to know who to watch for and who isn't allowed in the store. (Chang 016)
  - Chang testifies he believes the employees have informed him about one person through the book sometime in 2017. (Chang 017)

## Internal Reporting and Logs

- Chang testifies they maintain a security log of anyone they issue a criminal trespass to. He testifies the log is kept at the QT. "I guess most of the managers are aware of who we give out warnings to." (Chang 010)
- Chang testifies the off duty officers log in every night to track their hours. (Chang 011)
- Chang testifies if there was an incident they would get a copy of the police report. He testifies if he made an arrest "they'll" [QT?] will get a copy of it. He testifies QT fills out its own incident report. He testifies he does not fill out anything for QT. (Chang 015-16)
- Chang testifies the store manager, Gregg Romero, or Tony [Bolling?], have told him about incidents of shoplifting at the store. (Chang 020)
  - Chang agrees he would want to know if there had been multiple shootings at the premises. (Chang 020-21)

## Prior Crime

- Chang testifies there was an incident at the QT of an intoxicated individual shoplifting. He testifies the individual refused to leave when asked and he arrested the subject. (Chang 012)

- Chang testifies during a verbal altercation that occurred in the parking lot he asked both parties to leave. He agrees they left. "…they know what the next step is… somebody is going to go to jail…" He agrees his intervention was able to de-escalate the situation. (Chang 013-14)
- Chang testifies he hasn't witnessed any physical altercations at the store. He testifies he has been called to them in his normal duties at the sheriff's office but the subjects scattered on seeing him. He testifies someone alerted him to a fight while he was working part time, and testifies he was not called to it as part of the sheriff's office. He testifies when he goes outside they scatter. (Chang 014-15)
- Chang testifies he's handed out approximately two criminal trespass warnings [at the store in question?]. (Chang 016)
- Chang testifies he has no knowledge of prior crime at the premises or in the area. (Chang 021)
- **Chang testifies there was an incident in [Nov 09] 2014 when an H/M and B/M were in an altercation over a female and assault rifles were discharged into the air. He testifies he was working on the premises ATOI inside the store. He testifies where the incident was occurring in the far corner of the parking lot was hidden from his view**. (Chang 025-26)
  - Chang testifies he's not aware of incidents Apr 06 2014 or Mar 12 2016. (Chang 025-26)
  - "**Possibly that night one of the clubs were having a celebrity coming in. And usually when a celebrity comes in, it tends to draw more people**." (Chang 027)
- Chang testifies he heard about the Oct 01 2016 murder of the taxi driver on the news. (Chang 027-28)

## Assessments Performed

- Chang testifies he's never performed an independent investigation of crime at the premises. (Chang 020-21)

## Patterns and Key Points

- Chang testifies he is an investigator with the DeKalb County Sheriff's Office and testifies he works part time as a security officer at the QT in question, primarily on Saturday nights, rotating with Sgt. Bothwell. He testifies he was not working ATOI.
- Chang testifies if he saw a negative confrontation occurring outside in the parking lot he would go outside and investigate, and send the individuals off the property separately.
- Chang testifies he was instructed his primary responsibility was security was inside and that he worked in the parking lot. He testifies as an armed, uniformed officer he acts as a deterrent to crime.

Deposition: Ford, Captain Ernesto
Role ATOI: captain, Chamblee PD
Date: Nov 03 2017

## Key Persons Named in this Deposition
- Antinozzi, Gaetano – Sergeant, Chamblee PD; initial responder to incident in question
- Bakhari, Jilani – assailant
- Copney, Leroy – assailant, shooter
- Cushenan, Det. – investigator, Chamblee PD
- Tran, Det. - investigator, Chamblee PD

## Qualifications, Training, and Role of the Deposed
- Ford testifies he has worked at the Chamblee PD since Aug 1999. (Ford 005)
  - Ford testifies he is the Commander of the Criminal Investigative Division and the department's PIO [Public Information Officer]. (Ford 007)
- Discussion of background. (Ford 005)

## Description of Events
- Ford agrees he responded to the scene on the night of the incident. He testifies Detectives Cushenan and Tran notified him. He testifies he was notified there was a shooting at the QT and the person shot was dead on scene. (Ford 006)
  - Ford agrees he was gathering information at the scene as the PIO and acting as CID commander to make sure everything was done appropriately. (Ford 008)
  - "**I spoke to Antinozzi first. He told me that he was patrolling Buford Highway, decided to pull into the parking lot of the QT. He said he saw a group of people that didn't look right. And as he passed through the parking lot, he thought he heard what sounded like gunshots. By the time he realized what had happened, he had seen a vehicle flee the scene. He followed that vehicle but it ended up not being involved in the incident. He doubled back around, pulled into the parking lot and observed a body lying in the parking lot. That's when he got out and ascertained what happened**." (Ford 008-9)
- Ford testifies local media was on scene when he arrived. (Ford 009)
- **Ford testifies he doesn't think the shooter saw the police vehicle before firing his gun**. (Ford 018)
- Ford testifies he watched parts of the interview of the person with the victim ATOI. "I just remember him saying that they were out partying and they had stopped at the QT for something. **And I remember him saying something, some sort of altercation happened and the guy said something to Spencer, and next thing he knows he starts shooting at him**." (Ford 020)

## Relevant Information about the Assailant
- **Ford testifies he learned the assailant was a known gang member, had been involved in similar incidents in the past, had an extensive criminal history, and was armed and dangerous**. (Ford 010-11)

- o Ford agrees his understanding is the person arrested was the actual shooter in the incident. (Ford 011)
- o Ford testifies the assailant had shot someone in South Carolina in a similar incident during a dispute with a party that wasn't necessarily known to him. (Ford 011)
- o Ford testifies Copney is affiliated with a subset of the Bloods. (Ford 013)
- • Ford testifies Bahkari and Copney were charged with felony murder. (Ford 014-15)

## Prior Crime

- • Ford testifies there was another incident at the QT in question involving weapons. He testifies there was a group of people pointing guns and shooting at each other [at unknown date in 2014-2015]. (Ford 015-16)
    - o Ford testifies there was a journalist, Mario Guevara from Mundo Hispanico, who witnessed the event during a police ride-along. (Ford 016-17)
    - o Ford testifies to his knowledge there was no gang involvement in the incident. (Ford 017)
    - o Ford testifies he doesn't think the shooter saw the marked police vehicle before firing the weapons. (Ford 018)
- • Ford testifies there was another shooting in the QT parking lot. He agrees it was prior to the incident in question. (Ford 015)
- • Ford agrees during the Oct 01 2016 murder of a taxicab driver, the driver drove onto the QuikTrip premises. He testifies he did not speak with QT employees about the incident. (Ford 018-19)

## Assessments Performed

- • Ford testifies QT never asked him to do any sort of property check at the store in question. (Ford 020)

## Patterns and Key Points

- • Ford testifies he was acting as the Criminal Investigation Division commander and Public Information Officer for the Chamblee PD ATOI, and responded to the scene after the incident in question.
- • Ford testifies his understanding is the assailant was Leroy Copney, and that Copney has been arrested and charged with felony murder.

Deposition: Heard, Quintin Marcus
Role ATOI: witness, friend of victim
Date: Oct 03 2017

Key Persons Named in this Deposition
- Burgges, Tiffany – friend of victim
- Cushenan, Det.  – investigator, [Chamblee PD?]
- Spencer, Andrew – victim
- [Richmond], Antonio - witness

Qualifications, Training, and Role of the Deposed
- Heard testifies he has a nickname of "Q". (Heard 005)
- Discussion of background. (Heard 005-13)
  - Heard testifies he works in media entertainment. (Heard 008-9)
  - Heard testifies he served in the Marine Corps for 4.5 years and was honorably discharged at the rank of E5 sergeant. He testifies he served overseas in Iraq in Afghanistan and was frequently involved in combat. (Heard 011-12)
    - **Heard testifies he has training in terrorist profiling and in interrogation**. (Heard 050)
  - Heard testifies he's 30 y/o, born Jul 15 1987. (Heard 021)
- Heard testifies he knew the victim for 10 years. (Heard 013)
- Heard testifies he was arrested for possession of marijuana at age 19. (Heard 018)
- Heard testifies he has experience with gang signs and colors from growing up. He testifies he's aware of things everyone knows, including Crips wearing blue, Bloods wearing red.  (Heard 039)

Description of Events
- Heard agrees he and the victim were at Follies the night of the incident. (Heard 020)
  - Heard testifies he met with the victim at approximately 7pm the night before the incident, Dec 28. He testifies they met for a friend Tiffany Burgges' birthday. (Heard 026-27)
  - Heard testifies they initially went to a hookah lounge in Tucker. He testifies they went in Terrence's vehicle. He testifies Antonio also showed up. He testifies old high school friends were also there. (Heard 028-30)
    - Heard testifies he drank cognac at the lounge. He testifies the victim did as well. (Heard 031-33)
      - Heard testifies the victim had 4-5 glasses of cognac and "maybe a couple of beers." (Heard 033)
      - Heard testifies he had two glasses of cognac and one beer. (Heard 033-34)
      - Heard testifies he doesn't know what Antonio had to drink and states Antonio didn't use marijuana. (Heard 034)
    - Heard testifies they got to the lounge at approximately 9:45 [pm]. (Heard 031)

- - Heard testifies the victim had not had anything alcoholic to drink prior to arriving at the lounge. (Heard 032)
  - Heard testifies he smoked marijuana outside the lounge. He testifies the victim did not use marijuana. (Heard 032)
  - o Heard testifies they left the hookah lounge at approximately 12:30 – 12:45 [am] and went to Follies, arriving at 1:15-1:30 am. He testifies the entire party went. He testifies he drove Terrence's vehicle. (Heard 035)
    - Heard testifies Terrence drives a 99 Nissan Maxima. (Heard 035)
  - o Heard testifies they had a VIP area at Follies. He testifies it was crowded there. (Heard 036)
    - Heard testifies he stopped drinking alcohol after leaving the lounge. (Heard 036)
    - Heard testifies he can't say whether the victim had anything to drink at Follies. He testifies he didn't see him with a drink. He testifies he saw Antonio have a drink. (Heard 036-37)
    - Heard agrees Terrence was intoxicated from the lounge and stopped drinking at Follies. He testifies no one used marijuana. (Heard 037)
    - **Heard testifies there was no internal or external drama at Follies. He testifies there were 30 people, approximately 20 of whom he didn't know, and states it's hard for him to say. He testifies within the group he knows there were no disagreements**. (Heard 037-38)
    - Heard testifies they stayed at Follies until it closed at 3:00am. (Heard 038)
    - Heard testifies the shooters were not at Follies to his knowledge. (Heard 038)
    - Heard testifies Terrence left in an Uber. (Heard 038)
    - **Heard testifies the victim was wearing a red flannel plaid shirt, long sleeve with a black snapback, black jeans, and Timberland wheat colored boots ATOI**. (Heard 040)
      - Heard testifies he has heard red flannel is associated with the Bloods. (Heard 040)
    - Heard testifies he was wearing a blue cashmere sweater, blue jeans, and Polo boots. (Heard 042)
- Heard testifies they went directly to QT from Follies. He testifies he drove Terrence's vehicle, with only the victim also in the car. He testifies Antonio drove there separately, driving a white Mercedes Benz E-Class. (Heard 042)
  - o Heard testifies he went to QT for gas. He testifies he doesn't know why Antonio went. (Heard 043)
  - o Heard testifies he doesn't know if the victim had been to that QT before. (Heard 043)
  - o Heard testifies they went from the Pep Boys parking lot to the QT. He testifies the Follies parking lot was full and they were using the Pep Boys lot as overflow. (Heard 043)
  - o Heard testifies at the QT, he and the victim parked at a pump and went inside the store. He testifies nothing appeared dangerous. (Heard 044)

- o Heard testifies they entered the QT, and states he thinks they parked at pump 1, closest to the street. He testifies he noticed a 2017 Maserati Ghibli with New York plates. (Heard 044-45)
- o Heard testifies the victim walked into the QT in front of him. He testifies he noticed the assailant to his left as he entered in front of the hot dog stand, saying "Where the fuck are the hotdog buns at? They don't show you where anything is." He agrees the shooter was wearing red snakeskin Pumas. He states the assailant was with approximately 4 other people. (Heard 045-46)
  - ▪ Heard testifies the driver of the Maserati was at the register. (Heard 047)
  - ▪ Heard testifies the victim went to make a hot dog and was standing near the assailant. (Heard 047)
    - • **Heard testifies the victim didn't do anything that the assailant indicated made him angry.** (Heard 049)
    - • **Heard testifies he didn't hear anyone from the assailant's group say anything to the victim inside the QT.** (Heard 051)
  - ▪ **Heard testifies the assailant's "aura was a little off." He states he noticed the assailant had scarring on the back right side of his neck, such as from a stab or other wound that hadn't healed properly. He testifies he also saw teardrops on the assailant's face, with a red outline.** (Heard 047-48)
    - • Heard testifies his understanding is that Blood gang members get teardrop tattoos to indicate they've killed before. (Heard 051)
    - • Heard testifies he did not believe the assailant was a gang member while observing him inside the QT. (Heard 051)
    - • **Heard testifies nothing indicated to him there was a problem between the assailant and the victim prior to leaving the QT.** (Heard 052)
- o Heard testifies he noticed Antonio was in the store but did not say anything to him. (Heard 048)
- o Heard testifies because something was off about the assailant, he decided to get two teas from the refrigerator instead of a Slushy and went to check out. (Heard 048)
- o Heard testifies he saw three employees at the QT, one behind the counter, one cleaning a spill near the cappuccino machine, and one taking out the trash. (Heard 052)
- o Heard testifies the victim bought two hot dogs and states he bought drinks and gas. (Heard 053)
- o Heard testifies the victim exited the QT before him. He testifies he was initially in the lead but he had to reorganize his belongings and the victim got ahead of him. (Heard 054)
- • Heard testifies he had his head down adjusting his money clip as he exited the QT and saw the assailant's shoes out of the corner of his eye, standing approximately 5 feet away. **He states he noticed the assailant had changed his attire to a black thermal, with a jacket and hoodie, with the hoodie tied tight so his face was barely visible.** (Heard 054)

- o **Heard testifies the assailant said that Heard and the victim were looking at him "funny" inside and asked if there was a problem. Heard states he said there was no problem. "And then he proceeds to say, well, y'all out here fake reppin'."** Heard testifies at that time it clicked in his head that the assailant was affiliated with a gang. (Heard 055)
  - ▪ Heard testifies the assailant didn't specify why he said Heard and the victim were fake repping. He testifies he believes it was the victim's shirt. He testifies the victim had a neck tattoo of a phoenix that would have been visible to the assailant. (Heard 081-83)
- o **Heard testifies his tone became "a little defensive" and he stood his ground.** "…we were definitely just talking in an aggressive tone…" He testifies the assailant had one hand in a pocket and the other on top of the pocket. He testifies he didn't know at the time the assailant had a weapon. (Heard 055)
  - ▪ **Heard testifies he heard a click in the assailant's pocket approximately 20 seconds into the conversation**. (Heard 056)
    - • Heard testifies even after hearing the click he didn't know there was a weapon. (Heard 060)
  - ▪ Heard testifies the victim was still walking to the vehicle and did not appear to be aware of the situation. (Heard 056)
  - ▪ Heard agrees he assumed based on the assailant's conduct that he was going to attack Heard. (Heard 060)
- o Heard testifies the assailant began to walk behind him. He testifies he noticed another individual by the door that seemed affiliated with the assailant. He testifies it appeared the second individual had been trying to approach Heard from behind. (Heard 056)
- o **Heard testifies he saw Chamblee PD pull into the parking lot. He testifies the assailants weren't looking in that direction and didn't see the officer. Heard testifies he relaxed because he assumed someone had called the police "or they were just doing a regular routine in that area because of knowing what Follies is."** He testifies the officer was apparently there for a break and pulled off to pump 14 on the opposite side from where the incident was occurring. (Heard 057)
- o **Heard testifies the assailant walked back toward his own vehicle toward pump 5, on the other side from Heard's vehicle. "So we have to walk that way in order to get back to our vehicle. So he's now walking in-between the pump and the cement pillar. And the next thing I know, he pulled out a gun, didn't hesitate at all, shot Andrew, and then took two shots at me."** (Heard 058)
  - ▪ Heard testifies the victim never said anything to the assailant. He testifies the victim spoke to Heard and asked if there was a problem. (Heard 058-59)
  - ▪ Heard testifies based on the size of the weapon he believes it was a .38 revolver or smaller. (Heard 063)
  - ▪ Heard testifies he dove to the right after the shooting started and tried to get to the QT entrance. (Heard 064)

- o Heard testifies in a combat zone the assailant's change in attire would have automatically been a red flag to him. "…because there was no course of action that could have called for him to do what he did, I never would have thought that it was for anything but to attack other than until he started talking to me. So he could have literally just could have been cold, stood there and said nothing to me and walked by, and this would never have happened." (Heard 060)
- o Heard testifies the exchange in the parking lot took approximately 60-90 seconds in hindsight. (Heard 061)
- o Heard testifies the assailant was in a fighting posture outside the QT. He agrees he knows that from his military training. (Heard 061)
- o Heard testifies he did not see the victim run or fall. He testifies he did not see the police officer react. He testifies he did not see the assailant leave in the Maserati. (Heard 064)
- o Heard testifies he found the victim in a side parking spot toward the edge of the parking lot. He testifies the victim drew his last breath after Heard rolled him over. He testifies the victim was not conscious when he found him. He agrees the victim had been shot in the chest. (Heard 065-66)
- o Heard testifies it took a long time for the police to arrive. (Heard 066)
- o Heard testifies there were no QT employees in the parking lot ATOI. (Heard 066)
- o Heard testifies Antonio was still inside the QT ATOI. (Heard 067)
- o Heard testifies ATOI there was a taxi cab driver outside next to the ice machine on a smoke break. (Heard 067)
- Heard testifies he gave a statement to the Chamblee PD the morning of the shooting. (Heard 021-22)
- Heard testifies Det. Cushenan showed him the video of the incident. (Heard 025)
- **Exhibit 17** – Video of incident. (Heard 068)
  - o **Exhibit 61** – Still frame from video. Heard marks exhibit with A for location of victim when he was in vicinity of the assailant.  (Heard 068-69)
- **Exhibit 16** – Photo of QT exterior. Heard testifies the encounter with the assailant occurred on the steps. (Heard 071)
  - o **Exhibit 62** – Photo of QT exterior. Heard complies with request to mark his location with a Q, victim's with an A, and assailant's with an RS. (Heard 071)
- Heard testifies to his knowledge there's nothing the employees at QT could have done to prevent the incident, "maybe call the police… Maybe when they were outside or when they seen us not go directly to our vehicles, then they could have called the cops…" (Heard 074)
  - o "…everybody has like a security guard or anything like that … it always deters criminals…" (Heard 074)
  - o Heard testifies there was nothing that happened inside the store that would have alerted anyone from QT to call the police. He testifies no employee was outside to hear the interaction there. (Heard 075)
  - o Heard testifies on reviewing the video after the incident he saw the assailant make a gun symbol with his fingers toward the victim's back inside the store. He testifies the assailant looked upset. (Heard 076)
  - o Heard testifies Detective Cushenan pointed out gang signs being used inside the store on the video to him. (Heard 078)

- **Exhibit 63** – Article from ajc.com. (Heard 085)
    - Heard testifies the article may have changed his wording in the first quote used. (Heard 086)
    - Heard testifies the article is wrong that he told them the victim got in front of the assailant to assist him with the hot dog buns. He testifies the murder was not a dispute over a hot dog bun. He testifies the assailant was not talking about hot dogs in the parking lot.  (Heard 091-92)
- **Exhibit 64** – Photograph copy of Ex 13. Heard complies with request to put an X where the victim was shot, an O where the shooter was ATOI, and an A where he later found the victim after the shooting. He complies with request to put a C where the police officer was located. (Heard 087-88)

### Relevant Information about the Victim

- Heard testifies he called the victim Velate and states that's what the victim's friends called him. (Heard 014)
- Heard testifies ATOI the victim had a preliminary record contract with Arista Records. (Heard 015)
- Heard testifies the victim's girlfriend ATOI was Denisha. (Heard 017)
- Heard testifies he's never been involved with a gang and testifies the victim, Terrence, and Antonio never were to his knowledge. (Heard 039)
    - Heard testifies he doesn't know if the victim would have known wearing red flannel might be seen as a gang sign. (Heard 041)

### Relevant Information about the Assailant

- Heard testifies he learned afterward the assailant had a history of gun related incidents and had stabbed a police officer while being detained. (Heard 089)

### Security Measures In-Place at the Site at the Time of the Incident

- Heard testifies it was well lit ATOI at the QT. (Heard 044)

### Key Locations Mentioned

- Heard testifies he's never been to the SL Lounge. He testifies he heard there's gang activity there after the incident in question from Det. Cushenan. (Heard 038-39)

### Other Relevant Information about the Site

- Heard testifies he had been to the QT in question prior to the incident in question approximately 6 times when he was younger, less than 21 y/o. (Heard 019)
- Heard testifies no one told him there was gang activity at this QT before. (Heard 066-67)

### Prior Crime

- Heard testifies no one directly told him about criminal activity at the store in question prior to the incident. (Heard 086)

## Other Relevant Information

- Heard testifies he has no criticisms of QT based on his experience of using QT. (Heard 080)

## Patterns and Key Points

- Heard testifies he was with the victim at the QT ATOI. He testifies they had gone to the QT to get food, drinks, and gas after leaving Follies. He testifies he saw the victim and assailant near the hot dog stand inside the store prior to the incident and at the time did not see anything happen in the store. He testifies on viewing the surveillance video afterward he saw the assailant make a gang sign or gun symbol at the victim's back. He testifies the assailant confronted him and the victim about "fake reppin" when they exited the QT. He testifies the assailant had changed his attire and had his hoodie pulled close making it hard to see his face. He testifies the assailant walked after them and then shot the victim and fired at Heard.

**Deposition:** Peralta-Reyes, Rhamses
**Role ATOI:** relief assistant, QuikTrip
**Date:** Sep 28 2017

## Key Persons Named in this Deposition

- Marshall, Jesse – store supervisor, QuikTrip
- Mogensen, Alex – part time clerk, QuikTrip ATOI [no longer with company]
- Reid, Brian – QA employee for QuikTrip
- Romero, Gregg – store manager, QuikTrip store 797
- Spencer, Andrew – victim, deceased

## Qualifications, Training, and Role of the Deposed

- Discussion of background. (Reyes 006-12)
- Reyes testifies he's worked for QT for four years, starting Aug 08 2013. He testifies his wife had been working there and referred him. (Reyes 012)
  - Part time clerk for 1.5 years (Reyes 013)
  - Night assistant 2.5 years (Reyes 013)
  - Reyes testifies he is currently a relief assistant. He testifies night and relief assistant are the first level of management. (Reyes 013)
- Reyes testifies he was not involved in designing the security plan for the store in question. He testifies he had no role or responsibility for security at the QT the night of the incident. (Reyes 041)
  - **Reyes testifies he had no training on security. "…just training on when to push my remote alarm."** He testifies he had no training on security issues designed at or any responsibility for deterring criminal actions from occurring against the customers. (Reyes 041)
  - **Reyes agrees he basically knows nothing about security at QTs and how those decisions are arrived at.** (Reyes 043)
  - Reyes testifies he has no training in identifying gang activity. (Reyes 057)

## Description of Events

- Reyes agrees he was working Dec 29 2016 ATOI. (Reyes 014)
  - **Reyes agrees he was the senior management person on duty ATOI.** (Reyes 016)
  - Reyes testifies he worked from 5:30 pm to 7:00 am the night of the incident. (Reyes 061-62)
  - Reyes testifies a part time clerk named Alex and the QA employee Brian who cleans the machines were also working ATOI. (Reyes 016)
    - Reyes testifies the QA employee is only there to clean equipment and not help run the store. He testifies Brian was cleaning the ice cream machine in the kitchen ATOI. (Reyes 017-18)
  - Reyes testifies his responsibilities the night of the incident were to help customers at checkout, restock food on the grills, direct the part-time clerk if necessary. He testifies he had no responsibilities for patrolling or securing the parking lot. (Reyes 133-134)

- Reyes testifies the incident occurred on a Wednesday night going into Thursday morning. (Reyes 020)
    - Reyes testifies the incident occurred at approximately 3:00 – 3:30 am. (Reyes 016)
- **Reyes testifies he first learned someone was shot when he heard a gunshot and there was a hole in the window. He agrees that was his first notice that there was something amiss**. (Reyes 021)
- Reyes testifies he doesn't recall seeing the victim in the store. He testifies he doesn't typically remember any customer faces. (Reyes 021-22)
    - Reyes testifies by policy he would have greeted the victim as he came in the door to the QT. He testifies he has no recollection of the victim being disrespectful to him or any issue with the victim as a customer. (Reyes 022-23)
    - Reyes testifies he doesn't recall the victim being with friends or leaving the store. (Reyes 023-24)
    - **Reyes testifies he didn't know there was a group of individuals outside when the victim exited the store**. (Reyes 024)
    - Reyes testifies at no point while the victim or his friends were in the store did he feel threatened or concerned for his safety. (Reyes 027)
- Reyes testifies he watched the video of the incident soon after the incident and also in preparation for the deposition. (Reyes 024)
    - **Reyes testifies he recalls being at the register helping a customer, hearing gunshots, seeing the glass breaking, and diving to the ground. He agrees that was his first notice there was any kind of altercation**. (Reyes 024-25)
        - Reyes testifies the customer he was helping tried to hide. He testifies there were 7-8 customers in the store ATOI. (Reyes 031)
        - Reyes testifies he saw cars fleeing from the parking lot outside and people trying to get to their vehicles after the shooting. He testifies his view was partially obstructed because of the cars in the lot, and states there were **approximately 20 vehicles**. (Reyes 032-33)
    - Reyes testifies Alex was in the back of the store ATOI. He testifies Alex told him that the gunshots were his first notice of the incident as well. (Reyes 025-26)
    - Reyes testifies after going to the ground, he pressed his belt alarm. (Reyes 028)
        - Reyes testifies the security desk called the store and he answered, notified them there was a shooting, and they said they were calling the police. He agrees he knew someone had been shot at that time. (Reyes 030-31)
    - Reyes testifies he wasn't able to determine who was involved in the shooting. (Reyes 034)
    - Reyes testifies the police arrived approximately 5 minutes after the incident occurred. (Reyes 034)
    - Reyes testifies he didn't go outside until the police arrived because he didn't feel safe leaving the store. He testifies he turned people away who tried to come in and said the store was closed.  (Reyes 034-35)
        - Reyes testifies he didn't see where the victim was shot until after the police arrived. He testifies the victim was next to where he had parked on QT property. (Reyes 037-38)

