# EXHIBIT A

## Deposition of Quentin Heard

Certified Copy Transcript

# In The Matter Of:

## Yvette Adelle Sanders et al vs. QuikTrip Corporation, and BJS QT, LLC

## Deposition of Quintin Heard

## October 3rd, 2017



**AccuTran, Inc.**

*---certified court reporters---*
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705
770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

1   before the night of Andrew's death, was it in the

2   evening?

3       A   I would say probably not because I

4   was a kid.

5       Q   So you were younger when you had been

6   to that QuikTrip?

7       A   I was completely younger.  I was not

8   even an adult, not even 21.

9       Q   Before the night of Andrew's death,

10  as an adult and somebody over the age of 21, had

11  you been to that QuikTrip?

12      A   No.

13      Q   You and Andrew were at Follies that

14  night?

15      A   Correct.

16      Q   Had you been to Follies before?

17      A   No, not as an adult.

18      Q   Now, you're supposed to be an adult

19  to get into Follies.  I'm not sure that we want

20  to get into that.

21      A   Yes.  That's a whole other subject.

22      Q   So you had maybe been to Follies when

23  you weren't supposed to when you were younger?

24      A   Correct.

25      Q   I'm not sure I asked you, Quintin:

Quintin Heard

42

```
 1    be told not to answer any questions, so you'll
 2    just answer the questions after that.
 3                 THE WITNESS:  Sure.
 4                 MR. RUST:  Also, I didn't tell you,
 5    Quintin, any time you need to take a break, we're
 6    not -- it's not an endurance contest.
 7    BY MR. RUST:
 8         Q     What were you wearing that night?
 9         A     A blue cashmere sweater, blue jeans,
10    and some Polo boots.
11         Q     Did you go directly to the QuikTrip
12    from Follies?
13         A     Yes.
14         Q     How did you get there?
15         A     I drove in Terrence's vehicle.
16         Q     You said that was a Nissan?
17         A     Yes, Maxima.
18         Q     Who went with you?
19         A     Andrew.
20         Q     Anybody else?
21         A     No.
22         Q     Antonio drove separately?
23         A     Yes.
24         Q     What was Antonio driving?
25         A     A black Mercedes -- or white Mercedes
```

Quintin Heard

52

1    A    Yes.

2    Q    There was a guy behind the counter?

3    A    Correct.

4    Q    Anybody else?

5    A    There may have been a wanderer

6  cleaning, I think cleaning a spill next to the

7  cappuccino machines, and there may have been

8  another one taking trash.  So maybe three total.

9  But I think they were in-between a shift change,

10 if I'm not mistaken.

11   Q    I take it, Quintin, that based on

12 what happened inside the QT, nothing indicated to

13 you that there was a problem between Red Shoes

14 and either you or you or Andrew?

15   A    Not none at all, no.

16   Q    So as you were leaving the QT, you

17 didn't think there was any problem?

18   A    No.

19   Q    So far as you knew, Red Shoes and

20 those other guys, they were gone?

21   A    Right.  There was one straggler, he

22 was paying for a taquito, but he wasn't a driver,

23 and I didn't get a good look at him.

24   Q    Red Shoes, he was getting a hotdog;

25 right?  I know he was complaining about the bun,

1    CERTIFICATE OF COURT REPORTER

2 STATE OF GEORGIA

3 COUNTY OF COBB

4   I hereby certify that the foregoing

5 deposition was reported as stated in the caption,

6 and the questions and answers thereto were

7 reduced to writing by me;

8   That the witness's right to read and

9 sign the deposition was reserved;

10   That the foregoing pages 1 through 93

11 represent a true, correct, and complete

12 transcript of the evidence given on the

13 above-referenced date by the witness, QUINTIN

14 HEARD, who was first duly sworn by me;

15   That I am not of kin or counsel to any

16 of the attorneys or parties in this case.

17   I do hereby disclose pursuant to Article

18 10.B. of the Rules and Regulations of the Board

19 of Court Reporting of the Judicial Council of

20 Georgia that I am a Georgia Certified Court

21 Reporter; that AccuTran, Inc., was contacted by

22 the attorney taking the deposition to provide

23 court reporting services for this deposition;

24 that I am not taking this deposition under any

25 contract that is prohibited by OCGA 15-14-37(a)

1   and (b) or Article 7.C. of the Rules and

2   Regulations of the Board; and I am not

3   disqualified for a relationship of interest under

4   OCGA 9-11-28(c).

5           There is no contract to provide

6   reporting services between myself or any person

7   with whom I have a principal and agency

8   relationship nor any attorney at law in this

9   action, party to this action, party having a

10  financial interest in this action, or agent for

11  an attorney at law in this action, party to this

12  action, or party having a financial interest in

13  this action.  Any and all financial arrangements

14  beyond my usual and customary rates have been

15  disclosed and offered to all parties.

16          This 17th day of October, 2017.

17

18

19

20  _Sharon Overman_
    SHARON R. OVERMAN, CCR B-2363

21  Certified Court Reporter

22

23

24

25

# EXHIBIT B

## QuikTrip Surveillance Videos

(NOTE: VIDEO "GAS LEFT" SHOWS INCIDENT)



**Videos**

Disc No. 1/1

Sanders v. QT

Civil Action No.: 1:17-CV-02341-WSD

# EXHIBIT C

## Deposition of Gregg Romero

Certified Copy Transcript

# In The Matter Of:

Yvette Adelle Sanders et al vs. Quiktrip Corporation et al

Deposition of Gregg Romero

September 28th, 2017



**AccuTran, Inc.**

*---certified court reporters---*
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705
770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

1    would talk to corporate?

2        A    Yes.  Anything like that is handled

3    through corporate.

4        Q    Did corporate ever tell you, here are

5    the things we're concerned about regarding the

6    safety of our employees and customers regarding

7    being the victims of crime on the property?

8        A    The only thing is the policy, they

9    tell us it's expressed in the policy what we

10   need to do in situations, and it actually

11   explains what to do regarding different things.

12       Q    Like what?

13       A    We follow the policy.

14       Q    You still talking about pushing the

15   button?

16       A    Pushing the button if you feel a

17   customer/employee is in danger, a customer, or

18   fights on property, you hit the remote alarm.

19       Q    Did you have a security guard at the

20   QuikTrip for what we're here for in December of

21   2016?

22       A    On the night in question?

23       Q    Well, I was going to ask you about the

24   night in question.  There wasn't one on the

25   night in question; correct?

33

```
 1        A    Not on the night in question, no.

 2        Q    There was on weekends though; correct?

 3        A    On Fridays and Saturdays there is,

 4   yes.

 5        Q    And who made that decision to put a

 6   security guard there on Fridays and Saturdays?

 7        A    It's been there since before I got

 8   there, so I honestly don't know that answer.

 9   It's been there when I got there two years ago.

10        Q    Why did you have a security guard on

11   Fridays and Saturdays at that QuikTrip?

12        A    To handle all the traffic flow and to

13   keep people from standing around loitering from

14   all the clubs when they exit out of the clubs at

15   3:00 or 4:00 in the morning.

16        Q    A lot of clubs around there?

17        A    Yes.

18        Q    And that creates a problem to have

19   them loitering when they exit at 3:00 or 4:00 in

20   the morning?

21        A    They loiter --

22             MS. LEET:  Object to the form.

23        Q    (By Mr. Law) Go ahead.

24        A    There's loitering and there's also

25   traffic flow to get them in and out so it
```

Gregg Romero

68

1    couldn't have controlled this specific incident

2    right here that we're reading about.

3              (Plaintiff's Exhibit No. 39

4               was marked for identification.)

5        Q    Okay.  Let's look at Exhibit 39.

6    That's one that goes back, this is on QuikTrip's

7    security, their plan for this property.

8    11/9/2014, shots fired in the parking lot.

9              Now, I understand that was within the

10   year before you got there, but this is news to

11   you; right?

12       A    Yes.

13       Q    So now you have a second gun incident

14   in the 12 months before Andrew Spencer is shot.

15   Any concern to you?

16       A    None.

17       Q    Two years.  Two years.  This is the

18   second one.  Two years before, any concern?

19       A    No concern.

20       Q    None.  You're not requesting more

21   security?

22       A    From what I can read here, and based

23   on the dates, the security guard was there when

24   this happened.

25       Q    Oh, there was a security guard there?

1       A       Based on the dates I can read.  And

2   when it says Sunday, November 9th, which means

3   it would have been a Saturday into a Sunday

4   morning, so a security guard was there.

5       Q       So you're just arguing with me now

6   because you don't know?

7       A       No.

8       Q       You're making that up?

9       A       No.

10      Q       You're making that up, aren't you?

11      A       I am not making it up.

12      Q       You're just making stuff up?

13      A       I'm not making anything up.

14      Q       You know a security guard was there?

15      A       From what I -- if measures were there

16  that are in my store now, yes, a security guard

17  was there, or would have been there.  And what I

18  can read here where it says police were already

19  there.

20      Q       The police?  The police aren't your

21  security guards, are they?

22      A       Police were sent to the store and were

23  already on scene when they called the store,

24  which means a security guard was there, or an

25  officer was already in the parking lot when it

AccuTran, Inc.
770-426-9705

Gregg Romero

74

1   control.  There was an officer in the parking

2   lot when this situation happened.

3       Q    With Andrew Spencer?

4       A    Yes.

5       Q    You sure of that?

6       A    Yes.

7       Q    The police officer sitting in the

8   parking lot?

9       A    There was a police car coming into the

10  parking lot on premises.

11      Q    All right.  You're saying different

12  things.  Don't forgot you're under oath.  You

13  got a duty to make sure you tell things

14  accurately.

15      A    There's a police car on --

16      Q    You just told me there was a police

17  officer in the parking lot.

18      A    Officer in the car.  Police officer in

19  the car.

20      Q    There was a police officer riding down

21  the road, wasn't there?

22      A    He was pulling in the parking lot.

23      Q    He pulled in the parking lot after the

24  shooting.  You talk to him?