- Reyes testifies based on viewing the video, the victim was shot at the pump and tried to run toward the right of the frame. (Reyes 038)
  - Reyes testifies the police told him the victim was dead. (Reyes 039)
  - Reyes agrees he saw none of the event. (Reyes 040)
- Reyes testifies the assailants entered the store prior to the incident to get hot dogs and food. (Reyes 078)
  - Reyes testifies he didn't see the assailants were in the parking lot after they left the store. (Reyes 079)
- **Exhibit 11 –** Video of incident. (Reyes 085)
- [Exhibit 11] **[POS VIEW]**
  - Reyes testifies the person pushing the cart at the start of the video from the register perspective is Brian, the FS worker. (Reyes 089)
  - 3:15:38 am - Reyes testifies he is the person in red. (Reyes 089) [Attys. indicate the 4 people coming in are the shooter's group]
  - 3:20:47am – [Andrew Spencer enters per Atty. Law. He is wearing a red plaid shirt.]. (Reyes 091)
    - Reyes testifies people come in with hoodies all the time. He testifies it's normal. He testifies it was starting to rain at that time. (Reyes 091)
    - Reyes agrees there are 8-10 people in the store. (Reyes 091-92)
  - 3:21:16 am – Reyes states he goes to the kitchen to wash his hands. He states he can still see "…most of this right here." (Reyes 092)
  - 3:21:33 am – [Shooter exits per Atty. Law] (Reyes 093)
    - Reyes states he sold a person on the video something the person was holding. He states this person was trying to walk out without paying for a hotdog. He states the man's friend handed Reyes money to cover it. [Atty. Rose indicates that person is with the shooter's group.] (Reyes 093-94)
  - 3:22:21 am – Reyes agrees the shooter's group is walking out. (Reyes 094)
    - Reyes agrees it's a normal traffic pattern for that time of night. (Reyes 094)
  - 3:23:19 am – Reyes agrees the victim walking out at this time is the last time he sees the victim. (Reyes 094)
  - 3:24:20 to 3:24:24 am – Reyes agrees that's him hitting the deck from the gunshot. (Reyes 095)
  - Reyes agrees the video fairly depicts the events of the night in question. (Reyes 095)
- [Exhibit] [FRONT ENTRY VIEW]
  - 3:22:30 – [Shooter and friends standing in front per Attys. Law and Rose]. Reyes testifies he saw the assailants exit and continued helping other customers. (Reyes 096)
    - Reyes testifies people try to exit without paying and agrees he tells them they haven't paid yet. He agrees the person's friend in the video threw some money at him.  (Reyes 097)
  - 3:22:33 – [Atty. Law states the shooter is pacing]. (Reyes 098)
  - 3:23:18 – [Victim exits per Atty. Law]. Reyes testifies he doesn't know why the shooter would confront the victim and friends or why he was waiting for them. He testifies he doesn't know what they're saying or why people are circling. He

testifies he wasn't aware that any of this was going on in the parking lot as it was transpiring. (Reyes 098-99)

- [Exhibit 11] [GAS LEFT VIEW] (Reyes 101)
  - o **Reyes testifies he would not be able to see this camera view from inside the store**. **He testifies it's too far to the left for him to be able to see through the window from the check stand**. (Reyes 103)
  - o 3:21:44 am – [Atty. Rose indicates the shooter is walking toward his car.] (Reyes 101)
    - ▪ Reyes agrees the number of cars is typical for that time of day. (Reyes 101)
    - ▪ Reyes testifies he's just learning now that the shooter went to his vehicle and got a jacket. (Reyes 102)
      - Reyes testifies it wouldn't have concerned him if he had known the shooter was getting a jacket because it was raining that night. He testifies he didn't know the shooter had a weapon until the incident occurred. (Reyes 124-125)
  - o 3:23:54 – [Shooter confronts victim per Atty. Law]. (Reyes 104)
    - ▪ **Reyes agrees he has no idea any of this is going on. He testifies he would have had to see the entire thing going on to hit his panic button. He testifies "just based on looking out the window, seeing people walk to the pump, I wouldn't have known what's going on."** (Reyes 105)
      - Reyes testifies two guys are too far out of his view to know that people are being surrounded. (Reyes 105)
  - o 3:24:21 am – [Shooting occurs per Atty. Law.] Reyes agrees victim runs to the left toward Reyes' car. [Atty. Law states shooter's vehicle speeds off in upper left corner and shooter's friends pull out at 3:24:38.] (Reyes 106)
- **Exhibit 12** – Incident Report. Reyes agrees this is the report he prepared. (Reyes 107)
- **Exhibit 14** – photo of bullet [hole?]. (Reyes 111)
- **Exhibit 15** – Photo of gas pump. Reyes agrees he can see that pump from inside the store where he stands. (Reyes 112)
- **Exhibit 16** – Front store view photo. (Reyes 112)
  - o Reyes states it wasn't raining "this hard" [ATOI?]. (Reyes 113)
- **Exhibit 17** – Reyes agrees the camera was working. (Reyes 114)
- **Exhibit 18** – Police incident report. (Reyes 115)
- **Exhibit 19** – Medical Examiner Report. (Reyes 115-116)
- **Exhibit 20** – Photo of Buford Highway. (Reyes 116)
- **Exhibit 26** – Still photo from surveillance from night of incident from in front of register. (Reyes 120)

## Relevant Information about the Victim

- Reyes testifies he has no evidence or thought that the victim did something wrong that night. (Reyes 047)

## Relevant Information about the Assailant

- Reyes testifies he doesn't know anything about the shooter's group being affiliated with a gang. (Reyes 100)

## Security Measures In-Place at the Site at the Time of the Incident

- Reyes testifies there is a guard at the store in question on the weekends. He agrees that was in place prior to the incident and is still in place. He testifies the guard is there for crowd control and leaves at approximately 5:30 am on Saturday and Sunday morning. (Reyes 049-51)
  - o Reyes testifies he doesn't know why the security hours were set to what they are and testifies he never asked the purpose of the guard. (Reyes 052)
  - o Reyes testifies he's unsure what the security guard would do because the guard never worked on Reyes' shifts. (Reyes 52)
- Reyes testifies there was no security [guard?] there ATOI. (Reyes 031)
  - o "…**there was just a normal day… there was no need for security at our store**." (Reyes 042)
  - o Reyes testifies Alex had no responsibility for security. (Reyes 041)
  - o Reyes testifies other than pushing his panic button in response to an event, he had no security responsibilities. (Reyes 134)
  - o **Reyes testifies he had no duty to patrol the parking lot or check for people. He agrees there are areas of the parking lot he can't see. He testifies there are no parking lot patrols to his knowledge**. (Reyes 076)
- Reyes agrees it's an open counter at the QT with no glass partition between the employee and customer. (Reyes 027)
  - o Reyes states he doesn't know if there's bullet proof glass in the store. (Reyes 058)
- Reyes testifies he's not aware of anything QT did to make the property safe. (Reyes 073)
- **Reyes testifies only the store manager has access to the cameras. He testifies he is not required to monitor them.** (Reyes 077)
  - o "I try to watch the cameras as often as I can." (Reyes 077)
  - o "We just try to stay as aware as we can." Reyes testifies nothing was done to physically monitor the parking lot the night of the incident. (Reyes 080)
  - o **Reyes testifies inside the store he can view the camera feeds for inside the store, the back coffee area, and the beer area. He testifies the only outside camera view he has is of the dumpster area.** (Reyes 103)
- **Reyes testifies there are alarms at the check stand, back room, one of the coolers, and personal alarms on the employees' belts. He testifies it notifies the offsite QT security desk, which can then view the video feed of the store, and call the store if they see anything wrong.** (Reyes 028-29)
  - o Reyes testifies if someone was loitering and refused to leave he would use the remote alarm and contact the security desk. (Reyes 130)

## Prior / Alternate Security Measures

- Reyes agrees he's seen security at other QTs. (Reyes 042)
  - o Reyes testifies store 707 had a security guard on weekend overnights. (Reyes 053)

- - Reyes testifies some stores have security all week. He testifies some stores have no security guard. (Reyes 053-54)
- Reyes testifies he's not sure if Follies has security. (Reyes 075)

## Organizational Response to the Incident
- Reyes testifies he completed an incident report for QT after the incident. (Reyes 057)
  - Reyes testifies he would have taken photos of the exterior of the store for the incident except he felt it was too dangerous to go outside. (Reyes 110)
- Reyes testifies the store manager and store supervisor came to the scene after the incident. He testifies they asked if they [the store personnel?] were ok and did not ask about anything else. He testifies he did not provide any additional information to them. (Reyes 063)
  - Reyes testifies Romero helped law enforcement with the surveillance video. (Reyes 063)
- Reyes testifies he's not aware of any changes to QT operations because of the incident in question. (Reyes 083)

## Key Locations Mentioned
- Reyes agrees Follies is a nightclub / strip club. (Reyes 047)
  - Reyes testifies it's always full at Follies. (Reyes 059)
  - Reyes testifies Follies does not create any security issues. (Reyes 075)
- **Exhibit 21** – Photo of Plaza Fiesta. (Reyes 117)
- Reyes agrees Nam Phuong is a restaurant across the street. (Reyes 117)
- **Exhibit 22** – Aerial photo of 4050 Buford Highway. (Reyes 118)
  - Reyes testifies Follies is next to the Pep Boys Auto Parts Service and agrees the big complex to the top is Plaza Fiesta. (Reyes 118)

## Other Relevant Information about the Site
- Reyes agrees at 3:30 am on Buford Highway they do get loud, boisterous, and intoxicated people. (Reyes 027)
- Reyes testifies he didn't know anything about crime in the area before [the incident?] and doesn't know whether it's a high-crime area. (Reyes 043-44)
- Reyes testifies the store gets a diverse crowd. He testifies they are between Follies and Plaza Fiesta "which is mainly Hispanic." He testifies around 3:00 – 4:00 is when people begin leaving Follies and come into QT to buy food **"every-night."** He agrees some of the people from Follies come in intoxicated. (Reyes 047)
  - Reyes testifies customers typically come in for gas and make impulse purchases. He agrees they have a full service kitchen. (Reyes 048-49)
- Reyes states the store has 16 gas pumps. (Reyes 049)
- Reyes testifies the store in question is 797. (Reyes 053)
- Reyes testifies gang activity at the store was never brought to his attention. (Reyes 056)
- **Exhibit 13** – Diagram of store. (Reyes 110)
- **Reyes agrees there's a Wells Fargo ATM in the store.** (Reyes 117)
- **Exhibit 23** - photo of QT from street. (Reyes 119)

- **Exhibit 24 and 25** – Photos of front of QT. (Reyes 119)

Training of Personnel
- Reyes testifies QT goes over "a lot" of the policies and procedures when an employee is hired. (Reyes 120)
- Reyes testifies no one has talked to him about expectations of safety for the customers as an employee of QT. (Reyes 134)

Policies, Procedures, and Practices
- Reyes testifies QT is a CNG store, convenience store. (Reyes 018)
- **Reyes testifies it is policy for him to greet everyone.** (Reyes 021-22)
- Reyes testifies he reviewed the Daily Assignment Worksheet [DAW] in preparation for the deposition. (Reyes 061)
- Reyes testifies the DAW [Daily Assignment Worksheet] contains the tasks that need to be performed each shift. He states people need to sign off on them. (Reyes 127)

Organizational Approach to Security
- "…criminals are going to commit crimes wherever they want to." Reyes testifies they do not need a means or opportunity. "...even if there was somebody there, if a criminal has already decided to do something, they are still going to do it." (Reyes 069-70)
  - **Reyes testifies he has no training or experience to form his opinion about criminal behavior.** He testifies criminals tend to act on fear. (Reyes 070)
  - Reyes agrees his opinion is that security guards make no difference in deterring crime. He testifies a police officer may increase the likelihood of crime because criminals become scared and may act more violently. (Reyes 072)

Supervision of Personnel
- Reyes testifies Alex's main duties ATOI as part time clerk were to put up the order of supplies on the shelves, take out the trash, and pressure wash. He testifies Alex would help if Reyes had too many people in line as well. (Reyes 019)
- Reyes testifies the store supervisor was Jesse Marshall. (Reyes 052)
- Reyes testifies he wasn't acting general manager ATOI. He states he was "just responsible for … managing the store…" (Reyes 135)

Written Security Policies & Procedures
- Reyes testifies it's policy to close the store to customers after something like the shooting in question where a bullet came in the window because it became a crime scene. (Reyes 062)
- Reyes testifies if someone is loitering an employee may ask that person to leave if they feel safe to do so. (Reyes 074)
- **Exhibit 27** – QT Security guard policy. Reyes testifies he's not familiar with it. (Reyes 121)
- **Exhibit 28** – QT policy. Reyes testifies he's familiar with it and agrees it was in place ATOI. (Reyes 121)

- **Exhibit 29** – QT alarm policy. Reyes testifies he's familiar with it and agrees it was in place ATOI. (Reyes 121-122)
- **Exhibit 30** – QT security in the workplace policy. Reyes agrees it was in place ATOI. (Reyes 122)
- **Exhibit 31** – QT policy. Reyes testifies he's not familiar with it. (Reyes 122)
- **Exhibit 32** – QT policy. Reyes agrees it was in place ATOI. (Reyes 123)
- **Exhibit 33** – QT policy. Reyes agrees it was in place ATOI. He agrees he was trained that customers wearing out of season clothing may conceal a weapon. (Reyes 123-124)
  - Reyes testifies his understanding is tense situations refers to disputes between customer and employee or customer and customer. (Reyes 124)
- **Exhibit 34** – QT policy. Reyes testifies he's familiar and trained with it. (Reyes 125)
  - Reyes testifies he doesn't know why employees are required to wear the alarm if they step outside. (Reyes 125-126)
- **Exhibit 35** – QT policy. Reyes testifies he's familiar with it. (Reyes 125)

## Internal Reporting and Logs

- Reyes testifies if [a prior security threat at the store in question] was important enough, QT would tell him. He testifies no one had told him anything [about prior crime?]. (Reyes 046)
- Reyes agrees creating an incident report was policy and procedure for QT in this case. (Reyes 081)
- **Exhibit 36** – Reyes testifies this is what an incident report form looks like before it's submitted to corporate. (Reyes 126-127)
- **Exhibit 37** – Activity Report. Reyes testifies it's for store managers. (Reyes 128)
  - Reyes testifies he doesn't get access to prior events on the property. (Reyes 130)
  - [Atty. Leet states Ex 37 is a log of all panic alarm button pushes for the given time period.] (Reyes 131)

## Prior Crime

- Reyes testifies [before the incident in question?] he had never seen any crime when he was at the store in question. (Reyes 044)
  - Reyes testifies on a previous occasion he pushed the remote alarm when a customer collapsed on the way to the bathroom. He testifies the security desk contacted law enforcement. (Reyes 045)
- Shootings in QT Parking lot. (Reyes 067-69)
  - Apr 06 2014 Shooting – Reyes testifies he has no knowledge of it. (Reyes 067)
  - Nov 09 2014 shooting – Reyes testifies he didn't know about it. He agrees crime can happen at any moment and states also at any place.  (Reyes 067)
  - Mar 12 2016 shooting. – No knowledge. (Reyes 068)
  - Oct 01 2016 shooting and robbery. No knowledge. (Reyes 068)
- **Reyes agrees the store had people loitering from time to time. He agrees it's commonplace.** (Reyes 073-74)
- **Exhibit 37** – Activity Report. Reyes testifies it's for store managers. (Reyes 128)
  - **Jun 11 2015** – Altercation outside store. Reyes agrees he wasn't told. (Reyes 128)
  - **Jul 17 2015** - Loitering. Reyes agrees he had no idea. (Reyes 128)

- **Reyes testifies he wouldn't know about prior crimes from the Chamblee PD**. He testifies no one called a single crime at the property to his attention prior to the incident in question. (Reyes 132-133)

## Assessments Performed

- Reyes testifies he didn't do anything to familiarize himself with security in the area. (Reyes 075)
  - Reyes testifies he didn't do anything to familiarize himself with crime in the area before this event. (Reyes 138)
- Reyes testifies if a violent crime had occurred at the QT before the incident in question, he would not have wanted to know about it. He testifies he would still have to work. (Reyes 083)

## Patterns and Key Points

- Reyes testifies he was on the manager on duty at the store in question ATOI.
- Reyes testifies his first notice there was something amiss ATOI was when a bullet came through the glass window of the store. He testifies he went to the ground and activated his panic alarm, notifying the QT security desk about the incident. He testifies the security desk contacted law enforcement who arrived 5 minutes later.
- Reyes testifies the only training he received on security was when to activate his remote panic alarm. He testifies he had no responsibility to patrol or secure the parking lot. He testifies his view of the exterior is what he can see through the window from the check stand and the surveillance video of the dumpster. He testifies he does not have access to the other exterior camera views.

**Deposition:** Richmond, Antonio Jr.
**Role ATOI:** witness, friend of victim
**Date:** Oct 13 2017

Key Persons Named in this Deposition
- Heard, Quentin - witness
- [Richmond?], Terrence – friend of victim
- Spencer, Andrew - victim

Qualifications, Training, and Role of the Deposed
- Discussion of background. (Richmond 008-13)
  - Richmond agrees he has a brother named Terrence who was with him, the victim, and Quentin [Heard] the night of the incident. (Richmond 012)
  - Richmond testifies he worked for QT in high school for approximately a year. He testifies it was a "pretty decent place." (Richmond 020)
- Richmond testifies he has a mild understanding of gang signs or clothing and states he's not an expert. (Richmond 015-16)
  - Richmond testifies his understanding is the color red might be interpreted as a gang sign and states he hasn't heard red flannel might be. (Richmond 016)
- Richmond testifies he has no training on security at gas stations and testifies he does not consider himself a security expert. (Richmond 057)

Description of Events
- Richmond testifies he contacted the investigating detective after the incident and learned there was some gang affiliation involved. (Richmond 011)
- **Richmond testifies the night of the incident he met with Terrence and the victim at a hookah bar in Chamblee Tucker around 10:00pm.** (Richmond 016-17)
  - Richmond testifies they went to a birthday party for someone his brother went to school with. (Richmond 017)
  - Richmond testifies he drank two Heinekens at the bar. (Richmond 018)
  - "I know my brother had a bit. Andrew was more so concerned with the hookah.· Quentin was drinking as well. I'm not sure how much Quentin was drinking." Richmond agrees Terrence became intoxicated and he sent him home. (Richmond 018)
  - Richmond testifies they were at the bar for 2 hours. (Richmond 019)
- Richmond agrees after the bar the group went to Follies on Buford Highway. (Richmond 019)
  - Richmond testifies approximately half the group went from the bar to Follies. He agrees they were in a VIP area because B.o.B. was there. He testifies they arrived at approximately 1:00 – 1:40 am. (Richmond 021-22)
    - Richmond agrees the VIP area was closed off from public view. (Richmond 049)
  - Richmond testifies he had a Jack Daniels and Coke at Follies. (Richmond 022)

- o Richmond testifies the victim had one drink. He testifies the victim was tipsy but not intoxicated. He testifies Terrence was intoxicated and Quentin was not. (Richmond 022-23)
- o Richmond testifies he sent Terrence home at approximately 2:20-2:30 am in an Uber. (Richmond 023)
- o Richmond testifies he was driving a White Mercedes E350 the night of the incident. He testifies Quentin drove Terrence's car home, a Black Nissan Maxima. He agrees the victim was riding with Quentin. (Richmond 023)
- o Richmond testifies there were no incidents at Follies. (Richmond 045)
- o **Richmond agrees it was busy at Follies the night of the incident**. (Richmond 054)
- **Richmond testifies they left Follies at approximately 3:00am as the club closed. He testifies he went to the QT for gas and a snack**. (Richmond 024)
  - o Richmond agrees he was wearing a vest in the video of the incident. (Richmond 024)
  - o Richmond testifies in the video of the incident he is on his cell phone talking to his girlfriend at the time, Rita Lathnota. (Richmond 025)
    - ▪ Richmond agrees his attention was a little distracted from talking to Rita. (Richmond 050)
    - ▪ Richmond testifies Quentin and the victim were like younger brothers to him and he was also making sure they were okay. (Richmond 050)
  - o Richmond agrees he pulled up next to a pump at the QT and agrees Quentin and the victim were already inside when he arrived. He testifies Quentin was walking toward the check out counter. (Richmond 026)
    - ▪ Richmond testifies he thinks he said "You guys all right" to Quentin and Quentin said "Yea, we're good" when he saw them in the QT. (Richmond 030)
  - o Richmond testifies he saw the assailant's group in passing. (Richmond 026)
    - ▪ **Richmond testifies the assailant's group was walking out when he was walking in. He testifies there was nothing that alerted him to any danger**. (Richmond 028-29)
  - o Exhibit 17 – Photo. Richmond testifies he went toward the front of the store where the potato chips were located. (Richmond 027)
    - ▪ Exhibit 61 – Overhead of store. Richmond testifies he went left toward the Hot Fries. (Richmond 028)
  - o Richmond testifies he did not see any QT employees outside as he entered. He testifies he only recalls seeing the one employee behind the counter. (Richmond 030)
  - o Richmond testifies he planned to go home after the incident. (Richmond 031)
  - o Richmond testifies the entire time he was in the QT before the shooting, nothing alerted him to any danger. (Richmond 035)
  - o **Exhibit 65** – Diagram of QT. (Richmond 046)
  - o Exhibit 66 – Photo. Richmond complies with request to put an X where he parked at QT. (Richmond 047)
  - o Richmond agrees there were a lot of people in the parking lot at QT. He testifies no one appeared to be hanging out near the entrance. (Richmond 049-50)

- ▪ Richmond agrees the people in the lot appeared to be coming from clubs. (Richmond 054)
- **Richmond testifies he walked up to the QT counter as the victim and Quentin exited the store. He testifies from the time he saw them leave until he heard gunshots, there was nothing that alerted him to the fact that there might be gunshots or an event.** (Richmond 032)
    - o Richmond testifies he was watching Quentin and the victim outside after they left. He testifies he didn't see anything unusual and testifies it was a crowded parking lot and he didn't see anyone conversing with them. (Richmond 032-33)
        - ▪ Richmond testifies he didn't see anyone hanging out by the entrance when Quentin and the victim exited. (Richmond 056)
        - ▪ Richmond testifies he looked outside to watch the victim and Quentin for "a couple seconds." He testifies he carefully monitored their interactions outside in the parking lot. "I just wanted to make sure they were okay." (Richmond 060-61)
    - o Richmond testifies he didn't see any police in the parking lot. He testifies there was a Chamblee police vehicle trying to turn in as the shooting was taking place. (Richmond 033)
        - ▪ Richmond testifies the Chamblee PD went in pursuit of a vehicle full of girls. (Richmond 035)
        - ▪ Richmond testifies the shooter left very nonchalantly in the Maserati. (Richmond 035)
    - o Richmond testifies he saw no interaction between the victim and shooter inside QT. (Richmond 051-52)
- Richmond testifies after the shooting he saw Quentin, made sure Quentin was ok, and he and Quentin went to look for the victim. He testifies they found the victim outside, alive and lying on his stomach. He testifies they rolled him over and saw a gunshot wound to the victim's chest. He testifies the victim did not say anything. He testifies the victim died after approximately 30-40 seconds. (Richmond 033-34)
    - o Richmond testifies the victim moved approximately 100 feet after being shot. (Richmond 055)
    - o Richmond testifies he saw a woman from the party at Follies that the victim had been speaking to in the QT parking lot after the shooting. (Richmond 059)
- Richmond testifies he was in Atlanta from Chicago ATOI to visit family for Christmas and New Year's. (Richmond 031)
- **Richmond testifies after the incident Quentin told him he saw the [assailant] with the tattoo** and didn't mention any argument inside. He testifies Quentin said people circled around him outside and he walked behind [the victim?] because he could sense something was coming. (Richmond 036-37)
- Richmond testifies he notified the victim's mother about the incident after it occurred. (Richmond 040)
- Richmond testifies he didn't see anyone loitering at QT the night of the incident. He states there were a lot of people there. (Richmond 041)

## Relevant Information about the Victim

- Richmond testifies he met the victim through his brother [Terrence?] a few years ago. (Richmond 013)
  - o Richmond testifies Terrence and the victim were trying to break into the music industry together as performers. (Richmond 014)
- Richmond testifies he has never been affiliated with a gang and testifies to his knowledge, Terrence, the victim, and Quentin have never been affiliated with one. (Richmond 015)

## Relevant Information about the Assailant

- Richmond agrees he learned someone was arrested for the incident in question. (Richmond 011)
- Richmond testifies as far as he knows there was no reason for the assailant to shoot and kill the victim. (Richmond 048)

## Security Measures In-Place at the Site at the Time of the Incident

- Richmond agrees the store appeared to be well lit. (Richmond 030)
- Richmond agrees he saw no security on site. (Richmond 051)

## Prior / Alternate Security Measures

- Richmond testifies QT could have had armed security to deter the incident in question from happening. "Places like that in Atlanta are hot spots after nightclubs and after parties. Just having the presence of police or armed security would have or could have deterred the incident from happening." (Richmond 038-39)
  - o Richmond agrees in his opinion QT failed to properly secure the parking lot. (Richmond 053)
  - o Richmond testifies QT could have prevented the incident with additional security, having armed security outside the stores. He testifies he thinks they know it's a hot spot after the clubs.  (Richmond 056)

## Key Locations Mentioned

- Richmond testifies he'd never been to the S&L Club. (Richmond 021)
- Richmond agrees there are several clubs in the area of the store in question and agrees they get out at around 3:00am. (Richmond 054)

## Other Relevant Information about the Site

- "I think you have to be aware and alert when you go to places at night in the city of Atlanta, especially where alcohol has been consumed and knowing that there is a high rate of gang activity and drug trafficking, things of that nature, in Atlanta. So going to places like that and going to a gas station after, you do have to be alert and aware of your surroundings." (Richmond 058)

Prior Crime
- Richmond testifies his mother notified him there had been shootings at other QTs and gas stations in the Atlanta area. (Richmond 042-43)

Other Relevant Information
- Richmond testifies he had no criticisms of QT as a customer prior to the night in question. (Richmond 020-21)

Patterns and Key Points
- Richmond testifies he went to a birthday party that included the victim and then later went to Follies with that group. Richmond testifies he went from Follies to the QuikTrip in question at approximately 3:00am when Follies closed. He testifies it was well lit and crowded. He testifies he entered the store as the victim and Quentin Heard were checking out. He testifies he did not see any interaction with the victim and the assailant and testifies he had no indication there was going to be a shooting until he heard the gunshots.