25      A    No.  I just, as I said, I can try to

```
1                  C E R T I F I C A T E

2       G E O R G I A:

3       FULTON COUNTY:

4               I hereby certify the foregoing

5           transcript was taken down, as stated in

6           the caption, and the questions and the

7           answers thereto were reduced to

8           typewriting under my direction; that the

9           foregoing pages 1 through 147 represent a

10          true and correct transcript of the

11          evidence given upon said hearing.

12              The witness did reserve the right to

13          read and sign the transcript.

14              This, the 25th day of October 2017.

15                      Judy B. Mangiafico
                        _____
16                      Judy B. Mangiafico, CCR-B-713

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | DISCLOSURE |
| 2 | STATE OF GEORGIA: |
| 3 | FULTON COUNTY: |
| 4 | DEPOSITION OF:  GREGG ROMERO |

6    Pursuant to Article 10.B. of the Rules
and Regulations of the Board of Court Reporting
7  of the Judicial Council of Georgia, I make the
following disclosure:

9    I am a Georgia Certified Court
Reporter acting as an agent of AccuTran, Inc.,
10 who was contacted by the offices of Law & Moran
to provide court reporting services for this
11 deposition.  I will not be taking this
deposition under any contract that is prohibited
12 by O.C.G.A. 15-14-37 (a) and (b).

13    AccuTran, Inc., has no contract to
provide reporting services with any party to the
14 case, any counsel in the case, or any reporter
or reporting agency from whom a referral might
15 have been made to cover this deposition.
AccuTran, Inc. will charge its usual and
16 customary rates to all parties in the case, and
a financial discount will not be given to any
17 party to this litigation.

*Judy B. Mangiafico*

23 _____CCR# B-713 DATE:_____

24 Certified Court Reporter

# EXHIBIT D

## Deposition of Rhamses Reyes

Certified Copy Transcript

# In The Matter Of:

Yvette Adelle Sanders et al vs. Quiktrip Corporation et al

Deposition of Rhamses Reyes

September 28th, 2017



**AccuTran, Inc.**

*---certified court reporters---*
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705
770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

1    with friends?

2        A    No.

3        Q    Do you recall him leaving the store?

4        A    No.

5        Q    Did you know there were a group of

6    individuals out there as he left the store?

7        A    No.

8        Q    Have you watched the video of the

9    incident?

10       A    Yes.

11       Q    And when did you do that, was it to

12   prepare for this deposition or was it soon

13   after, or tell me when, or both?

14       A    It was both.

15       Q    Okay.  And what did you see in the

16   video?  We brought it to watch it, so we can do

17   that in a bit.  But tell me what you recall

18   seeing in the video.

19       A    Well, I recall me being on register

20   helping out a customer and I heard gunshots, I

21   looked up, I saw glass breaking, and I dove to

22   the ground.

23       Q    Anything else you can recall?

24       A    No.

25       Q    And that's the first notice you had

1    that there was even any kind of altercation is

2    when you were basically diving to the ground?

3        A    Yes, sir.

4        Q    Okay.  What about Alex, where was he

5    when this occurred?

6        A    He was somewhere in the back of the

7    store.

8        Q    All right.  Do you know if he knew of

9    any incident brewing or any of the events?

10       A    No.

11           MS. LEET:  Object to the form.

12       Q    (By Mr. Law) From your having been

13   there, are you comfortable in saying he probably

14   didn't see anything either because where he was

15   he wouldn't have been able to see it?

16           MS. LEET:  Object to the form.

17           MR. LAW:  What's the problem with

18       the form of the question, Nicole?

19           MS. LEET:  You're asking his

20       impression of another person's --

21           MR. LAW:  No, I'm not.  I didn't ask

22       for his impression.

23   BY MR. LAW:

24       Q    I said from where you were, are you

25   comfortable saying that he probably couldn't

1    and that's all he told me.  He said he was okay.

2        Q    The QTs, there's not a glass partition

3    between you and the customer in that particular

4    store, is there?

5        A    No.

6        Q    So it's the open counter like we see

7    in all the QTs.  I got pictures of it too.

8        A    Yes, sir.

9        Q    Okay.  At any point when Andrew and

10   his friends were in there, did you feel

11   threatened or concerned for your safety?

12       A    No.

13       Q    Were they doing anything loud,

14   boisterous, acting intoxicated or anything, to

15   your recollection?

16       A    No.

17       Q    I assume at 3:30 in the morning at

18   times over there on Buford Highway you do get

19   people like that?

20       A    Yes.

21       Q    But that wasn't this situation.  They

22   weren't acting inappropriate or out of --

23       A    No.

24       Q    Okay.  Really they were uneventful

25   when they came in, bought whatever they want and

Rhamses Reyes

28

1   left?

2       A    Yes, sir.

3       Q    Do you remember how many was with

4   Andrew when they came in and bought stuff?

5       A    No.

6       Q    Did you recognize Andrew ever

7   previously?

8       A    No.

9       Q    So you hit the ground after you heard

10  the gunshot; yes?

11      A    Yes.

12      Q    Then what?

13      A    I pressed my remote alarm.

14      Q    Okay.  There's something behind the

15  counter that's a remote alarm?

16      A    My -- well, we have several alarms:

17  The checkstand, back room, one of the coolers,

18  but we also have personal alarms on our -- that

19  we wear on our belts.

20      Q    Do you have yours on now?

21      A    No.

22      Q    And so you have a little kind of like,

23  what does it look like, a garage door opener or

24  something?

25      A    Yes.

1                    C E R T I F I C A T E

2    G E O R G I A:

3    FULTON COUNTY:

4              I hereby certify the foregoing

5        transcript was taken down, as stated in

6        the caption, and the questions and the

7        answers thereto were reduced to

8        typewriting under my direction; that the

9        foregoing pages 1 through 138 represent a

10       true and correct transcript of the

11       evidence given upon said hearing.

12             The witness did reserve the right to

13       read and sign the transcript.

14             This, the 25th day of October 2017.

15                    *Judy B. Mangiafico*

16             Judy B. Mangiafico, CCR-B-713

17

18

19

20

21

22

23

24

25

1                        DISCLOSURE

2    STATE OF GEORGIA:

3    FULTON COUNTY:

4        DEPOSITION OF:  RHAMSES PERALTA-REYES

5

6            Pursuant to Article 10.B. of the Rules
     and Regulations of the Board of Court Reporting
7    of the Judicial Council of Georgia, I make the
     following disclosure:

8
             I am a Georgia Certified Court
9    Reporter acting as an agent of AccuTran, Inc.,
     who was contacted by the offices of Law & Moran
10   to provide court reporting services for this
     deposition.  I will not be taking this
11   deposition under any contract that is prohibited
     by O.C.G.A. 15-14-37 (a) and (b).

12
             AccuTran, Inc., has no contract to
13   provide reporting services with any party to the
     case, any counsel in the case, or any reporter
14   or reporting agency from whom a referral might
     have been made to cover this deposition.
15   AccuTran, Inc. will charge its usual and
     customary rates to all parties in the case, and
16   a financial discount will not be given to any
     party to this litigation.

17

18

19

20

21

22

         _Judy B. Mangiafieo_
23   _____CCR# B-713 DATE:_____

24   Certified Court Reporter

25

AccuTran, Inc.
770-426-9705

# EXHIBIT E

## Plaintiff's Rule 26 Expert Report

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

## I.     Qualifications of Witness with List of All Publications within Last Ten Years

My name is John C. Villines; I have earned the following board certifications issued by ASIS International (ASIS): CPP (Security Management); PCI (Professional Certified Investigator); and PSP (Physical Security Specialist). I am designated by the International Society of Crime Prevention Practitioners as an "International Crime Prevention Specialist," and certified by the National Crime Prevention Association as a "National Crime Prevention Specialist" (Level II; Advanced Certification). My professional experience includes certification as an instructor for law enforcement, security personnel and investigators. Much of my professional research has been dedicated to topics associated with security management and policies and procedures as they relate to commercial properties, including convenience stores. Similarly, I studied related topics from an academic perspective when I obtained a Master of Science in Security Management and when I served as a Research Associate and Adjunct Instructor at the Georgia Police Academy.

Academically, I have completed post-graduate study in Statistics and Quantitative Methods (Harvard University) and various other courses related to Crime Analysis and Crime Prevention. I developed the Crime Prevention Specialist curriculum for the State of Georgia, which included the development and teaching of a curriculum used to train police and private sector crime prevention personnel in the fundamentals of crime prevention related to a variety of environments, including convenience stores. Please see attached CV (Exhibit A) for list of publications and additional qualifications.

Based upon my review of materials relevant to this case, and having relied upon a body of knowledge and experience relative to such an assessment, I have reached the following conclusions and opinions, as supported by attached exhibits (listed below), which are derived to a reasonable degree of professional probability, and which I reserve the right to amend and supplement.

## II.     Statement of Opinions to be Expressed and the Basis

### Crime Prevention Principles

This section summarizes the current state of crime prevention theory and peer-reviewed, published research on the efficacy of crime prevention methods; published standards and guidelines of the security and crime prevention industry; and widely-accepted methodologies utilized by security and crime prevention professionals to evaluate and mitigate security risks at a given location.

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

*Crime prevention* is defined as "the anticipation, recognition and appraisal of a crime risk and the initiation of some action to remove or reduce it" (National Crime Prevention Institute).[1] This report functions with that definition by addressing its two major elements. The first component – "appraisal of a crime risk" speaks to the issue of *foreseeability*, which is specifically addressed in the ASIS International *General Risk Assessment Guidelines*. Those guidelines recommend evaluating the following sources for crime-related events:

- Local police crime statistics and calls for service at the site and the immediate vicinity for a three-to-five year period
- Uniform Crime Reports published by the U.S. Department of Justice for the municipality
- The enterprise's internal records of prior reported criminal activity
- Demographic/social condition data providing information about economic conditions, population densities, transience of the population, unemployment rates, etc.
- Prior criminal and civil complaints brought against the enterprise
- Intelligence from local, state, or federal law enforcement agencies regarding threats or conditions that may affect the enterprise
- Professional groups and associations that share data and other information about industry-specific problems or trends in criminal activity
- Other environmental factors such as climate, site accessibility, and presence of "crime magnets"[2]

As that guideline observes, "Probability of loss is not based upon mathematical certainty, it is consideration of the likelihood that a loss risk event may occur in the future, based upon historical data at the site, the history of like events at similar enterprises, the nature of the neighborhood, the immediate vicinity, overall geographical location, political and social conditions, and changes in the economy, as well as other factors that may affect probability."[3] In the absence of "mathematical certainty," security professionals use a number of widely accepted methods to establish foreseeability based on the factors named above.[4] This report relies on a review of prior similar criminal activity, along with review of additional factors such as the nature of the site and apparent security vulnerabilities at that site, to establish the types of incidents that are reasonably foreseeable, which is to say, those incidents which a reasonable person would consider likely to occur at a particular site if no changes are made to the security posture of that site.

This site-specific focus addresses the criminological concept of place, which is an essential element in the second component of the definition of crime prevention noted above:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

"initiation of some action to remove or reduce" crime. "Routine Activity Theory" describes three elements which need to converge in time and space (i.e. at a particular place): a likely offender, a suitable target, and the absence of a capable guardian.[5] John Eck applies Routine Activity Theory in a manner particularly suited to the process of assessing the adequacy and vulnerability of a crime prevention program. Eck presents his approach with two concentric triangles, and it is often referred to as the "Crime Triangle" or the "Problem Analysis Triangle." Marcus Felson summarizes Eck's concentric crime triangles thusly:

> "The *inside triangle* has three elements that must converge for a normal crime to occur: the potential offender, the crime target, and the place or setting for the crime. For a crime problem to occur, the offender needs to find a target in a suitable place."[6]

> "The *outside triangle* depicts three sorts of supervisors: the handler, the guardian, and the place manager. The handler supervises the offender, the guardian supervises the target and the manager supervises the crime setting. Their absences make crime feasible. A crime occurs when the offender escapes handlers, finds targets free from guardians in settings not watched by managers."[7]

These principles are often integrated with "Rational Choice Theory" to help understand practices likely to reduce crime. As one criminologist explains, in Rational Choice Theory, "individual actors try to realize their goals to the highest degree taking into account the constraints (or opportunities). In other words, individuals try to maximize their utility."[8] The elements of that utility are, in RCT, addressed through three propositions:

- *preference proposition*: individual preferences (or goals) are conditions of behaviors which are instrumental in satisfying the respective preferences;
- *constraints proposition*: any phenomena that increase or decrease the possibilities of satisfying individual preferences (that is, constraints or opportunities) by performing individual actions are conditions for performing these actions;
- *utility maximization proposition*: individuals choose those actions that satisfy their preferences to the highest extent, taking into account the constraints (or opportunities) imposed on (or open to) them."[9]

Put more broadly, Rational Choice Theory is built on the concept that the offender's decision to perpetrate a crime is based on their likelihood of accomplishing their goals, and the likelihood of encountering constraints limiting access to those or other, pre-existing goals. As a simple example, a person whose goal is to obtain money, but who also wishes to retain their freedom, is

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

more likely to offend somewhere that they expect to find unprotected money, and where they do not expect to be caught, arrested, and incarcerated. Significantly, Rational Choice Theory is not predicated on fully reasonable behavior on the part of the offender, but rather on "limited" or "bounded" rationality based on the immediate likelihood of obtaining their goals and/or encountering constraints.[10]

Collectively, Routine Activity Theory, the Crime Triangle, and Rational Choice Theory are all widely-accepted criminological concepts. They are addressed in more detail in several seminal texts, including: Ronald Clarke and Marcus Felson's book, *Routine Activity and Rational Choice* (1993); two books edited by Dr. Clarke, *Situational Crime Prevention: Successful Case Studies* (2ed) (1997) and *Rational Choice and Situational Crime Prevention* (1997); and, *Explaining Criminals and Crime: Essays in Contemporary Theory*, edited by Paternoster and Bachman, (2000). In addition, these theories underlie the work on crime prevention – conducted by Ronald Clarke and John Eck – published by the United Stated Department of Justice.[11] They are also a significant component of the Congressionally-mandated study, *Preventing Crime: What Works, What Doesn't, and What's Promising*.[12]

Together, these concepts underline a set of practices generally referred to as "Situational Crime Prevention." Established and expanded over decades by Dr. Clarke, situational crime prevention methods fall into five general categories:

- Increase the Effort needed to commit a crime
- Increase the Risks of committing a crime
- Reduce the Rewards for committing a crime
- Reduce the Provocations for committing a crime
- Remove Excuses for committing a crime[13]

One key practice that significantly supports the first two of these sets of practices is the establishment of capable guardianship. As Harvard criminologist Daniel Nagin explains, "Capable guardians are persons whose presence discourages a motivated offender from victimizing a criminal opportunity. Capable guardians include persons with no official crime control authority who nonetheless are personally willing to intervene or to summon those with the authority to intervene. The police themselves also serve as capable guardians in their conventional patrol and monitoring functions."[14]  In a 1995 book chapter entitled "Those Who Discourage Crime," prominent criminologist Marcus Felson describes capable guardians as those who supervise suitable targets and serve to prevent crime "by simple presence,"[15] and states that place managers are, broadly, "those who control or monitor places," which may include management-level and staff-level employees.[16] Felson explains that, "In general, crime is most

readily discouraged when people have personal and assigned responsibility and a clear focus on places or settings."[17]

Capable guardianship can be established through the deployment of private security and public law enforcement personnel, through the use of physical security measures, and by giving employees and other "place managers" a visible presence and the capability to maintain active surveillance.[18] Specifically, Clarke and Eck note that, "In addition to their primary function, some employees also perform a surveillance role."[19]

Along with establishing capable guardianship, another key element of situational crime prevention is "opportunity blocking," a strategy which has proven to be highly effective in preventing crime at places, as reported by the National Institute of Justice in 1996.[20] Published scientific research, reported in the above-referenced Congressionally-mandated study, supports this assertion, stating: "blocking crime opportunities at places can reduce crime...over 90 percent of the interventions reported evidence of crime reduction following the installation of an opportunity blocking tactic."[21]

Opportunity blocking can include hardening targets with physical security measures, controlling access, and deflecting offenders.[22] The effectiveness of these techniques in preventing crime at places is well-established. It is important to note, however, that the primary resource for implementation of opportunity blocking tactics is typically the entity or entities in charge of the place, as opposed to the users of the place or even public law enforcement (with the latter responsible for a variety of public safety-related issues throughout the entire surrounding area). Put simply, management that does not deter criminal opportunity enables criminal activity, by the absence of a capable guardian or other sufficient deterrence measures. This is a direct reflection of the importance of place management, one element of the Crime Triangle noted above.[23]

In determining where and to what degree to implement these and other situational crime prevention measures, place managers and security professionals consider the foreseeability of criminal activity at a specific place. One component of analyzing foreseeability is looking at prior criminal activity at a site and in the surrounding area. Of relevance is not simply the types of prior criminal acts, but the "opportunity structure" of those acts. For instance, a 1988 article published in the widely respected *Journal of Quantitative Criminology* noted that the opportunities associated with the property crime of residential burglary are very similar to those associated with residential rape, though the former is a property crime and the latter is a violent crime.[24] Similarly, the opportunities associated with the property crime of breaking into a vehicle or theft of a vehicle in a parking lot can reasonably be correlated with the opportunities

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

associated with crimes of assault or robbery in that same parking lot. The essential variable in considering the relevance of these prior events, and whether they provide predictive value of future events, is whether the opportunity structures are similar.

## Defendant's Failures Relevant to the Instant Case

NFPA 730 *Guide for Premises Security*, 2014 Edition, was approved as an American National Standard on December 2, 2013[25] with the primary goals of providing "an environment for the occupants inside or near a building that is reasonably safe from security threats" as well as "reasonable safeguards for protection of property from security threats."[26] NFPA 730 states that "Implementing the goals of this guide should require a security plan,"[27] and specifically advises that a "retail establishment should have a security management plan."[28] The guide states that as part of that security plan, a security vulnerability assessment (SVA) – defined as a "systematic and methodical process for examining ways an adversary might exploit an organization's security vulnerabilities to produce an undesired outcome"[29] – should be conducted for a retail establishment[30] by a qualified, certified professional.[31] Because the landscape of security risks is dynamic, "The review and update of the SVA should be based on the level of risk, threats, crime, and change of conditions within the organization."[32] The SVA and the security plan serve as the basis for implementing procedures and controls for the premises;[33] for the decision to provide security personnel;[34] and for conducting security patrols.[35]

The ASIS International *Protection of Assets* manual – widely regarded as perhaps the most authoritative and comprehensive published treatment of security management topics – explains the critical importance of assessment to the provision of adequate security as follows:

> "The protection of assets is not an exact science. What works in one situation may have disastrous results in another. Asset owners and security professionals alike must analyze specific situations or environments; recognize needs, issues and resources; and draw conclusions regarding the most appropriate protection strategies and applications."[36]

Defendant QuikTrip Corporation ("Defendant QuikTrip") acknowledges the relevance of criminal activity in the surrounding area to the security needs of a property in its "Security Guards" policy, which states that "It may become necessary to place a security guard in a store to provide safety for employees and customers or as a deterrent in areas where crime or the chance of crime is prevalent."[37] However, there is no indication in the evidence reviewed that Defendant QuikTrip took reasonable proactive steps to fulfill this voluntary guideline by making itself

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

aware of the "chance of crime" in the area of the subject QuikTrip store (#797) at 4050 Buford Highway, Atlanta, Georgia. Instead, this policy appears to leave evaluation of risk to the subjective discretion of non-security personnel, beginning with the store manager:

> "If a Store Manager believes he/she has the need for a security guard, he/she should contact his/her Store Supervisor. The Store Supervisor will then discuss the needs of the store with the Store Manager. If at that time it is decided there is a need for security, the Store Supervisor will take a proposal to the Division Manager, who will make the final decision."[38]

The activation of this process requires on-site personnel to observe risk factors and security vulnerabilities and to proactively volunteer that information up the management chain. The *Risk Assessment Standard* – published by ASIS International and The Risk and Insurance Management Society and approved by the American National Standards Institute – advises that "Confidence in the risk assessment process is dependent on an impartial evaluation of the risk sources and management practices" and states that assessors "should be impartial[.]"[39] This standard explains that "[t]hreats to impartiality include… c) Familiarity – threats that arise from being too familiar with the processes and/or persons being assessed to obtain unbiased evidence and conclusions; d) Habituation – threats that arise from complacency or over-familiarity with the context of operating conditions; [and] e) Cognitive-bias – threats that arise from individuals creating their own subjective reality through their preconceived perception of the input…"[40] It is reasonable to expect that the observations of on-site personnel – and their willingness to communicate those observations – could readily be influenced by any or all of the above factors. As such, predicating the performance of any assessment upon voluntary communication from on-site personnel introduces inherent unreliability into the process, and is inconsistent with published standards and guidelines.

In the instant case, the evidence reviewed indicates that on-site staff members employed at the subject QuikTrip were not provided with relevant training regarding a reasonable methodology to guide them in making informed observations regarding the security posture of the store. Anthony Bolling (night assistant)[41] and Rhamses Peralta-Reyes (relief assistant)[42] testify that they have no training on security or crime deterrence,[43,44] and store manager Gregg Romero[45] gives no indication that he received any security-related training beyond what appears in Defendant QuikTrip's policies and procedures.[46] The failure to either provide the personnel entrusted to assess security needs with the necessary training to make such an evaluation – or to retain a qualified security professional to formally make that evaluation – is inconsistent with published industry standards and guidelines. Furthermore, it is inconsistent with the Defendant's stated priorities regarding employee and customer safety, as articulated in QuikTrip's policies:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

- "QuikTrip's primary concern is the safety of its customers and employees."[47]
- "You and your customers are the most important concern of QT. Nothing is more valuable."[48]
- "The store security system is designed to provide protection for both employees and customers."[49]