Deposition: Romero, Gregg
Role ATOI: store manager, QuikTrip
Date: Sep 28 2017

Key Persons Named in this Deposition
- Hodges, Evans – first assistant manager, QuikTrip Store 797 ATOI
- Knight, Greg – QuikTrip Store 797 employee
- Marshall, Jesse – store supervisor for Store 797, QuikTrip
- Milburn, Marc – division manager, Atlanta, QuikTrip
- Reyes, Rhamses – relief assistant, QuikTrip
- Spencer, Andrew – victim

Qualifications, Training, and Role of the Deposed
- Discussion of background. (Romero 006)
  - Romero testifies ATOI he lived approximately 30-35 minutes from the store in question. He testifies he arrived at approximately 4am. (Romero 107)
- Romero testifies he served in the Marine Corps for 10 years and worked as a recruiter in Atlanta. He testifies he was honorably discharged in 2007. (Romero 008-9)
- Romero testifies he began working for QuikTrip two months after leaving the Marines [in 2007?]. (Romero 010)
  - **Romero testifies as a store manager he runs the day to day operations of the store and is in charge of all shifts and employees. He testifies he takes in customer concerns, handles customer issues and problems, and works on the financials**. (Romero 012)
  - **Romero testifies he currently manages QuikTrip Store 797, the store in question. He testifies he has held the position for approximately two years at time of deposition**. (Romero 012)
    - **Romero testifies he started at Store 797 in Oct 2015**. (Romero 052)
  - Romero testifies he started at QuikTrip as a relief assistant and held that role for approximately 2 years. He testifies he was promoted to second assistant, then first assistant, then store manager. (Romero 013)
  - Romero testifies he received training at QuikTrip regarding the policies and procedures for the belt alarm and what to do regarding QuikTrip's security policies and procedures. (Romero 031)

Description of Events
- Romero testifies he was not on site ATOI. (Romero 013)
  - Romero testifies Rhamses called him directly by phone and he went right over after the incident. (Romero 106)
- Romero testifies he watched the video of the incident with the police. (Romero 020)
  - "**What I recall seeing is it looked like there was a group of people talking by the hotdog buns and right over there by the roller grills, and then one group paid for something and then they went back outside. And from what I was able to see, it looked like they were just talking or having a verbal**

conversation… they weren't close to each other or next to each other. **And then one [the victim] … went to his car or he was going to his car and then everything happened**." (Romero 021)

- Romero testifies he didn't see anyone circling around the victim. He testifies he watched the angles of the video the police were looking for. (Romero 022)
- Romero testifies to him it wasn't a confrontation. "They were just outside… I saw them outside together." (Romero 022)
- Romero testifies he did not see the assailants try to leave without paying for a hot dog, Rhamses ask them to pay, and the assailants throw money at him. (Romero 023)
- Romero testifies the assailants weren't loitering because the incident happened in a 5 minute span. (Romero 038)
- "There was no fight that night." (Romero 041)

o Romero testifies Rhamses watched the people involved in the incident and made sure it didn't escalate. "And I would have done the same exact thing." (Romero 041-42) [consistent with Reyes?]

- "He [Reyes] was paying attention closely to make sure it did not escalate into anything." Romero agrees that is exactly what Reyes is supposed to do. (Romero 043) [consistent with Reyes?]
- Romero agrees that if Reyes did not pay attention to the situation, that would have been a mistake on his part; "but he paid attention." (Romero 044) [consistent with Reyes?]
- Romero testifies he spoke with Rhamses and was told Rhamses saw the interaction between Spencer and the shooters in the parking lot. He testifies Rhamses didn't feel it was going to be a shooting. (Romero 044-45)

o Romero testifies Rhamses said the [assailants and victim?] were talking by the hot dog buns and Rhamses was looking at them "just making sure… He said they didn't come in together, so he just wanted to pay attention… Nothing was out of the ordinary he said. He said they left. **He was still looking at them or he was going to be taking the customers also paying attention outside to see anything, and he didn't notice anything… then he said he heard the shots and that's when he hit the remote alarm. And he didn't know what happened**…" (Romero 108-109)

- Romero agrees Rhamses said it started in the store and then continued outside the store. (Romero 109)
- Romero testifies Rhamses said he wasn't sure if the subjects on the night of the incident were intoxicated. (Romero 109)

- Romero testifies there was a police officer in the parking lot ATOI. (Romero 048)
  o Romero testifies the police officer was pulling in the parking lot ATOI. (Romero 074)
- Romero testifies the victim bought a hot dog. He testifies the assailants also purchased something. (Romero 124-125)
- Romero testifies there was another employee on duty ATOI who said he was in the back of the store by the cappuccino machine. (Romero 136-137)

- Romero testifies he doesn't think twenty cars outside and 8-9 customers inside is a lot. (Romero 146-147)
  - **Romero testifies if Rhamses couldn't watch people in the parking lot then he would expect Rhamses to have his clerk keep an eye on them or hit the [alarm] button.** (Romero 147)

## Security Measures In-Place at the Site at the Time of the Incident

- **Romero testifies employees have a belt clip alarm that they activate in response to a danger or threatening situation or if they feel an event is imminent. He testifies the alarm triggers store security contacting the store. He testifies if they can't contact the store, they can access the camera to see what's happening**. (Romero 018-19)
  - Romero testifies they will activate the alarm if they feel a situation is escalating. "But there are many things that we can't control or see happening through the course of interaction between people or employees or customers." (Romero 019)
    - Romero testifies the security desk can see what happens and contact the police. (Romero 029)
  - **Romero testifies the belt alarm is standard for every store. He testifies there were no other security measures in place**. (Romero 029)
  - Romero testifies employees are to watch a situation closely to decide whether or not it's escalated to the point where they need to push the alarm button. "…if you see it getting loud, then you hit the button…" (Romero 040)
    - "…there's things that QuikTrip and me as the store manager, I can't control…" (Romero 040)
  - Romero testifies if Rhamses feels there are too many customers in the store or parking lot he can hit the [alarm] button and security will contact him and issue the police. He testifies whether an employee does so is based on what that employee feels comfortable with. (Romero 145)
- Romero testifies there was no security guard at the QuikTrip on the night in question. He testifies there was one there on Fridays and Saturdays. He testifies he doesn't know why that was implemented and testifies it was in place when he started at Store 797. (Romero 032-33)
  - Romero testifies the security guard was to handle the traffic flow and keep people from loitering when they exit the clubs at 3:00 or 4:00 am. (Romero 033)
  - Romero testifies his understanding is Friday and Saturday nights are when the clubs "…have the most [traffic?]". (Romero 035)
  - Romero testifies when the security guard is on duty he stays in the store "unless he needs to go outside." He agrees the security guard is uniformed. He agrees the uniform is a deterrent. (Romero 049)
  - **Romero agrees if the guard sees trouble he is supposed to intercede**. (Romero 076)
- Romero testifies there are cameras "all over the parking lot… You can see everything from when you walk on the property to everything in the store on the security cameras." (Romero 045)
  - Romero testifies the cameras are a deterrent. (Romero 134)
- Romero testifies it's a store manager task and not a requirement for Rhamses to inspect the parking lot. Romero states as store manager he does it every morning. (Romero 126)

- **Romero agrees a well lit property could help with security. He testifies customers come to the store because it's safe and lit.** (Romero 128)
  - o Romero agrees customers expect QT to appropriately staff the store. He agrees staffing is exclusively within QT's control. (Romero 135)
- Romero testifies cleanliness of the store could have an incidental security benefit. (Romero 129)
- Romero agrees the friendly greeting QT employees give to people walking in could have an incidental security benefit and agrees it's a QT policy to greet each customer coming in. (Romero 129)

## Prior / Alternate Security Measures

- Romero agrees some properties at QuikTrip have no guards and some have full time guards. He testifies his understanding is the decision about guards is based on the amount of crime at the property. (Romero 050-51)
- Romero agrees Follies has a security guard full time. (Romero 099)
- Romero testifies Plaza Fiesta has its own security next door. He testifies he doesn't know if it's full time. He testifies it's a father / son security team. (Romero 103-104)
  - o Romero testifies he didn't notify QuikTrip about the security measures at Follies or Plaza Fiesta. He testifies it's handled above his level. (Romero 104-105)
- Romero testifies store 797 is the first QuikTrip he's worked in with a security guard. (Romero 112-113)
  - o Romero testifies he believes all QuikTrip security officers are off duty police officers. (Romero 113-114)

## Organizational Response to the Incident

- Romero testifies he did what the police told him to. He testifies he did not perform an investigation of the incident. (Romero 024)
  - o "I just do what I was told by the police and by my supervisor. **Everything else is handled above my level with incidents, whether it's a fender-bender on the property or any situation whatsoever**." Romero testifies they have their own security department that handles everything like that. (Romero 024-25)
  - o Romero testifies his role after the incident was to get the video for the police and nothing else. (Romero 027)
- Romero testifies they were safe and testifies he wouldn't change anything to the security measures. (Romero 077)

## Key Locations Mentioned

- Romero testifies he currently manages QuikTrip Store 797, the store in question. (Romero 012)
- Romero agrees there are a lot of clubs around the store in question. (Romero 033)
  - o Romero testifies Mansion Elan is only open Friday and Saturday. (Romero 035-36)
- Romero testifies QT corporate security is based in Tulsa, OK. (Romero 132)

## Other Relevant Information about the Site

- Romero agrees the store in question is at 4050 Buford Highway. (Romero 012)
- Romero testifies the QuikTrip has always been 24 hours. He agrees if there's a shooting in the parking lot there's someone there from QuikTrip who knows about it. (Romero 056)
- Romero agrees there are times the police are on the property without their lights on and he doesn't know they are there. (Romero 131)
  - o Romero agrees the store in question has daily police customers. He testifies they offer free fountain drinks and coffee to uniformed police officers. (Romero 131)

## Training of Personnel

- Romero testifies he trained his employees regarding the security policy and when and when not to use the belt alarm. (Romero 031)
  - o Romero testifies he has monthly policy and procedure meetings with the store team. (Romero 129-130)
- Romero testifies he talks to his employees, especially the overnight employees, about their safety on a daily basis. (Romero 066-67)

## Policies, Procedures, and Practices

- Romero testifies Rhamses [Reyes?] was working as relief assistant ATOI, with two overnight shifts a week. (Romero 013-14)
- Romero testifies customer comments and complaints come into the store and "we handle them. We get it e-mailed to us or get a copy of it." (Romero 125)
- Romero testifies they have a scheduling assistant that tells them based on the amount of transactions they have how many employees they need per shift. He testifies it has nothing to do with the crime aspect to his knowledge. (Romero 136)
  - o Romero testifies an entry level employee is a store clerk, paid $10 an hour. (Romero 136)
  - o Romero testifies staffing is based solely on sales volume. He testifies staffing was in his discretion "If it needed to be." (Romero 137-138)
- Romero testifies customer satisfaction is QT's priority. (Romero 139)

## Organizational Approach to Security

- **Romero testifies designing a security plan is done at the corporate level. He testifies he has no involvement in design as store manager.** (Romero 017-18)
  - o "If I see criminal activity, I use our security protocols in place and policies in place and do what I am required to do." Romero testifies they have the policies to follow to prevent "things." (Romero 079)
    - ▪ **Romero testifies if he sees crime happening too much he can do consistent training with his employees and make sure they are paying attention and "going out there and sweeping the lot… when they sweep the lot to make sure to keep their eyes open…"** (Romero 080)
  - o **Romero agrees criminal decisions should be made based on past history. (**Romero 094-95)

- o   Romero testifies all decisions about security guard hours are made at corporate level and aren't made by him as store manager. (Romero 102)
- Romero testifies his definition of security is "…That you have measures in place to keep everybody, employees and customers, safe alike." (Romero 028)
- Romero testifies they don't want loitering at 3:00 or 4:00 am after the clubs get out because it could lead to theft. He testifies it "possibly" could lead to other problems. (Romero 035)
  - o   **Romero testifies loitering is someone outside for thirty minutes or more. "If you see someone outside or they are being aggressive towards customers."** (Romero 038)
- **"…We are not supposed to go outside."** (Romero 040)
- Romero testifies they don't want to confront the customers. (Romero 046)
- "**My employees are safe. If they're not safe, they tell me.**" (Romero 065)
- Romero testifies no one from corporate has contacted him about what they can do to make the property safer. (Romero 067)
- Romero testifies it should never happen that the victim should come as an innocent customer to QT and be shot dead on the property. (Romero 140-141)
  - o   Romero testifies the friendly atmosphere and cleanliness do not hide an underlying fundamental criminal problem. (Romero 141)

### Supervision of Personnel
- Romero testifies Rhamses was the manager on duty [the night of the incident?] and not the store manager. (Romero 014)
  - o   **Romero testifies the managers on duty are his assistants. "They handle issues to the best of their ability, but they may not be as trained to handle financial situations or accessing DVR cameras if there's needs to be, or certain decisions they will call me or contact me for guidance."** (Romero 014)
- Romero testifies his first assistant would have been Evan Hodges on Dec 29 2016. (Romero 015)
- Romero testifies the store supervisor is directly above him in the hierarchy and managers 14-17 stores. (Romero 016)
- Romero testifies the division manager for Atlanta, Marc Milburn, is above the store supervisor. He testifies the Atlanta district includes all of Georgia and has 134 stores. (Romero 016-17)

### Notifications and Warnings
- Romero testifies they do not warn customers about prior shootings when they come in. (Romero 141)

### Written Security Policies & Procedures
- **Romero testifies it doesn't say loitering is 30 minutes in the QuikTrip policy. He testifies it's a judgment call.** (Romero 038-39)
- **Exhibit 27** – Policy. Romero agrees the fact that they had a security guard at certain times reflected the policy that states it may be necessary to place a security guard in a

store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent. (Romero 110-111)

- o Romero agrees the policy says if a store manager believes he or she needs a security guard, he or she should contact his or her store supervisor. (Romero 112)
- **Exhibit 28** – Romero testifies the policy states if there is a verbal altercation, the police should be called immediately "If you think it's escalating…" (Romero 114-115)
- **Exhibit 29** – Romero agrees the policy says to activate the alarm for any fight or suspicious loitering on a QT property. (Romero 115)
- **Exhibit 30** – Romero testifies individuals who the company knows pose a risk of harm to others include those participating in an incident and who have been used criminal trespass citations or if they've had to use the remote alarm to ask someone to leave "a few times." (Romero 116)
- **Exhibit 31** – Romero testifies QuikTrip requires anyone working outside to wear a remote transmitter alarm in case they see something. (Romero 116-117)
- **Exhibit 32** – Romero testifies when an employee pushes the alarm button, the security cameras at the store go to the security office's main screen. (Romero 117)
  - o Romero states the security office monitors "everything." He agrees they might check in on the store throughout the day. (Romero 118)
  - o Romero testifies they are to look at the checkstand monitor before going outside to empty trash to make sure no one is loitering. He testifies if someone has been there for a "long time" they use the alarm and ask the police to ask them to leave the property. He testifies the manager on duty will go out first and ask them to leave politely before using the alarm. (Romero 118-119)
    - ▪ Romero testifies they have two people go outside and do the trash at the same time for safety. (Romero 119)
  - o Romero testifies he has seen the QT corporate security office. He testifies he doesn't know what they do day to day. (Romero 127)
  - o Romero testifies QT corporate security has the ability to monitor 24 hours a day, 7 days a week. (Romero 127)
- **Exhibit 33** – Romero testifies he did not notice the assailant went to his car and got something out of the car, including a jacket before returning to shoot the victim. Romero agrees the policy indicates a person doing something with clothing like that may be concealing a weapon. He agrees they could trip an alarm if they suspected something was going on. (Romero 119-121)
  - o Romero agrees customers love attention and potential robbers and other criminals hate it. (Romero 129)
- **Exhibit 34** – Romero testifies the policy at night is to wear their alarm no matter what they do. He agrees the darkness might possibly provide an opportunity for someone to hide or get away with a crime. (Romero 122)
- Romero agrees the policies in Exhibits 27 through 35 were in place in Dec 2016. (Romero 124)

## Internal Reporting and Logs

- Romero agrees he's the eyes and ears for QuikTrip at the property. He testifies he provides input and observations to his supervisor on a daily basis. (Romero 051-52)

- - Romero testifies his employees tell him everything that takes place on the property. (Romero 052)
  - Romero testifies it's up to corporate to determine why the police are routinely on the property. (Romero 096)
  - Romero testifies his supervisor would probably discuss the alarm logs with him at their weekly meeting. (Romero 112)
- Romero testifies if there had been a shooting in the parking lot Mar 12 2016, it would have been brought to his attention. (Romero 055-56)
- Romero testifies [incident reports?] are not provided to him. (Romero 060)
- Romero testifies they issue a criminal trespass if they have to hit the alarm button 20 times for panhandling [for the same person?]. He testifies they maintain a banned list. (Romero 084)
- Romero testifies there's no documentation that they have that they go outside and check the parking lot. (Romero 125-126)

## Prior Crime

- **Romero testifies his knowledge of prior crime at the property is only what he's seen on the news.** (Romero 036)
- Romero testifies while he's been there, there have been no instances of any crime on the property.  He testifies the only criminal activity has been "your average shoplifter or people we've had to ask to leave because they'd been panhandling." (Romero 036-37)
  - Romero testifies there was more panhandling than loitering. (Romero 037)
- Romero testifies he was not familiar with a shooting at QuikTrip Apr 06 2014. He testifies if he had known it would probably not have factored into any request for more security. (Romero 052)
- Shooting at QuikTrip Nov 09 2014. (Romero 052-53)
- Romero testifies there was no shooting in the QuikTrip parking lot Mar 12 2016. He testifies he would have known about it. (Romero 054)
  - Romero testifies there have been shooting incidents in the area of the QuikTrip. He testifies there was one that took place a mile from the store. (Romero 054)
- Robbery and shooting Oct 01 2016. Romero testifies neither the police nor employees ever made him aware of it. (Romero 056)
- Battery Nov 21 2015. Romero testifies customers pushed each other and threw 5-Hour Energies at each other, then left. He testifies it was a Saturday night.  (Romero 058)
- **Exhibit 38** – Romero testifies the Greg is probably Greg Knight, his assistant. (Romero 059)
  - Firearm pointed at taxi driver at QuikTrip. (Romero 059) [Atty. indicates incident ended in a homicide]
  - Romero testifies Greg Knight told him about the taxi driver incident. He testifies the police, Knight, and QuikTrip never told him about a gun being held to someone's head. (Romero 061)
  - Romero testifies the incident is hearsay. (Romero 063)
  - Romero testifies a security guard couldn't have controlled this incident [from Exhibit 38?]. (Romero 067-68)

- **Exhibit 39** – Shots fired in parking lot Nov 09 2014. Romero testifies he wasn't aware and states he has no concern. (Romero 068)
  - Romero testifies based on the dates, the security guard would have been on the property ATOI in Exhibit 39 if the same measures were in place then as now. (Romero 068-69)
    - Romero testifies the report indicates the police were on site ATOI [in Ex 39]. (Romero 069)
- **Exhibit 40** – Oct 09 2014 - Arrest of suspect with firearms in bathroom. (Romero 071)
- **Exhibit 41** – May 31 2014 – Fight. Romero agrees there would be a security guard there on the Saturday. **He agrees the guard would intercede in a fight**. (Romero 072)
- **Exhibit 42** – 2014. Shots fired outside the store. (Romero 076)
- **Exhibit 43** – Possession of heroin arrest on property. (Romero 077)
  - "…police officers don't inform me of everything they do on property as far as traffic stops, whether it's a traffic stop or not." (Romero 077)
  - Romero testifies the police are pulling people over into the store parking lot "all the time." He testifies it occurs on a weekly basis.  (Romero 078)
- **Exhibit 37** - QuikTrip incident reports. (Romero 082)
  - Jun 11 2015. Romero testifies he wasn't there. (Romero 082)
  - Jul 17 2015. Romero testifies he wasn't there. (Romero 082)
  - Sep 11 2015. Romero testifies he wasn't there. (Romero 082-83)
  - Dec 25 2015. Romero testifies he knew about the incident. (Romero 085)
  - Mar 12 2016. Romero testifies the subject was aggressively panhandling but there was no assault. (Romero 085)
  - Mar 20 2016. Romero agrees a potential fight was rapidly defused by good employee vigilance. Romero agrees the employee used the alarm and the security guard separated the subjects. (Romero 086-87)
  - Apr 20 2016. Romero agrees the employee became involved, separated the customers, and there was no problem. (Romero 087)
  - Oct 01 2016. Homicide. (Romero 088)
  - Oct 24 2016. Romero agrees the security office contacted the police and the Chamblee County police arrived at the store and separated the subjects. (Romero 089-90)
  - Nov 02 2016. Romero agrees six hours is too long for someone to be on the lot. (Romero 090)
    - **Romero agrees loitering can lead to more serious crimes.** (Romero 090)
  - Nov 21 2016. Argument at gas pump. (Romero 090)
  - Nov 27 2016. Romero agrees someone stepped in to mediate the argument and dissipated it. (Romero 091)
- **Exhibit 44** – Shots fired Mar 12 2016. (Romero 091)
- **Exhibit 45** – Mutual combat. (Romero 093)
  - Romero testifies he doesn't believe the Chamblee police let the QuikTrip office know about every traffic stop or arrest they make in and around the property. (Romero 094)
- Exhibit 46 – (Romero 095)
- Exhibit 47 – Assault. (Romero 097)

- Exhibit 48 – Mar 05 2015. Fighting over parking spot. (Romero 097)
  - Romero testifies there are "discussions" between customers frequently. (Romero 098)
- Exhibit 49 – Shots fired Nov 09 2014. (Romero 098)
- Exhibit 50 – Person with a gun Oct 09 2014. (Romero 098)
- Exhibit 52 – Person shot. Victim said it was gang related. (Romero 099)
  - Romero testifies the police never told him about gangs in the area. He testifies he wasn't aware of gangs in the area and testifies he's not an expert on gangs. (Romero 099)
- Romero testifies he wasn't aware of anyone loitering for sex at the store in 2013. (Romero 102)
- Aug 04 2012 – Robbery, discharge of a firearm. (Romero 102)
- Exhibit 60 - Apr 04 2016 – Aggravated Assault at Plaza Fiesta. (Romero 102-105)
  - Romero testifies he doesn't know what the crime is like at Plaza Fiesta or at Follies. He testifies he wasn't aware there were a lot of robberies and shootings at Plaza Fiesta. (Romero 105-106)

## Assessments Performed

- Romero testifies he didn't ask the police about gangs in the area. (Romero 100)

## Other Relevant Information

- Romero testifies QuikTrip is owned by the Cadieux family. (Romero 011)
- Romero testifies Rhamses is an "outstanding" employee. (Romero 106)

## Patterns and Key Points

- Romero testifies as the store manager he runs the day to day operations of the store in question and schedules employees. He testifies the number of employees scheduled is based exclusively on transaction volume history.
- Romero testifies that security policy and measures are decided above him at the corporate level. He testifies he did not ask corporate about crime at the store, about implementing more security guard hours, or inform corporate about the security measures being taken at neighboring properties because those matters are handled above his level.
- Romero testifies his knowledge of the incident comes from reviewing the surveillance video with the police and speaking to Rhamses Reyes, who was working ATOI.
- Romero testifies the store employees are equipped with belt clip alarm buttons to notify corporate security, who can view the store surveillance cameras and contact the police. He testifies the store in question has a security guard on Fridays and Saturdays because of the number of clubs in the vicinity that all close at the same time.
- Romero testifies he relies on his store supervisor and his employees to inform him about incidents at the property that occur when he is not on site. He appears to testify he was aware of two incidents of prior crime at the property.

Exhibit F

Quick Reference: Deponents

| Name | Affiliation | Notes |
|---|---|---|
| Antinozzi, Sgt. Gaetano "Guy" | LEO | Chamblee PD |
| Bolling, Anthony "Tony" | QuikTrip | Night assistant, not working ATOI |
| Bothwell, Sgt. Christopher | LEO / QuikTrip | DeKalb County Sheriff's Office; security at QuikTrip (not on duty ATOI) |
| Chang, Inv. Alex | LEO / QuikTrip | DeKalb County Sheriff's Office; security at QuikTrip (not on duty ATOI) |
| Ford, Cpt. Ernesto | LEO | Chamblee PD |
| Heard, Quintin | Witness | Friend of victim |
| Peralta-Reyes, Rhamses | QuikTrip | Relief assistant |
| Richmond, Antonio Jr. | Witness | Friend of victim |
| Romero, Gregg | QuikTrip | Store manager |

Horizontal Analysis: Defendant Awareness of Prior Incidents

- 12/14/16 – Internal Report
- 11/27/16 – Internal Report
- 11/26/16 – Internal Report
- 11/21/16 – Internal Report
- 11/02/16 – Internal Report
- 10/24/16 – Internal Report
- 10/01/16 – Internal Report
- 09/28/16 – Internal Report
- 08/08/16 – Internal Report
- 07/12/16 – Internal Report
- 06/06/16 – Internal Report
- 05/16/16 – Internal Report
- 05/09/16 – Internal Report
- 04/10/16 – Internal Report
- 03/21/16 – CPD IR #16-02339 / Internal Report
- 03/12/16 – CPD IR #16-02070
- 03/12/16 – Internal Report
- 02/28/16 – Internal Report
- 12/25/15 – Internal Report
- 12/21/15 – Internal Report
- 12/15/15 – Internal Report
- 12/05/15 – Internal Report
- 11/21/15 – CPD IR #15-09964 / Internal Report
- 09/11/15 – CPD IR #15-07785 / Internal Report
- 07/17/15 – Internal Report
- 07/09/15 – CPD IR #15-05756
- 06/26/15 – Internal Report
- 06/11/15 – CPD IR #15-04900 / Internal Report
- 01/15/15 – CPD IR #15-00423
- 12/04/14 – CPD IR #14-09412
- 11/09/14 – CPD IR #14-08852
- 10/09/14 – CPD IR #14-08002 / Internal Report
- 05/31/14 – Internal Report
- 04/24/14 – CPD IR #14-02925
- 04/19/14 – Internal Report
- 04/06/14 – CPD IR #14-02297 / Internal Report
- 01/18/14 – CPD IR #14-00161
- 12/06/12 – DCPD IR #12-137575
- 11/18/12 – DCPD IR #12-130439
- 06/19/12 – DCPD IR #12-068929

Horizontal Analysis: Description of Events

## Employees

### Reyes, Rhamses

- Reyes agrees he was working Dec 29 2016 ATOI. (Reyes 014)
  - **Reyes agrees he was the senior management person on duty ATOI.** (Reyes 016)
  - Reyes testifies he worked from 5:30 pm to 7:00 am the night of the incident. (Reyes 061-62)
  - Reyes testifies a part time clerk named Alex and the QA employee Brian who cleans the machines were also working ATOI. (Reyes 016)
    - Reyes testifies the QA employee is only there to clean equipment and not help run the store. He testifies Brian was cleaning the ice cream machine in the kitchen ATOI. (Reyes 017-18)
  - Reyes testifies his responsibilities the night of the incident were to help customers at checkout, restock food on the grills, direct the part-time clerk if necessary. He testifies he had **no responsibilities for patrolling or securing the parking lot.** (Reyes 133-134)
- Reyes testifies the incident occurred on a Wednesday night going into Thursday morning. (Reyes 020)
  - Reyes testifies the incident occurred at approximately 3:00 – 3:30 am. (Reyes 016)
- **Reyes testifies he first learned someone was shot when he heard a gunshot and there was a hole in the window. He agrees that was his first notice that there was something amiss**. (Reyes 021)
- Reyes testifies he doesn't recall seeing the victim in the store. He testifies he doesn't typically remember any customer faces. (Reyes 021-22)
  - Reyes testifies by policy he would have greeted the victim as he came in the door to the QT. He testifies he has no recollection of the victim being disrespectful to him or any issue with the victim as a customer. (Reyes 022-23)
  - Reyes testifies he doesn't recall the victim being with friends or leaving the store. (Reyes 023-24)
  - **Reyes testifies he didn't know there was a group of individuals outside when the victim exited the store**. (Reyes 024)
  - Reyes testifies at no point while the victim or his friends were in the store did he feel threatened or concerned for his safety. (Reyes 027)
- Reyes testifies he watched the video of the incident soon after the incident and also in preparation for the deposition. (Reyes 024)
  - **Reyes testifies he recalls being at the register helping a customer, hearing gunshots, seeing the glass breaking, and diving to the ground. He agrees that was his first notice there was any kind of altercation**. (Reyes 024-25)
    - Reyes testifies the customer he was helping tried to hide. He testifies there were 7-8 customers in the store ATOI. (Reyes 031)
    - Reyes testifies he saw cars fleeing from the parking lot outside and people trying to get to their vehicles after the shooting. He testifies his view was partially obstructed because of the cars in the lot, and states there were **approximately 20 vehicles**. (Reyes 032-33)