There existed an established security vulnerability at the property, specifically the proximity of multiple clubs,[50] and the evidence reviewed indicates that employees were aware of the vulnerability, but the Defendant did not evaluate or address that vulnerability in a manner consistent with the above principles or their own policies. The relationship between alcohol consumption and the risk of violent crime is well-established in published standards, guidelines, and peer-reviewed published research, including *Assaults in and Around Bars* (Department of Justice, 2006) and *Alcohol Outlets as Attractors of Violence and Disorder* (National Institute of Justice, 2008). Relevant citations include:

- "The proliferation of bars in many communities has led to increases in assaults in and around bars."[51]
- "The density of on-premise [alcohol] outlets is a significant predictor of aggravated assault."[52]
- "The research conducted over the last few decades has suggested that drinking establishments, particularly bars, attract clientele more likely to include motivated or potential offenders."[53]

To use the language of Defendant QuikTrip's "Security Guards" policy, an area with several establishments that serve alcohol in close proximity to each other could reasonably be described as an area where "the chance of crime is prevalent," and evidence indicates that patrons of those establishments frequented the subject QuikTrip as a routine activity. Mr. Reyes testifies that it is "an every-night thing" for sometimes-intoxicated customers leaving the strip club Follies between 3:00 a.m. and 4:00 a.m. to come into the subject QuikTrip and buy food.[54] Defendant deployed off-duty law enforcement officers to provide security on Friday and Saturday – which deponents testify were the nights with the highest volume of customers coming in from clubs[55,56,57] – but did not engage in ongoing formal assessment of threats and vulnerabilities to determine the requirements for guardianship at the site on other days of the week. Known prior incidents of violent crime at the site, including two "shoot outs" in the parking lot in 2014 (elaborated below), should have alerted Defendant that such ongoing evaluation was warranted. An appropriate needs-based analysis – taking into consideration both qualitative and quantitative factors – would have identified a different pattern of risk than that which was identified by informal observation, as addressed below.

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

Defendant's own criteria for considering the deployment of security personnel – evaluating and responding to the "chance of crime" in the area – inherently requires awareness of those factors which affect a "chance of crime." The reasonable methodology for accomplishing that objective would have included: requesting and reviewing data regarding reported criminal activity on the property and in the surrounding area in the course of conducting a site-specific SVA; creating a site-specific written security plan; implementing physical security measures, policies, and procedures consistent with assessed need; regularly re-assessing to determine whether the measures implemented are or remain effective; and regularly updating the site-specific SVA and site-specific written security plan to detect and respond to changing risk.

Defendant QuikTrip's failure to conduct a site-specific security vulnerability assessment and create a site-specific written security plan[58] is inconsistent with the published industry standards and guidelines cited herein.


### Defendant's Awareness of Prior Incidents

The evidence reviewed indicates that Defendant QuikTrip was aware of multiple reported incidents of violent criminal activity which occurred in the parking lot in the three years prior to the murder on December 29, 2016, including:

- October 1, 2016 – Security Alert-Assault – Police officers requested surveillance video for a murder investigation. In an internal report, an employee writes: "The police officer informed me that there was a taxi driver driving a blue Toyota Prius that was on our property at 9:21 PM with a gun pointed to her head. She screamed from her vehicle 'somebody help me' then left the store by 9:22 PM and was murdered sometime after leaving our property."[59]
- November 9, 2014 – Shots Fired – Shoot out between two vehicles. Nine suspects detained, assault rifles and handguns found.[60,61]
- April 6, 2014 – Aggravated Assault – Shoot out between parties in two vehicles in parking lot of subject QuikTrip. Police report narrative states that shots fired were initially called in by a security officer at Follies nightclub, and indicates the totality of the incident spanned multiple locations, including the Mansion nightclub (where two victims stated they were shot) and Queen of Sheba restaurant.[62,63]

These police report narratives, indicative of the observations of responding law enforcement officer(s), provide documentation of Defendant's notice of the dangerous and violent conditions at the property and in the surrounding area. A larger, quantitative analysis of reported incidents

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

of criminal activity with predictive value in the subject incident (time period: January 1, 2012 through December 29, 2016; radius: up to ½ mile from the site) reveals noteworthy trends:

- Of the 20 violent incidents which occurred outside in the above time period, 15 occurred between the dates of January 1, 2015 and December 29, 2016.
- Of the 14 gun-related incidents which occurred outside in the above time period, 11 occurred between the dates of January 1, 2015 and December 29, 2016.

In this time period in which it appears that significant violent outdoor activity increased in the area (January 1, 2015 through December 29, 2016):

- the one-hour periods with the highest incidence of reported criminal activity were: 3:00 a.m. to 4:00 a.m. (20% of counted incidents), followed by 2:00 a.m. to 3:00 a.m. and 3:00 p.m. to 4:00 p.m. (13.33% of counted incidents each);
- the days of the week with the highest incidence of reported criminal activity were: Saturday (33%), Thursday (20%), Tuesday (20%), and Sunday (13%); and
- the months with the highest incidence of reported criminal activity were: August (27%), October (20%), and December (13%).

It is important to note that, consistent with this pattern, the event which is the subject of this case was a violent, outdoor incident which occurred on a Thursday in December at approximately 3:24 a.m.

Gathering and reviewing the aforementioned, relevant data on prior criminal activity would also have informed Defendant of a specific prior incident that was indicative of a need to revise and/or reinforce internal policies and procedures. On December 13, 2015, police officers arrested two females engaged in a fight out front of the subject QuikTrip. In narrative, the reporting officer notes that he heard "a loud commotion across the street" while concluding a traffic stop at Buford Highway/Dering Circle.[64] Despite this indication that the sound of the conflict was sufficient to draw the attention of an officer off-property, no internal report was noted for this incident in the evidence reviewed. From this it is reasonable to conclude that Defendant QuikTrip's employees either did not observe the violent conflict (which would further reinforce shortcomings in guardianship), or they did not report the incident internally (which would indicate non-compliance with both company policy and established guidelines, for example, "Once the company has established guidelines regarding which types of incidents must be written up, all such incidents should be reported to a central point"[65]).

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

*Statement of Opinion*

The qualitative analysis of documented criminal activity at or near the site, to include those incidents known to Defendant Quick Trip and those reported in the narratives of police incident reports, along with the quantitative analysis of patterns of reported criminal activity at or near the site, can be reasonably stated to rise to Defendant Quick Trip's own standard of a "chance of crime." In addition, a review of that data indicates that it is reasonable to anticipate the specific possibility of violent criminal activity at or near the site, and that, based on the analysis above, it is also reasonable to anticipate that violent, criminal activity would happen during that hour of the morning, on that day of the week, during that time of the year.

**Preventability Analysis**

Daniel Nagin advises that "improved guardianship reduces the probability that the target can be successfully victimized and increases the probability of the… outcomes that represent failure from the offender's perspective."[66] In the instant case, improved guardianship of the parking lot (beginning with and as informed by a systematic, evidence-based assessment of the risks) could have been achieved with improved employee observation and response, off-duty law enforcement presence, or both.

The evidence reviewed indicates that – when they accepted the responsibility of exercising guardianship of the parking lot – Defendant QuikTrip's employees had a practice of reporting and reacting to circumstances substantially similar to those which preceded the subject shooting when they observed those circumstances to be taking place. It does not appear, however, that Mr. Reyes – who was working at the subject QuikTrip at the time of the incident[67] – accepted such a responsibility; in fact, he testifies that at the time of the subject shooting he had no responsibilities for patrolling or securing the parking lot.[68]

Examples of similar, reported circumstances where Defendant's employees performed their guardianship and place management functions include:

- December 14, 2016 – Panhandling – Employee pressed panic alarm and "reported a panhandler in front of the store bothering customers. He has been asked to leave but refused to comply. The suspect left before police arrived."[69]
- November 27, 2016 – Disorderly Conduct – Employee pressed panic alarm "because she had a couple people arguing out front. Another customer stepped in to mediate the argument… No police needed."[70]

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

- November 21, 2016 – Disorderly Conduct – Employee pressed panic alarm to report an incident wherein suspect and victims argued at gas pumps. "Suspect… pulled the gas nozzle out of the victims car sprayed the car." Employee reported this incident after suspect and victims had already left property; no police dispatched.[71]
- October 24, 2016 – Disorderly Conduct – Employee pressed panic alarm reported two subjects arguing in parking lot; police dispatched.[72]

Relative to the instant case, Mr. Reyes appears to indicate in testimony that, had he observed all the events preceding the shooting, he would have hit his panic alarm.[73] However, Mr. Reyes testifies that he neither saw the assailants in the parking lot after they left the store[74] nor knew there was a group of individuals outside when the victim exited the store,[75] and he testifies that his first notice that there was something amiss was when he heard gunshots.[76] Additionally, Mr. Reyes' testimony indicates that the other two employees working at the time[77,78] were also not positioned to fulfill a place management function – he states that at the time of the shooting, the part-time clerk was in the back of the store,[79] while the QA employee was cleaning the ice cream machine in the kitchen.[80]

Mr. Romero's attested understanding of what Mr. Reyes saw and did at the time of the subject incident is not consistent with the above testimony from Mr. Reyes. Mr. Romero testifies that Mr. Reyes monitored the people involved and made sure the incident did not escalate, and states, "I would have done the exact same thing."[81] Mr. Romero subsequently reasserts that Mr. Reyes "was paying attention closely to make sure [the situation] did not escalate into anything[,]" and he agrees that is exactly what Mr. Reyes was supposed to do.[82] Mr. Romero testifies further that if Mr. Reyes could not watch people in the parking lot, he would expect Mr. Reyes to have his clerk keep an eye on them, or to hit the alarm button.[83] The actions described by Mr. Romero would have been consistent with exercising capable guardianship; however, Mr. Reyes does not corroborate Mr. Romero's account, and the employee's behaviors as recorded in video surveillance in the several minutes preceding the subject incident do not appear consistent with a state of close attentiveness to activity outside of the store.[84]

Testimony of multiple law enforcement officers reinforces the value that capable guardianship and effective place management could have had in the instant case. Sgt. Gaetano Antinozzi of the Chamblee Police Department, who was on duty at the time of the murder on December 29, 2016, testifies that he pulled into the parking lot of the subject QuikTrip and observed two or three people involved in a conversation that "looked animated and… negative." He testifies that as he was pulling into position to get a better view, he heard three gun shots.[85] Quintin Heard, a friend of victim Andrew Spencer[86] and witness to the subject incident,[87] testifies as follows regarding Sgt. Antinozzi's arrival on the property just before the shooting:

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

"At that moment was when I seen Chamblee PD pull into the parking lot, and they entered from the Buford Highway side of the street. So Red Shoes would have his face towards me, back towards Buford Highway, and didn't see the police officer nor did the driver, and I don't think that the gentleman that was with him saw them either. I automatically relaxed because I was assuming that someone had called the police or they were just doing a regular routine in that area because of knowing what Follies is."[88]