Horizontal Analysis: Description of Events

- o Reyes testifies Alex was in the back of the store ATOI. He testifies Alex told him that the gunshots were his first notice of the incident as well. (Reyes 025-26)
- o Reyes testifies after going to the ground, he pressed his belt alarm. (Reyes 028)
  - ▪ Reyes testifies the security desk called the store and he answered, notified them there was a shooting, and they said they were calling the police. He agrees he knew someone had been shot at that time. (Reyes 030-31)
- o Reyes testifies he wasn't able to determine who was involved in the shooting. (Reyes 034)
- o Reyes testifies the police arrived approximately 5 minutes after the incident occurred. (Reyes 034)
- o Reyes testifies he didn't go outside until the police arrived because he didn't feel safe leaving the store. He testifies he turned people away who tried to come in and said the store was closed.  (Reyes 034-35)
  - ▪ Reyes testifies he didn't see where the victim was shot until after the police arrived. He testifies the victim was next to where he had parked on QT property. (Reyes 037-38)
  - ▪ Reyes testifies based on viewing the video, the victim was shot at the pump and tried to run toward the right of the frame. (Reyes 038)
  - ▪ Reyes testifies the police told him the victim was dead. (Reyes 039)
- o Reyes agrees he saw none of the event. (Reyes 040)
- Reyes testifies the assailants entered the store prior to the incident to get hot dogs and food. (Reyes 078)
  - o Reyes testifies he didn't see the assailants were in the parking lot after they left the store. (Reyes 079)
- **Exhibit 11 –** Video of incident. (Reyes 085)
- [Exhibit 11] **[POS VIEW]**
  - o Reyes testifies the person pushing the cart at the start of the video from the register perspective is Brian, the FS worker. (Reyes 089)
  - o 3:15:38 am - Reyes testifies he is the person in red. (Reyes 089) [Attys. indicate the 4 people coming in are the shooter's group]
  - o 3:20:47am – [Andrew Spencer enters per Atty. Law; wearing a red plaid shirt.]. (Reyes 091)
    - ▪ Reyes testifies people come in with hoodies all the time. He testifies it's normal. He testifies it was starting to rain at that time. (Reyes 091)
    - ▪ Reyes agrees there are 8-10 people in the store. (Reyes 091-92)
  - o 3:21:16 am – Reyes states he goes to the kitchen to wash his hands. He states he can still see "…most of this right here." (Reyes 092)
  - o 3:21:33 am – [Shooter exits per Atty. Law] (Reyes 093)
    - ▪ Reyes states he sold a person on the video something the person was holding. He states this person was trying to walk out without paying for a hotdog. He states the man's friend handed Reyes money to cover it. [Atty. Rose indicates that person is with the shooter's group.] (Reyes 093-94)
  - o 3:22:21 am – Reyes agrees the shooter's group is walking out. (Reyes 094)
    - ▪ Reyes agrees it's a normal traffic pattern for that time of night. (Reyes 094)

Horizontal Analysis: Description of Events

- o 3:23:19 am – Reyes agrees the victim walking out at this time is the last time he sees the victim. (Reyes 094)
  - o 3:24:20 to 3:24:24 am – Reyes agrees that's him hitting the deck from the gunshot. (Reyes 095)
  - o Reyes agrees the video fairly depicts the events of the night in question. (Reyes 095)
- [Exhibit] [FRONT ENTRY VIEW]
  - o 3:22:30 – [Shooter and friends standing in front per Attys. Law and Rose]. Reyes testifies he saw the assailants exit and continued helping other customers. (Reyes 096)
    - ▪ Reyes testifies people try to exit without paying and agrees he tells them they haven't paid yet. He agrees the person's friend in the video threw some money at him.  (Reyes 097)
  - o 3:22:33 – [Atty. Law states the shooter is pacing]. (Reyes 098)
  - o 3:23:18 – [Victim exits per Atty. Law]. Reyes testifies he doesn't know why the shooter would confront the victim and friends or why he was waiting for them. He testifies he doesn't know what they're saying or why people are circling. He testifies he wasn't aware that any of this was going on in the parking lot as it was transpiring. (Reyes 098-99)
- [Exhibit 11] [GAS LEFT VIEW] (Reyes 101)
  - o **Reyes testifies he would not be able to see this camera view from inside the store**. **He testifies it's too far to the left for him to be able to see through the window from the check stand**. (Reyes 103)
  - o 3:21:44 am – [Atty. Rose indicates the shooter is walking toward his car.] (Reyes 101)
    - ▪ Reyes agrees the number of cars is typical for that time of day. (Reyes 101)
    - ▪ Reyes testifies he's just learning now that the shooter went to his vehicle and got a jacket. (Reyes 102)
      - • Reyes testifies it wouldn't have concerned him if he had known the shooter was getting a jacket because it was raining that night. He testifies he didn't know the shooter had a weapon until the incident occurred. (Reyes 124-125)
  - o 3:23:54 – [Shooter confronts victim per Atty. Law]. (Reyes 104)
    - ▪ **Reyes agrees he has no idea any of this is going on. He testifies he would have had to see the entire thing going on to hit his panic button. He testifies "just based on looking out the window, seeing people walk to the pump, I wouldn't have known what's going on."** (Reyes 105)
      - • Reyes testifies two guys are too far out of his view to know that people are being surrounded. (Reyes 105)
  - o 3:24:21 am – [Shooting occurs per Atty. Law.] Reyes agrees victim runs to the left toward Reyes' car. [Atty. Law states shooter's vehicle speeds off in upper left corner and shooter's friends pull out at 3:24:38.] (Reyes 106)
- **Exhibit 12** – Incident Report. Reyes agrees this is the report he prepared. (Reyes 107)
- **Exhibit 14** – photo of bullet [hole?]. (Reyes 111)

Horizontal Analysis: Description of Events

- **Exhibit 15** – Photo of gas pump. Reyes agrees he can see that pump from inside the store where he stands. (Reyes 112)
- **Exhibit 16** – Front store view photo. (Reyes 112)
  - Reyes states it wasn't raining "this hard" [ATOI?]. (Reyes 113)
- **Exhibit 17** – Reyes agrees the camera was working. (Reyes 114)
- **Exhibit 18** – Police incident report. (Reyes 115)
- **Exhibit 19** – Medical Examiner Report. (Reyes 115-116)
- **Exhibit 20** – Photo of Buford Highway. (Reyes 116)
- **Exhibit 26** – Still photo from surveillance from night of incident from in front of register. (Reyes 120)

## Romero, Gregg

- Romero testifies he was not on site ATOI. (Romero 013)
  - Romero testifies Rhamses called him directly by phone and he went right over after the incident. (Romero 106)
- Romero testifies he watched the video of the incident with the police. (Romero 020)
  - "**What I recall seeing is it looked like there was a group of people talking by the hotdog buns and right over there by the roller grills, and then one group paid for something and then they went back outside. And from what I was able to see, it looked like they were just talking or having a verbal conversation… they weren't close to each other or next to each other. And then one [the victim] … went to his car or he was going to his car and then everything happened.**" (Romero 021)
    - Romero testifies he didn't see anyone circling around the victim. He testifies he watched the angles of the video the police were looking for. (Romero 022)
    - Romero testifies to him it wasn't a confrontation. "They were just outside… I saw them outside together." (Romero 022)
    - Romero testifies he did not see the assailants try to leave without paying for a hot dog, Rhamses ask them to pay, and the assailants throw money at him. (Romero 023)
    - Romero testifies the assailants weren't loitering because the incident happened in a 5 minute span. (Romero 038)
    - "There was no fight that night." (Romero 041)
  - Romero testifies Rhamses watched the people involved in the incident and made sure it didn't escalate. "And I would have done the same exact thing." (Romero 041-42) [consistent with Rhamses?]
    - Romero testifies he spoke with Rhamses and was told Rhamses saw the interaction between Spencer and the shooters in the parking lot. [consistent with Rhamses?] He testifies Rhamses didn't feel it was going to be a shooting. (Romero 044-45)
  - Romero testifies Rhamses said the [assailants and victim?] were talking by the hot dog buns and Rhamses was looking at them "just making sure… He said they didn't come in together, so he just wanted to pay attention… Nothing was out of the ordinary he said. He said they left. **He was still looking at them or he was**

Horizontal Analysis: Description of Events

**going to be taking the customers also paying attention outside to see anything, and he didn't notice anything… then he said he heard the shots and that's when he hit the remote alarm. And he didn't know what happened**…" (Romero 108-109)

- ■ Romero agrees Rhamses said it started in the store and then continued outside the store. (Romero 109)
- ■ Romero testifies Rhamses said he wasn't sure if the subjects on the night of the incident were intoxicated. (Romero 109)

- Romero testifies there was a police officer in the parking lot ATOI. (Romero 048)
  - o Romero testifies the police officer was pulling in the parking lot ATOI. (Romero 074)
- Romero testifies the victim bought a hot dog. He testifies the assailants also purchased something. (Romero 124-125)
- Romero testifies there was another employee on duty ATOI who said he was in the back of the store by the cappuccino machine. (Romero 136-137)
- Romero testifies he doesn't think twenty cars outside and 8-9 customers inside is a lot. (Romero 146-147)
  - o **Romero testifies if Rhamses couldn't watch people in the parking lot then he would expect Rhamses to have his clerk keep an eye on them or hit the [alarm] button.** (Romero 147)

## Law Enforcement Officers

### Antinozzi, Sgt. Guy

- Antinozzi testifies he was working as watch commander the night of the incident, with responsibility over all the patrol and part time officers. (Antinozzi 007-8)
  - o Antinozzi testifies he was in patrol unit 74 the night of the incident. (Antinozzi 008-9)
  - o Antinozzi testifies his shift was 6:30-7:00 pm to 7:00 am. (Antinozzi 011)
- Antinozzi testifies Detective Clark showed him one view of the QuikTrip video of the incident later that morning. (Antinozzi 010)
  - o Antinozzi testifies he originally said he was at the first set of pumps when he heard the gunshots and testifies he saw in the video he was at the second set. He testifies the video also shows him pulling away and the Maserati pulling behind him. (Antinozzi 011)
- **Antinozzi testifies the incident occurred at approximately 4:00am**. He testifies if he's working overnight he usually gets gas at that time and usually at a QT. (Antinozzi 015)
  - o **Antinozzi testifies he was traveling south on Buford Highway and went past Plaza Fiesta and Follies and pulled into the first QT entrance, the most northerly off Buford Highway. He testifies as he pulled in he scanned to see what was going on out of habit and then went next to the second set of pumps**. (Antinozzi 015-16)
- **Antinozzi testifies he saw two people and a possible third person, involved in a negative conversation. "It wasn't a fight immediately, but it looked animated and it … was negative." He testifies he didn't want to "just drive up on it" and pulled around the pumps to put the QT on his left and the pumps on his right to get a**

Horizontal Analysis: Description of Events

**better view. He testifies as he was thinking about doing that he heard three gunshots.** (Antinozzi 016)
- o Antinozzi testifies he can't identify any of the people that were involved in the conversation he saw. (Antinozzi 024)
- o Antinozzi testifies he never saw a firearm ATOI. (Antinozzi 025)
- o Antinozzi testifies on seeing the confrontation between the individuals in the parking lot he was alerted right away that it appeared to be a negative confrontation. (Antinozzi 046-47)
- o Antinozzi testifies if he had received a radio call about a fight at the QT he would still have approached tactically. (Antinozzi 047)
- o "…**if any alert police officer had seen … what I saw, they would have recognized it as … a negative confrontation that they should have at least investigated**." (Antinozzi 048)
- o Antinozzi agrees it was seconds from the time he saw the confrontation to the time he heard gunshots. He testifies he has no idea how long the confrontation had been going on before he entered the parking lot. (Antinozzi 050)
- **Antinozzi testifies after hearing the shots he laid down in his vehicle and drove straight. He testifies as he did he saw a white car pull off from the front of the QT. "…my instinct was the car was involved. I got behind the car… called out shots fired. I didn't know anyone had been hit yet, so I didn't call out a Signal 50…"** (Antinozzi 017)
  - o Antinozzi testifies when he pulled behind the white car on Buford Highway they saw the blue lights and stopped and became compliant. "I thought, they're not involved. I made a U-turn, went back north… I don't think I went a hundred yards…" (Antinozzi 017)
  - o **Exhibit 68** – copy of exhibit 13, diagram of QT. Antinozzi complies with request to mark it with an arrow where he pulled in and an X where he ended up. (Antinozzi 019-20)
    - ▪ Antinozzi complies with request to mark exhibit 68 with a Y where he was when heard the gunshots. He testifies he was not stopped at a pump at that time. (Antinozzi 021)
    - ▪ Antinozzi complies with request to mark Exhibit 68 with a Z where the victim was on the ground. (Antinozzi 028)
  - o Antinozzi testifies Signal 50 is a person shot. (Antinozzi 025)
- Antinozzi testifies he returned to QT, pulled past the pumps, and saw one man standing and another on the ground. (Antinozzi 018)
  - o Antinozzi testifies he saw hot dog parts on the ground. **"…the man that was talking to me… all I could get out of it was it was an argument that began over the hot dogs…"** (Antinozzi 018)
  - o Antinozzi testifies the assailant was driving a distinctive vehicle, a silver or gold Maserati. (Antinozzi 019)
    - ▪ Antinozzi testifies he never saw the Maserati before reviewing the video. (Antinozzi 022-23)
- Antinozzi testifies uniform patrol officers Gatlin and Polanco arrived at the QT after him. (Antinozzi 025)

Horizontal Analysis: Description of Events

- Antinozzi testifies Detective Loc Tran arrived first from CID, then Detective Andrew Clark, Sergeant Tong Ngo, and Captain Ernesto Ford. (Antinozzi 030-31)
- **Exhibit 18** – Chamblee PD Incident Report. (Antinozzi 031-32)
  - Antinozzi testifies the statement in the report narrative that the altercation began at Follies and continued at the QT came from Ofc. Polanco. (Antinozzi 033)
- Antinozzi testifies after the incident he gathered that one group came from Follies and another came from SL Lounge. (Antinozzi 038)
- Antinozzi testifies he did not interview any QT employees. (Antinozzi 039)
- Antinozzi testifies there was no indication of gang involvement in the incident while he was there. (Antinozzi 040)

Bothwell, Sgt. Chris
- Bothwell testifies he heard about the incident in question from the news. He testifies it didn't happen on a Friday or Saturday night when he was there so he had no knowledge of what happened. (Bothwell 030)

Chang, Inv. Alex
- Chang testifies he learned about the incident in question from the news. (Chang 021)
- Chang testifies he watched the full video of the incident, inside and outside. (Chang 022)
  - Chang testifies he didn't see any aggression in the video and would not have walked outside to investigate if he had been there. He testifies he did not see the guy circling around the victim. (Chang 023)
    - Chang testifies if he had seen a negative interaction occurring in the parking lot it's possible he would have investigated. (Chang 028)
  - Chang testifies he would describe it as a "dead night" for how busy the store was ATOI. (Chang 023)
  - Chang testifies he did not watch all angles of the video. He testifies he doesn't know if he had been there that night whether he would have noticed any sort of negative confrontation. (Chang 024)

Ford, Cpt. Ernesto
- Ford agrees he responded to the scene on the night of the incident. He testifies Detectives Cushenan and Tran notified him. He testifies he was notified there was a shooting at the QT and the person shot was dead on scene. (Ford 006)
  - Ford agrees he was gathering information at the scene as the PIO and acting as CID commander to make sure everything was done appropriately. (Ford 008)
  - **"I spoke to Antinozzi first. He told me that he was patrolling Buford Highway, decided to pull into the parking lot of the QT. He said he saw a group of people that didn't look right. And as he passed through the parking lot, he thought he heard what sounded like gunshots. By the time he realized what had happened, he had seen a vehicle flee the scene. He followed that vehicle but it ended up not being involved in the incident. He doubled back around, pulled into the parking lot and observed a body lying in the parking lot. That's when he got out and ascertained what happened."** (Ford 008-9)

Horizontal Analysis: Description of Events

- Ford testifies local media was on scene when he arrived. (Ford 009)
- **Ford testifies he doesn't think the shooter saw the police vehicle before firing his gun**. (Ford 018)
- Ford testifies he watched parts of the interview of the person with the victim ATOI. "I just remember him saying that they were out partying and they had stopped at the QT for something. **And I remember him saying something, some sort of altercation happened and the guy said something to Spencer, and next thing he knows he starts shooting at him**." (Ford 020)

## Witnesses

### Heard, Quintin

- Heard agrees he and the victim were at Follies the night of the incident. (Heard 020)
  - Heard testifies he met with the victim at approximately 7pm the night before the incident, Dec 28. He testifies they met for a friend Tiffany Burgges' birthday. (Heard 026-27)
  - Heard testifies they initially went to a hookah lounge in Tucker. He testifies they went in Terrence's vehicle. He testifies Antonio also showed up. He testifies old high school friends were also there. (Heard 028-30)
    - Heard testifies he drank cognac at the lounge. He testifies the victim did as well. (Heard 031-33)
      - Heard testifies the victim had 4-5 glasses of cognac and "maybe a couple of beers." (Heard 033)
      - Heard testifies he had two glasses of cognac and one beer. (Heard 033-34)
      - Heard testifies he doesn't know what Antonio had to drink and states Antonio didn't use marijuana. (Heard 034)
    - Heard testifies they got to the lounge at approximately 9:45 [pm]. (Heard 031)
    - Heard testifies the victim had not had anything alcoholic to drink prior to arriving at the lounge. (Heard 032)
    - Heard testifies he smoked marijuana outside the lounge. He testifies the victim did not use marijuana. (Heard 032)
  - Heard testifies they left the hookah lounge at approximately 12:30 – 12:45 [am] and went to Follies, arriving at 1:15-1:30 am. He testifies the entire party went. He testifies he drove Terrence's vehicle. (Heard 035)
    - Heard testifies Terrence drives a 99 Nissan Maxima. (Heard 035)
  - Heard testifies they had a VIP area at Follies. He testifies it was crowded there. (Heard 036)
    - Heard testifies he stopped drinking alcohol after leaving the lounge. (Heard 036)
    - Heard testifies he can't say whether the victim had anything to drink at Follies. He testifies he didn't see him with a drink. He testifies he saw Antonio have a drink. (Heard 036-37)
    - Heard agrees Terrence was intoxicated from the lounge and stopped drinking at Follies. He testifies no one used marijuana. (Heard 037)

Horizontal Analysis: Description of Events

- **Heard testifies there was no internal or external drama at Follies. He testifies there were 30 people, approximately 20 of whom he didn't know, and states it's hard for him to say. He testifies within the group he knows there were no disagreements**. (Heard 037-38)
- Heard testifies they stayed at Follies until it closed at 3:00am. (Heard 038)
- Heard testifies the shooters were not at Follies to his knowledge. (Heard 038)
- Heard testifies Terrence left in an Uber. (Heard 038)
- **Heard testifies the victim was wearing a red flannel plaid shirt, long sleeve with a black snapback, black jeans, and Timberland wheat colored boots ATOI**. (Heard 040)
  - Heard testifies he has heard red flannel is associated with the Bloods. (Heard 040)
- Heard testifies he was wearing a blue cashmere sweater, blue jeans, and Polo boots. (Heard 042)
- Heard testifies they went directly to QT from Follies. He testifies he drove Terrence's vehicle, with only the victim also in the car. He testifies Antonio drove there separately, driving a white Mercedes Benz E-Class. (Heard 042)
  - Heard testifies he went to QT for gas. He testifies he doesn't know why Antonio went. (Heard 043)
  - Heard testifies he doesn't know if the victim had been to that QT before. (Heard 043)
  - Heard testifies they went from the Pep Boys parking lot to the QT. He testifies the Follies parking lot was full and they were using the Pep Boys lot as overflow. (Heard 043)
  - Heard testifies at the QT, he and the victim parked at a pump and went inside the store. He testifies nothing appeared dangerous. (Heard 044)
  - Heard testifies they entered the QT, and states he thinks they parked at pump 1, closest to the street. He testifies he noticed a 2017 Maserati Ghibli with New York plates. (Heard 044-45)
  - Heard testifies the victim walked into the QT in front of him. He testifies he noticed the assailant to his left as he entered in front of the hot dog stand, saying "Where the fuck are the hotdog buns at? They don't show you where anything is." He agrees the shooter was wearing red snakeskin Pumas. He states the assailant was with approximately 4 other people. (Heard 045-46)
    - Heard testifies the driver of the Maserati was at the register. (Heard 047)
    - Heard testifies the victim went to make a hot dog and was standing near the assailant. (Heard 047)
      - **Heard testifies the victim didn't do anything that the assailant indicated made him angry.** (Heard 049)
      - **Heard testifies he didn't hear anyone from the assailant's group say anything to the victim inside the QT**. (Heard 051)
    - **Heard testifies the assailant's "aura was a little off." He states he noticed the assailant had scarring on the back right side of his neck, such as from a stab or other wound that hadn't healed properly. He**

Horizontal Analysis: Description of Events

**testifies he also saw teardrops on the assailant's face, with a red outline.** (Heard 047-48)

- Heard testifies his understanding is that Blood gang members get teardrop tattoos to indicate they've killed before. (Heard 051)
- Heard testifies he did not believe the assailant was a gang member while observing him inside the QT. (Heard 051)
- **Heard testifies nothing indicated to him there was a problem between the assailant and the victim prior to leaving the QT**. (Heard 052)

  o Heard testifies he noticed Antonio was in the store but did not say anything to him. (Heard 048)
  o Heard testifies because something was off about the assailant, he decided to get two teas from the refrigerator instead of a Slushy and went to check out. (Heard 048)
  o Heard testifies he saw three employees at the QT, one behind the counter, one cleaning a spill near the cappuccino machine, and one taking out the trash. (Heard 052)
  o Heard testifies the victim bought two hot dogs and states he bought drinks and gas. (Heard 053)
  o Heard testifies the victim exited the QT before him. He testifies he was initially in the lead but he had to reorganize his belongings and the victim got ahead of him. (Heard 054)

- Heard testifies he had his head down adjusting his money clip as he exited the QT and saw the assailant's shoes out of the corner of his eye, standing approximately 5 feet away**. He states he noticed the assailant had changed his attire to a black thermal, with a jacket and hoodie, with the hoodie tied tight so his face was barely visible.** (Heard 054)

  o **Heard testifies the assailant said that Heard and the victim were looking at him "funny" inside and asked if there was a problem. Heard states he said there was no problem. "And then he proceeds to say, well, y'all out here fake reppin'**." Heard testifies at that time it clicked in his head that the assailant was affiliated with a gang. (Heard 055)

    ▪ Heard testifies the assailant didn't specify why he said Heard and the victim were fake repping. He testifies he believes it was the victim's shirt. He testifies the victim had a neck tattoo of a phoenix that would have been visible to the assailant. (Heard 081-83)

  o **Heard testifies his tone became "a little defensive" and he stood his ground**. "…we were definitely just talking in an aggressive tone…" He testifies the assailant had one hand in a pocket and the other on top of the pocket. He testifies he didn't know at the time the assailant had a weapon. (Heard 055)

    ▪ **Heard testifies he heard a click in the assailant's pocket approximately 20 seconds into the conversation**. (Heard 056)

      • Heard testifies even after hearing the click he didn't know there was a weapon. (Heard 060)

    ▪ Heard testifies the victim was still walking to the vehicle and did not appear to be aware of the situation. (Heard 056)

---

Spencer v. QuikTrip                                                    Page 10 of 19

Horizontal Analysis: Description of Events

- ▪ Heard agrees he assumed based on the assailant's conduct that he was going to attack Heard. (Heard 060)
- o Heard testifies the assailant began to walk behind him. He testifies he noticed another individual by the door that seemed affiliated with the assailant. He testifies it appeared the second individual had been trying to approach Heard from behind. (Heard 056)
- o **Heard testifies he saw Chamblee PD pull into the parking lot. He testifies the assailants weren't looking in that direction and didn't see the officer. Heard testifies he relaxed because he assumed someone had called the police "or they were just doing a regular routine in that area because of knowing what Follies is."** He testifies the officer was apparently there for a break and pulled off to pump 14 on the opposite side from where the incident was occurring. (Heard 057)
- o **Heard testifies the assailant walked back toward his own vehicle toward pump 5, on the other side from Heard's vehicle. "So we have to walk that way in order to get back to our vehicle. So he's now walking in-between the pump and the cement pillar. And the next thing I know, he pulled out a gun, didn't hesitate at all, shot Andrew, and then took two shots at me."** (Heard 058)
  - ▪ Heard testifies the victim never said anything to the assailant. He testifies the victim spoke to Heard and asked if there was a problem. (Heard 058-59)
  - ▪ Heard testifies based on the size of the weapon he believes it was a .38 revolver or smaller. (Heard 063)
  - ▪ Heard testifies he dove to the right after the shooting started and tried to get to the QT entrance. (Heard 064)
- o Heard testifies in a combat zone the assailant's change in attire would have automatically been a red flag to him. "…because there was no course of action that could have called for him to do what he did, I never would have thought that it was for anything but to attack other than until he started talking to me. So he could have literally just could have been cold, stood there and said nothing to me and walked by, and this would never have happened." (Heard 060)
- o Heard testifies the exchange in the parking lot took approximately 60-90 seconds in hindsight. (Heard 061)
- o Heard testifies the assailant was in a fighting posture outside the QT. He agrees he knows that from his military training. (Heard 061)
- o Heard testifies he did not see the victim run or fall. He testifies he did not see the police officer react. He testifies he did not see the assailant leave in the Maserati. (Heard 064)
- o Heard testifies he found the victim in a side parking spot toward the edge of the parking lot. He testifies the victim drew his last breath after Heard rolled him over. He testifies the victim was not conscious when he found him. He agrees the victim had been shot in the chest. (Heard 065-66)
- o Heard testifies it took a long time for the police to arrive. (Heard 066)
- o Heard testifies there were no QT employees in the parking lot ATOI. (Heard 066)
- o Heard testifies Antonio was still inside the QT ATOI. (Heard 067)