Sgt. Antinozzi testifies further that if an off-duty had been present at the time, that person would have been obligated to intervene.[89] Sgt. Chris Bothwell and Investigator Alex Chang of the DeKalb County Sheriff's Office – both of whom have worked extra-duty shifts at the subject QuikTrip for several years[90,91] – provide testimony that is consistent with Sgt. Antinozzi's statement. Sgt. Bothwell states that if he observed an argument or a negative confrontation, he would approach and investigate, and he agrees that on prior occasions he has done so and it has de-escalated the situation.[92] Similarly, Investigator Chang testifies that if he saw a negative confrontation occurring between two persons outside, "we go out there, mainly it's going to be a deterrent, so they leave or, if they don't, of course I approach both of them… If it's something minor, just make sure they leave separate ways. To be on the safe side, I take the less aggressive, tell them to leave first, possibly wait 15 minutes and have the next subject leave… that seems to work most of the time. No one wants to go to jail."[93] Had an extra-duty law enforcement officer been visibly deployed and monitoring the parking lot, the interactions that preceded the murder would, more likely than not, have prompted intervention – or been deterred from occurring at all.

*Statement of Opinion*

The presence of an appropriately trained and deployed capable guardian in the exterior common areas of the subject QuikTrip on Thursday, December 29, 2016 in the hour of 3:00 a.m. would, more likely than not, have deterred or prevented the murder of Andrew Spencer.

## Summary and Opinion

I am aware that the failures referenced herein are significant deficiencies and reflect a lack of conformity with widely accepted industry practices and published guidelines, as noted above. Based upon this information and my review of materials relevant to this case, and having relied upon a body of knowledge and experience relative to such an assessment, I have reached the

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

following conclusions and opinions, which are derived to a reasonable degree of professional probability, and which I reserve the right to amend and supplement.

1. Defendant QuikTrip failed to comply with published industry standards and guidelines and with relevant methodologies for assessing and mitigating risk, including:
   a. Failure to conduct a security vulnerability assessment (SVA) or comparable methodical, evidence-based assessment of the subject QuikTrip;
   b. Failure to create a site-specific written security plan for the subject QuikTrip;
   c. Failure to evaluate the effectiveness of existing security measures on an ongoing basis; and,
   d. Failure to select, implement, and/or deploy security countermeasures consistent with assessed needs.

2. Defendant QuikTrip failed to comply with their voluntary guideline which recognized the correlation between the risk or "chance of crime" in an area and the security needs of the property.

3. The qualitative analysis of documented criminal activity at or near the site, to include those incidents known to Defendant Quick Trip and those reported in the narratives of police incident reports, along with the quantitative analysis of patterns of reported criminal activity at or near the site, can be reasonably stated to rise to Defendant Quick Trip's own standard of a "chance of crime." In addition, a review of that data indicates that it is reasonable to anticipate the specific possibility of violent criminal activity at or near the site, and that, based on the analysis above, it is also reasonable to anticipate that violent, criminal activity would happen during that hour of the morning, on that day of the week, during that time of the year.

4. The presence of an appropriately trained and deployed capable guardian in the exterior common areas of the subject QuikTrip on Thursday, December 29, 2016 in the hour of 3:00 a.m. would, more likely than not, have deterred or prevented the murder of Andrew Spencer.

## III.    Data or Other Information Considered in Forming Opinions

Please see Endnotes and attached Exhibits:
- Exhibit B – List of Materials Received
- Exhibit C – Works Cited

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

**IV.    Exhibits to be Used as a Summary of or Support for the Opinions**

In addition to Endnotes and Exhibits B and C please see:
- Exhibit D – Opinion Support
- Exhibit E – Annotations
- Exhibit F – Horizontal Analysis
- Exhibits G-1 and G-2 – Data Analysis and Spreadsheet Key

No other Exhibits have been identified at this time.

**V.    List of Cases in which Expert has Testified at Trial or Deposition in Previous Four Years**

Please see attached Exhibit H.

**VI.    Compensation**

My rate of compensation for providing consulting services and/or expert testimony is four hundred dollars ($400) per hour, billed against an initial retainer of $4000; additionally, a minimum of $2000 is billed for testimony at trial or in deposition.

Respectfully submitted,

_____
John C. Villines

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

## Endnotes

[1] Dixon, R.W. *Practice of Crime Prevention, Vol. 1 – Understanding Crime Prevention*. National Crime Prevention Institute, 1978.

[2] ASIS International. *General Security Risk Assessment Guideline*. Alexandria, VA: ASIS International, 2003. p. 12

[3] ASIS International. *General Security Risk Assessment Guideline*. Alexandria, VA: ASIS International, 2003. p. 13

[4] Kennedy, Daniel B. "Forensic Security and the Law." In *The Handbook of Security*. 1st ed. Martin Gill, Ed. New York: Palgrave Macmillan, 2006. pp 118-145.

[5] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 87

[6] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 91

[7] Felson, Marcus. "The Routine Activity Approach." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. p. 91

[8] Opp, Karl-Deiter. "'Limited Rationality' and Crime." In *Rational Choice and Situational Crime Prevention*. Graeme Newnan, Ronald V. Clarke, and Shlomo Shoham, Eds. New York: Ashgate Publishing, 1997.

[9] Opp, Karl-Deiter. "'Limited Rationality' and Crime." In *Rational Choice and Situational Crime Prevention*. Graeme Newnan, Ronald V. Clarke, and Shlomo Shoham, Eds. New York: Ashgate Publishing, 1997.

[10] Cornish, Derek B. and Ronald V. Clarke. "The Rational Choice Perspective." In *Environmental Criminology and Crime Analysis*. 2nd ed. Richard Wortley and Michael Townsley, Eds. New York: Routledge, 2017. pp. 50-51

[11] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005.

[12] Eck, John E. "Preventing Crime at Places." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998. p. 7-1 – 7-77.

[13] Cornish, Derek and Ronald V. Clarke. "Opportunities, Precipitators, and Criminal Decisions: A Reply to Wortleys's Critique of Situational Crime Prevention." In *Theory for Situational Crime Prevention*. M. Smith and D.B. Cornish, Eds. Crime Prevention Studies, vol 16. Monsey, NY: Criminal Justice Press, 2003. p. 90

[14] Nagin, Daniel S. "Deterrence in the Twenty-First Century," *Crime and Justice,* Vol. 42, 2013. p. 43

[15] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. pp. 53-54

[16] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. pp. 54-55

[17] Felson, Marcus. "Those Who Discourage Crime." In *Crime and Place: Crime Prevention Studies, Volume 4*. John Eck and David Weisburd, Eds. Monsey, New York: Criminal Justice Press, 1995. p. 64

[18] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 14

[19] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 78

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

---

[20] Weisburd, David. "Reorienting Crime Prevention Research and Policy: From the Causes of Criminality to the Context of Crime." Washington, DC: National Institute of Justice, 1996.

[21] Sherman, Lawrence W. "Preventing Crime: An Overview." In *Preventing Crime: What Works, What Doesn't, What's Promising*. Lawrence W. Sherman, et al, Eds. Washington, DC: National Institute of Justice, 1998.

[22] Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 76

[23] See, for instance, Clarke, Ronald V. and John E. Eck. "Crime Analysis for Problem Solvers: In 60 Small Steps." Washington, DC: US Department of Justice, 2005. p. 32

[24] Warr, M. "Rape, Burglary, and Opportunity." Journal of Quantitative Criminology, Vol. 4, No. 3, 1988.

[25] NFPA 730 *Guide for Premises Security*, 2014 Edition. 730-1

[26] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.1.1

[27] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.1.2

[28] NFPA 730, *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.1

[29] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 3 Definitions, Section 3.3.41

[30] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.2

[31] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 5 Security Planning, Section 5.3.2

[32] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 4 General, Section 4.4.2

[33] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.1.2.2.2

[34] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.2.1.4.1

[35] NFPA 730 *Guide for Premises Security*, 2014 Edition. Chapter 18 Retail Establishments, Section 18.2.1.4.3

[36] ASIS International. "Security Management: Basis For Enterprise Assets Protection 4.1.3 Historical Perspectives." *Protection of Assets*. Alexandria, VA: ASIS International, 2012.

[37] Plaintiff's Exhibit 27; Policy ST5-06-009 Security Guards, Revised July 2010; Bates QT000029

[38] Plaintiff's Exhibit 27; Policy ST5-06-009 Security Guards, Revised July 2010; Bates QT000029

[39] ASIS International and The Risk and Insurance Management Society, Inc. *Risk Assessment Standard*. ANSI/ASIS/RIMS RA.1-2015. Alexandria, VA: ASIS International, 2015. p. 9

[40] ASIS International and The Risk and Insurance Management Society, Inc. *Risk Assessment Standard*. ANSI/ASIS/RIMS RA.1-2015. Alexandria, VA: ASIS International, 2015. p. 9

[41] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 9-10

[42] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 12-13

[43] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 20-21

[44] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 41

[45] Deposition Testimony of Gregg Romero, September 28, 2017, pp. 12, 52

[46] Deposition Testimony of Gregg Romero, September 28, 2017, p. 31

[47] Plaintiff's Exhibit 28; Policy 2-01-002 Fights on QuikTrip Property, Updated June 2016; Bates QT000023

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

[48] Plaintiff's Exhibit 33; Store Security Procedures CD Guide dated June 22, 2016; Bates QT000100

[49] Plaintiff's Exhibit 31; Policy ST5-04-007 Store Security System, Revised October 17, 2016; Bates QT000006

[50] Deposition Testimony of Gregg Romero, September 28, 2017, p. 33

[51] Scott, Michael S. & Kelly Dedel. *Assaults in and Around Bars*, 2nd Ed. Washington, DC: Office of Community Oriented Policing Services, US Department of Justice. August 2006. p. 1

[52] Roman, Catherina Gouvis, Shannon E. Reid, Avinash S. Bhati, & Bogdan Tereshchenko. *Alcohol Outlets as Attractors of Violence and Disorder.* Washington, DC: The Urban Institute; prepared for The National Institute of Justice, 2008. p. IV

[53] Roman, Catherina Gouvis, Shannon E. Reid, Avinash S. Bhati, & Bogdan Tereshchenko. *Alcohol Outlets as Attractors of Violence and Disorder.* Washington, DC: The Urban Institute; prepared for The National Institute of Justice, 2008. p. 104

[54] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 47

[55] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 49-51

[56] Deposition Testimony of Gregg Romero, September 28, 2017, pp. 32-33

[57] Deposition Testimony of Anthony Bolling, November 2, 2017, pp. 13-14

[58] Defendant QuikTrip Corporation's Responses to Plaintiffs' Interrogatories, p. 8, No. 12

[59] Store 797 Incident Report dated October 1, 2016; Bates stamp QT000036

[60] Chamblee Police Department Incident Report, Case #14-08852

[61] Store 797 Incident Report dated November 9, 2014; Bates stamp QT000038

[62] Chamblee Police Department Incident Report, Case #14-02297

[63] Store 797 Incident Report dated April 6, 2014; Bates stamp QT000039

[64] Chamblee Police Department Incident Report, Case #15-10516

[65] ASIS International. "Security Management: 5.7 Systematic Incident Reporting." Protection of Assets. Alexandria, VA: ASIS International, 2012.

[66] Nagin, Daniel S. "Deterrence in the Twenty-First Century," *Crime and Justice,* Vol. 42 (2013), p. 44

[67] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 14, 16

[68] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 76, 134

[69] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000050

[70] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000049

[71] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000049

[72] Customer Activity Report, QuikTrip #797, April 30, 2015 through December 31, 2016; Bates stamp QT000048

[73] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 104-105

[74] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 79

[75] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 24

Yvette Adelle Sanders, et al. v. QuikTrip Corporation
United States District Court
Northern District of Georgia, Atlanta Division
Case Number 17-cv-023441-WSD

---

[76] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 21, 24-25

[77] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, p. 16

[78] Plaintiff's Exhibit 12; QuikTrip Damage to Property form dated December 29, 2016; Bates stamps QT 000088 to QT 000090

[79] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 25-26

[80] Deposition Testimony of Rhamses Peralta-Reyes, September 28, 2017, pp. 17-18

[81] Deposition Testimony of Gregg Romero, September 28, 2017, p. 41

[82] Deposition Testimony of Gregg Romero, September 28, 2017, p. 43

[83] Deposition Testimony of Gregg Romero, September 28, 2017, p. 147

[84] 0797-lcheatha-POS1_2-20161229-0200-20161229-0300.ave, approximately 3:21:35 AM to 03:24:20 AM

[85] Deposition Testimony of Sergeant Gaetano Antinozzi, November 14, 2017, p. 16

[86] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, pp. 13-14

[87] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, pp. 20, 42

[88] Deposition Testimony of Quintin Marcus Heard, October 3, 2017, p. 57

[89] Deposition Testimony of Sergeant Gaetano Antinozzi, November 14, 2017, p. 47

[90] Deposition Testimony of Sergeant Christopher Bothwell, November 27, 2017, p. 7

[91] Deposition Testimony of Investigator Alex Chang, November 27, 2017, p. 7

[92] Deposition Testimony of Sergeant Christopher Bothwell, November 27, 2017, pp. 15, 24-25

[93] Deposition Testimony of Investigator Alex Chang, November 27, 2017, pp. 17-18

# EXHIBIT F

## Deposition of Marc Milburn

Certified Copy Transcript