Horizontal Analysis: Description of Events

- - Heard testifies ATOI there was a taxi cab driver outside next to the ice machine on a smoke break. (Heard 067)
- Heard testifies he gave a statement to the Chamblee PD the morning of the shooting. (Heard 021-22)
- Heard testifies Det. Cushenan showed him the video of the incident. (Heard 025)
- **Exhibit 17** – Video of incident. (Heard 068)
  - **Exhibit 61** – Still frame from video. Heard marks exhibit with A for location of victim when he was in vicinity of the assailant.  (Heard 068-69)
- **Exhibit 16** – Photo of QT exterior. Heard testifies the encounter with the assailant occurred on the steps. (Heard 071)
  - **Exhibit 62** – Photo of QT exterior. Heard complies with request to mark his location with a Q, victim's with an A, and assailant's with an RS. (Heard 071)
- Heard testifies to his knowledge there's nothing the employees at QT could have done to prevent the incident, "maybe call the police… Maybe when they were outside or when they seen us not go directly to our vehicles, then they could have called the cops…" (Heard 074)
  - "…everybody has like a security guard or anything like that … it always deters criminals…" (Heard 074)
  - Heard testifies there was nothing that happened inside the store that would have alerted anyone from QT to call the police. He testifies no employee was outside to hear the interaction there. (Heard 075)
  - Heard testifies on reviewing the video after the incident he saw the assailant make a gun symbol with his fingers toward the victim's back inside the store. He testifies the assailant looked upset. (Heard 076)
  - Heard testifies Detective Cushenan pointed out gang signs being used inside the store on the video to him. (Heard 078)
- **Exhibit 63** – Article from ajc.com. (Heard 085)
  - Heard testifies the article may have changed his wording in the first quote used. (Heard 086)
  - Heard testifies the article is wrong that he told them the victim got in front of the assailant to assist him with the hot dog buns. He testifies the murder was not a dispute over a hot dog bun. He testifies the assailant was not talking about hot dogs in the parking lot.  (Heard 091-92)
- **Exhibit 64** – Photograph copy of Ex 13. Heard complies with request to put an X where the victim was shot, an O where the shooter was ATOI, and an A where he later found the victim after the shooting. He complies with request to put a C where the police officer was located. (Heard 087-88)


**Richmond, Antonio**

- Richmond testifies he contacted the investigating detective after the incident and learned there was some gang affiliation involved. (Richmond 011)
- **Richmond testifies the night of the incident he met with Terrence and the victim at a hookah bar in Chamblee Tucker around 10:00pm.** (Richmond 016-17)
  - Richmond testifies they went to a birthday party for someone his brother went to school with. (Richmond 017)

Horizontal Analysis: Description of Events

- o Richmond testifies he drank two Heinekens at the bar. (Richmond 018)
  - o "I know my brother had a bit. Andrew was more so concerned with the hookah.· Quentin was drinking as well. I'm not sure how much Quentin was drinking." Richmond agrees Terrence became intoxicated and he sent him home. (Richmond 018)
  - o Richmond testifies they were at the bar for 2 hours. (Richmond 019)
- • Richmond agrees after the bar the group went to Follies on Buford Highway. (Richmond 019)
  - o Richmond testifies approximately half the group went from the bar to Follies. He agrees they were in a VIP area because B.o.B. was there. He testifies they arrived at approximately 1:00 – 1:40 am. (Richmond 021-22)
    - ▪ Richmond agrees the VIP area was closed off from public view. (Richmond 049)
  - o Richmond testifies he had a Jack Daniels and Coke at Follies. (Richmond 022)
  - o Richmond testifies the victim had one drink. He testifies the victim was tipsy but not intoxicated. He testifies Terrence was intoxicated and Quentin was not. (Richmond 022-23)
  - o Richmond testifies he sent Terrence home at approximately 2:20-2:30 am in an Uber. (Richmond 023)
  - o Richmond testifies he was driving a White Mercedes E350 the night of the incident. He testifies Quentin drove Terrence's car home, a Black Nissan Maxima. He agrees the victim was riding with Quentin. (Richmond 023)
  - o Richmond testifies there were no incidents at Follies. (Richmond 045)
  - o **Richmond agrees it was busy at Follies the night of the incident**. (Richmond 054)
- • **Richmond testifies they left Follies at approximately 3:00am as the club closed. He testifies he went to the QT for gas and a snack**. (Richmond 024)
  - o Richmond agrees he was wearing a vest in the video of the incident. (Richmond 024)
  - o Richmond testifies in the video of the incident he is on his cell phone talking to his girlfriend at the time, Rita Lathnota. (Richmond 025)
    - ▪ Richmond agrees his attention was a little distracted from talking to Rita. (Richmond 050)
    - ▪ Richmond testifies Quentin and the victim were like younger brothers to him and he was also making sure they were okay. (Richmond 050)
  - o Richmond agrees he pulled up next to a pump at the QT and agrees Quentin and the victim were already inside when he arrived. He testifies Quentin was walking toward the check out counter. (Richmond 026)
    - ▪ Richmond testifies he thinks he said "You guys all right" to Quentin and Quentin said "Yea, we're good" when he saw them in the QT. (Richmond 030)
  - o Richmond testifies he saw the assailant's group in passing. (Richmond 026)
    - ▪ **Richmond testifies the assailant's group was walking out when he was walking in. He testifies there was nothing that alerted him to any danger**. (Richmond 028-29)

Horizontal Analysis: Description of Events

- o Exhibit 17 – Photo. Richmond testifies he went toward the front of the store where the potato chips were located. (Richmond 027)
  - ▪ Exhibit 61 – Overhead of store. Richmond testifies he went left toward the Hot Fries. (Richmond 028)
- o Richmond testifies he did not see any QT employees outside as he entered. He testifies he only recalls seeing the one employee behind the counter. (Richmond 030)
- o Richmond testifies he planned to go home after the incident. (Richmond 031)
- o Richmond testifies the entire time he was in the QT before the shooting, nothing alerted him to any danger. (Richmond 035)
- o **Exhibit 65** – Diagram of QT. (Richmond 046)
- o Exhibit 66 – Photo. Richmond complies with request to put an X where he parked at QT. (Richmond 047)
- o Richmond agrees there were a lot of people in the parking lot at QT. He testifies no one appeared to be hanging out near the entrance. (Richmond 049-50)
  - ▪ Richmond agrees the people in the lot appeared to be coming from clubs. (Richmond 054)
- **Richmond testifies he walked up to the QT counter as the victim and Quentin exited the store. He testifies from the time he saw them leave until he heard gunshots, there was nothing that alerted him to the fact that there might be gunshots or an event.** (Richmond 032)
  - o Richmond testifies he was watching Quentin and the victim outside after they left. He testifies he didn't see anything unusual and testifies it was a crowded parking lot and he didn't see anyone conversing with them. (Richmond 032-33)
    - ▪ Richmond testifies he didn't see anyone hanging out by the entrance when Quentin and the victim exited. (Richmond 056)
    - ▪ Richmond testifies he looked outside to watch the victim and Quentin for "a couple seconds." He testifies he carefully monitored their interactions outside in the parking lot. "I just wanted to make sure they were okay." (Richmond 060-61)
  - o Richmond testifies he didn't see any police in the parking lot. He testifies there was a Chamblee police vehicle trying to turn in as the shooting was taking place. (Richmond 033)
    - ▪ Richmond testifies the Chamblee PD went in pursuit of a vehicle full of girls. (Richmond 035)
    - ▪ Richmond testifies the shooter left very nonchalantly in the Maserati. (Richmond 035)
  - o Richmond testifies he saw no interaction between the victim and shooter inside QT. (Richmond 051-52)
- Richmond testifies after the shooting he saw Quentin, made sure Quentin was ok, and he and Quentin went to look for the victim. He testifies they found the victim outside, alive and lying on his stomach. He testifies they rolled him over and saw a gunshot wound to the victim's chest. He testifies the victim did not say anything. He testifies the victim died after approximately 30-40 seconds. (Richmond 033-34)
  - o Richmond testifies the victim moved approximately 100 feet after being shot. (Richmond 055)

Horizontal Analysis: Description of Events

- o Richmond testifies he saw a woman from the party at Follies that the victim had been speaking to in the QT parking lot after the shooting. (Richmond 059)
- Richmond testifies he was in Atlanta from Chicago ATOI to visit family for Christmas and New Year's. (Richmond 031)
- **Richmond testifies after the incident Quentin told him he saw the [assailant] with the tattoo** and didn't mention any argument inside. He testifies Quentin said people circled around him outside and he walked behind [the victim?] because he could sense something was coming. (Richmond 036-37)
- Richmond testifies he notified the victim's mother about the incident after it occurred. (Richmond 040)
- Richmond testifies he didn't see anyone loitering at QT the night of the incident. He states there were a lot of people there. (Richmond 041)

## Information about the Site/Area

- Romero testifies he currently manages QuikTrip Store 797, the store in question. (Romero 012)
- Romero agrees there are a lot of clubs around the store in question. (Romero 033)
  - o Romero testifies Mansion Elan is only open Friday and Saturday. (Romero 035-36)
- Romero agrees the store in question is at 4050 Buford Highway. (Romero 012)
- Romero testifies the QuikTrip has always been 24 hours. He agrees if there's a shooting in the parking lot there's someone there from QuikTrip who knows about it. (Romero 056)
- Romero agrees there are times the police are on the property without their lights on and he doesn't know they are there. (Romero 131)
  - o Romero agrees the store in question has daily police customers. He testifies they offer free fountain drinks and coffee to uniformed police officers. (Romero 131)

- Reyes agrees Follies is a nightclub / strip club. (Reyes 047)
  - o Reyes testifies it's always full at Follies. (Reyes 059)
  - o Reyes testifies Follies does not create any security issues. (Reyes 075)
- **Exhibit 21** – Photo of Plaza Fiesta. (Reyes 117)
- Reyes agrees Nam Phuong is a restaurant across the street. (Reyes 117)
- **Exhibit 22** – Aerial photo of 4050 Buford Highway. (Reyes 118)
  - o Reyes testifies Follies is next to the Pep Boys Auto Parts Service and agrees the big complex to the top is Plaza Fiesta. (Reyes 118)
- Reyes agrees at 3:30 am on Buford Highway they do get loud, boisterous, and intoxicated people. (Reyes 027)
- Reyes testifies he didn't know anything about crime in the area before [the incident?] and doesn't know whether it's a high-crime area. (Reyes 043-44)
- Reyes testifies the store gets a diverse crowd. He testifies they are between Follies and Plaza Fiesta "which is mainly Hispanic." He testifies around 3:00 to 4:00 is when people begin leaving Follies and come into QT to buy food as **"an every-night thing."** He agrees some of the people from Follies come in intoxicated. (Reyes 047)

Horizontal Analysis: Description of Events

- o Reyes testifies customers typically come in for gas and make impulse purchases. He agrees they have a full service kitchen. (Reyes 048-49)
- Reyes states the store has 16 gas pumps. (Reyes 049)
- Reyes testifies the store in question is 797. (Reyes 053)
- Reyes testifies gang activity at the store was never brought to his attention. (Reyes 056)
- **Exhibit 13** – Diagram of store. (Reyes 110)
- **Reyes agrees there's a Wells Fargo ATM in the store.** (Reyes 117)
- **Exhibit 23** - photo of QT from street. (Reyes 119)
- **Exhibit 24 and 25** – Photos of front of QT. (Reyes 119)


- "There is some clubs, different types of clubs on that strip down there. And once it gets – the clubs let out, folks like to congregate, talk, meet women, whatever." (Bothwell 013)
- Bothwell testifies immediately in the area of the QT are the Mansion nightclub, Follies strip club, family fairs, and Plaza Fiesta. "There is a lot of things in the area." (Bothwell 020)
- Bothwell testifies he guesses the reason a security guard is placed at the property is because it's busy. He testifies the level of activity varies from week to week. He agrees when the clubs are busier, QT is busier. (Bothwell 019-20)
  - o Bothwell testifies at approximately 3am on Friday and Saturday a majority of the QT patrons are coming from the clubs. (Bothwell 027)


- Chang testifies the City of Chamblee PD would be first responders to the QT, not the sheriff's office. (Chang 014)
  - o Chang testifies if there was an incident he would contact Chamblee PD. (Chang 017)
- Chang testifies summer is the busiest at the QT. He testifies it is busier around the holidays depending on the holiday. (Chang 019)
  - o Chang testifies the QT is busier on the weekends when the clubs are busy. He testifies if Follies had a busy night the QT would not become busier at 3am like it would if Mansion was open. (Chang 019)
  - o Chang testifies if there were 15 customers in the store and 15-20 cars in the lot that would be moderately busy. He testifies busy is when there are 20-25 people inside and there is no parking outside. (Chang 019-20)
- Chang testifies he's not aware of gang activity in the area. (Chang 021)


- Bolling agrees the store is busier in the morning than at night. (Bolling 015)
  - o Bolling testifies Saturday is the busiest night and gets especially busy at approximately 3am when the clubs close. (Bolling 016)
  - o **Bolling testifies at 3am on nights other than Friday or Saturday, there are typically 5-10 customers in the store and 3-4 cars in the parking lot. He agrees 20 cars in the lot or 20 customers in the store would be "really busy" for that time.** (Bolling 032)
    - ▪ Bolling testifies on a Friday or Saturday night when the clubs get out typically there are 20-30 people will be in the store and the pumps and lot will be full with approximately 25 vehicles at 3am. (Bolling 032-33)

Horizontal Analysis: Description of Events

- o Bolling testifies it might be "a little bit" busier when school is out for the holidays. (Bolling 075)
  - o Bolling agrees when the clubs are busy in the area around the QT, the QT is usually busier around 3:00 and 4:00 am. (Bolling 075)
- Bolling testifies he's never complained to QT about feeling unsafe at the store. (Bolling 035)

- Antinozzi testifies Brookhaven police use the QT in question "a lot." (Antinozzi 013)
  - o Antinozzi testifies the QT is on the Brookhaven city line. (Antinozzi 015)
- Antinozzi testifies Chamblee PD has primary jurisdiction at the property. He testifies the DeKalb County Sheriff's Office can work there because they have statewide jurisdiction. "…the problem is anything they do, they would probably call us to do the report." (Antinozzi 014)

- Heard testifies he's never been to the SL Lounge. He testifies he heard there's gang activity there after the incident in question from Det. Cushenan. (Heard 038-39)
- Heard testifies he had been to the QT in question prior to the incident in question approximately 6 times when he was younger, less than 21 y/o. (Heard 019)
  - o Heard testifies he has no criticisms of QT based on his experience of using QT. (Heard 080)
- Heard testifies no one told him there was gang activity at this QT before. (Heard 066-67)

- Richmond testifies he'd never been to the S&L Club. (Richmond 021)
- **Richmond agrees there are several clubs in the area of the store in question and agrees they get out at around 3:00am.** (Richmond 054)
- "I think you have to be aware and alert when you go to places at night in the city of Atlanta, especially where alcohol has been consumed and knowing that there is a high rate of gang activity and drug trafficking, things of that nature, in Atlanta. So going to places like that and going to a gas station after, you do have to be alert and aware of your surroundings." (Richmond 058)

## Relevant Information about the Victim

- Reyes testifies he has no evidence or thought that the victim did something wrong that night. (Reyes 047)

- Heard testifies he called the victim Velate and states that's what the victim's friends called him. (Heard 014)
- Heard testifies ATOI the victim had a preliminary record contract with Arista Records. (Heard 015)
- Heard testifies the victim's girlfriend ATOI was Denisha. (Heard 017)
- Heard testifies he's never been involved with a gang and testifies the victim, Terrence, and Antonio never were to his knowledge. (Heard 039)
  - o Heard testifies he doesn't know if the victim would have known wearing red flannel might be seen as a gang sign. (Heard 041)

Horizontal Analysis: Description of Events

- Richmond testifies he met the victim through his brother [Terrence?] a few years ago. (Richmond 013)
    - Richmond testifies Terrence and the victim were trying to break into the music industry together as performers. (Richmond 014)
- Richmond testifies he has never been affiliated with a gang and testifies to his knowledge, Terrence, the victim, and Quentin have never been affiliated with one. (Richmond 015)

## Relevant Information about the Assailant

- **Ford testifies he learned the assailant was a known gang member, had been involved in similar incidents in the past, had an extensive criminal history, and was armed and dangerous**. (Ford 010-11)
    - Ford agrees his understanding is the person arrested was the actual shooter in the incident. (Ford 011)
    - Ford testifies the assailant had shot someone in South Carolina in a similar incident during a dispute with a party that wasn't necessarily known to him. (Ford 011)
    - Ford testifies Copney is affiliated with a subset of the Bloods. (Ford 013)
- Ford testifies Bahkari and Copney were charged with felony murder. (Ford 014-15)

- Bolling testifies Ofc. Chang told him the assailant in the incident in question was apprehended. (Bolling 081)

- Heard testifies he learned afterward the assailant had a history of gun related incidents and had stabbed a police officer while being detained. (Heard 089)

- Reyes testifies he doesn't know anything about the shooter's group being affiliated with a gang. (Reyes 100)

- Richmond agrees he learned someone was arrested for the incident in question. (Richmond 011)
- Richmond testifies as far as he knows there was no reason for the assailant to shoot and kill the victim. (Richmond 048)

## Organizational Response to the Incident

- Romero testifies he did what the police told him to. He testifies he did not perform an investigation of the incident. (Romero 024)
    - "I just do what I was told by the police and by my supervisor. **Everything else is handled above my level with incidents, whether it's a fender-bender on the property or any situation whatsoever**." Romero testifies they have their own security department that handles everything like that. (Romero 024-25)
    - Romero testifies his role after the incident was to get the video for the police and nothing else. (Romero 027)

Horizontal Analysis: Description of Events

- Romero testifies they were safe and testifies he wouldn't change anything to the security measures. (Romero 077)

- Reyes testifies he completed an incident report for QT after the incident. (Reyes 057)
    - Reyes testifies he would have taken photos of the exterior of the store for the incident except he felt it was too dangerous to go outside. (Reyes 110)
- Reyes testifies the store manager and store supervisor came to the scene after the incident. He testifies they asked if they [the store personnel?] were ok and did not ask about anything else. He testifies he did not provide any additional information to them. (Reyes 063)
    - Reyes testifies Romero helped law enforcement with the surveillance video. (Reyes 063)
- Reyes testifies he's not aware of any changes to QT operations because of the incident in question. (Reyes 083)

- Bolling testifies someone in management informed him about the incident in question that day or the next morning when he came in to work. He states the manager told him someone was shot near the pumps. (Bolling 042)

Horizontal Analysis: Foreseeability

## Prior Crime

- **Romero testifies his knowledge of prior crime at the property is only what he's seen on the news.** (Romero 036)
- Romero testifies while he's been there, there have been no instances of any crime on the property.  He testifies the only criminal activity has been "your average shoplifter or people we've had to ask to leave because they'd been panhandling." (Romero 036-37)
  - Romero testifies there was more panhandling than loitering. (Romero 037)
- Romero testifies he was not familiar with a shooting at QuikTrip Apr 06 2014. He testifies if he had known it would probably not have factored into any request for more security. (Romero 052)
- Shooting at QuikTrip Nov 09 2014. (Romero 052-53)
- Romero testifies there was no shooting in the QuikTrip parking lot Mar 12 2016. He testifies he would have known about it. (Romero 054)
  - Romero testifies there have been shooting incidents in the area of the QuikTrip. He testifies there was one that took place a mile from the store. (Romero 054)
- Robbery and shooting Oct 01 2016. Romero testifies neither the police nor employees ever made him aware of it. (Romero 056)
- Battery Nov 21 2015. Romero testifies customers pushed each other and threw 5-Hour Energies at each other, then left. He testifies it was a Saturday night.  (Romero 058)
- **Exhibit 38** – Romero testifies the Greg is probably Greg Knight, his assistant. (Romero 059)
  - Firearm pointed at taxi driver at QuikTrip. (Romero 059) [Atty. indicates incident ended in a homicide]
  - Romero testifies Greg Knight told him about the taxi driver incident. He testifies the police, Knight, and QuikTrip never told him about a gun being held to someone's head. (Romero 061)
  - Romero testifies the incident is hearsay. (Romero 063)
  - Romero testifies a security guard couldn't have controlled this incident [from Exhibit 38?]. (Romero 067-68)
- **Exhibit 39** – Shots fired in parking lot Nov 09 2014. Romero testifies he wasn't aware and states he has no concern. (Romero 068)
  - Romero testifies based on the dates, the security guard would have been on the property ATOI in Exhibit 39 if the same measures were in place then as now. (Romero 068-69)
    - Romero testifies the report indicates the police were on site ATOI [in Ex 39]. (Romero 069)
- **Exhibit 40** – Oct 09 2014 - Arrest of suspect with firearms in bathroom. (Romero 071)
- **Exhibit 41** – May 31 2014 – Fight. Romero agrees there would be a security guard there on the Saturday. **He agrees the guard would intercede in a fight**. (Romero 072)
- **Exhibit 42** – 2014. Shots fired outside the store. (Romero 076)
- **Exhibit 43** – Possession of heroin arrest on property. (Romero 077)
  - "…police officers don't inform me of everything they do on property as far as traffic stops, whether it's a traffic stop or not." (Romero 077)
  - Romero testifies the police are pulling people over into the store parking lot "all the time." He testifies it occurs on a weekly basis.  (Romero 078)

Horizontal Analysis: Foreseeability

- **Exhibit 37** - QuikTrip incident reports. (Romero 082)
  - Jun 11 2015. Romero testifies he wasn't there. (Romero 082)
  - Jul 17 2015. Romero testifies he wasn't there. (Romero 082)
  - Sep 11 2015. Romero testifies he wasn't there. (Romero 082-83)
  - Dec 25 2015. Romero testifies he knew about the incident. (Romero 085)
  - Mar 12 2016. Romero testifies the subject was aggressively panhandling but there was no assault. (Romero 085)
  - Mar 20 2016. Romero agrees a potential fight was rapidly defused by good employee vigilance. Romero agrees the employee used the alarm and the security guard separated the subjects. (Romero 086-87)
  - Apr 20 2016. Romero agrees the employee became involved, separated the customers, and there was no problem. (Romero 087)
  - Oct 01 2016. Homicide. (Romero 088)
  - Oct 24 2016. Romero agrees the security office contacted the police and the Chamblee County police arrived at the store and separated the subjects. (Romero 089-90)
  - Nov 02 2016. Romero agrees six hours is too long for someone to be on the lot. (Romero 090)
    - **Romero agrees loitering can lead to more serious crimes.** (Romero 090)
  - Nov 21 2016. Argument at gas pump. (Romero 090)
  - Nov 27 2016. Romero agrees someone stepped in to mediate the argument and dissipated it. (Romero 091)
- **Exhibit 44** – Shots fired Mar 12 2016. (Romero 091)
- **Exhibit 45** – Mutual combat. (Romero 093)
  - Romero testifies he doesn't believe the Chamblee police let the QuikTrip office know about every traffic stop or arrest they make in and around the property. (Romero 094)
- Exhibit 46 – (Romero 095)
- Exhibit 47 – Assault. (Romero 097)
- Exhibit 48 – Mar 05 2015. Fighting over parking spot. (Romero 097)
  - Romero testifies there are "discussions" between customers frequently. (Romero 098)
- Exhibit 49 – Shots fired Nov 09 2014. (Romero 098)
- Exhibit 50 – Person with a gun Oct 09 2014. (Romero 098)
- Exhibit 52 – Person shot. Victim said it was gang related. (Romero 099)
  - Romero testifies the police never told him about gangs in the area. He testifies he wasn't aware of gangs in the area and testifies he's not an expert on gangs. (Romero 099)
- Romero testifies he wasn't aware of anyone loitering for sex at the store in 2013. (Romero 102)
- Aug 04 2012 – Robbery, discharge of a firearm. (Romero 102)
- Exhibit 60 - Apr 04 2016 – Aggravated Assault at Plaza Fiesta. (Romero 102-105)

Horizontal Analysis: Foreseeability

> o Romero testifies he doesn't know what the crime is like at Plaza Fiesta or at Follies. He testifies he wasn't aware there were a lot of robberies and shootings at Plaza Fiesta. (Romero 105-106)

- Bolling agrees he has seen verbal altercations in the store and agrees on all occasions he told the participants to move on. (Bolling 028)
- Bolling testifies he activated his panic alarm when a shooting occurred at the store in 2014. (Bolling 030)
- Bolling testifies he activated his panic alarm at another store on Buford Highway because there were too many people in the store. He testifies this hasn't happened at the store in question. (Bolling 031)
- Bolling testifies he learned from Gregg Romero at QT that someone's car was stolen at the store sometime in 2016. He testifies Romero showed him the video of the incident. (Bolling 043-44)
- Bolling testifies none of the guards have discussed crime at or around the QT with him. (Bolling 050-51)
- Bolling testifies he hasn't seen people he believed to be gang affiliated hanging out at the QT. (Bolling 052)
- Apr 06 2014 – Shots fired at QT. Bolling agrees he remembers it and states he saw someone fire shots from pump 4-5 toward pump 16. (Bolling 052-53)
  - o Bolling testifies he believes this incident was the reason he asked for an additional night of security. He testifies he was asking because it was "real crowded" anyway. (Bolling 054)
  - o Bolling testifies he's not sure if there was a guard working during the Apr 06 2014 incident and states the incident occurred at approximately 2:00 – 3:00 [am]. He agrees it was crowded and agrees it was people coming from the clubs. He testifies he didn't hear that a woman was shot. (Bolling 055)
  - o Bolling testifies he spoke with the store manager Gretchen and the morning assistant about the incident. (Bolling 057)
  - o **Exhibit 67** – Bolling's statement to the police. Bolling agrees he wrote it while the incident was fresh in his mind. (Bolling 058-59)
  - o Bolling testifies he thinks they kept the store open after the incident Apr 06 2014. "We try to keep the store open no matter what's going on…" (Bolling 059)
  - o **Exhibit 65 –** Diagram of QT Parking lot. Bolling testifies pumps 4 and 5 are where it says E-Stop. (Bolling 060)
  - o **Bolling testifies there were no changes to security after the Apr 06 2014 incident. He testifies there was no meeting to discuss the shooting and no training about what to do in the event there is a shooting.** (Bolling 061)
  - o **Exhibit 42** – Incident Report for Apr 06 2014. (Bolling 061)
  - o Bolling testifies Armond Taylor was working ATOI on Apr 06 2014. (Bolling 063)
  - o Bolling testifies no one came to the store after the shooting Apr 06 2014 other than the police. (Bolling 065)
- Nov 09 2014 – Shooting. Bolling testifies he doesn't recall. (Bolling 066)

Horizontal Analysis: Foreseeability

- o **Exhibit 39** – Incident Report. Bolling testifies he could be the Tony referred to. (Bolling 067)
  - o **Exhibit 49** – Police report for Nov 09 2014 incident. Bolling testifies he has no recollection of the incident. (Bolling 068-69)
- **Mar 12 2016** – Shooting. Bolling testifies he can't recall it. (Bolling 080)
- **Oct 01 2016** – Female threatened with firearm. Bolling testifies no one told him about it. (Bolling 080)

- Reyes testifies [before the incident in question?] he had never seen any crime when he was at the store in question. (Reyes 044)
  - o Reyes testifies on a previous occasion he pushed the remote alarm when a customer collapsed on the way to the bathroom. He testifies the security desk contacted law enforcement. (Reyes 045)
- Shootings in QT Parking lot. (Reyes 067-69)
  - o Apr 06 2014 Shooting – Reyes testifies he has no knowledge of it. (Reyes 067)
  - o Nov 09 2014 shooting – Reyes testifies he didn't know about it. He agrees crime can happen at any moment and states also at any place.  (Reyes 067)
  - o Mar 12 2016 shooting. – No knowledge. (Reyes 068)
  - o Oct 01 2016 shooting and robbery. No knowledge. (Reyes 068)
- **Reyes agrees the store had people loitering from time to time. He agrees it's commonplace.** (Reyes 073-74)
- **Exhibit 37** – Activity Report. Reyes testifies it's for store managers. (Reyes 128)
  - o **Jun 11 2015** – Altercation outside store. Reyes agrees he wasn't told. (Reyes 128)
  - o **Jul 17 2015** - Loitering. Reyes agrees he had no idea. (Reyes 128)
- **Reyes testifies he wouldn't know about prior crimes from the Chamblee PD**. He testifies no one called a single crime at the property to his attention prior to the incident in question. (Reyes 132-133)