# In The Matter Of:

Yvette Adelle Sanders et al vs. QuikTrip Corporation, and BJS QT, LLC

Deposition of Marc Milburn

February 27th, 2018



**AccuTran, Inc.**
*---certified court reporters---*
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
Phone: 770-426-9705
Fax: 770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

Marc Milburn

1    and make sure that we have a good environment for our

2    customers to shop, for our employees to work, and to

3    make sure that our merchandise is secure.

4        Q.   What about deterring third-party crime as to

5    as it concerns people, are they there for that purpose

6    as well?

7        A.   That is something that we use it for, as a

8    deterrent.

9        Q.   Are they used as a deterrent at Store 797?

10       A.   They're there for lot control and obviously

11   their presence will also support that as well as a

12   deterrent.

13       Q.   On the night of our incident and at the time

14   of the incident, are you aware there were three

15   employees working at QuikTrip?

16       A.   Yes, ma'am.

17       Q.   Two of those employees were in the back and

18   one was in the front of the store.  Is that typical

19   when you have customers inside the store and outside

20   the store, that you would have only one person kind of

21   on the floor?

22       A.   That could happen.

23       Q.   Should that happen?

24       A.   Depending on what their work tasks and what

25   their assignments were, that is a possibility and that

1                            DISCLOSURE

2      STATE OF GEORGIA:

3      COBB COUNTY:

4

5                 DEPOSITION OF:  MARC MILBURN

6

7              Pursuant to Article 10.B. of the Rules and

       Regulations of the Board of Court Reporting of Judicial

8      Council of Georgia, I make the following disclosure:

9              I am a Georgia Certified Court Reporter acting

10     as an agent of AccuTran, Inc., who was contacted by the

11     offices of Law & Moran, to provide court reporting

12     services for this deposition.  I will not be taking this

13     deposition under any contract that is prohibited by

14     O.C.G.A. 15-14-37 (a) and (b).

15             AccuTran, Inc., has no contract to provide

16     reporting services with any party to the case, and

17     counsel in the case, or any reporter or reporting agency

18     from whom a referral might have been made to cover this

19     deposition.  AccuTran, Inc. will charge its usual and

20     customary rates to all parties in the case, and a

21     financial discount will not be given to any party to

22     this litigation.

23

24     _____, CCR# B-2007 DATE:_____

25     Debbie C. Hennings

Marc Milburn

63

                              CERTIFICATE


STATE OF GEORGIA:

COBB COUNTY:


        I hereby certify that the foregoing transcript

was taken down, as stated in the caption, and the

questions and answers thereto were reduced to

typewriting under my direction; that the foregoing pages

1 through 63 represent a true and correct transcript of

the evidence given upon said hearing.

        The witness did reserve the right to read and

sign the transcript.

        This, the 27th day of February 2018.

                    _____
                    DEBBIE C. HENNINGS, CCR-B-2007
                    My commission expires the
                    1st day of April 2019

# EXHIBIT G

## Quick Trip Incident Report 4/6/14

(NOTE: TO PRESERVE CONFIDENTIALITY, NAMES ARE
REDACTED FROM THIS REPORT. THE FULL, PROTECTED
RECORD HAS PREVIOUSLY BEEN PRODUCED TO PLAINTIFF'S
COUNSEL)

**From:**
**To:**

**Subject:** Incident Report - Division 7
**Date:** Sunday, April 06, 2014 4:20:56 AM

Store: 797
Time: 4/6/2014 4:02:33 AM
Signal/Zone/Operator: REMOTE ALARM / 23 / HD
Description: REMOTE ALARM #3
Disposition: Incident
Acknowledged by: HD at 4/6/2014 3:03:15 AM

Note added:
A/V looked good. I tried to call the store but no one was picking up. I contacted dipatch to get police out to the store. I called the store back and spoke with ████. He said he heard shots fired right outside of the store. He heard 3 shots fired at first and saw someone shooting between pumps 4 and 5 towards pump 16. Then he heard about 7 more shots fired. He could not get a good description of the shooters. He and the other employee on duty are okay. No one was hurt to his knowledge. ████already contacted police and they are currently at the store. I notified Weekend Duty ████ ████. No other calls made. ac

Signal Logged by: HD at 4/6/2014 3:21:03 AM

If you are in the QT Corporate environment you can click on the link below to view the full report.
Incident Report



CONFIDENTIAL                                     QT 000039

# EXHIBIT H

## Police Report Case 14-02297

| | AGENCY ID(ORI) | AGENCY NAME | | | INCIDENT REPORT | CASE NUMBER |
|---|---|---|---|---|---|---|
| SA | GA GA0440400 | Chamblee PD | | | | 14-02297 |

**INCIDENT TYPE**

| INCIDENT TYPE | COUNTS | INCIDENT CODE | PREMISE TYPE | |
|---|---|---|---|---|
| 16-5-21 AGGRAVATED ASSAULT | 1 | 1314 | HIGHWAY ● | SVC. STATION |
| | | | CONVENIENCE STORE | BANK |
| | | | COMMERCIAL | RESIDENCE |
| | | | SCHOOL CAMPUS | ALL OTHER |

**EVENT**

INCIDENT LOCATION: 4050 BUFORD HWY Chamblee GA        LOC CODE

WEAPON TYPE: ● KNIFE / CUTTING TOOL        OTHER

| INCIDENT DATE | TIME | DATE | TIME | STRANGER TO STRANGER | GUN |
|---|---|---|---|---|---|
| 04/06/2014 | 04:30 | TO | | YES ☐ NO ☐ UNK ● | HANDS/FIST,ETC |

COMPLAINANT: JENSON        ADDRESS        PHONE NUMBER

VICTIMS NAME: DAVIS,        RACE: B   SEX: F   DOB        AGE: 20   RESIDENCE PHONE        BUSINESS PHONE

ADDRESS        EMPLOYER OR OCCUPATION        EMPLOYER NAME        EMAIL

STUDENT? ☐ YES ☐ NO   IF YES, NAME VICTIM'S SCHOOL

**OFFENDER**

| NAME | | RACE | SEX | DATE OF BIRTH | AGE |
|---|---|---|---|---|---|
| WANTED  ADDRESS | | HEIGHT | WEIGHT | HAIR | EYES |
| WARRANT  CHARGES | | COUNTS | OFFENSE CODE | OFFENSE/ARREST | JURIS. |
| ARREST | | | | | |

TOTAL NUMBER ARRESTED        ARREST AT OR NEAR OFFENSE SCENE   YES ☐ NO ☐        DATE OF OFFENSE: 04/06/2014

**VEHICLE**

| STOLEN | TAG NUMBER | STATE | YEAR | V.I.N. | |
|---|---|---|---|---|---|
| RECOVD | YEAR | MAKE | MODEL | STYLE | COLOR |
| SUSPECTS | | | | | |

MOTOR SIZE (CID)        TRANS: AUTO ☐  MAN. ☐        INSURED BY

**WITNESS**

NAMES        ADDRESS        PHONE NUMBER

**PROPERTY**

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS |
|---|---|---|---|---|
| STOLEN | | | | |
| RECOVERED | | | | |
| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS |
| STOLEN | | | | |
| RECOVERED | | | | |
| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
| STOLEN | | | | | |
| RECOVERED | | | | | |

**ADM**

GQIC ENTRY ☐   WARRANT ☐   MISSING PERSONS ☐   VEHICLE ☐   ARTICLE ☐   BOAT ☐   GUN ☐   SECURITIES ☐

**DRUG**

DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED?   ☐ YES   ☒ NO
IF YES, PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER

☐ 1 - AMPHETAMINE   ☐ 2 - BARBITURATE   ☐ 3 - COCAINE   ☐ 4 - HALLUCINOGEN   ☐ 5 - HEROIN
☐ 6 - MARIJUANA   ☐ 7 - METHAMPHETAMINE   ☐ 8 - OPIUM   ☐ 9 - SYNTHETIC NARCOTIC   ☐ U - UNKNOWN

**CLEAR**

| REQUIRED DATA FIELDS FOR CLEARANCE REPORT | CLEARED BY ARREST ☐ | EXCEPTIONALLY CLEARED ☐ | UNFOUNDED ☐ | REPORT DATE: 04/06/2014 |
|---|---|---|---|---|
| DATE OF CLEARANCE | ADULT | JUVENILE | | |

**NARRATIVE**

INITIAL REPORT
SEE ADDITIONAL NARRATIVE

| REPORTING OFFICER | NUMBER | APPROVING OFFICER | NUMBER |
|---|---|---|---|
| WINFIELD MIKE | 261 | ENDS ANDY | 218 |

PAGE ____ of ____



# ADDITIONAL NARRATIVE

| Agency Name: Chamblee PD | ORI #: GA0440400 | Report Date/Time: 04/06/2014 | Case Number #: 14-02297 |
|---|---|---|---|

**INITIAL REPORT**

ON THE ABOVE LISTED DATE AND TIME I RESPONDED TO 4073 BUFORD HWY (FOLLIES) IN REFERENCE TO A SHOTS FIRED CALL. UPON MY ARRIVAL I SPOKE TO THE WITNESS WHO IS A SECURITY GUARD FOR THE ESTABLISHMENT. HE STATED HE WAS IN THE REAR OF THE BUILDING IN THE PARKING LOT WHEN HE HEARD WHAT APPEARED TO BE GUN SHOTS. HE STATED HE THEN RAN TO THE FRONT WHERE HE HEARD MORE SHOTS AND PIN-POINTED THE LOCATION TO 4050 BUFORD HWY (QT). HE WENT TO THE LOCATION AND OBSERVED A DARK COLORED SEDAN BEARING GA TAG ████████ WITH THE REAR WINDOW SHATTERED. HE APPROACHED THE VEHICLE AND MADE CONTACT WITH A FEMALE WHO STATED THAT EVERYONE WAS OK. HE THEN ADVISED THE VEHICLE LEFT AT A HIGH-RATE OF SPEED. HE ALSO NOTICED A TAN 4 DOOR CHEVY SUBURBAN LEAVE AT A HIGH RATE OF SPEED. HE THEN CALLED THE POLICE AND RETURNED TO FOLLIES.

AFTER TALKING TO THE WITNESS BRIEFLY, I PROCEED TO THE QT. I AND OTHER OFFICERS CANVASSED THE PARKING LOT FOR VICTIMS BUT COULDN'T FIND ANY. I ADVISED DISPATCH TO NOTIFY THE AREA HOSPITALS OF THE SITUATION AND NOTIFY US IF ANY VICTIMS WITH GUNSHOT WOUNDS CAME IN FOR TREATMENT. I THEN BEGAN TO PROCESS THE CRIME SCENE. I NOTICED SEVERAL 9MM SHELL CASINGS(7) NEAR THE FRONT ENTRANCE TO THE STORE. I ALSO NOTICED A CHICAGO BULLS BALL CAP LAYING IN PARKING SPACES TO THE RIGHT OF THE ENTRANCE TO THE STORE. NEXT TO THE HAT APPEARED TO BE BROKEN GLASS FROM A VEHICLE WINDOW. I OBSERVED SEVERAL .40 CAL SHELL CASINGS NEAR GAS PUMP. 5. PHOTOGRAPHS OF THE EVIDENCE WERE TAKEN AND PLACED INTO EVIDENCE. THE SHELL CASINGS AND HAT WERE ALSO PLACED INTO EVIDENCE. OFFICER SMITHWICK OBTAINED A STATEMENT FROM THE STORE CLERK. NO VIDEO EVIDENCE IS KNOWN AT THIS TIME.

A SHORT WHILE LATER DISPATCH ADVISED DEKALB MEDICAL CENTER HAD TWO VICTIMS COME IN THAT ADVISED THEY WERE SHOT AT THE MANSION. WHILE ENROUTE DISPATCH ADVISED ANOTHER VICTIM CAME TO EMORY HOSPITAL WITH A GUN SHOT WOUND. OFFICER TRAN RESPONDED TO EMORY.

WHILE AT DEKALB MEDICAL I INTERVIEWED ONE OF THE VICTIMS. MR. ELKAHIRAS WESLEY WHO WAS SHOT TWICE ONCE IN THE LEFT HAND AND ONCE IN THE RIGHT SHOULDER. HE STATED THEY WERE AT THE MANSION AND WERE SHOT IN THE PARKING LOT. THE VICTIM ADVISED IT WAS A BLUR DUE TO HIM BEING ON XANEX. HE THEN STATED HE DOES NOT REMEMBER WHERE IT HAPPEN. HE LATER STATED AFTER THEY LEFT THE MANSION, THEY WENT TO QUEEN OF SHEBA IN DEKALB COUNTY OFF OF N. DRUID HILLS ROAD. THE OTHER VICTIM WAS UNABLE TO TALK DUE TO HIM BEING IN SURGERY. I HAD DISPATCH CONTACT DEKALB COUNTY TO ASK ABOUT A SHOOTING AT THE LOCATION THE VICTIM DESCRIBED. THEY ADVISED THEY DID HAVE A SHOOTING AND CURRENTLY SENDING A OFFICER TO EACH HOSPITAL. THE VICTIM AT EMORY ADVISED THE SAME STORY THAT THE VICTIM AT DEKALB MEDICAL ADVISED.

ONCE DEKALB POLICE ARRIVED WE TURNED OVER THE INVESTIGATION TO THEM (14-032790). CHAMBLEE CID (CAPT FORD) WAS NOTIFIED OF THE INCIDENT AND WENT TO THE QUEEN OF SHEBA LOUNGE AT 1394 WOODCLIFF DRIVE ATLANTA GA 30329. HE TOOK A PICTURE OF THE LOCATION AND SENT IT TO ME. I SHOWED THE VICTIM THE PICTURE AND HE ADVISED THAT WAS THE LOCATION WHERE HE WAS SHOT AT. THIS INFORMATION WAS GIVEN TO DEKALB COUNTY. NOTHING FURTHER AT THIS TIME.


EVIDENCE MARKER NUMBERS LIST

A  9MM BLAZER LUGER CASING
B  9MM BLAZER LUGER CASING
C  9MM F.C. LUGER CASING
D  BROKEN GLASS
E  RED/GRAY BULLS BASEBALL HAT
F  9MM BLAZER LUGER CASING
G  9MM BLAZER LUGER CASING
H  9MM BLAZER LUGER CASING
I  9MM BLAZER LUGER CASING
J  9MM F.C. LUGER CASING
K  .40 CAL S&W FMC CASING
L  .40 CAL S&W BLAZER CASING
M  .40 CAL S&W R.P CASING

# ADDITIONAL NARRATIVE

| Agency Name:<br>Chamblee PD | ORI #:<br>GA0440400 | Report Date/Time:<br>04/06/2014 | Case Number #:<br>14-02297 |
|---|---|---|---|

N .40 CAL WINCHESTER S&W CASING
O .40 CAL S&W BLAZER CASING

ON 04/06/2014 AT APPROXIMATELY 1900 HOURS I RESPONDED TO NORTHSIDE HOSPITAL IN REFERENCE TO A GUN SHOT VICTIM BEING TREATED FROM THIS INCIDENT. UPON MY ARRIVAL I SPOKE TO THE VICTIM MS. DAVIS. SHE STATED SHE LEFT CLUB MANSION AT 0300 HOURS ON 4/6/2014. SHE ADVISED HER FRIEND ▓▓▓▓▓ (▓▓▓▓▓▓▓) DROVE HER AND A FEMALE NAMED ▓▓▓▓ TO THE QT IN A SILVER TOYOTA OR CHEVY SEDAN AND PARKED TO THE LEFT OF THE FRONT DOOR. SHE HEARD WHAT APPEARED TO BE AN ARGUMENT BEHIND HER AS SHE WAS WALKING INTO THE BUSINESS. AFTER A SHORT TIME INSIDE SHE EXITED THE BUSINESS WHEN THE GUN SHOTS STARTED. SHE FURTHER ADVISED SHE WAS STRUCK IN THE RIGHT HAND AND ADVISED SHE ONLY THOUGHT IT WAS A GRAZE WOUND. SHE THEN LEFT THE LOCATION WITH LATISHA AND FLAME TO LATISHA'S HOUSE IN ▓▓▓▓▓▓▓▓▓▓▓▓ SHE ADVISED SHE STAYED AT HER HOUSE UNTIL 0900 HOURS AND ONLY WRAPPED UP HER WOUND BECAUSE IT DIDNT HURT. SHE THEN ADVISED AT AROUND 1900 HOURS SHE WAS DROPPED OFF AT THE HOSPITAL BY A NEIGHBOR BECAUSE IT BEGAN TO HURT. I ASKED IF I COULD LOOK THROUGH HER PHONE TO OBTAIN LATISHA'S PHONE NUMBER AND SEE IF ANY INFORMATION WAS ON HER PHONE IN REGARDS TO THE SHOOTING. SHE STATED I COULD. WHEN QUESTIONING HER ABOUT A TEXT MESSAGE THAT STATED FROM  DANIEL "ARE YOU SCARED THAT YOU WILL BE ARRESTED." SHE ADVISED I COULDNT LOOK IN HER PHONE ANYMORE AND SHE RESCIND CONSENT. I THEN ADVISED HER THAT HER PHONE WAS BEING PLACED INTO EVIDENCE AND A SEARCH WARRANT WOULD BE OBTAINED TO LOOK THROUGH HER PHONE. SHE WAS UNABLE TO PROVIDE A WRITTEN STATEMENT DUE TO THE HAND SHE WRITES WITH WAS SHOT AND IN A SLING. THE PHONE WAS PLACED INTO EVIDENCE. PHOTOGRAPHS OF THE VICTIMS INJURIES WERE ALSO PLACED INTO EVIDENCE.

# EXHIBIT I

## Deposition of Kevin Thornton

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3
    YVETTE ADELLE SANDERS, Individually as the surviving
 4  parent, and YVETTE ADELLE SANDERS, as Administratrix of
    The Estate of ANDREW THOMAS SPENCER, deceased,
 5
            Plaintiffs,
 6
    vs.                    No. 1:17-CV-02341-WSD
 7
    QUIKTRIP CORPORATION,
 8
            Defendant.
 9


10  _____


11          VIDEOTAPED DEPOSITION OF KEVIN THORNTON
             TAKEN ON BEHALF OF THE PLAINTIFFS
12      ON FEBRUARY 22, 2018, BEGINNING AT 9:57 A.M.
                  IN TULSA, OKLAHOMA
13          REPORTED BY KARLI PIANALTO, CSR

14                      APPEARANCES:

15  ON BEHALF OF THE PLAINTIFFS:

16          Ms. Elizabeth Rose
            LAW & MORAN
17          563 Springs Street
            Atlanta, GA 30308
18          (404)814-5700
            elizabeth@lawmoran.com
19

20  ON BEHALF OF THE DEFENDANT:

21          Ms. Nichole C. Leet
            GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP
22          1700 Atlanta Plaza
            950 East Paces Ferry Road
23          Atlanta, GA 30326
            nleet@grsmb.com
24

25  VIDEOGRAPHER:  Mr. Jim Langolis
```