- **Bothwell testifies he can recall an incident of a verbal altercation outside the store door. He testifies he walked out to de-escalate the situation. He agrees after he intervened the individuals went on their way without a physical altercation**. (Bothwell 016)
- Bothwell testifies he's completed one sheriff's report in the 6-7 years at QT. He testifies it was for a male subject that came in cursing, belligerent, drinking sodas and refusing to pay. (Bothwell 021)
- Bothwell testifies he cannot remember a specific instance of "just fighting" in the seven years he's worked at QT. He testifies it may have happened once. (Bothwell 025-26)
  - o Bothwell testifies he's intervened in less than ten verbal altercations. (Bothwell 026)
- Bothwell testifies he has no independent knowledge of crime on the premises. He testifies QT hasn't told him and he hasn't asked. "…I could research it, but I never felt the need to. It's unimportant to me." (Bothwell 027)
- Bothwell testifies the incident in question is the first shooting at this QT he's heard of. (Bothwell 028-29)

Horizontal Analysis: Foreseeability

- Ford testifies there was another incident at the QT in question involving weapons. He testifies there was a group of people pointing guns and shooting at each other [at unknown date in 2014-2015]. (Ford 015-16)
    - Ford testifies there was a journalist, Mario Guevara from Mundo Hispanico, who witnessed the event during a police ride-along. (Ford 016-17)
    - Ford testifies to his knowledge there was no gang involvement in the incident. (Ford 017)
    - Ford testifies he doesn't think the shooter saw the marked police vehicle before firing the weapons. (Ford 018)
- Ford testifies there was another shooting in the QT parking lot. He agrees it was prior to the incident in question. (Ford 015)
- Ford agrees during the Oct 01 2016 murder of a taxicab driver, the driver drove onto the QuikTrip premises. He testifies he did not speak with QT employees about the incident. (Ford 018-19)

- Chang testifies there was an incident at the QT of an intoxicated individual shoplifting. He testifies the individual refused to leave when asked and he arrested the subject. (Chang 012)
- Chang testifies during a verbal altercation that occurred in the parking lot he asked both parties to leave. He agrees they left. "…they know what the next step is… somebody is going to go to jail…" He agrees his intervention was able to de-escalate the situation. (Chang 013-14)
- Chang testifies he hasn't witnessed any physical altercations at the store. He testifies he has been called to them in his normal duties at the sheriff's office but the subjects scattered on seeing him. He testifies someone alerted him to a fight while he was working part time, and testifies he was not called to it as part of the sheriff's office. He testifies when he goes outside they scatter. (Chang 014-15)
- Chang testifies he's handed out approximately two criminal trespass warnings [at the store in question?]. (Chang 016)
- Chang testifies he has no knowledge of prior crime at the premises or in the area. (Chang 021)
- **Chang testifies there was an incident in [Nov 09] 2014 when an H/M and B/M were in an altercation over a female and assault rifles were discharged into the air. He testifies he was working on the premises ATOI inside the store. He testifies where the incident was occurring in the far corner of the parking lot was hidden from his view**. (Chang 025-26)
    - Chang testifies he's not aware of incidents Apr 06 2014 or Mar 12 2016. (Chang 025-26)
    - "**Possibly that night one of the clubs were having a celebrity coming in. And usually when a celebrity comes in, it tends to draw more people**." (Chang 027)
- Chang testifies he heard about the Oct 01 2016 murder of the taxi driver on the news. (Chang 027-28)

- Antinozzi testifies he had responded to crimes at the QT in question prior to the incident in question. (Antinozzi 011)

Horizontal Analysis: Foreseeability

- o Antinozzi testifies he recalls suspicious person calls at the QT. (Antinozzi 012)
  - o Antinozzi testifies a sheriff's deputy called on a Friday or Saturday night for assistance with fights and "a lot of people involved." He testifies it was multiple disorderly conducts. (Antinozzi 012-13)
- Antinozzi testifies a Brookhaven officer located a motorcycle with a tag that came back as stolen. He states the [suspect?] ran and [Chamblee PD?] assisted in locating the person. (Antinozzi 013)
- **Exhibit 48** – Incident report. Dec 03 2014. Simple Battery. Antinozzi testifies he does not recall the incident. (Antinozzi 051)
- **Exhibit 69** – Incident report. Jan 07 2015. Entering Auto. Antinozzi testifies he doesn't recall the incident. (Antinozzi 053)
- Antinozzi testifies he's responded to property crimes at Plaza Fiesta. (Antinozzi 041)
- Antinozzi testifies he was involved with human trafficking investigations and states a number of the cases had a Follies connection. (Antinozzi 042)
- Antinozzi testifies in Nov 2014 there was an incident with gunfire that began at the store in question and went south on Buford Highway. (Antinozzi 042-43)
  - o Antinozzi testifies the shooting occurred on Buford Highway and not at the QT. (Antinozzi 050-51)
- Antinozzi testifies there was a shooting incident at the Mansion Elan parking lot in 2014. (Antinozzi 044)
- Antinozzi testifies on an unknown date in 2014-2015 there was a drive by shooting at Follies involving suspects who got mad at the Follies security officers and drove north on Buford Highway and put rounds into the Pep Boys next to [Follies?]. (Antinozzi 045)


## Area Crime

- Richmond testifies his mother notified him there had been shootings at other QTs and gas stations in the Atlanta area. (Richmond 042-43)


## Assessments Performed

- Reyes testifies he didn't do anything to familiarize himself with security in the area. (Reyes 075)
  - o Reyes testifies he didn't do anything to familiarize himself with crime in the area before this event. (Reyes 138)
- Reyes testifies if a violent crime had occurred at the QT before the incident in question, he would not have wanted to know about it. He testifies he would still have to work. (Reyes 083)

- Bothwell testifies he has no independent knowledge of crime on the premises. He testifies QT hasn't told him and he hasn't asked. "…I could research it, but I never felt the need to. It's unimportant to me." (Bothwell 027)

- Chang testifies he's never performed an independent investigation of crime at the premises. (Chang 020-21)

Horizontal Analysis: Foreseeability

- Antinozzi testifies he has never been asked to perform a security threat assessment for the store in question or to drive by and check on the store at certain times. (Antinozzi 045-46)

- Ford testifies QT never asked him to do any sort of property check at the store in question. (Ford 020)

- Romero testifies he didn't ask the police about gangs in the area. (Romero 100)

Horizontal Analysis: Policies, Procedures & Practices

## Assessments Performed

- Reyes testifies he didn't do anything to familiarize himself with security in the area. (Reyes 075)
  - Reyes testifies he didn't do anything to familiarize himself with crime in the area before this event. (Reyes 138)
- Reyes testifies if a violent crime had occurred at the QT before the incident in question, he would not have wanted to know about it. He testifies he would still have to work. (Reyes 083)

- Bothwell testifies he has no independent knowledge of crime on the premises. He testifies QT hasn't told him and he hasn't asked. "…I could research it, but I never felt the need to. It's unimportant to me." (Bothwell 027)

- Chang testifies he's never performed an independent investigation of crime at the premises. (Chang 020-21)

- Antinozzi testifies he has never been asked to perform a security threat assessment for the store in question or to drive by and check on the store at certain times. (Antinozzi 045-46)

- Ford testifies QT never asked him to do any sort of property check at the store in question. (Ford 020)

- Romero testifies he didn't ask the police about gangs in the area. (Romero 100)

## Written Security Policies & Procedures

- **Romero testifies it doesn't say loitering is 30 minutes in the QuikTrip policy. He testifies it's a judgment call.** (Romero 038-39)
- **Exhibit 27** – Policy. Romero agrees the fact that they had a security guard at certain times reflected the policy that states it may be necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent. (Romero 110-111)
  - Romero agrees the policy says if a store manager believes he or she needs a security guard, he or she should contact his or her store supervisor. (Romero 112)
- **Exhibit 28** – Romero testifies the policy states if there is a verbal altercation, the police should be called immediately "If you think it's escalating…" (Romero 114-115)
- **Exhibit 29** – Romero agrees the policy says to activate the alarm for any fight or suspicious loitering on a QT property. (Romero 115)
- **Exhibit 30** – Romero testifies individuals who the company knows pose a risk of harm to others include those participating in an incident and who have been used criminal trespass citations or if they've had to use the remote alarm to ask someone to leave "a few times." (Romero 116)
- **Exhibit 31** – Romero testifies QuikTrip requires anyone working outside to wear a remote transmitter alarm in case they see something. (Romero 116-117)

Horizontal Analysis: Policies, Procedures & Practices

- **Exhibit 32** – Romero testifies when an employee pushes the alarm button, the security cameras at the store go to the security office's main screen. (Romero 117)
    - Romero states the security office monitors "everything." He agrees they might check in on the store throughout the day. (Romero 118)
    - Romero testifies they are to look at the checkstand monitor before going outside to empty trash to make sure no one is loitering. He testifies if someone has been there for a "long time" they use the alarm and ask the police to ask them to leave the property. He testifies the manager on duty will go out first and ask them to leave politely before using the alarm. (Romero 118-119)
        - Romero testifies they have two people go outside and do the trash at the same time for safety. (Romero 119)
    - Romero testifies he has seen the QT corporate security office. He testifies he doesn't know what they do day to day. (Romero 127)
    - Romero testifies QT corporate security has the ability to monitor 24 hours a day, 7 days a week. (Romero 127)
- **Exhibit 33** – Romero testifies he did not notice the assailant went to his car and got something out of the car, including a jacket before returning to shoot the victim. Romero agrees the policy indicates a person doing something with clothing like that may be concealing a weapon. He agrees they could trip an alarm if they suspected something was going on. (Romero 119-121)
    - Romero agrees customers love attention and potential robbers and other criminals hate it. (Romero 129)
- **Exhibit 34** – Romero testifies the policy at night is to wear their alarm no matter what they do. He agrees the darkness might possibly provide an opportunity for someone to hide or get away with a crime. (Romero 122)
- Romero agrees the policies in Exhibits 27 through 35 were in place in Dec 2016. (Romero 124)

- Bolling testifies QT's policy on when to call the police is if he feels personally threatened. He agrees he's been instructed to call 911 if he's concerned about a customer's safety. (Bolling 028-29)

- Reyes testifies it's policy to close the store to customers after something like the shooting in question where a bullet came in the window because it became a crime scene. (Reyes 062)
- Reyes testifies if someone is loitering an employee may ask that person to leave if they feel safe to do so. (Reyes 074)
- **Exhibit 27** – QT Security guard policy. Reyes testifies he's not familiar with it. (Reyes 121)
- **Exhibit 28** – QT policy. Reyes testifies he's familiar with it and agrees it was in place ATOI. (Reyes 121)
- **Exhibit 29** – QT alarm policy. Reyes testifies he's familiar with it and agrees it was in place ATOI. (Reyes 121-122)
- **Exhibit 30** – QT security in the workplace policy. Reyes agrees it was in place ATOI. (Reyes 122)

Horizontal Analysis: Policies, Procedures & Practices

- **Exhibit 31** – QT policy. Reyes testifies he's not familiar with it. (Reyes 122)
- **Exhibit 32** – QT policy. Reyes agrees it was in place ATOI. (Reyes 123)
- **Exhibit 33** – QT policy. Reyes agrees it was in place ATOI. He agrees he was trained that customers wearing out of season clothing may conceal a weapon. (Reyes 123-124)
  - Reyes testifies his understanding is tense situations refers to disputes between customer and employee or customer and customer. (Reyes 124)
- **Exhibit 34** – QT policy. Reyes testifies he's familiar and trained with it. (Reyes 125)
  - Reyes testifies he doesn't know why employees are required to wear the alarm if they step outside. (Reyes 125-126)
- **Exhibit 35** – QT policy. Reyes testifies he's familiar with it. (Reyes 125)

- **Bothwell testifies he hasn't read the QT written policy for security guards. He testifies he wasn't aware one existed.** (Bothwell 017)
  - Bothwell agrees on reviewing Exhibit 27 that part of his purpose is to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent. He agrees his primary responsibility is to ensure the employees and customers of the store are safe and the items in the store remain secure. (Bothwell 018-19)
  - Bothwell agrees he performed regular patrols of the location perimeter and oversaw the operation inside the store. (Bothwell 019)
- **Bothwell testifies he's not aware of any QT company policies relating to fights on the premises.** (Bothwell 017)


## Response to Loitering and Fights

- Romero testifies they don't want loitering at 3:00 or 4:00 am after the clubs get out because it could lead to theft. He testifies it "possibly" could lead to other problems. (Romero 035)
  - **Romero testifies loitering is someone outside for thirty minutes or more. "If you see someone outside or they are being aggressive towards customers."** (Romero 038)
  - **Romero testifies it doesn't say loitering is 30 minutes in the QuikTrip policy. He testifies it's a judgment call.** (Romero 038-39)
- **Romero agrees loitering can lead to more serious crimes.** (Romero 090)

- **Bolling testifies someone would have to loiter for over an hour for him to trigger his alarm. He testifies he would ask the individual why they were standing outside first after 15-20 minutes.** (Bolling 023)
  - Bolling testifies he's never pushed his panic button for loitering or called 911 for someone loitering in front of the store. (Bolling 024)
  - Bolling agrees loitering "could be" a safety concern. (Bolling 073)
- **Bolling testifies if a fight occurs inside the store he will push his panic button. He testifies if it's outside the store, it depends on the severity. He testifies if it's pushing and shoving in the parking lot he won't hit the button.** He testifies he wouldn't call that a fight. (Bolling 024-25)

Horizontal Analysis: Policies, Procedures & Practices

- o **Bolling testifies he wasn't trained to push the button if he saw someone shoving someone else**. He agrees he's trained just to let it be and stay inside. (Bolling 025)
- o Bolling testifies if a verbal altercation occurred inside the store he would say something to those involved to take it somewhere else. He agrees he would get involved as an initial step. He testifies if they took the verbal altercation to the front of the store, he would tell them to move away. He agrees if it became physical he would push the alarm button. (Bolling 026-27)

- **Chang testifies if he saw a negative confrontation occurring between two persons outside, he would go outside. He testifies if the individuals didn't leave he would approach them and investigate. He testifies if it was minor he would make sure they left in separate ways. "…that seems to work most of the time. No one wants to go to jail."** (Chang 017-18)
  - o Chang agrees if he saw someone pacing in front of the entrance he would investigate. (Chang 018)
- Chang testifies if someone was loitering in the parking lot he would tell them to leave. He testifies he would determine if it was loitering based on what he observes and customer complaints. (Chang 018)

- Bothwell testifies if he sees someone loitering he makes contact and instructs them to leave if they are not going to be a customer. He testifies he doesn't have a specific time threshold for loitering. (Bothwell 023-24)
  - o Bothwell testifies if someone is hanging out in the store for more than 20-30 minutes it's loitering. (Bothwell 031)
  - o Bothwell testifies he observes until his suspicion is aroused. (Bothwell 032)
- Bothwell testifies if he observed a negative confrontation he would observe and investigate. He agrees he's done that on prior occasions and that's de-escalated the situation. (Bothwell 024-25)
  - o "…But if they was going – if they was going to fight, they was going to fight regardless." (Bothwell 025)

## Security Decisions

- Reyes testifies he was not involved in designing the security plan for the store in question. He testifies he had no role or responsibility for security at the QT the night of the incident. (Reyes 041)

## Training of Personnel

- Bolling testifies QT does not perform any annual training or retraining. (Bolling 020)
- Bolling testifies there are store meetings approximately every six weeks where store issues are discussed, including customer service, inventory. He testifies they don't really ever talk about safety. He testifies there's been no discussion of crime deterrence. (Bolling 020-21)

Horizontal Analysis: Policies, Procedures & Practices

- Bolling agrees he's been trained on what to do if someone is loitering. He testifies he uses his belt clip alarm.  (Bolling 022)

- **Reyes testifies he had no training on security. "…just training on when to push my remote alarm.**" He testifies he had no training on security issues designed at or any responsibility for deterring criminal actions from occurring against the customers. (Reyes 041)
    - **Reyes agrees he basically knows nothing about security at QTs and how those decisions are arrived at.** (Reyes 043)
    - Reyes testifies he has no training in identifying gang activity. (Reyes 057)
- Reyes testifies QT goes over "a lot" of the policies and procedures when an employee is hired. (Reyes 120)
- Reyes testifies no one has talked to him about expectations of safety for the customers as an employee of QT. (Reyes 134)

- Romero testifies he received training at QuikTrip regarding the policies and procedures for the belt alarm and what to do regarding QuikTrip's security policies and procedures. (Romero 031)
- Romero testifies he trained his employees regarding the security policy and when and when not to use the belt alarm. (Romero 031)
    - Romero testifies he has monthly policy and procedure meetings with the store team. (Romero 129-130)
- Romero testifies he talks to his employees, especially the overnight employees, about their safety on a daily basis. (Romero 066-67)

## Supervision of Personnel

- Romero testifies Rhamses was the manager on duty [the night of the incident?] and not the store manager. (Romero 014)
    - **Romero testifies the managers on duty are his assistants. "They handle issues to the best of their ability, but they may not be as trained to handle financial situations or accessing DVR cameras if there's needs to be, or certain decisions they will call me or contact me for guidance."** (Romero 014)
- Romero testifies his first assistant would have been Evan Hodges on Dec 29 2016. (Romero 015)
- Romero testifies the store supervisor is directly above him in the hierarchy and managers 14-17 stores. (Romero 016)
- Romero testifies the division manager for Atlanta, Marc Milburn, is above the store supervisor. He testifies the Atlanta district includes all of Georgia and has 134 stores. (Romero 016-17)

- Reyes testifies Alex's main duties ATOI as part time clerk were to put up the order of supplies on the shelves, take out the trash, and pressure wash. He testifies Alex would help if Reyes had too many people in line as well. (Reyes 019)
- Reyes testifies the store supervisor was Jesse Marshall. (Reyes 052)

Horizontal Analysis: Policies, Procedures & Practices

- Reyes testifies he wasn't acting general manager ATOI. He states he was "just responsible for … managing the store…" (Reyes 135)

## Organizational Approach to Security

- **Romero testifies designing a security plan is done at the corporate level. He testifies he has no involvement in design as store manager.** (Romero 017-18)
  - ○ "If I see criminal activity, I use our security protocols in place and policies in place and do what I am required to do." Romero testifies they have the policies to follow to prevent "things." (Romero 079)
    - ▪ **Romero testifies if he sees crime happening too much he can do consistent training with his employees and make sure they are paying attention and "going out there and sweeping the lot… when they sweep the lot to make sure to keep their eyes open…"** (Romero 080)
  - ○ **Romero agrees criminal decisions should be made based on past history.** (Romero 094-95)
  - ○ Romero testifies all decisions about security guard hours are made at corporate level and aren't made by him as store manager. (Romero 102)
- Romero testifies his definition of security is "…That you have measures in place to keep everybody, employees and customers, safe alike." (Romero 028)
- Romero testifies they don't want loitering at 3:00 or 4:00 am after the clubs get out because it could lead to theft. He testifies it "possibly" could lead to other problems. (Romero 035)
- **Romero testifies loitering is someone outside for thirty minutes or more. "If you see someone outside or they are being aggressive towards customers."** (Romero 038)
- **"…We are not supposed to go outside."** (Romero 040)
- Romero testifies they don't want to confront the customers. (Romero 046)
- "**My employees are safe. If they're not safe, they tell me.**" (Romero 065)
- Romero testifies no one from corporate has contacted him about what they can do to make the property safer. (Romero 067)
- Romero testifies it should never happen that the victim should come as an innocent customer to QT and be shot dead on the property. (Romero 140-141)
  - ○ Romero testifies the friendly atmosphere and cleanliness do not hide an underlying fundamental criminal problem. (Romero 141)

- "…criminals are going to commit crimes wherever they want to." Reyes testifies they do not need a means or opportunity. "...even if there was somebody there, if a criminal has already decided to do something, they are still going to do it." (Reyes 069-70)
  - ○ **Reyes testifies he has no training or experience to form his opinion about criminal behavior.** He testifies criminals tend to act on fear. (Reyes 070)
  - ○ Reyes agrees his opinion is that security guards make no difference in deterring crime. He testifies a police officer may increase the likelihood of crime because criminals become scared and may act more violently. (Reyes 072)

Horizontal Analysis: Policies, Procedures & Practices

- Bolling agrees if a violent crime occurs at the property he wants to know. He agrees if someone shoots a gun on QT's premises it's dangerous. (Bolling 070)
  - Bolling testifies he doesn't know what QT could do to deter crime in the parking lot. (Bolling 071)
  - Bolling testifies he would want to know about violent crime to know what's going on and would store it in his mind. (Bolling 078)
- **Bolling testifies his security role as the night assistant for the store and parking lot is to notify the authorities if something goes wrong. He testifies he does "not really" have a responsibility to monitor the parking lot. He testifies it's impossible for him to make sure customers are going to be safe if they pull into the parking lot.** (Bolling 045-47)
  - "…So once they get outside, once they're outside of the store, it's wide open space…" (Bolling 048)
  - Bolling testifies "pretty much" every time someone asks for gas he has to look outside the store. (Bolling 049)
  - Bolling testifies he can see all the gas pumps from the register. (Bolling 049)
- Bolling testifies if he see something the guard doesn't see or sees someone hanging around, he might say to the guard to tell the person to leave the property. (Bolling 050)
- Bolling testifies to his knowledge QT has never made any changes to security following a criminal incident. (Bolling 072)
  - **Bolling testifies he doesn't think having a security guard will stop or prevent crime from happening on a lot. He testifies "maybe" crime would be less likely if a guard was in the lot.** (Bolling 072)

- **Chang testifies before going out to the QT he checks the radio to see if any celebrity is out promoting a club and gets the details on what's going on.** He testifies it's not something QT informed him of and it's something he did on his own. (Chang 027)
- Chang testifies his understanding of why the QT has a security guard is because of the weekend traffic and because of all the clubs. (Chang 028)


Notifications and Warnings

- Romero testifies they do not warn customers about prior shootings when they come in. (Romero 141)


Internal Reporting and Logs

- Romero agrees he's the eyes and ears for QuikTrip at the property. He testifies he provides input and observations to his supervisor on a daily basis. (Romero 051-52)
  - Romero testifies his employees tell him everything that takes place on the property. (Romero 052)
  - Romero testifies it's up to corporate to determine why the police are routinely on the property. (Romero 096)
  - Romero testifies his supervisor would probably discuss the alarm logs with him at their weekly meeting. (Romero 112)

Horizontal Analysis: Policies, Procedures & Practices

- Romero testifies if there had been a shooting in the parking lot Mar 12 2016, it would have been brought to his attention. (Romero 055-56)
- Romero testifies [incident reports?] are not provided to him. (Romero 060)
- Romero testifies they issue a criminal trespass if they have to hit the alarm button 20 times for panhandling [for the same person?]. **He testifies they maintain a banned list.** (Romero 084)
- Romero testifies there's no documentation that they have that they go outside and check the parking lot. (Romero 125-126)

- Reyes testifies if [a prior security threat at the store in question] was important enough, QT would tell him. He testifies no one had told him anything [about prior crime?]. (Reyes 046)
- Reyes agrees creating an incident report was policy and procedure for QT in this case. (Reyes 081)
- **Exhibit 36** – Reyes testifies this is what an incident report form looks like before it's submitted to corporate. (Reyes 126-127)
- **Exhibit 37** – Activity Report. Reyes testifies it's for store managers. (Reyes 128)
  - Reyes testifies he doesn't get access to prior events on the property. (Reyes 130)
  - [Atty. Leet states Ex 37 is a log of all panic alarm button pushes for the given time period.] (Reyes 131)

- **Bothwell testifies he does not keep any log of his activities while working his security shift and testifies there is no daily activity report.** He testifies there is a sign in sheet for payroll purposes. (Bothwell 011)
- Bothwell testifies if an incident occurred he would complete a DeKalb sheriff's report that would go directly to his supervisors. He testifies he would leave it for the manager to see. (Bothwell 021)
- Bothwell testifies he hasn't discussed crime with the store employees. (Bothwell 030)

- Bolling testifies "we don't talk about crime at our store. We only talk about things that happen at other stores… I kind of have a rule I don't speak on those things at my store." (Bolling 040)
- Exhibit 37 – Alarm activity report. (Bolling 076)

- Chang testifies he does not give instruction to the QT employees. He testifies the employees will put information on suspected shoplifters and robbers in their book for him to know who to watch for and who isn't allowed in the store. (Chang 016)
  - Chang testifies he believes the employees have informed him about one person through the book sometime in 2017. (Chang 017)
- Chang testifies they maintain a security log of anyone they issue a criminal trespass to. He testifies the log is kept at the QT. "I guess most of the managers are aware of who we give out warnings to." (Chang 010)
- Chang testifies the off duty officers log in every night to track their hours. (Chang 011)

Horizontal Analysis: Policies, Procedures & Practices

- Chang testifies if there was an incident they would get a copy of the police report. He testifies if he made an arrest "they'll" [QT?] will get a copy of it. He testifies QT fills out its own incident report. He testifies he does not fill out anything for QT. (Chang 015-16)
- Chang testifies the store manager, Gregg Romero, or Tony [Bolling?], have told him about incidents of shoplifting at the store. (Chang 020)
    - Chang agrees he would want to know if there had been multiple shootings at the premises. (Chang 020-21)

## Inspections and Maintenance

- Bolling testifies he goes outside into the parking lot to sweep and get fresh air. (Bolling 034)
- Bolling testifies the QT employees from FS [facilities maintenance] come on Wednesday or Thursday when he's not working. (Bolling 075)

## Staffing

- Chang testifies there are generally two store employees working when he's at the QT. (Chang 020)

Horizontal Analysis: Preventability

## Key Statements

- Antinozzi testifies if an off duty officer were present ATOI that person would have been obligated to intervene. (Antinozzi 047)
- Antinozzi testifies the incident occurred at approximately 4:00am. He testifies if he's working overnight he usually gets gas at that time and usually at a QT. (Antinozzi 015)
  - Antinozzi testifies he was traveling south on Buford Highway and went past Plaza Fiesta and Follies and pulled into the first QT entrance, the most northerly off Buford Highway. He testifies as he pulled in he scanned to see what was going on out of habit and then went next to the second set of pumps. (Antinozzi 015-16)
  - Antinozzi testifies he saw two people and a possible third person, involved in a negative conversation. "It wasn't a fight immediately, but it looked animated and it … was negative." He testifies he didn't want to "just drive up on it" and pulled around the pumps to put the QT on his left and the pumps on his right to get a better view. He testifies as he was thinking about doing that he heard three gunshots. (Antinozzi 016)

- Bothwell agrees part of his responsibility is to monitor the QT parking lot. (Bothwell 015)
- "If I observed an argument, I will ask what's going on and then I would tell them to leave promptly." (Bothwell 015)
- Bothwell testifies if he observed a negative confrontation he would observe and investigate. He agrees he's done that on prior occasions and that's de-escalated the situation. (Bothwell 024-25)