1        Q      Would you do any sort of after action review to

2   determine whether the security features that were in place

3   functioned at the time of the incident?

4        A      Typically, it's one of those that the incident

5   says that the employee hit the alarm and the details or

6   whatever's in there.  So it shows that the process worked,

7   so there was nothing to go back and follow up on.

8        Q      Following any incident that occurred in the

9   Atlanta market, have you ever placed a security guard in a

10  store in response to one of those incidents?

11       A      Not that I can recall right now.

12       Q      Okay.

13       A      And if I can go back on that, it's at -- the one

14  incident at 97, it was really kind of -- I think Tony

15  wanted to further crowd control, but the timing of the

16  incident's there along with him wanting additional

17  security, but it was from an employee request.

18       Q      What incident are you talking about?  Sorry.  I

19  need you to clarify for the record.

20       A      It was in reference to a shooting or gunshots

21  being fired on the property.

22       Q      Sure.

23       A      And it was all in the timing of, I think, the

24  club -- one of the clubs over there was open on Saturday

25  nights as well at that time.  So it all kind of -- the

1    timing of it just happened to be along the same.  He

2    wanted additional security for the crowd, but along the

3    same time, that's when the incident happened, the shooting

4    incident.

5        Q    Okay.  So Tony Bolling, I believe is his last

6    name, requested a security guard around the same time as

7    there was a shooting in the QuikTrip parking lot?

8        A    Right.

9        Q    Okay.  And you guys added an additional night of

10   security guards?

11       A    Yes.

12       Q    Why are there security guards at certain

13   QuikTrip locations?

14       A    The employees have asked for it for whatever

15   reason, various reasons.  It could be anything from people

16   are parking, leaving their cars on the lot, so we need to

17   make sure that somebody's there to tell them to move them

18   along, to, you know, the fact that there's crowd overflow.

19       Q    Do they ever request security guards because

20   they feel unsafe?

21       A    I've not had anyone request because they don't

22   feel safe.

23       Q    Do you agree that QuikTrip provides security

24   guards at stores to make them safer?

25            MS. LEET:  Object to the form.

1       A    I just said if it was like a skate rink.  A

2    skating rink.  And we had -- where was that -- it may have

3    been off of Westly Chapel they had a skating rink one time

4    and it was briefly open.

5       Q    When there are special events in the area of a

6    QuikTrip location, do you hire security specifically in

7    relation to the hours of the event?  Have you ever done

8    that as division manager?

9       A    In terms of special events in the -- in the

10   area, what do you mean special events in the area?

11      Q    I mean, if you knew there was going to be an

12   event that brought a lot of people to the area of a

13   specific QuikTrip location, would you then hire security

14   in relation to the event?

15      A    If the store team requested it.

16      Q    Why was there a security guard on Friday and

17   Saturday nights at the QuikTrip on 3040 Buford Highway?

18      A    Because the employees had asked for security

19   because of crowd control.

20      Q    Are you familiar with store 848 located at 5500

21   Buford Highway?

22      A    848?  Yes.

23      Q    And are you familiar with store 721 located at

24   3292 Buford Highway?

25      A    Yes.

1                        JURAT

2      YVETTE ADELLE SANDERS, et al. vs. QUIKTRIP CORPORATION

3              I, Kevin Thornton, do hereby state under oath

4    that I have read the above and foregoing deposition in its

5    entirety and that the same is a full, true and correct

6    transcription of my testimony so given at said time and

7    place.

8

9

10            _____

11            Signature of Witness

12

13

14            Subscribed and sworn to before me, the

15    undersigned Notary Public in and for the State of Arkansas

16    by said witness, Kevin Thornton, on this _____day

17    of_____, 2018.

18

19

20

21            _____

22            NOTARY PUBLIC

23            MY COMMISSION EXPIRES:_____

24            JOB NO. 127916

25

```
 1                    C E R T I F I C A T E

 2          I, Karli Pianalto, Certified Shorthand Reporter,

 3   do hereby certify that the above-named Kevin Thornton was

 4   by me first duly sworn to testify the truth, the whole

 5   truth, and nothing but the truth, in the case aforesaid;

 6   that the above and foregoing deposition was by me taken

 7   and transcribed pursuant to agreement, and under the

 8   stipulations hereinbefore set out; and that I am not an

 9   attorney for nor relative of any of said parties or

10   otherwise interested in the event of said action.

11          IN WITNESS WHEREOF, I have hereunto set my hand

12   and official seal this 1st day of March, 2018.

13

14

15

16

17

18

19

20

21

22

23

24

25          KARLI PIANALTO, CSR
```

# EXHIBIT J

**Deposition of Anthony "Tony" Bolling**

Certified Copy Transcript

# In The Matter Of:

Yvette Adelle Sanders et al vs. QuikTrip Corporation, and BJS QT, LLC

Deposition of Anthony Bolling

November 2nd, 2017



**AccuTran, Inc.**

*---certified court reporters---*
707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705
770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

Anthony Bolling

13

1    Monday, and two of us Monday and Tuesday.

2        Q     So if I came by the QuikTrip on a

3    Sunday night after 10:00 p.m., you'd be the only

4    employee there?

5        A     Up until 11:00.

6        Q     Until 11:00 p.m.?

7        A     Right.  Then that's when the other

8    assistant gets off, at 11:00.

9        Q     So you have one hour of overlap?

10       A     Overlap, one-hour overlap.

11       Q     And so then from 11:00 p.m. until

12   7:00 a.m., you'd be the only employee there?

13       A     Well, the manager comes in.  The

14   store manager comes in at 4:30.

15       Q     And that's both on Sunday and Monday

16   night going into --

17       A     Sunday into Monday, the one I just --

18   that's Sunday into Monday, the one I just

19   explained.  Monday into Tuesday, that's when I

20   got an overnight clerk with me.

21       Q     Gotcha.  Two people.  So there's only

22   a few hours that you're really by yourself at the

23   store?

24       A     Five, six.

25       Q     During any of the nights that you

Anthony Bolling

14

1    work, is there a security guard present?

2        A       Friday night, Saturday night.

3        Q       Do you know any of the security

4    guards?

5        A       Do I know their names?

6        Q       Yes.

7        A       Chang, Officer Chang, Officer Chris.

8    I don't know Chris's last name.

9        Q       Could it be Beltwell?

10       A       Yeah, Boswell.

11       Q       Those are the only two --

12       A       And Echols, Officer Echols.

13       Q       And do you know what police

14   department these officers work for?

15       A       DeKalb sheriff's office.

16               MS. ROSE:   Is this the same Chang

17   that's coming in?

18               MS. LEET:   (Nods head affirmatively.)

19   BY MS. ROSE:

20       Q       So explain to me:   As the night

21   assistant, you're the only acting manager, except

22   for the one night when the store manager is

23   there; correct?

24               MS. LEET:   Object to form.

25       A       Say that again.

```
 1            CERTIFICATE OF COURT REPORTER

 2   STATE OF GEORGIA

 3   COUNTY OF COBB

 4            I hereby certify that the foregoing

 5   deposition was reported as stated in the caption,

 6   and the questions and answers thereto were

 7   reduced to writing by me;

 8            That the witness's right to read and

 9   sign the deposition was reserved;

10            That the foregoing pages 1 through 82

11   represent a true, correct, and complete

12   transcript of the evidence given on the

13   above-referenced date by the witness, ANTHONY

14   BOLLING, who was first duly sworn by me;

15            That I am not of kin or counsel to any

16   of the attorneys or parties in this case.

17            I do hereby disclose pursuant to Article

18   10.B. of the Rules and Regulations of the Board

19   of Court Reporting of the Judicial Council of

20   Georgia that I am a Georgia Certified Court

21   Reporter; that AccuTran, Inc., was contacted by

22   the attorney taking the deposition to provide

23   court reporting services for this deposition;

24   that I am not taking this deposition under any

25   contract that is prohibited by OCGA 15-14-37(a)
```

1  and (b) or Article 7.C. of the Rules and

2  Regulations of the Board; and I am not

3  disqualified for a relationship of interest under

4  OCGA 9-11-28(c).

5      There is no contract to provide

6  reporting services between myself or any person

7  with whom I have a principal and agency

8  relationship nor any attorney at law in this

9  action, party to this action, party having a

10  financial interest in this action, or agent for

11  an attorney at law in this action, party to this

12  action, or party having a financial interest in

13  this action.  Any and all financial arrangements

14  beyond my usual and customary rates have been

15  disclosed and offered to all parties.

16      This 14th day of November, 2017.

17

18

19

20

21  _____
    SHARON R. OVERMAN, CCR B-2363
22  Certified Court Reporter

23

24

25

# EXHIBIT K

## Deposition of Alex Chang

Certified Copy Transcript

# In The Matter Of:

Yvette Adelle Sanders et al vs. QuikTrip Corporation, and BJS QT, LLC

Deposition of Alex Chang

November 27th, 2017



**AccuTran, Inc.**

---*certified court reporters*---

707 Whitlock Avenue
Suite A42
Marietta, Georgia 30064
770-426-9705
770-426-9706
production@accutrancr.com
www.accutrancourtreporters.com

1    shooting in the parking lot of the subject QuikTrip?

2        A.   I knew there was -- 2014?  I'm aware of one, but I

3    don't know if that's the one.

4        Q.   Well, why don't you tell me about the one you are

5    aware of.

6        A.   There was one -- two -- I think two members, one

7    Hispanic, one black.  I believe they were in an altercation

8    over a female or someone disrespected a female.  And I know

9    about the shooting then, when that happened, but it was

10   basically a shooting in the air.

11       Q.   Did that shooting involve assault rifles?

12       A.   Yes, it did.

13       Q.   I believe that was November 9th of 2014.  So the one

14   that involves assault rifles you believe you were aware of?

15       A.   Yes.  And actually, I was working that night when

16   that happened.

17       Q.   You were on the premises at the time?

18       A.   Yes, ma'am.

19       Q.   Do you have any -- you don't have any knowledge of

20   the April 6, 2014 shooting?

21       A.   No.

22       Q.   Are you aware of a March 12, 2016 shooting in the

23   parking lot of the QuikTrip?

24       A.   March?  Not that I'm aware of.  Only one I'm aware

25   of is when your guy got shot and also the one with the AR

1                          DISCLOSURE

2    STATE OF GEORGIA:

3    COBB COUNTY:

4

5                  DEPOSITION OF:  ALEX CHANG

6

7         Pursuant to Article 10.B. of the Rules and

     Regulations of the Board of Court Reporting of Judicial

8    Council of Georgia, I make the following disclosure:

9         I am a Georgia Certified Court Reporter acting

10   as an agent of AccuTran, Inc., who was contacted by the

11   offices of Law & Moran, to provide court reporting

12   services for this deposition.  I will not be taking this

13   deposition under any contract that is prohibited by

14   O.C.G.A. 15-14-37 (a) and (b).

15        AccuTran, Inc., has no contract to provide

16   reporting services with any party to the case, and

17   counsel in the case, or any reporter or reporting agency

18   from whom a referral might have been made to cover this

19   deposition.  AccuTran, Inc. will charge its usual and

20   customary rates to all parties in the case, and a

21   financial discount will not be given to any party to

22   this litigation.