- Chang states if he saw a negative confrontation occurring between two persons outside, he would go outside. "…we go out there, mainly it's going to be a deterrent, so they leave or, if they don't, of course I approach both of them… If it's something minor, just make sure they leave separate ways. To be on the safe side, I take the less aggressive, tell them to leave first, possibly wait 15 minutes and have the next subject leave… that seems to work most of the time. No one wants to go to jail." (Chang 017-18)
  - Chang agrees if he saw someone pacing in front of the entrance he would investigate. (Chang 018)
- Chang testifies he did not watch all angles of the video. He testifies he doesn't know if he had been there that night whether he would have noticed any sort of negative confrontation. (Chang 024)
  - Chang testifies if he had seen a negative interaction occurring in the parking lot it's possible he would have investigated. (Chang 028)

- Ford agrees he responded to the scene on the night of the incident. (Ford 006)
  - "I spoke to Antinozzi first. He told me that he was patrolling Buford Highway, decided to pull into the parking lot of the QT. **He said he saw a group of people that didn't look right.** And as he passed through the parking lot, he thought he heard what sounded like gunshots. By the time he realized what had happened, he had seen a vehicle flee the scene. He followed that vehicle but it ended up not being involved in the incident. He doubled back around, pulled into the parking

Horizontal Analysis: Preventability

lot and observed a body lying in the parking lot. That's when he got out and ascertained what happened." (Ford 008-9)

## Crime Deterrents

- Bothwell agrees his presence on the premises could "possibly" deter crime. "Any officer presence could deter crime…" (Bothwell 014)

- Chang testifies he was told his primary function as a security guard was inside. He testifies they also do outside parking lot. He testifies inside the store he acts as a deterrent for shoplifting, prevention of armed robbery, and provides officer presence. He agrees he's a deterrent for crime. (Chang 011)
  - Chang testifies Major Ola instructed him they were there to be a deterrent and to act as law enforcement if needed. (Chang 015)
  - Chang agrees in his experience as a security guard he thinks his presence deters crime. (Chang 018)
  - Chang testifies an armed and uniformed police officer provides a visual deterrent to criminal activity. He testifies a security guard does not. (Chang 024)

- Romero testifies when the security guard is on duty he stays in the store "unless he needs to go outside." He agrees the security guard is uniformed. He agrees the uniform is a deterrent. (Romero 049)
- Romero testifies there are cameras "all over the parking lot… You can see everything from when you walk on the property to everything in the store on the security cameras." (Romero 045)
  - Romero testifies the cameras are a deterrent. (Romero 134)
- **Romero testifies Rhamses watched the people involved in the incident and made sure it didn't escalate. "And I would have done the same exact thing."** (Romero 041) [consistent with Reyes?]
  - "He [Reyes] was paying attention closely to make sure it did not escalate into anything." Romero agrees that is exactly what Reyes is supposed to do. (Romero 043) [consistent with Reyes?]
  - Romero agrees that if Reyes did not pay attention to the situation, that would have been a mistake on his part; "but he paid attention." (Romero 044) [consistent with Reyes?]
  - Romero testifies he spoke with Rhamses and was told Rhamses saw the interaction between Spencer and the shooters in the parking lot. He testifies Rhamses didn't feel it was going to be a shooting. (Romero 044-45)
  - Romero testifies Rhamses said the [assailants and victim?] were talking by the hot dog buns and Rhamses was looking at them "just making sure… He said they didn't come in together, so he just wanted to pay attention… Nothing was out of the ordinary he said. He said they left. **He was still looking at them or he was going to be taking the customers also paying attention outside to see anything, and he didn't notice anything… then he said he heard the shots**

Horizontal Analysis: Preventability

> **and that's when he hit the remote alarm. And he didn't know what happened**…" (Romero 108-109)
> - ▪ Romero agrees Rhamses said it started in the store and then continued outside the store. (Romero 109)
> - o **Romero testifies if Rhamses couldn't watch people in the parking lot then he would expect Rhamses to have his clerk keep an eye on them or hit the [alarm] button.** (Romero 147)

- Reyes testifies Alex was in the back of the store ATOI. He testifies Alex told him that the gunshots were his first notice of the incident as well. (Reyes 025-26)
  - o **Reyes testifies he didn't know there was a group of individuals outside when the victim exited the store.** (Reyes 024)
    - ▪ Reyes testifies he didn't see the assailants were in the parking lot after they left the store. (Reyes 079)
  - o Reyes testifies he had no responsibilities for patrolling or securing the parking lot ATOI. (Reyes 134)
- Reyes testifies he didn't see where the victim was shot until after the police arrived. He testifies the victim was next to where he had parked on QT property. (Reyes 037-38)
  - o Reyes testifies based on viewing the video, the victim was shot at the pump and tried to run toward the right of the frame. (Reyes 038)
- Reyes agrees at 3:30 am on Buford Highway they do get loud, boisterous, and intoxicated people. (Reyes 027)
- Reyes testifies the store gets a diverse crowd. He testifies they are between Follies and Plaza Fiesta "which is mainly Hispanic." He testifies around 3:00 – 4:00 is when people begin leaving Follies and come into QT to buy food **"every-night."** He agrees some of the people from Follies come in intoxicated. (Reyes 047)
  - o Reyes testifies customers typically come in for gas and make impulse purchases. He agrees they have a full service kitchen. (Reyes 048-49)
- Reyes agrees there's a Wells Fargo ATM in the store. (Reyes 117)

Video [Reyes Ex 11]
- [POS 3:20:47] Reyes agrees there are 8-10 people in the store. (Reyes 091-92)
- [FRONT ENTRY 3:22:30 to 3:23:18] Reyes testifies he doesn't know why the shooter would confront the victim and friends or why he was waiting for them. He testifies he doesn't know what they're saying or why people are circling. He testifies he wasn't aware that any of this was going on in the parking lot as it was transpiring. (Reyes 098-99)
- [GAS LEFT 3:23:54] Reyes agrees he has no idea any of this is going on. **He testifies he would have had to see the entire thing going on to hit his panic button.** He testifies "just based on looking out the window, seeing people walk to the pump, I wouldn't have known what's going on." (Reyes 105)

Horizontal Analysis: Preventability

- **Bolling testifies at 3am on nights other than Friday or Saturday, there are typically 5-10 customers in the store and 3-4 cars in the parking lot. He agrees 20 cars in the lot or 20 customers in the store would be "really busy" for that time.** (Bolling 032)
  - Bolling testifies on a Friday or Saturday night when the clubs get out typically there are 20-30 people will be in the store and the pumps and lot will be full with approximately 25 vehicles at 3am. (Bolling 032-33)

Horizontal Analysis: Security Measures

## Extra-Duty Law Enforcement Officer Services

- Reyes testifies there is a guard at the store in question on the weekends. He agrees that was in place prior to the incident and is still in place. He testifies the guard is there for crowd control and leaves at approximately 5:30 am on Saturday and Sunday morning. (Reyes 049-51)
  - o Reyes testifies he doesn't know why the security hours were set to what they are and testifies he never asked the purpose of the guard. (Reyes 052)
  - o Reyes testifies he's unsure what the security guard would do because the guard never worked on Reyes' shifts. (Reyes 52)
- Reyes testifies there was no security [guard?] there ATOI. (Reyes 031)
  - o "…there was just a normal day… there was no need for security at our store." (Reyes 042)

- Romero testifies there was no security guard at the QuikTrip on the night in question. He testifies there was one there on Fridays and Saturdays. He testifies he doesn't know why that was implemented and testifies it was in place when he started at Store 797. (Romero 032-33)
  - o Romero testifies the security guard was to handle the traffic flow and keep people from loitering when they exit the clubs at 3:00 or 4:00 am. (Romero 033)
  - o Romero testifies his understanding is Friday and Saturday nights are when the clubs "…have the most [traffic?]". (Romero 035)
  - o Romero testifies when the security guard is on duty he stays in the store "unless he needs to go outside." He agrees the security guard is uniformed. He agrees the uniform is a deterrent. (Romero 049)
  - o **Romero agrees if the guard sees trouble he is supposed to intercede**. (Romero 076)

- Bolling testifies on Friday and Saturday night a security guard is posted at the QT. (Bolling 013-14)
  - o Bolling testifies the officers who work at the QT are Officer Chris Boswell, Officer Chang, and Officer Echols. (Bolling 014)
  - o Bolling testifies on Friday and Saturday nights there are two employees working plus the security guard. (Bolling 033)
  - o Bolling agrees the guards are armed and in police uniform. (Bolling 051)

- **Bothwell testifies he has worked as a security guard at QT for approximately 6-7 years**. (Bothwell 007)
- Bothwell testifies he has worked at the DeKalb County Sheriff's Office since Jun 1996. He testifies his current rank is sergeant of field division services. (Bothwell 007)
  - o Bothwell testifies he hasn't received any training about what he's supposed to do as a security guard for QT. "I just use my law enforcement training." (Bothwell 017)
- Bothwell testifies when working security he is in uniform with his complete gear, including firearm. (Bothwell 010)

Horizontal Analysis: Security Measures

- **Chang testifies he has worked as a security officer for QT for the past 3-4 years**. (Chang 007)
- **Chang testifies he began working for the sheriff's office in 2003. He testifies he currently holds the rank of investigator, and has held that rank for five years [2012 through time of depo?].** (Chang 007)
  - Chang testifies he has not received any training from QuikTrip. (Chang 015)

- **Antinozzi testifies if an off duty officer were present ATOI that person would have been obligated to intervene.** (Antinozzi 047)

- Richmond agrees he saw no security on site. (Richmond 051)

Deployment / Scheduling

- Bothwell testifies he worked as a security officer at QT on Fridays and / or Saturdays. He testifies in the past year he has been there on the end of month Friday and Saturday. (Bothwell 007)
  - Bothwell testifies when he first started at QT as security, he only worked one day a week there. (Bothwell 008)
  - **Bothwell testifies his security shift at QT is typically 11pm to 6am**. (Bothwell 010)

- Chang agrees while working at QT he is in full uniform and armed. He testifies he works from 10:30 pm to 5:30 am on Saturday nights. (Chang 009)
  - Chang testifies he alternates Saturday nights with Sergeant Bothwell. (Chang 010)

- Antinozzi testifies the QT usually has a security guard from DeKalb sheriff's office on duty on Friday and Saturday. (Antinozzi 043)

Patrol Procedures / Practices

- "My job is to, if I observe something… for instance, if I observe two people just arguing… then I will go out there and separate or whatever." (Bothwell 015)
  - "If I observed an argument, I will ask what's going on and then I would tell them to leave promptly." (Bothwell 015)
- Bothwell agrees he performed regular patrols of the location perimeter and oversaw the operation inside the store. (Bothwell 019)
  - "I would stand by the counter. I stand up front. I walk around the store. I make sure there is no one that's in the bathroom that's loitering, sleeping. I'll go outside, make sure everything is okay. I walk around the back of the store near the Dumpster. I'll come back. So generally it's just a redundant thing. You just provide security, make sure there is no issues, no problems. If there is, you'll handle it accordingly to what happens." Bothwell testifies there's no specific time when he's in the parking lot. "It's whenever." He agrees he's making rounds as he feels necessary. (Bothwell 012-13)

Horizontal Analysis: Security Measures

- o "…you're there to observe everything to make sure that cars don't park at the pumps unnecessarily alone. If they're not getting gas, they need to move the vehicles. People sometime, for whatever reason, like to park at the pump and leave their vehicle and jump in someone else's car. So you just basically for observation, make sure everything go good. **A clerk may tell you, assistant may tell you that vehicle's on pump whatever, been there too long. Then you go out there and have the car moved**." (Bothwell 013)
  - o "…**my job is to make sure the store doesn't get too crowded, crowd control. And then observe outside, make sure it doesn't, you know, get too busy.**" Bothwell testifies he is also there for security purposes including shoplifting prevention, "things of that nature." (Bothwell 013-14)
- Bothwell testifies if an incident occurred at the QT he would handle it himself. (Bothwell 010)
  - o "I guess my presence could deter crime if that was to happen, yeah." (Bothwell 022)
  - o Bothwell testifies it's possible his presence could deter crime. He testifies "if it's going to happen, it's going to happen anywhere, outside, inside, off the premises or whatever." (Bothwell 014-15)
- Bothwell testifies if he observed an argument he would ask what's going on and would tell them to leave promptly. **He agrees part of his responsibility is to monitor the QT parking lot**. (Bothwell 015)
  - o Bothwell testifies when he's on the premises it's a collaboration between himself and the employees to monitor the parking lot. (Bothwell 026) [Consistent with Romero, Reyes?]
- Bothwell testifies if he sees someone loitering he makes contact and instructs them to leave if they are not going to be a customer. He testifies he doesn't have a specific time threshold for loitering. (Bothwell 023-24)
  - o Bothwell testifies if someone is hanging out in the store for more than 20-30 minutes it's loitering. (Bothwell 031)
  - o Bothwell testifies he observes until his suspicion is aroused. (Bothwell 032)
- Bothwell testifies if he observed a negative confrontation he would observe and investigate. He agrees he's done that on prior occasions and that's de-escalated the situation. (Bothwell 024-25)
  - o "…But if they was going – if they was going to fight, they was going to fight regardless." (Bothwell 025)
- Bothwell testifies he did not receive any instruction from the store supervisor or division manager. He testifies only Major Ola told him what to do. "Walk around the property, stand there, make sure the store is – stand up front, walk around, do security checks, make sure cars are not parked on the property abandoned. But crowd control, stuff like that." (Bothwell 019)
  - o Bothwell testifies the store employees may tell him to remove someone loitering from the property or to tell a vehicle to move from the pumps. "…they will tell me if I need to interject with something." (Bothwell 022)

- **Chang testifies he was told his primary function as a security guard was inside. He testifies they also do outside parking lot. He testifies inside the store he acts as a**

Horizontal Analysis: Security Measures

**deterrent for shoplifting, prevention of armed robbery, and provides officer presence. He agrees he's a deterrent for crime.** (Chang 011)
  - Chang testifies Major Ola instructed him they were there to be a deterrent and to act as law enforcement if needed. (Chang 015)
  - Chang testifies an armed and uniformed police officer provides a visual deterrent to criminal activity. He testifies a security guard does not. (Chang 024)
  - Chang agrees in his experience as a security guard he thinks his presence deters crime. (Chang 018)
  - Chang agrees not all criminals are deterrable. (Chang 028-29)
- Chang testifies he goes outside every hour or less. He testifies it depends on where it's most populated. "…got people hanging outside, then we walk outside and basically park and patrol and tell them to leave." (Chang 011)
  - Chang agrees from where he's standing inside he can see out in the parking lot. (Chang 012)
- Chang testifies if he takes a break it's inside the store. (Chang 012)
- **Chang testifies if there is any criminal action going on, the security officers will step in and deal with it, and call the local jurisdiction if they need to.** (Chang 012)
- **Chang testifies if he saw a negative confrontation occurring between two persons outside, he would go outside. He testifies if the individuals didn't leave he would approach them and investigate. He testifies if it was minor he would make sure they left in separate ways. "…that seems to work most of the time. No one wants to go to jail."** (Chang 017-18)
  - Chang agrees if he saw someone pacing in front of the entrance he would investigate. (Chang 018)
- Chang testifies if someone was loitering in the parking lot he would tell them to leave. He testifies he would determine if it was loitering based on what he observes and customer complaints. (Chang 018)

- Bolling testifies the purpose of the security guard is to look out for the employees and to perform crowd control. He testifies they work both inside and outside. He testifies when making rounds outside, the guard "pretty much" stays in front of the building. (Bolling 033)

## Natural Surveillance

- Bothwell agrees he can see all the gas pumps from the check stand. (Bothwell 024)

- **Chang agrees from where he typically stands [in the store?] he can see all the pumps.** (Chang 028)

- Heard testifies it was well lit ATOI at the QT. (Heard 044)

- Richmond agrees the store appeared to be well lit. (Richmond 030)

- **Romero agrees a well lit property could help with security. He testifies customers come to the store because it's safe and lit**. (Romero 128)

Horizontal Analysis: Security Measures

- o Romero agrees customers expect QT to appropriately staff the store. He agrees staffing is exclusively within QT's control. (Romero 135)

## Staff Responsibilities

- Reyes testifies Alex had no responsibility for security. (Reyes 041)
- Reyes testifies other than pushing his panic button in response to an event, he had no security responsibilities. (Reyes 134)
  - o **Reyes testifies he had no duty to patrol the parking lot or check for people. He agrees there are areas of the parking lot he can't see. He testifies there are no parking lot patrols to his knowledge.** (Reyes 076)

- Romero testifies it's a store manager task and not a requirement for Rhamses to inspect the parking lot. Romero states as store manager he does it every morning. (Romero 126)
- Romero agrees the friendly greeting QT employees give to people walking in could have an incidental security benefit and agrees it's a QT policy to greet each customer coming in. (Romero 129)

## Video Surveillance and Alarms

- **Romero testifies employees have a belt clip alarm that they activate in response to a danger or threatening situation or if they feel an event is imminent. He testifies the alarm triggers store security contacting the store. He testifies if they can't contact the store, they can access the camera to see what's happening.** (Romero 018-19)
  - o Romero testifies they will activate the alarm if they feel a situation is escalating. "But there are many things that we can't control or see happening through the course of interaction between people or employees or customers." (Romero 019)
    - ▪ Romero testifies the security desk can see what happens and contact the police. (Romero 029)
  - o **Romero testifies the belt alarm is standard for every store. He testifies there were no other security measures in place.** (Romero 029)
  - o Romero testifies employees are to watch a situation closely to decide whether or not it's escalated to the point where they need to push the alarm button. "…if you see it getting loud, then you hit the button…" (Romero 040)
    - ▪ "…there's things that QuikTrip and me as the store manager, I can't control…" (Romero 040)
  - o Romero testifies if Rhamses feels there are too many customers in the store or parking lot he can hit the [alarm] button and security will contact him and issue the police. He testifies whether an employee does so is based on what that employee feels comfortable with. (Romero 145)
- Romero testifies there are cameras "all over the parking lot… You can see everything from when you walk on the property to everything in the store on the security cameras." (Romero 045)
  - o Romero testifies the cameras are a deterrent. (Romero 134)

Horizontal Analysis: Security Measures

- **Reyes testifies only the store manager has access to the cameras. He testifies he is not required to monitor them.** (Reyes 077)
  - "I try to watch the cameras as often as I can." (Reyes 077)
  - "We just try to stay as aware as we can." Reyes testifies nothing was done to physically monitor the parking lot the night of the incident. (Reyes 080)
  - **Reyes testifies inside the store he can view the camera feeds for inside the store, the back coffee area, and the beer area. He testifies the only outside camera view he has is of the dumpster area.** (Reyes 103)
- **Reyes testifies there are alarms at the check stand, back room, one of the coolers, and personal alarms on the employees' belts. He testifies it notifies the offsite QT security desk, which can then view the video feed of the store, and call the store if they see anything wrong.** (Reyes 028-29)
  - Reyes testifies if someone was loitering and refused to leave he would use the remote alarm and contact the security desk. (Reyes 130)

- Bolling testifies there's no monitor near the register where he can see feed from the cameras in the store. He testifies while working night shift there's no way for him to see any of the camera feeds. He testifies he guesses they're monitored in the OK office. He testifies his understanding is they're monitored only when he hits the panic button. (Bolling 078-79)
  - Bolling agrees he's supposed to wear his panic alarm at all times during his shift. (Bolling 022)

- Bothwell testifies he does not wear a store panic button. He agrees he has direct access to DeKalb County Sheriff's Office if he needs backup. (Bothwell 023)

## Prior/Alternate Security Measures

- **Bolling testifies he asked for a security guard on other nights of the week due to the size of the crowds 2-3 weeks after he first started at the store. He testifies when he first started the guard was only one night a week and they added an additional night.** (Bolling 036)
  - Bolling testifies he made his request for an extra to his manager, Gretchen [LNU], and the store supervisor, Cindy Runion. (Bolling 037)
  - **Bolling testifies he hasn't asked for a guard for other nights beyond Friday and Saturday because it's not that busy.** (Bolling 037-38)
- Bolling testifies the QT down the street on Buford Highway also has a security guard Fridays and Saturdays and agrees it's also off duty DeKalb County sheriff officers. (Bolling 038)
- Bolling testifies the Covington Highway QT had a security officer all nights except Sunday. (Bolling 038)

- Reyes agrees it's an open counter at the QT with no glass partition between the employee and customer. (Reyes 027)
  - Reyes states he doesn't know if there's bullet proof glass in the store. (Reyes 058)
- Reyes agrees he's seen security at other QTs. (Reyes 042)

Horizontal Analysis: Security Measures

- o Reyes testifies store 707 had a security guard on weekend overnights. (Reyes 053)
- o Reyes testifies some stores have security all week. He testifies some stores have no security guard. (Reyes 053-54)
- Reyes testifies he's not sure if Follies has security. (Reyes 075)

- Romero agrees some properties at QuikTrip have no guards and some have full time guards. He testifies his understanding is the decision about guards is based on the amount of crime at the property. (Romero 050-51)
- Romero agrees Follies has a security guard full time. (Romero 099)
- Romero testifies Plaza Fiesta has its own security next door. He testifies he doesn't know if it's full time. He testifies it's a father / son security team. (Romero 103-104)
  - o Romero testifies he didn't notify QuikTrip about the security measures at Follies or Plaza Fiesta. He testifies it's handled above his level. (Romero 104-105)
- Romero testifies store 797 is the first QuikTrip he's worked in with a security guard. (Romero 112-113)
  - o Romero testifies he believes all QuikTrip security officers are off duty police officers. (Romero 113-114)

- Antinozzi testifies DeKalb County police work at Plaza Fiesta next door to the QT. (Antinozzi 014)

- Richmond testifies QT could have had armed security to deter the incident in question from happening. "Places like that in Atlanta are hot spots after nightclubs and after parties. Just having the presence of police or armed security would have or could have deterred the incident from happening." (Richmond 038-39)
  - o Richmond agrees in his opinion QT failed to properly secure the parking lot. (Richmond 053)
  - o Richmond testifies QT could have prevented the incident with additional security, having armed security outside the stores. He testifies he thinks they know it's a hot spot after the clubs.  (Richmond 056)

Exhibit G1-Excel Sheet Provided
Directly to Defendant

Exhibit G-2

# Estate of Andrew Thomas Spencer v. Quiktrip Corp., et al.

Spreadsheet Key

Incident Source:

CPD IR – Chamblee Police Department Incident Report

DCPD IR – DeKalb County Police Department Incident Report

INT – Internal Report

CAR – Customer Activity Report

Doc Location:

1: DB: Instant Case Report: Incident Report (Chamblee PD)

2: DB: Prior Crime: Chamblee PD Incident Reports (Bates 1-128)

3: DB: Prior Crime: Chamblee PD Incident Reports (Bates 129-250)

4: DB: Prior Crime: Chamblee PD Incident Reports (Bates 251-388)

5: DB: Prior Crime: Chamblee PD Incident Reports (Bates 389-492)

6: DB: Prior Crime: Chamblee PD Incident Reports (Bates 493-787)

7: DB: Depositions; Exhibits; Ex_69

8: DB: Internal Incident Reports (Bates Stamped); 797 4-16-14 Security Alert

9: DB: Internal Incident Reports (Bates Stamped); 797 5-31-14 – Fight

10: DB: Internal Incident Reports (Bates Stamped); 797 10-1-16 Security Alert

11: DB: Internal Incident Reports (Bates Stamped); 797 10-9-2014 – Carrying a weapon

12: DB: Internal Incident Reports (Bates Stamped); 797 11-9-14 Security Alert

13: DB: Internal Incident Reports (Bates Stamped); 797 11-21-15 Security Alert

14: DB: Internal Incident Reports (Bates Stamped); Customer Activity Report 4-30-15

through 12-31-16

Exhibit H

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Roosevelt Pugh, as Personal Representative of the Estate of Deovan Pugh,
vs. Sutton Place Associates, et al. (P) (2013)**
Apartment Complex; murder; crime prevention, security, policies and procedures
Attorney: Christopher Marlowe, The Haggard Law Firm, P.A. (FL)
In the Circuit Court In and For Escambia County, Florida
Case No.: 2010-CA-001404
Deposition: 5/29/13
Trial: 10/28/14 - 10/30/14

**Jimmie & Marva Bradford v. State of Tennessee (P) (2006)**
University campus parking lot; murder, policies and procedures, crime prevention
and security
Attorney: Ron Stewart, Stewart, Johnson, Conner & Manson, LLP (TN)
In the Claims Commission for the State of Tennessee, Western Division
Case No: 20061103106
Deposition date: 11/14/13 & 1/13/14
Trial date: 1/30/14

**Catherine E Davey, as Personal Rep. of the Estate of Nathaniel Keaton vs.
AFJA, Investment, LLC, et al.  (P) (2013)**
Liquor store parking lot; murder; crime prevention, security, policies and
procedures
Attorney: Tyrone King, King and Markman, P.A. (FL)
In the Circuit Court of the Ninth Judicial Circuit, In and For Orange County,
Florida
Case No.: 2009-CA-040022
Deposition date: 3/3/14

**Maria Marlowe & Danis Marlowe vs. Gwinnett Prado, LP, et al. (P) (2012)**
Workplace parking lot; murder; crime prevention, security, policies and
procedures
Attorney: Jeff Shiver, Shiver & Hamilton (GA)
In the State Court of Gwinnett County, State of Georgia
Case No.: 13C-02470-4
Deposition date: 7/18/14

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Jonathan Morgan v. IB Property Holdings, et al.** (P) (2013)
Apartment complex parking lot; shooting, attempted robbery; crime prevention,
security, policies and procedures
Attorney: Matthew Boylton, Keller & Keller, LLP/Thomas Hastings, The Hastings
Law Firm (IN)
In the Superior Court of Marion County, State of Indiana
Case No.: 49D10-1011-CT-050465
Deposition date: 8/07/14

**Margaret Sklenar v. CBL & Associates Properties, Inc., and CBL
Monroeville Partnership, LP** (P) (2014)
Mall parking lot; purse snatching with injury; crime prevention, security, policies
and procedures
Attorney: Michael Balzarini, Balzarini & Watson (PA)
In the Court of Common Pleas of Allegheny County, Pennsylvania
Case No.: GD-11-18740
Trial date: 9/25/14

**Levet Miles v. Benchwarmers Sports Grill, Inc. & John Doe I** (P) (2014)
Bar & restaurant; assault & battery; security management, use of force, policies
and procedures
Attorney: Matthew T. Wilson, Princenthal & May LLC (GA)
In the State Court of DeKalb County, State of Georgia
Case No.: 14A50087-2
Deposition date: 11/18/14

**Heinz G. Fojutowski v. Bhagywanti, Inc, and Care Hospitality, Inc.** (P) (2013)
Hotel parking lot; Shooting, agg assault/battery, armed robbery & carjacking;
crime prevention, security, policies and procedures
Attorney: Julian Sanders, The Sanders Law Firm (GA)
In the State Court of Fulton County, State of Georgia
Case No.: 2012-v-04397-PF
Deposition date: 12/10/14
Trial date: 12/17/14