23

24   _____, CCR# B-2007 DATE:_____

25   Debbie C. Hennings

```
 1                        CERTIFICATE

 2

 3   STATE OF GEORGIA:

 4   COBB COUNTY:

 5
             I hereby certify that the foregoing transcript
 6
     was taken down, as stated in the caption, and the
 7
     questions and answers thereto were reduced to
 8
     typewriting under my direction; that the foregoing pages
 9
     1 through 31 represent a true and correct transcript of
10
     the evidence given upon said hearing.
11
             The witness did not reserve the right to read
12
     and sign the transcript.
13
             This, the 27th day of November 2017.
14

15

16

17

18

19

20

21

22

23
             _____
24           DEBBIE C. HENNINGS, CCR-B-2007
             My commission expires the
25           31st day of March 2018
```

# EXHIBIT L

## Police Report Case 14-08852

**SUPPLEMENT REPORT**

SA | AGENCY ID (ORI) GA GA0440400

CASE NUMBER 14-08852

### EVENT

INCIDENT TYPE

COUNTS | INCIDENT CODE

PREMISE TYPE

| 1 | HIGHWAY | 2 | SVC. STATION |
| 3 | CONVENIENCE STORE | 4 | BANK |
| 5 | COMMERCIAL | 6 | RESIDENCE |
| 7 | SCHOOL/CAMPUS | 8 | ALL OTHER |

INCIDENT LOCATION | LOC CODE

WEAPON TYPE

| 1 | GUN | 2 | KNIFE/CUTTING TOOL |
| 3 | HANDS/FIST, ETC | 4 | OTHER |

INCIDENT DATE 11/09/2014 03:48:47 | TIME 03:48 | DATE | TIME | TO | STRANGER TO STRANGER YES ☐ NO ☐ UNK ☐

COMPLAINANT | ADDRESS | PHONE NUMBER

### VICTIM

VICTIMS NAME | RACE | SEX | DOB | AGE | RESIDENCE PHONE | BUSINESS PHONE

ADDRESS | EMPLOYER OR OCCUPATION | EMPLOYER NAME | EMAIL

STUDENT? ☐ YES ☐ NO | IF YES, NAME VICTIM'S SCHOOL

### OFFENDER

NAME | RACE | SEX | DATE OF BIRTH | AGE

WANTED ☐ | ADDRESS | HEIGHT | WEIGHT | HAIR | EYES

WARRANT ☐ | CHARGES | COUNTS | OFFENSE CODE | OFFENSE/ARREST | JURIS.

ARREST ☐

TOTAL NUMBER ARRESTED | ARREST AT OR NEAR OFFENSE SCENE YES ☐ NO ☐ | DATE OF OFFENSE 11/09/2014 03:48:47

### VEHICLE

STOLEN ☐ RECOVD ☐ SUSPECTS ☐

TAG NUMBER | STATE | YEAR | V.I.N.

YEAR | MAKE | MODEL | STYLE | COLOR

MOTOR SIZE (CID) | TRANS AUTO ☐ MAN. ☐ | INSURED BY

### WITNESS

NAMES | ADDRESS | PHONE NUMBER

### PROPERTY

| | VEHICLES | CURRENCY, NOTES, ETC | JEWELRY, PREC. METALS | FURS |
| STOLEN | | | | |
| RECOVERED | | | | |
| | CLOTHING | OFFICE EQUIP. | TV, RADIO, ETC | HOUSEHOLD GOODS |
| STOLEN | | | | |
| RECOVERED | | | | |
| | FIREARMS | CONSUMABLE GOODS | LIVESTOCK | OTHER | TOTAL |
| STOLEN | | | | | |
| RECOVERED | | | | | |

### ADM

GCIC ENTRY ☐ WARRANT ☐ MISSING PERSONS ☐ VEHICLE ☐ ARTICLE ☐ BOAT ☐ GUN ☐ SECURITIES

### DRUG

DID INVESTIGATION INDICATE THAT THIS INCIDENT WAS DRUG-RELATED? ☐ YES ☐ NO
IF YES, PLEASE INDICATE THE TYPE OF DRUG(S) USED BY OFFENDER

☐ 1 - AMPHETAMINE ☐ 2 - BARBITURATE ☐ 3 - COCAINE ☐ 4 - HALLUCINOGEN ☐ 5 - HEROIN
☐ 6 - MARIJUANA ☐ 7 - METHAMPHETAMINE ☐ 8 - OPIUM ☐ 9 - SYNTHETIC NARCOTIC ☐ U - UNKNOWN

### CLEAR

REQUIRED DATA FIELDS FOR CLEARANCE REPORT | CLEARED BY ARREST ☐ | EXCEPTIONALLY CLEARED ☐ | UNFOUNDED ☐ | REPORT DATE 11/10/2014

DATE OF CLEARANCE | ADULT ☐ | JUVENILE ☐

REPORTING OFFICER KHOSHTARIYA VALERIAN | NUMBER 256 | APPROVING OFFICER PEARSON JAMES MICHAEL | NUMBER 263



# ADDITIONAL NARRATIVE

| Agency Name: | ORI #: | Report Date/Time: | Case Number #: |
|---|---|---|---|
| Chamblee PD | GA0440400 | 11/10/2014 | 14-08852 |

SUPPLEMENTAL NARRATIVE

ON NOVEMBER 9, 2014 AT AROUND 0345 HOURS I RESPONDED TO A SHOTS FIRED CALL AT 4030 BUFORD HWY CHAMBLEE GA 30345, QUICK TRIP GAS STATION. UPON ARRIVAL ON SCENE I OBSERVED THAT OFFICER COLLAR #282, OFFICER R. JACKSON #274, AND A DEKALB SHERIFF'S DEPUTY HAD A BLACK BMW AND IT'S OCCUPANTS DETAINED. I WAS ADVISED THAT AN OTHER INVOLVED VEHICLE HAD LEFT THE SCENE SOUTH BOUND ON BUFORD HWY. I PROCEEDED SOUTH ON BUFORD HWY WERE MULTIPLE OTHER CHAMBLEE OFFICERS HAD STOPPED A SILVER DODGE CHARGER THAT WAS OCCUPIED BY MULTIPLE SUBJECTS. A FELONY STOP WAS CONDUCTED AND ALL OCCUPANTS OF THE CHARGER WERE DETAINED. IN PLAIN VIEW, A SMITH & WESSON M&P 15 ASSAULT RIFLE (SU33001) WAS FOUND ON THE REAR PASSENGER SEAT FLOOR BOARD OF THE CHARGER. SAID ASSAULT RIFLE WAS LOADED WITH 30 STEEL CASE WOLF AMMO .223 ROUNDS. SAID AMMO WAS IN TWO MAGAZINES TAPED TOGETHER FACING OPPOSITE DIRECTIONS.

I RETURNED TO THE INITIAL INCIDENT LOCATION AT QUICK TRIP. AT QUICK TRIP I IDENTIFIED SEVEN BLACK MALE WITNESSES, BY PHOTOGRAPHING THEIR ID CARDS, THAT WERE IN A GROUP OF NINE BLACK MALES. TWO OF THE WITNESSES REFUSED TO IDENTIFY THEMSELVES. SAID GROUP OF WITNESSES WERE INSIDE THE BUSINESS AT THE TIME OF THE SHOOTING AND STATED THAT THEY ONLY HEARD GUN SHOOTS BUT DID NOT SEE ANYTHING OR KNOW WHAT HAD OCCURRED. I ALSO PHOTOGRAPHED THE LICENSE PLATES OF THE VEHICLES' OF SAID WITNESS GROUP.

INSIDE THE ABOVE MENTIONED DETAINED BLACK BMW, WITH THE CONSENT TO SEARCH OF THE VEHICLE OWNER, THE FOLLOWING WAS LOCATED; SMITH & WESSON M&P 15 ASSAULT RIFLE (5U43843), A AR15 MAGAZINE THAT WAS LOADED WITH SEVEN .223 "LC 13" ROUNDS, ONE .223 "LC 13" ROUND WAS CHAMBERED IN THE AR15, A GLOCK 19 9MM, THREE GLOCK 9MM MAGAZINES, 30 9MM HOLLOW POINT ROUNDS, AND ONE 9MM FMJ ROUND.

I TOOK CUSTODY OF ALL THE ABOVE MENTIONED FIREARMS, AMMO, AND MAGAZINES, PHOTOGRAPHED THE SAME AND ENTERED IT INTO EVIDENCE. ALL THE ABOVE MENTIONED PHOTOGRAPHS WERE ALSO ENTERED INTO EVIDENCE.

# EXHIBIT M

## Quick Trip Incident Report 11/9/14

(NOTE: TO PRESERVE CONFIDENTIALITY, NAMES ARE
REDACTED FROM THIS REPORT. THE FULL, PROTECTED
RECORD HAS PREVIOUSLY BEEN PRODUCED TO PLAINTIFF'S
COUNSEL)

| | |
|---|---|
| **From:** | ███████████████████████████████████ |
| **To:** | |
| **Subject:** | Incident Report - Division 7 |
| **Date:** | Sunday, November 09, 2014 3:55:16 AM |

Store: 797
Time: 11/9/2014 3:49:24 AM
Signal/Zone/Operator: REMOTE ALARM / 23 / HD
Description: REMOTE ALARM #3
Disposition: Incident
Acknowledged by: HD at 11/9/2014 2:49:26 AM

Note added:
A/V looked good. I called the store and spoke with ██████, he said there were shots fired in the parking lot. Police were sent to the store and were already on scene when I called the store. As far as he knows no one was hurt. I called and informed ████████████ of the situation.-AT

Signal Logged by: HD at 11/9/2014 2:54:49 AM

If you are in the QT Corporate environment you can click on the link below to view the full report.
Incident Report



# EXHIBIT N

## Quick Trip Incident Report 10/1/16

(NOTE: TO PRESERVE CONFIDENTIALITY, NAMES ARE
REDACTED FROM THIS REPORT. THE FULL, PROTECTED
RECORD HAS PREVIOUSLY BEEN PRODUCED TO PLAINTIFF'S
COUNSEL)

**From:**
**To:**
**Subject:** QT ATLANTA:0797 - Assault (attempted or actual): Customer Victim
**Date:** Saturday, October 01, 2016 11:50:34 PM
**Importance:** High

Workflow Notification

Workflow Notification

**Store:** ATLANTA:0797
Reason Code: Assault (attempted or actual): Customer Victim
Alarm Received: 10/1/2016@9:55 PM
Security system working properly? Yes

## Incident Details:

I was called by store employee ▇▇▇ and he informed me that police officers were needing to look at DVR video for a Murder investigation. The murder took place earlier tonight. I then asked to speak with the police officers. The police officer informed me that there was a taxi driver driving a blue Toyota Prius that was on our property at 9:21 PM with a gun pointed to her head. She screamed from her vehicle "somebody help me" then left the store by 9:22 PM and was murdered sometime after leaving our property. I pulled video for the officers and gave them all the information that I could. I contacted weekend duty ▇▇▇▇▇▇. No other calls were made.

The incident can be seen when the toyota prius arrives on property at 9:20:55 pm shown on the Parking Left camera. The victim then pulls up to the front of the store at 9:21:13 pm and backs into a parking spot next to another taxi driver. While they are parked, you can see a lot of movement inside the vehicle but can't ever make out a gun. The suspect is in the front passenger seat. She then pulls out of the parking spot at 9:22:01 pm and leave the property. The taxi driver she parked next to then gets on the phone, assuming she is calling 911, and speeds off the property after them. No one at the store was made aware of this incident until police arrive requesting video. Nor the suspect or victim got out of the car.

**Customers or Employees Injured:** No-
**Do operations appear normal:**Yes-
Initial Contact Date/Time:10/1/2016@9:55 PM
Employee & Position: ▇▇▇▇

**Police/EMS Contacted:** No
Authority Responding:
Contacted:
Arrived:

**Was the supervisor contacted:** Yes
Supervisor: ▇▇▇▇▇▇