**Denecia Swinton, and her husband, Kevin Walker, vs. Glades Plaza
Enterprises, LLC** (D) (2014)
Shopping center parking lot; drive-by shooting; crime prevention, security, polices
and procedures
Attorney: Dina Contri, Sellars, Marion & Bachi (FL)
In the Circuit Court, Fifteenth Judicial Circuit, In and For Palm Beach County,
Florida
Case No.: 2013-CA-0104444
Deposition date: 1/9/15

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Michael C. Fair & Elizabeth Flynn, et al. v. CV Underground, LLC, O'Leary Partners, City of Atlanta, et al. (P) (2014)**
Retail shopping center common area; murder; crime prevention, security, policies & procedures
Attorney: L. Chris Stewart, Stewart, Seay & Felton (GA)
In the State Court of Fulton County, State of Georgia
Case No.: 13EV018743G
Deposition date: 1/29/15

**Yuelin Guo, as Personal Representative of the Estate of Zhiwei Huang, deceased, vs. TWC Seventy-Eight, Ltd., d/b/a Westchase Apartments, and Wilson Mgmt. Co., and Wilson Construction Co. d/b/a The Wilson Co. (P) (2013)**
Apartment community common area; murder; crime prevention, security, policies & procedures
Attorney: Christopher Marlowe, The Haggard Law Firm (FL)
In the Circuit Court of the 20th Judicial Circuit In and For Lee County, Florida
Case No.: 12-CA-003368
Deposition date: 2/25/15

**M.M., an adult female, vs. Season SP, LLC, Signature Management Corp., and First Communities Management, Inc. (P) (2014)**
Apartment complex (vacant apartment); abduction, rape; crime prevention, security, policies & procedures
Attorney: James Rice, The Rice Firm (GA)
In the State Court of Fulton County, State of Georgia
Case No. 12EV016327F
Deposition date: 3/19/15 & 3/30/15

**Jane and John Doe vs. St. Joseph's/Candler Health System, Inc. (P) (2014)**
Health facility; abduction, rape & armed robbery; crime prevention, security, policies & procedures
Attorney: Mark Tate & Jim Shipley, Tate Law Group, LLC (GA)
In the State Court of Chatham County, State of Georgia
Case No. STCV1400197
Deposition date: 3/24/15 & 5/6/15

**Christopher Middleton vs. Applebee's Services, Inc.; Neighborhood Restaurant Partners, LLC; Glenwood Development Co., et al. (P) (2014)**
Restaurant parking lot; shooting; crime prevention, security, policies & procedures
Attorney: Brandon L Peak, Butler, Wooten, Cheeley, & Peak, LLP
In the State Court of Fulton County, State of Georgia
Case No. 13EV018866D
Deposition date: 4/7/15

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Latrina Staffine, as Personal Representative of the Estate of Shantia Renee
Staffine, vs. ONIC-Hidden Cove, Inc., d/b/a Hidden Cove Apartments, and
Lane Management, LLC (P) (2014)**
Apartment complex; murder, stabbing, arson; crime prevention, security, policies
& procedures
Attorney: Tyrone King, King & Markman, PA (FL)
In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida
Case No. 2010-CA-011274-O
Deposition date: 4/23/15

**Nerva Almeida vs. Central Investments Enterprises, Inc.  (P) (2014)**
Apartment complex common area; armed robbery (gun), battery of letter carrier;
crime prevention, security, policies and procedures
Attorney: Justin Elegant, Petros & Elegant (FL)
In the Eleventh Judicial Circuit Court In and For Miami-Dade County, Florida,
General Jurisdiction Division
Case No. 12-43445 CA 01 (15)
Deposition date: 5/13/15

**Amanda Coulter, as the Special Administrator of the Estate of Katherine D.
Pedigo, deceased, vs. Eric Henry, Gustavo Dominguez, Jasbir S. Hullon,
Kundip K. Hullon, and John Doe Defendants 1-5 (P) (2014)**
Apartment community; burglary, rape, murder, arson; crime prevention, security,
policies & procedures, background checks
Attorney: Stephen Sael, The Middleton Firm, LLC
In the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois
Case No. 10-L-44
Deposition date: 5/27/15

**B.C., an Adult Female, vs. Rayman Associates Buckhead, LLC, Executive
Affiliates, Inc., and Myers Boicourt  (P) (2015)**
Apartment community; armed robbery, rape; crime prevention, security, policies
& procedures
Attorney: R. Scott Campbell, Shiver & Hamilton, LLC
In the State Court of Fulton County, State of Georgia
Case No. 15EV000139D
Deposition date: 6/30/15

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Ijanique Thomas, a minor by and through her guardian, Sharon Kitchen v. Crescent Hotel KC South, LLC, d/b/a Joshua's Bar, and Lion Protective Services II, LLC (P) (2014)**
Parking lot of hotel/bar; shooting, murder; crime prevention, security, policies & procedures
Attorney: Brian McCallister, McCallister Law Firm, PC
In the Circuit Court of Jackson County, Missouri
Case No. 1216-CV32365
Deposition date: 8/20/15 & 9/3/15

**Viergina Alexis; Pierre Pierre; and Natalie Gabriel, as administrator of the estate of Kevin Pierre, deceased v. Riverstone Residential SE, LLC; Impact Bradford, LP; Progressive Impact Bradford, LLC; Affordable Housing Solutions, Inc. (MD); Signal 88 Franchise Group, Inc.; Signal 88 Security of Atlanta, LLC; and John Does Nos. 4-5 (P) (2015)**
Apartment/Townhome complex common area; shooting, murder; crime prevention, security, policies & procedures
Attorney: Matthew Stoddard, The Stoddard Firm
In the State Court for the County of DeKalb, State of Georgia
Case No. 14A52296E5
Deposition date: 10/9/15

**Ann Herrera as Administratrix of the Estate of Jorge Eduardo Rosales-Santoyo and Diana Rodriguez as the natural mother and next friend of Edward Rosales-Rodriguez and Brandon Rosales-Rodriguez, minor children of Jorge Eduardo Rosales-Santoyo vs. CV Underground, LLC and Underground Management, LLC and IPC International Corp. and Hispanic Marketing Group, Inc. and Defendants John Do Nos. 1-5 (P) (2014)**
Interior common area of mall; stabbing, murder; develop security plan
Attorney: Melvin Hewitt, Isenberg & Hewitt, PC
In the State Court of Fulton County, State of Georgia
Case No. 12EV015573H
Deposition date: 10/21/15

**Shanista Brown, as the next of kin and Administrator of the Estate of David Brown vs. Wesley Club, LLC, and AGPM Georgia, LLC and Security Protection Services, LLC (P) (2015)** *(Rebuttal witness only)*
Apartment complex parking lot; murder – gun; policies & procedures, crime prevention & security
Attorney: Melvin Hewitt, Isenberg & Hewitt, PC
In the State Court of Fulton County, State of Georgia
Case No. 14EV002336E
Deposition date: 10/29/15

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Sabrina Duncan vs, CRE Las Olas Riverfront, LLC d/b/a Las Olas
Riverfront; One River Plaza Co.; Stiles Corporation; Stiles Realty Inc.; Red
Coats, Inc. d/b/a Admiral Security Services; Ameripark, LLC; and E&B
Parking Services, Inc., f/n/a Ameripark, LLC (P) (2011)**
Alleyway outside a parking garage; assault; policies & procedures, crime
prevention & security
Attorney: Thomas Buser, Krupnick, Campbell, Malone, Buser, Slama, Hancock &
Liberman, PA
In the Circuit Court of the Seventeenth Judicial Circuit In and For Broward
County, Florida
Case No. 12-000208(25)
Deposition date: 11/5/15
Trial: 3/14/17

**Dorian Richardson and Jimmy Deadwyler vs. ORIX Bristol Court, LLC, d/b/a
Bristol Court Apartments; ABS Owner Co., d/b/a Bristol Court Apartments;
First Communities Management, Inc.; Def Management Co.; Plaza Security,
LLC; Plaza security Investigations, LLC; XYZ Security Co.; and Delores
Doe, Individual Apartment Mgr. (P) (2015)**
Apartment complex; home invasion, armed robbery – gun, rape; polices &
procedures, crime prevention & security
Attorney: David Currie, David S. Currie, LLC
In the State Court of Gwinnett County, State of Georgia
Case No. 14-C-04938-3
Deposition date: 11/20/15

**Rodriguez Price vs. Tailfeathers LLC d/b/a Tailfeathers Restaurant & Piano
Bar; and Hammond TSO, LP (P) (2014)**
Nightclub parking lot; aggravated assault/battery – gun; policies & procedures,
crime prevention & security
Attorney: Chuck Clay, Chuck Clay & Associates, LLC
In the State Court of Fulton County, State of Georgia
Case No. 14EV001256C
Deposition date: 12/3/15

**Cydney Puryea v. Christopher Campbell; Purveebhavini, LLC;
Dipakkummar B Patel; and Steven Robinson (P) (2014)**
Hotel; rape; policies & procedures & security
Attorney: Jerry Lumley, Lumley & Harper, LLC
In the State Court of Bibb County, State of Georgia
Case No. 81114
Deposition date: 12/8/15
Trial date: 2/2/16

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Landon Elijah Blue, a minor, by and through his Natural Guardian
Shawntae Blue, and Shawntae Blue, as the Administrator of the Estate of
Terry L. Rankins, deceased, vs. Wh-Tri County Shopping Center, LLC,
Safeway Group, Inc., MRB, Inc. d/b/a 50 Yard Line Sports Bar & Grill, The
Alexxson Group, LLC d/b/a The Inner Circle and Hunt Security Services,
LLC (P) (2015)**
Strip center parking lot; murder, agg assault, armed robbery – gun; policies and
procedures, crime prevention & security
Attorney: Chuck Clay, Chuck Clay and Associates
In the State Court of Fulton County, State of Georgia
Case No. 14EV002835F
Deposition date: 12/16/15

**Angela Williams, as the surviving mother of Markeith Lamar Williams,
Deceased; Beverly Williams and Gwendolyn Johnson, as Co-
Administrators of the Estate of Markeith Lamar Williams, Deceased, vs. H.J.
Russell & Co., Paul York, Sr.; Etheridge Court Redevelopment Partnership
I, LP; and Iron Sky, Inc. (P) (2014)**
Apartment complex common area; murder/willful killing - gun; policies and
procedures, crime prevention & security
Attorney: Chuck Clay, Chuck Clay and Associates
In the State Court of Fulton County, State of Georgia
Case No. 14EV001393C
Deposition date: 3/14/16

**Ashlie Danielle Ishmael, individually, and as next friend of Alayna Rose
Ishmael, a minor, v. General Growth Properties, Inc., General Growth
Management, Inc.; General Growth Services, Inc.; Augusta Mall, LLC;
Andrew Paul Wilke; National Life and Accident Insurance Co.; Valor
Security Services, Inc.; John Doe Corp. 1-10; and John Doe 1-50 (D) (2014)**
Shopping mall common area fountain & play area; injury to child; contract
security, policies, procedures & practices
Attorney: Michael Rust, Gray, Rust, St. Amand, Moffett, & Brieske, LLP
In the Superior Court of Richmond County, State of Georgia
Case No. 2014 RCCV 372
Deposition date: 3/28/16

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Mary Elizabeth Santelli as the Administrator of the Estate of James F.
Santelli vs. Abu M. Rahmatullah, Individually and d/b/a Super 8 Motel (P)
(2015)**
Motel room; murder; security, policies & procedures, access control, crime
prevention
Attorney: Roger Pardieck & Karen Davis, The Pardieck Law Firm
In the Marion Superior Court, State of Indiana, County of Marion
Case No. 49D04-0704-CTI4720
Deposition date: 4/21/16

**Aleida Pilotos, as Personal Representative of the Estate of Miguel Pilotos,
deceased, vs. Ryta Icon Food Corp.; 13931 NW 27th Ave, LLC; and Taumara
Protection Services, Inc. (P) (2016)**
Supermarket parking lot; murder - gun; security, policies & procedures, & crime
prevention
Attorney: Todd Michaels, The Haggard Law Firm
In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County,
Florida
Case No. 2014-017132 CA
Deposition date: 5/3/16

**Jonathan Rivers v. Mercy Housing Management Group, Inc., MPI Highland
Place Apts. LP and Avis Ledbetter  (P) (2014)**
Apartment complex common area; murder - gun; security, policies & procedures
& crime prevention
Attorney: James Rice, The Rice Firm
In the State Court of Clayton County, State of Georgia
Case No. 2013CV00715FF
Deposition date: 6/14/16

**Jeannette Villalpando, Ind. & as the Personal Representative of the Estate
of Renee Almeida, Deceased; Guadalupe Almeida; Abelardo Almeida; Rene
Almeida, Jr.; Carmen Fausto; Santos Almeida; and Irene Alonzo vs. Texas
State Private Security Services, Inc. and Leawood Homeowners
Association, Inc.  (P) (2015)**
Apartment complex entrance gate; murder of security officer - gun; security,
policies & procedures & crime prevention
Attorney: Troy Chandler, Chandler McNulty, LLP
In the District Court of Harris County, Texas, 80th Judicial District
Case No. 201504100
Deposition date: 6/23/16

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**David Widner vs. Mundel, Ltd. and Ronald Shane Mundell, Individually and
d/b/a Champs Sports Bar  (P) (2015)**
Parking lot of sports bar; aggravated assault; security, policies & procedures &
crime prevention
Attorney: Michael Stapleton, Ball Eggleston, PC
In the Tippecanoe Superior Court 1, State of Indiana
Case No. 79DO1-1310-CT-00113
Trial date: 6/28/16

**Roger Kirschenbaum, as Administrator of the Estate of Florencio Gomez-
Mendez, deceased, and Pascuala Perez-Hernandez, Individually, and as
Next Friend and Guardian of Maria Magdalena Gomez-Perez, Ermenegildo
Gomez-Perez, and Antonio Gomez-Perez, Minors vs. Jamco Properties,
Inc., and Clayton Carriage Apartments, LLC (P) (2015)**
Apartment complex common area; murder, armed robbery - gun; security,
policies & procedures & crime prevention
Attorney: Jeff Shiver, Shiver Hamilton, LLC
In the State Court for the County of Clayton, State of Georgia
Case No. 2015CV00848E
Deposition Date: 7/7/16

**Shannon Dietz, Neal Dietz, Pat Twohy, Nora Twohy, Doug Chandler,
Gretchen Chandler, Rigoberto Contreras, Michael Anthony Picou, Kimberly
Picou, Diane Clark, Michael Debes & Bill Debes vs. Metro Mini
Storage/Kingwood Lts., Metro Mini Storage/Kingwood GP, Inc. & Ray Drake
(P) (2015)**
Commercial storage unit facility; property loss due to arson; security, policies &
procedures, crime prevention, access control
Attorney: Patrick Dennis, Doyle Raizner, LLP
In the District Court of Harris County, Texas, 133rd Judicial District
Case No. 2014-41383
Deposition Date: 7/27/16

**Bryan Perez vs. Carmel Lakes Property Owners Assoc., Inc.; Carmel Lakes
Condominium No. 9 Assoc., Inc.; Phoenix Management Services, Inc. (P)
(2016)**
Apartment complex; home invasion robbery & shooting; security, policies &
procedures & crime prevention
Attorney: Pedro Echarte, The Haggard Law Firm
In the Circuit Court of the 11th Judicial Circuit, Miami-Dade, Florida
Case No. 14-032582 CA-01
Deposition date: 9/15/16

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Rochele & John Brady Hittle vs. Wal-Mart Stores East, LP & Ohio Attorney
General, Michael DeWine (P) (2016)**
Retail establishment; sexual assault; security, policies & procedures & crime
prevention
Attorney: Ethan Vessels, Fields, Dehmlow & Vessels, LLC
In the Muskingham County Court of Pleas, Zanesville, Ohio
Case No. 2:15 CV 2763
Deposition date: 9/21/16

**Elizabeth Fundora & William Fundora, as Natural Parents and Co-Personal
Representatives of the Estate of Daniel Fundora, deceased, vs. Ryta Food
Corp., 13931 NW 37 Avenue, LLC and Taumara Protection Services (P)
(2016)**
Shopping mall parking lot; homicide (shooting); security, policies & procedures &
crime prevention
Attorney: Todd Michaels, The Haggard Law Firm
In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County,
Florida
Case No. 2015-002091 CA 01 (10)
Deposition date: 10/17/16

**Alexander Simon Fundora vs. Ryta Food Corp., and 13931 NW 27 Avenue,
LLC (P) (2016)**
Shopping mall parking lot; attempted homicide (shooting); security, policies &
procedures & crime prevention
Attorney: Brett Yonon, Wolf & Pravato
In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County,
Florida
Case No. 2015-06633 CA 01 (10)
Deposition date: 10/17/16

**Konstantinos Karfis and Angeliki Karfis, as Personal Representatives for
the Estate of Alex Karfis, for the benefit of the Estate of Alex Karfis and its
survivors vs. The Marseilles Hotel, a d/b/a of MCM Corp., a FL Corp.,
Majestic Security, Inc., a FL Corp., Douglas Pacaccio, and Joseph Alexis
(P) (2015)**
Hotel lobby; homicide/wrongful death; security, training, use of force, policies &
procedures
Attorney: Raymond Dieppa & Christopher Wadsworth, Wadsworth Huott, LLP
In the Eleventh Judicial Circuit Court In and For Miami-Dade County, Florida
Case No. 2014-18151-CA-01
Deposition date 10/19/16

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**<u>Remoan Littlejohn vs. Intown Suites Piedmont, LLC, Intown Suites, Inc.,
and Intown Suites Management, Inc.</u> (P)(2015)**
Hotel common area (exterior); aggravated assault – gun, armed robbery- gun;
security, crime prevention, policies & procedures
Attorney: Peter Law, Michael Moran & Tyler Schermerhorn, Law & Moran
In the State Court of Fulton County, State of Georgia
Case No. 2013-EV-018439-F
Deposition date: 12/12/16

**<u>Kareem U. Ali, Individually and as Executor of the Estate of Mohammed H.
Ali vs. JP Morgan Chase Bank, NA, Selig Enterprises, Inc., Emory
Commons Partnership</u> (P) (2015)**
Bank/shopping center parking lot; strong arm robbery & aggravated assault;
security, crime prevention, policies & procedures
Attorney: Mike Moran, Law & Moran
In the State Court of Fulton County, State of Georgia
Case No. 15EV001853
Deposition date: 2/3/17

**<u>Mahir Assad Amin vs. Lodge Development, Inc. and Lodge Management,
LLC</u> (P) (2016)**
Hotel parking lot; aggravated assault (cutting tool); security, crime prevention,
policies & procedures
Attorney: Shean Williams, The Cochran Firm – Atlanta
In the State Court of DeKalb County, State of Georgia
Case No. 15A56958E7
Deposition date: 2/14/17

**<u>Christopher Alan Sparkman and Jamie Lynn Sparkman v. FedEx Ground
Package System, Inc., FedEx Corporate Services, Inc., Estate of Geddy Lee
Kramer, Lucas Dziedvic, Sean Fajay, Cullen Derdarko, Sean Weir, and John
Doe Nos. 1-10</u> (P) (2016)**
Shipping facility; aggravated assault (gun); security, crime prevention, policies,
procedures & practices
Attorney: Gilbert Deitch, Deitch & Rogers, LLC
In the State Court of Cobb County, State of Georgia
Case No. 15 A 3196-4
Deposition date: 3/30/17

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Patricia Aguilar Flores v. Villas at Druid Hills 2007, LLC, and Sabra Property Management, LLC** (P) (2016)
Apartment complex common area; strongarm robbery, battery, rape; security, crime prevention, policies & procedures
Attorney: Randall Grayson, DelCamp & Grayson
In the State Court of DeKalb County, State of Georgia
Case No. 15A54929E6
Deposition date: 4/6/17

**Alan E. Robles v. QuikTrip Corporation** (P) (2016)
Gas station/convenience store parking lot; aggravated assault – gun; security, crime prevention, policies & procedures
Attorney: Parag Shah, Shah Law Firm
In the United States District Court for the Northern District of Georgia, Atlanta Division
Case No. 1:16-CV-02050-WSD
Deposition date: 5/17/17

**Kayla Hairston v. First Communities Management, Inc., Centennial Chase Lake, LLC & John Does No. 1-5** (P) (2016)
Apartment complex common area; rape, armed robbery – gun; security, crime prevention, policies & procedures
Attorney: Gilbert Deitch & Michael D'Antignac, Deitch & Rogers, LLC
In the State Court of Clayton County, State of Georgia
Case No. 2015CV01818
Deposition date: 5/24/17

**Karima Harris vs. First Communities Management, Inc., Averly Holdings, LLC & John Does No. 1-5** (P) (2016)
Apartment complex common area; Armed robbery – knife; aggravated assault; security, crime prevention, policies & procedures
Attorney: Gilbert Deitch & Michael D'Antignac, Deitch & Rogers, LLC
In the State Court of Clayton County, State of Georgia
Case No. 2015CV01842
Deposition date: 5/24/17

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Evelin Matamoros and Vladimir Matamoros, her husband, vs. Ru Yi, Inc., a
FL Corp. Café Ruyi, a FL Corp., Guo Tai Deng, Autozone, Inc., a Foreign
Corp., Autozone Stores, Inc., a Foreign Corp.** (P) (2017)
Retail establishment parking lot; armed robbery, aggravated assault – gun
(shooting); security, crime prevention, policies & procedures
Attorney: Carlos Gomez, Law Offices of Carlos Gomez, PA
In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County,
Florida
Case No. 2013-39346-CA-01
Deposition date: 6/2/17

**Sean Kauzmann v. Tribridge Residential Property Management Advisors,
LLC, Williamsburg Apartments, LLC, and RAPP Williamsburg, LLC** (P)
(2016)
Apartment complex common area; armed robbery, aggravated assault – gun
(shooting); security, crime prevention, policies & procedures
Attorney: George S. Johnson, Law Office of George S. Johnson, LLC / Daniel
Cotter, Law Offices of Daniel Cotter, PC
In the State Court of DeKalb County, State of Georgia
Case No. 16A60127
Deposition date: 6/7/17

**Bintou Cham, as surviving spouse of Franklin Callens, and Aeysha Harris
as Administrator of the estate of Franklin Callens, deceased, vs. ECI
Management Corp., and Cobb – Six Flags Associates, LTD** (P) (2017)
Apartment complex parking lot; carjacking, homicide – gun; security, crime
prevention, policies & procedures
Attorney: Scott Campbell, Shiver Hamilton, LLC
In the State Court of Cobb County, State of Georgia
Case No. 16A-1608-6
Deposition date: 6/23/17

**Audrey Sabala vs. The Kroger Co.** (P) (2017)
Grocery store entry area; shooting; security, crime prevention, policies &
procedures
Attorney: Alan Hamilton, Shiver Hamilton, LLC
In the United States District Court, Northern District of Georgia, Atlanta Division
Case No. 1: 15-CV-04367-ELR
Deposition date: 7/20/17

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Keandra Charmene, as Personal Representative of the Estate of
Christopher Cornelio, deceased, vs. GMF-Jacksonville Pool, LLC, a Foreign
Limited Liability Co. and Andrew Parham, individually, and BSR Trust
Management, LLC, f/k/a Summit Housing Partners Management, LLC (P)
(2016)**
Apartment complex; homicide (firearm); security, crime prevention, policies &
procedures
Attorney: Douglas McCarron & Jason Brenner, The Haggard Law Firm
In the Circuit Court, Fourth Judicial Circuit, In and For Duval County, Florida
Case No.: 2014-CA-008904
Deposition date: 8/18/17

**Marcela Borges and Ruben Morais vs. Meritage Homes of Florida, Inc. a
Florida Profit Corporation d/b/a Meritage Homes; and Lake Roberts
Landing Homeowners Assocation, Inc. (P) (2017)**
Single family home in residential community; home invasion, kidnapping,
shooting & armed robbery; security, crime prevention, policies & procedures
Attorney: Fermin Lopez, Colling, Gilbert, Wright & Carter
In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida
Case No.: 2013-CA-009017-O
Deposition dates: 8/30/17 & 9/25/17

**Timothy Matthews vs. Union Realty Company, GP; Belz Investco GP; Urco,
Inc; Central Defense, LLC (P) (2016)**
Grocery store parking lot; armed robbery, shooting; security, crime prevention,
policies & procedures
Attorney: Thomas Greer, Bailey & Greer, PLLC
In the Circuit Court of Shelby County, Tennessee for the Thirtieth Judicial District
at Memphis
Case No.: CT-000344-14
Deposition date: 9/1/17

**Julia Machado and Rafael Guevara, as Co. Per. Reps. Of The Estate of
Yaimi Guevara Machado, deceased v. The Waves of Hialeah, Inc. (P) (2017)**
Budget motel common area; agg assault, sexual assault, murder; security, crime
prevention, policies & procedures
Attorney: Jason Brenner, The Haggard Law Firm
In the Circuit Court of the 11th Judicial Circuit In and For Miami-Dade County,
Florida
Case No.: 2016-009731 CA 01
Deposition date: 10/17/17
Trial date: 11/28/17

JOHN C. VILLINES INVOLVEMENT AS EXPERT WITNESS TESTIFYING AT
DEPOSITION AND/OR TRIAL (PRIOR 4-YEAR PERIOD)

**Ernest Stewart, Jr., as Personal Representative of the Estate of Victor
Shane Stewart, deceased, vs. Arlington Village Apartments, LLC, a FL
Corp. (P) (2017)**
Apartment complex parking lot; shooting resulting in subsequent death; security,
crime prevention, policies & procedures
Attorney: Christopher Marlowe, The Haggard Law Firm
In the Circuit Court of the Fourth Judicial Circuit In and For Duval Court, Florida
Case No.: 2016-CA-4363
Deposition date: 11/17/17

**Elvia Monjes, Individually, and as Spouse and Next Friend of Juan Casillas,
vs, Union Insurance Company, vs. Stone Mountain Motel, Inc., Exceptional
Hospitality, Inc., Days Inn Worldwide, Inc. (P) (2017)**
Budget motel room; armed robbery, aggravated assault – gun; security, crime
prevention, policies & procedures
Attorney: R. Scott Campbell, Shiver Hamilton, LLC
In the State Court of Gwinnett County, State of Georgia
Case No.: 16C-02311-2
Deposition date: 12/7/17

**Jose Cruz Velasquez v. AV Huntington Station, LLC (P) (2017)**
Apt complex parking lot; aggravated assault (stabbing); security, crime
prevention, policies & procedures
Attorney: Brian Mickelsen, Pratt Clay, LLC
In the State Court of DeKalb County, State of Georgia
Case No.: 17A64096
Deposition date: 1/5/18

**Ann J. Herrera, as Conservator and Personal Representative of D'Marcus J.
Clements and Tamiya N. Clements, Minors, and Administratrix of the Estate
of Antonio D. Clements, deceased v. Stanton Road Investments, LLC,
Strong Enterprises, Inc., Barrett Symone Property Managers, Inc., John
Does Nos. 2-5 (P) (2017)**
Service station parking lot; murder (shooting); security, crime prevention, policies
& procedures
Attorney: Kara Phillips & Gilbert Deitch, Deitch & Rogers, LLC
In the State Court of Fulton County, State of Georgia
Case No.: 16EV001209
Deposition date: 1/11/18