```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3
    YVETTE ADELLE SANDERS, Individually as the surviving
 4  parent, and YVETTE ADELLE SANDERS, as Administratrix of
    The Estate of ANDREW THOMAS SPENCER, deceased,
 5
            Plaintiffs,
 6
    vs.                    No. 1:17-CV-02341-WSD
 7
    QUIKTRIP CORPORATION,
 8
            Defendant.
 9

10  _____

11          VIDEOTAPED DEPOSITION OF KEVIN THORNTON
              TAKEN ON BEHALF OF THE PLAINTIFFS
12      ON FEBRUARY 22, 2018, BEGINNING AT 12:17 P.M.
                    IN TULSA, OKLAHOMA
13            REPORTED BY KARLI PIANALTO, CSR

14                      APPEARANCES:

15  ON BEHALF OF THE PLAINTIFFS:

16          Ms. Elizabeth Rose
            LAW & MORAN
17          563 Springs Street
            Atlanta, GA 30308
18          (404)814-5700
            elizabeth@lawmoran.com
19

20  ON BEHALF OF THE DEFENDANT:

21          Ms. Nichole C. Leet
            GRAY, RUST, ST. AMAND, MOFFETT & BRIESKE, LLP
22          1700 Atlanta Plaza
            950 East Paces Ferry Road
23          Atlanta, GA 30326
            nleet@grsmb.com
24

25  VIDEOGRAPHER:  Mr. Jim Langolis
```



1                              INDEX

2                                                       Page

3    Direct Examination by Ms. Rose                     3

4                             EXHIBITS

5    Number  Description                               Page

6    76      Police Department Incident Report 14-02925    27

7    55      Police Report                             28

8    57      Police Report, 08/04/12                   29

9    77      QuikTrip Incident Report 11/21/15         30

10

11

12                          STIPULATIONS

13          It is stipulated that the deposition of Kevin

14   Thornton may be taken pursuant to agreement and in

15   accordance with the Federal Rules of Civil Procedure on

16   February 22, 2018, before Karli Pianalto, CSR.

17

18

19

20

21

22

23

24

25



1              THE VIDEOGRAPHER:  We are now on the record.

2    This is the video deposition of Kevin Thornton as a

3    30(b)(6) in the case of Sanders verses QuikTrip.  Civil

4    Action File Number 1:17-CV-02341-WSD.

5              Today's date is February 22, 2018.  The time is

6    12:17 p.m.

7              At this time would counsel identify themselves

8    and the parties they represent, after which the court

9    reporter will swear in the witness.

10             MS. ROSE:  Elizabeth Rose here on behalf of the

11   plaintiffs.

12             MS. LEET:  Nichole Leet on behalf of QuikTrip

13   Corporation.

14             MS. ROSE:  This will be the 30(b)(6) deposition

15   of QuikTrip Corporation given by Kevin Thornton pursuant

16   to notice and agreement.  We'll reserve all objections,

17   except those as to the form of the question and

18   responsiveness of the answer, until first use of the

19   deposition or time of trial.  That's agreeable?

20             MS. LEET:  Agreed.

21   WHEREUPON,

22                KEVIN THORNTON,

23   after having been first duly sworn, deposes and says in

24   reply to the questions propounded as follows, to-wit:

25                DIRECT EXAMINATION



 1   BY MS. ROSE:

 2       Q     All right.  Mr. Thornton, we've met because we

 3   just did your personal deposition.  And this one is in

 4   your capacity as a representative of QuikTrip Corporation.

 5   You understand that the testimony that you give is on

 6   behalf of QuikTrip, correct?

 7       A     Yes.

 8       Q     And you've been identified with regard to

 9   certain topics on the 30(b)(6) notice.  Have you been

10   provided with a copy of the 30(b)(6) notice?

11       A     Yes.

12       Q     Okay.  And just for the record, I'll state that

13   you've been identified as the representative for topics

14   two, three, four, six, eight, nine, and ten.

15           And I'm going to refer now to -- part of the

16   notice was a notice of production.  And the first part of

17   that notice of production asks for all documents, records,

18   e-mails, correspondence, videos, photographs, and/or other

19   records or items of any kind related to the above stated

20   topics that have not been previously produced by QuikTrip.

21   Have you brought any additional documents with you here

22   today that have not been produced?

23       A     No.  I -- unless you're speaking to my personal

24   notes.

25       Q     Sure.  And we'll get to your personal notes in a



1   bit, and that's fine.

2            And can you tell me all the documents, records,

3   e-mails, correspondence, videos, photographs, and/or other

4   records or items that you have reviewed in preparation to

5   answer questions about the above stated topics?

6        A    Yeah.  I reviewed our security policies, our

7   policies and procedures; again, from earlier, I reviewed

8   the deposition of our store manager and employee that were

9   from 797; incident reports.  I think that may entail it

10  all.

11       Q    Sure.  And I think you --

12       A    I'm sure I'm missing something.

13       Q    That's fine.  And I think you told me earlier

14  you did watch the video --

15       A    Yeah.

16       Q    -- from our incident?

17       A    And the video.  I'm sorry.  Yes.

18       Q    No, that's okay.  All right.  I'm going to jump

19  right into the topics then.  And the first topic was

20  QuikTrip's policies, procedures, and practices concerning

21  physical security, loitering, verbal and physical fights

22  or altercations -- oh, this is not your topic.  Scratch

23  that.

24            I'm going to go to the second topic, which you

25  have been designated as a witness for.



1      A     Okay.

2      Q     And that topic is QuikTrip's "Policies,

3  procedures, and practices concerning its efforts, if any,

4  to evaluate the security needs for the subject premises,

5  the risk of criminal activity to customers, crimes

6  occurring on the premises, and the crime and the security

7  risk in the .5 miles surrounding the subject premises

8  between June 1, 2012 and December 29 of 2016."  And I'm

9  going to break that down a little bit because that's a

10  fairly large topic.

11          First off, just so it's clear on the record,

12  when we refer to the subject premises, we're discussing

13  store 797, which is located at 4050 Buford Highway,

14  Atlanta, Georgia, correct?

15      A     Okay.  Yes.

16      Q     Okay.  So let's first talk about QuikTrip's

17  policies, procedures, and practices concerning its

18  efforts, if any, to evaluate the security needs for the

19  subject premises.  What do you know about that subject?

20      A     I know about we have several policies and

21  procedures that are given to the employees trained,

22  through their initial training all the way throughout the

23  system as they move positions, various positions.

24      Q     What policies and procedures are you aware of

25  that are used for the purpose of evaluating the security



1  needs for store 797?

2      A    Evaluating security needs?  Can you clear that

3  up for me, when you say "evaluating"?

4      Q    By evaluating, I mean looking at a specific

5  store and determining whether it has any unique security

6  needs.  Do you have any policies and procedures for

7  conducting an evaluation of that sort?

8      A    If you're talking about physical, then Charles

9  Tennison, normally he looks and he's responsible for

10  ensuring that we have cameras in certain positions and

11  where the alarms are.  Which the alarms are in all the

12  same places, but camera locations, if the store has a

13  little different or unique feature, then we make sure that

14  we've got a camera in that area.

15      Q    Are you aware of Charles Tennison or anyone at

16  QuikTrip conducting such an evaluation for store 797?

17      A    797 doesn't have a unique feature in the

18  building, so it would be standard with all the store

19  footprints like that.

20      Q    What about any policies, procedures, or

21  practices concerning any efforts to evaluate the need for

22  a security guard at the subject premises?

23      A    We don't have a formal system to evaluate.  We

24  depend on the employees and the managers to make us aware

25  if they feel there's a security need.



1      Q    And can you explain for me how that system works

2   when you say employees and managers report that up?

3      A    Basically, the employees or manager would get

4   with their store supervisor and suggest or request

5   security, if we're talking about a security guard and --

6   or even if there was a feature that they thought was

7   needed.  And from a feature, that would go up the chain

8   and be evaluated.  If it's a need for a security guard,

9   then that supervisor would bring it to the division

10  manager for approval.

11     Q    Okay.  What about QuikTrip's policies,

12  procedures, and practices concerning its efforts, if any,

13  to evaluate the risk of criminal activity to customers at

14  the subject premises?

15     A    Evaluation of risk?

16     Q    Yes.

17     A    To --

18     Q    Risk to customers of criminal activity at --

19     A    Are you asking if we have a formal process for

20  that?

21     Q    I'm asking if you have any policies, procedures,

22  or practices relating to that subject?

23     A    I can tell you what we have and what we do that

24  we think makes it -- mitigates risk.  That's the

25  lighting -- if we're talking about the same thing.  I'm



1  hoping we are.  But the lighting of the store; the

2  cleanliness of the store; greeting of customers; again,

3  our physical security system; then cameras; alarms.  I'm

4  assuming we're talking about the same thing.

5      Q    Well, I appreciate your response, but I'm not

6  sure we quite are.

7      A    Okay.

8      Q    So let me make sure that you're understanding

9  what I'm asking.  I'm looking for if QuikTrip has any

10  policies, procedures, or practices of determining the

11  specific risk at store 797 of criminal activity occurring

12  on that premises?

13      A    No.

14      Q    Okay.  Does QuikTrip have any policies,

15  procedures, or practices concerning any efforts to

16  evaluate the crime and security risk in the .5 miles

17  surrounding store 797?

18      A    No, none.

19      Q    Okay.

20      A    None to my knowledge.

21      Q    All right.  I'm going to move on to topic number

22  three, which is QuikTrip's decision to employ armed

23  security guards on particular nights and during particular

24  hours at the subject premises, including but not limited

25  to when security guards were first used on the premises,



1   the length of time and dates said security guards were

2   employed to be on the premises, whether the deployment

3   schedule for security guards has ever been altered, any

4   and all security companies and/or police forces that have

5   been used as security, the reasons for having security

6   guards, and the identity of the decision makers who aided

7   in making those determinations.  I understand for this

8   one -- is that what your notes are for?

9        A    Yes.

10       Q    Okay.  I'm going to go ahead and mark it as

11   Exhibit 76.

12            MS. LEET:  I'm going to object.  His notes are

13   not subject to being marked as an exhibit to his

14   deposition.

15            MS. ROSE:  I think they are.  He's relying on

16   them in the middle of the deposition.

17            MS. LEET:  He can testify from his notes, but he

18   is not here to create evidence, and this would be creation

19   of evidence that he has obtained in his capacity as a

20   corporate representative.

21       Q    (BY MS. ROSE)  I'm going to ask you then, in

22   light of the objection, to read verbatim what you have

23   written on that sheet of paper, please.

24       A    "Store 797, opened in May 2005.  Security guard

25   started in 2007.  Decision maker, Bill Geigerich.  Kevin



1  Thornton, requester.  Irakli Kilasonia, manager.  Reason,

2  customer overflow from club.  Friday night into Saturday

3  morning.

4          Second night of security added week ending

5  4/13/14."  4/13/14.  I'm sorry.  "Decision makers, Cindi

6  Runion, Kevin Thornton.  Requester, Gretchen Gruber, per

7  Tony Bolling.  Reason, customer overflow from club, a

8  firearm had been discharged prior Saturday night.

9          Schedules:  April 6th, '14, Friday; 11:00 p.m.

10  to 5 a.m.  April 13th, 14th, Friday and Saturday; 11 p. to

11  5 a.  August 16th, Friday and Saturday.  December 16th,

12  Friday, Saturday; 10 p.m., 5 a.m., 10:30 p. to 5:30 a.

13          No changes since.  No requests.  Security at

14  location.  Off duty DeKalb County Police and sheriff

15  deputies."

16      **Q    Thank you for reading that.  I'm going to ask**

17  **some questions, which I think you'll end up still**

18  **referring to those notes.**

19      A    Okay.

20      **Q    And I just want to be clear.  Security guards**

21  **were first used on the premises in 2007?**

22      A    Yes.

23      **Q    And the purpose was customer overflow from clubs**

24  **in the area?**

25      A    Yes.



1       Q    And then the next time that QuikTrip revisited

2   its security needs for store 797 was April 13th of 2014?

3            MS. LEET:  Object to the form.

4       A    Are you saying the next time we added something?

5       Q    (BY MS. ROSE)  Yeah.  The next time you changed

6   the security guards.

7       A    Yes.  The second night of security was added

8   weekend ending 4/13/14.

9       Q    And that would have been Saturday into Sunday

10  night?

11      A    Yes.  Saturday night into Sunday morning.

12      Q    Sunday morning, yes.

13      A    Okay.

14      Q    Excuse me.  In 2014, what were the times that

15  they were working?

16      A    2014, it would have been 11 p. to 5 a.

17  11:00 p.m., I'm sorry, to 5 a.m.

18      Q    And that would have been both Friday and

19  Saturday nights?

20      A    Yes.

21      Q    And then after that, I -- you were speaking fast

22  and I wasn't able to write it down.

23      A    Oh, I'm sorry.

24      Q    So when was the next time -- no, that's okay.

25  You were just reading.  When was the next time that

 1   something about the security guards changed?

 2       A    December.  August and December, they moved from

 3   10 to 5, 10:00 p.m. to 5, and 10:30 p.m. to 5:30 a.m.

 4       Q    You said this is in August of 2016?

 5       A    Yes.

 6       Q    Why did they change the hours?

 7       A    Really, it's not a matter of changing.  It's --

 8   they're allowed as security guards, if they can get in

 9   early or want to come in early, they allow them to clock

10   in or come in and then be on the clock.  So it's a matter

11   of really availability and if they're there early, then

12   just go ahead and get on the clock.

13       Q    Okay.  So the security guards requested coming

14   in at an earlier time?

15       A    I wouldn't say they requested it.  If they

16   decided to come earlier then they were scheduled, they

17   were okay -- we were okay with that.

18       Q    So the hours were really 11 a.m. [sic] to 5 a.m.

19   still, but you guys would allow them to clock in at

20   10:00 p.m. --

21       A    Yes.

22       Q    -- if they showed up at 10:00 p.m.?

23       A    Yes.

24       Q    Okay.  And what changed about the security in

25   December of 2016?



1     A     We had a guard there.  His schedule, he

2  needed to -- apparently, one of them that we used, he

3  needed to come in 30 minutes later, leave 30 minutes

4  later.  So it was, again, the availability, 10:30 to 5:30.

5     Q     **So in 2016 the guards were working an extra**

6  **hour?**

7     A     Yes.

8     Q     **And the only reason they were working an extra**

9  **hour is if they showed up early for their shift?**

10    A     Right.

11    Q     **And that was something that they requested or**

12  **QuikTrip requested?**

13    A     No, we didn't request it.  We said we were okay

14  with it.  If they show up early, it's all right.

15    Q     **And you said you were using DeKalb County**

16  **Sheriff's Office?**

17    A     DeKalb County Police and DeKalb -- and sheriff

18  deputies.

19    Q     **Are you -- in 2016 were they using both DeKalb**

20  **County Police and the sheriffs?**

21    A     To my knowledge, yes.

22    Q     **And we discussed the reasons for having the**

23  **security guards was because of overflow from people**

24  **leaving the clubs?**

25    A     Yes.  And when I say that, that's also



1   assumption because we don't have any definitive way of

2   saying that's certainly where they came from.  That's

3   the -- that's what the employees felt it was from.  So

4   when I say that, just for clarity, I don't have a way of

5   saying for sure that those are who those customers were.

6       **Q    Sure.  You're not standing at the door asking**

7   **them, where did you come from?**

8       A    Right, right.

9       **Q    But the employees felt that these were people**

10  **who had been out clubbing and would come to QuikTrip after**

11  **they left the clubs?**

12      A    I don't know.  They just said crowd overflow.

13  So potentially from the club.

14      **Q    Who else besides you in 2007 did you say were**

15  **involved in the decision to add security guards?**

16      A    Bill Giegerich.

17      **Q    How do you spell that?**

18      A    G-I-E-G-E-R-I-C-H.

19      **Q    Is Bill still employed with QuikTrip?**

20      A    No.

21      **Q    Okay.  I'm going to move on to topic number**

22  **four, which is QuikTrip's decision not to employ a**

23  **security guard at the subject premises on December 29,**

24  **2016.  Why wasn't there a security guard there?**

25      A    There was no request and no need for a security



1    guard there.

2         Q    When you say there was no need, how did you

3    determine there was no need?

4         A    Because the employees hadn't said -- informed us

5    that they had any needs.

6         Q    Is it fair to say that the reason why there was

7    no security guard at the QuikTrip on December 29, 2016 is

8    because no employee had requested one?

9         A    I think that's what I said, yeah.  The -- no

10   employee or management had requested it.

11        Q    Okay.  Topic number six is QuikTrip's knowledge

12   of crimes occurring on the subject premises and in the .5

13   miles surrounding the subject QuikTrip between January 1,

14   2012 and December 29, 2016.  I'm going to start off

15   with -- perhaps we can eliminate a whole category and ask

16   you, does QuikTrip have any knowledge of any crimes

17   occurring within -- not on its premises, but within the .5

18   miles of its premises?

19        A    When you say QuikTrip, you're speaking of --

20   because I guess I want to be clear when I give the answer,

21   I don't know if an employee -- an employee had any

22   knowledge, but QuikTrip corporate, no, we would not have.

23        Q    If an employee had knowledge of crimes occurring

24   within .5 miles of the premises, is that something they're

25   supposed to report to QuikTrip?



1     A     No.

2     Q     **Why not?**

3     A     We don't ask them to report incidents that are

4     occurring at other businesses or other residences or in

5     the area.

6     Q     **And why don't you ask them to do that?**

7     A     Just we've never asked them.  We have them focus

8     on maintaining and doing their job within the confines of

9     QuikTrip.

10     Q     **And I think we covered this when we talked about**

11     **topic two.  But QuikTrip doesn't consider criminal events**

12     **occurring within .5 miles from its premises when**

13     **determining security needs for the premises?**

14     A     No.

15     Q     **All right.  Because I have a stack of incident**

16     **reports for things that happened within .5 miles of the**

17     **premises, but not necessarily on the premises.  So I'm not**

18     **going to show them to you, though, because you're telling**

19     **me QuikTrip corporate doesn't know about them, correct?**

20     A     No.

21     Q     **All right.  I'm going to hand you several**

22     **incident reports that are from QuikTrip, and it's labeled**

23     **Plaintiff's Exhibit 38, Plaintiff's Exhibit 39,**

24     **Plaintiff's Exhibit 40, and Plaintiff's Exhibit 41 and 42.**

25     **I'll give you a second to review those.  And we'll go**

1  through them very briefly, but once you've read the first

2  one, if you could let me know.

3      A    Okay.  I've read it.

4      Q    Okay.  Have you ever seen Plaintiff's Exhibit 38

5  before?

6      A    Yes.

7      Q    Okay.  And it's an incident occurring on

8  October 1st of 2016, and I'm reading the text in the first

9  paragraph.  And it says, "Taxi driver driving a blue

10  Toyota Prius that was on our property at 9:21 p.m. with a

11  gun pointed at her head," correct?

12      A    Yes.

13      Q    Is this something that would have been e-mailed

14  to you as a VP of operations?

15      A    I would have got the incident report.

16      Q    And is this the incident report that you're

17  holding in your hand?

18      A    Yes.

19      Q    And it's fair to say QuikTrip knew about this

20  incident?

21      A    Yes.  And this incident is an incident that

22  originated with -- I think her name was Lou Matthew, was

23  the victim's name.  But she had picked up a fare and

24  somehow he had to pull into our store.  And if I'm

25  recalling, other taxi cab drivers were there and they saw



1   this going on and actually followed -- were attempting to

2   follow them.  And, actually, they were calling the police

3   as the whole thing unfolded.

4        Q    How did you find out about that?

5        A    Find out about --

6        Q    All this other information that's --

7        A    Just the media reports.

8        Q    Okay.  So you just saw it on the news?

9        A    Yeah, the media reports about it.

10        Q    All right.  I'm going to turn to -- now to

11   Plaintiff's Exhibit 39.  Do you recognize this incident

12   report?

13        A    I think this was -- is this -- no.  This

14   wouldn't have been the April one.

15        Q    Yeah.  This is dated November 9th of 2014.

16        A    No, I don't recall this one.

17        Q    If you look at the top at the e-mail

18   distribution list, you're on there.

19        A    Right.

20        Q    It says Kevin Thornton?

21        A    Right.  I'm saying I don't recall the incident.

22        Q    Okay.  Fair enough.

23        A    Okay.

24        Q    This is something that QuikTrip knew about?

25        A    Yes.



1     Q     And it's an incident where an employee reported

2  that shots were fired in the parking lot, correct?

3     A     That shots were fired.  And if I can recall a

4  little bit about this -- well, I don't want to say for

5  sure.  But I know on one incident, the shots were not on

6  QuikTrip parking lot.  I probably shouldn't because I

7  don't want to get it confused.

8     Q     Because this one says shots were fired in the

9  parking lot, right?  That's what that says?

10     A     Yeah, that's what it says.  I'm -- I just want

11  to make sure I don't get it confused, so --

12     Q     Sure.  And that's why, yeah, if you don't have

13  any additional information --

14     A     Oh, okay.

15     Q     -- I'm not asking you for any additional

16  information.

17     A     Okay.  I'm sorry.

18     Q     Just whether you recognize this --

19     A     Right.

20     Q     -- and whether QuikTrip had knowledge of it?

21     A     Yes.  I'm sorry.

22     Q     Let's go to Exhibit 40, which is an incident

23  report dated October 9th of 2014.  Do you recognize this

24  incident report?

25     A     Uh-huh.  Yes.  I'm sorry.



1      Q      You're all good.  Good catch.  This is something

2      that QuikTrip knew about?

3      A      Yes.  This was a security guy from some other --

4      he worked security somewhere else.  But anyway, a

5      customer, I believe, brought it to our attention that he

6      had two firearms, but apparently he wasn't -- didn't have

7      the credentials to be carrying those firearms.

8      Q      Would you agree that these incidents involving

9      guns on QuikTrip's property are serious incidents?

10             MS. LEET:  I'm going to object to the form and

11      ask him not to answer in the capacity as a 30(b)(6)

12      representative.  It's not part of the notice topics.

13      Q      (BY MS. ROSE)  Okay.  You can answer in your

14      personal capacity.

15      A      In my personal capacity?

16      Q      Yeah.  Do you think that these are serious

17      incidents?

18      A      I would say I don't know what you would call

19      serious.  Define serious.  Someone having guns on them and

20      they're a security guard, you know, I don't know if I

21      would have recognized it as somebody that I would have

22      been concerned about.

23      Q      What about someone firing guns in the parking

24      lot, does that concern you?

25      A      If I had had somebody actually witness that that



 1   occurred.

 2        Q     Well, there's a -- you had someone who witnessed

 3   that that occurred, right, Tony, your employee?

 4             MS. LEET:  I'm going to object to the extent

 5   that he's testifying in his personal capacity now, not as

 6   the corporate representative.

 7             MS. ROSE:  Sure.  I already said that.

 8             THE WITNESS:  So -- I'm sorry.

 9             MS. LEET:  You can answer in your personal

10   capacity --

11             THE WITNESS:  Yeah.

12             MS. LEET:  -- if you know.

13        A     Personally, like I said, I would not -- I would

14   not be concerned in regards to this because when you say

15   you've got shots being fired, are we shooting at someone,

16   shooting in the air?  What kind of -- what's the details

17   behind it?  That doesn't give me a whole lot of details.

18        Q     (BY MS. ROSE)  Sure.

19        A     I'm sorry.  If you're asking me in my personal

20   --

21        Q     And, again, in your personal capacity, you were

22   the division manager in November of 2014, right?

23        A     In 2014, yes.

24        Q     In November of 2014, and, again, I'm asking in

25   your personal capacity, if you found out that there were



1    shots being fired in the parking lot, even into the air --

2    I guess I'll ask it this way.  Would it concern you if

3    shots were being fired into the air on QuikTrip's

4    premises?

5        A    Yes.

6        Q    Okay.

7        A    I would want the details around what's going on.

8        Q    Okay.  Let's move to Plaintiff's Exhibit 41.

9             MS. LEET:  Are we back on to --

10            MS. ROSE:  Yes.  We're going to go back to

11   his -- back to 30(b)(6).  You're now answering on behalf

12   of QuikTrip again.

13            MS. LEET:  Yeah.  It's very confusing.  If -- if

14   you're at all confused, please let us know.

15            THE WITNESS:  Okay.

16       Q    (BY MS. ROSE)  I'm looking at Plaintiff's

17   Exhibit 41.  It's an incident report dated May 31st of

18   2014, correct?

19       A    Right.

20       Q    Do you recognize this incident report?

21       A    I don't recall it.  I recognize it being an

22   incident report.

23       Q    Okay.  And this is something QuikTrip had

24   knowledge of, right?

25       A    Yes.  It looks like our security guard or an

1   officer dealt with the issue.

2       Q    Sure.  And if you could please set that aside.

3   I'm going to move on to Plaintiff's Exhibit 42, which is

4   an incident report dated April 6th of 2014, correct?

5       A    Yes.

6       Q    And this one is about -- again, involving Tony,

7   and it says, "Heard shots fired right outside of the

8   store", correct?

9       A    Yes.

10      Q    And this is the incident that we discussed

11  earlier that happened right before you guys added an extra

12  night of security guard?

13      A    Right, around the time that he requested it.

14      Q    Sure.  Okay.  I'm going to show you what's been

15  marked at Plaintiff's Exhibit 75.

16      A    Do you need these back or --

17      Q    Sure.  Thank you.  We looked at this earlier

18  during your individual deposition.  It's an incident

19  report dated -- a police report dated December 19th of

20  2016, correct?

21      A    Right.

22      Q    And it involves the potential sale of drugs on

23  QuikTrip's premises, correct?

24      A    This says possession.  It doesn't say sale.

25      Q    If you turn to the narrative.



1     A    Okay.

2     Q    It says, "Who may be selling drugs", right?

3     A    Yes, that's what it says.

4     Q    Okay.  And this is something that QuikTrip did

5  not know about, correct?

6     A    Correct.

7     Q    Okay.  All right.  I'll take that back.  I'm

8  going to hand you what's been marked as Plaintiff's

9  Exhibit 44.

10     A    Thank you.

11     Q    This is an incident report dated March 12th of

12  2016, correct?

13     A    Yes.

14     Q    And if you turn to the second page of the

15  report, it says, "On March 12th of 2016, I, Officer Curry,

16  responded to 4050 Buford Highway, QuikTrip, in reference

17  to DeKalb County deputy calling for backup for shot being

18  fired," correct?

19     A    Yes.

20     Q    Is this something that QuikTrip knew about?

21     A    No.

22     Q    Okay.  I'm going to hand you what's been marked

23  as Plaintiff's Exhibit 45.  This is a police report dated

24  December 13th of 2015.

25     A    I'm sorry.  Can I --



 1          MS. LEET:  No.

 2      Q    (BY MS. ROSE)  And if you turn to the last page

 3  of this report, it says, "I observed two female subjects

 4  engaging in mutual combat with each other."  Do you see

 5  that?

 6      A    Uh-huh.

 7      Q    Sorry.  Is that a yes?

 8      A    Yes.

 9      Q    Is this something that QuikTrip knew about?

10      A    I'm trying to -- I would say I don't know if we

11  have an incident report that corresponds with this.

12      Q    Okay.

13      A    So --

14      Q    Is it fair to say that all the incidents that

15  QuikTrip knows about have a corresponding incident report?

16      A    Yes.

17      Q    Okay.  I'm going to hand you what's been marked

18  as Plaintiff's Exhibit 47.  This is a plaintiff report

19  dated March 5th of 2015.  And if you look at the last

20  page, it says it's an incident occurring at 4050 Buford

21  Highway, the QuikTrip, and it says there was a verbal

22  altercation over a handicapped parking space.  Do you see

23  that?

24      A    Yes.

25      Q    Is this something that QuikTrip knew about?

1     A    No.

2     Q    Okay.  I'm going to hand you what's been marked

3 as Plaintiff's Exhibit 69, and it's a police report dated

4 January 7th of 2015.  And it's a call regarding police

5 being dispatched to the QuikTrip in reference to a car

6 that was broken into, correct?

7     A    Yes.

8     Q    Did QuikTrip know about that incident?

9     A    No.

10     Q    We're on Exhibit 76.  All right.  I'm going to

11 hand you what I'm marking as Plaintiff's Exhibit 76.

12     (WHEREUPON, Exhibit 76 was marked for

13 identification.)

14     MS. LEET:  Hold on.  I have to see it first.

15 Thanks.

16     Q    (BY MS. ROSE)  And this is a criminal trespass

17 occurring on April 24th of 2014, correct?

18     A    Yes.

19     Q    And it says, "I responded to 4050 Buford Highway

20 QuikTrip in reference to an out of control individual

21 yelling at customers.  When I arrived, I walked through

22 the entrance and found one black male standing next to the

23 entrance."  Do you see that?

24     A    Yes.

25     Q    Is this something that QuikTrip knew about?



1    A    Again, when you -- you're talking about --

2   that's really not an incident -- it wouldn't generate an

3   incident alarm.  There wasn't an action.  I didn't read

4   the rest of it, but a guy yelling --

5    **Q    So if there's a customer inside of a QuikTrip**

6   **yelling at customers, that's not something that you would**

7   **expect the employees to press a panic button for?**

8    A    I would say yes, if he's out of control.  I

9   don't know the level of what this was.  But to answer your

10  question, no, we didn't know about it.

11       MS. ROSE:  Okay.  This was previously marked as

12  Plaintiff's Exhibit 55, but we haven't -- we haven't put

13  it into evidence.  I just marked it.  So we skipped some

14  numbers.

15       One of those copies is yours, if you want it.

16       (WHEREUPON, Exhibit 55 was marked for

17  identification.)

18       MS. LEET:  Oh, okay.  Good.

19    **Q    (BY MS. ROSE)  All right.  I've just shown you**

20  **what's been marked as Plaintiff's Exhibit 55.  And this is**

21  **an incident police report occurring on May 1st of 2013,**

22  **correct?**

23    A    Yes.

24    **Q    And this is an incident where the police arrived**

25  **and arrested someone for loitering for sex and drugs,**

1    correct?

2         A    It says loitering for sex.

3         Q    **If you turn to the back page, it says that the**

4    **person was arrested for loitering for sex and drugs,**

5    **correct?**

6         A    Uh-huh.  Yes.

7         Q    **Is this something that QuikTrip knew about?**

8         A    No.

9              (WHEREUPON, Exhibit 57 was marked for

10   identification.)

11        Q    **This is similar in that we labeled it but didn't**

12   **use it.  So that's Plaintiff's Exhibit 57, which is a**

13   **police report dated August 4th of 2012, correct?**

14        A    Yes.

15        Q    **And it says, "Discharge of firearms on property**

16   **of another," correct?**

17        A    Yes.

18        Q    **All right.  And if you turn back to the**

19   **narrative, it indicates that, "Upon my arrival, I observed**

20   **a large crowd in front of the store around the gas pumps.**

21   **We identified a potential fight in the center of the crowd**

22   **where a number of males were pushing each other, and at**

23   **some point, someone fired two shots," correct?  That's**

24   **what it says?**

25             MS. LEET:  I'm going to object to the form to



1   the extent that certain words on sentences were removed

2   from that recitation.

3           You can answer.

4       A    Okay.  I'm sorry.  Can you repeat yourself?

5       Q    **(BY MS. ROSE)  Sure.  Do you agree that,**

6   **according to the narrative of this incident report, that**

7   **it involved a large crowd having a fight and two gunshots**

8   **were fired?**

9       A    Yes, the officer said -- the deputy said he

10  heard two gunshots.

11      Q    **Is this something that QuikTrip was aware of?**

12      A    No.

13      Q    **Okay.  I'm going to mark this as Plaintiff's**

14  **Exhibit 77.  And it's a QuikTrip incident report from**

15  **November 21st of 2015, correct?**

16          (WHEREUPON, Exhibit 77 was marked for

17  identification.)

18      A    Yes.

19      Q    **And it's an incident where a customer was**

20  **assaulted while he was in the store, correct?  And I'll**

21  **permit you to take your time and read it.**

22      A    Yes.

23      Q    **Okay.  And fair to say that QuikTrip created an**

24  **incident report and knew about the incident?**

25      A    Yes.



1       Q     Okay.  All right.  I'm going to move on to topic

2    eight now.  And topic eight is, "Any and all complaints,

3    recommendations, or requests relating to security,

4    security measures, crime, and/or crime deterrence at the

5    subject QuikTrip between January 1st of 2012 and

6    December 29th of 2016.  This includes, but is not limited

7    to, complaints relating to physical safety and requests to

8    implement additional security measures on the premises."

9    Have you ever had any complaints relating to any security

10   at store 797?

11      A     No.

12      Q     Have you ever had any complaints relating to

13   crime at store 797?

14      A     No.

15           MS. LEET:  I'm going to object to the form to

16   the extent that all of these questions are with the caveat

17   that you are referencing the time period from January 1,

18   2012 to December 29, 2016, for the notice, correct?

19           MS. ROSE:  Yes, correct.

20           MS. LEET:  Okay.

21      Q     (BY MS. ROSE)  And so I'll reask the question so

22   I make it clear on the record.

23           Does QuikTrip know of any complaints relating to

24   crime occurring on the subject premises, store 797,

25   between January 1, 2012 and December 29th of 2016?



1      A      Not to my knowledge.

2      Q      Does QuikTrip know of any complaints relating to

3  crime deterrence at store 797 between January 1st of 2012

4  and December 29th of 2016?

5      A      Does QuikTrip know of any crime deterrence?

6      Q      Any complaints about --

7      A      I'm sorry.  Can you repeat that?

8      Q      Complaints about crime deterrence that were in

9  place at the subject QuikTrip January 1, 2012 and

10  December 29th of 2016?

11      A      No, not to my knowledge.

12      Q      Is QuikTrip aware of any recommendations that

13  have been made relating to security measures between

14  January 1, 2012 and December 29, 2016 at the subject

15  QuikTrip?

16              MS. LEET:  I'm going to object to the form to

17  the extent that this request is complaints related to --

18              MS. ROSE:  Using the second word that I --

19              MS. LEET:  Never mind.  Withdraw.  Sorry.  I'm

20  reading sideways.

21              MS. ROSE:  Fair enough.  Okay.  So I'm going to

22  read the question again --

23              MS. LEET:  I apologize.

24      Q      (BY MS. ROSE)  -- in light of the objections.

25              Okay.  Is QuikTrip aware of any recommendations



1    relating to security at the subject QuikTrip between

2    January 1, 2012 and December 29 of 2016?

3        A    It would be the request when we added a second

4    night per -- I'm sorry, per Gretchen and Tony.

5        Q    So it would be when you added the second night

6    of security guard duty?

7        A    Yes.

8        Q    Was there any other recommendation made?

9        A    No.

10       Q    Was there any recommendation made at the

11   subject -- for -- related -- scratch that.  Start again.

12            Is there any recommendation that has been made

13   for the subject QuikTrip between January 1st of 2012 and

14   December 29th of 2016 relating to crime deterrence at the

15   subject QuikTrip, other than that security guard?

16       A    No.

17       Q    And other than the request relating to adding

18   one night of security guard duty, has there been any other

19   requests relating to security measures, crime, or crime

20   deterrence at the subject QuikTrip between January 1, 2012

21   and December 29th of 2016?

22       A    No, not to my knowledge.

23       Q    And I think this falls within the category, so

24   I'm going to ask it.  Has there been any recommendation or

25   request to evaluate the crime levels at store 797 between

1  January 1, 2012 and December 29th of 2016?

2      A    No, not to my knowledge.

3      Q    Has there ever been a complaint relating to

4  physical safety of any employee or customer at the subject

5  QuikTrip between January 1st of 2012 and December 29th of

6  2016?

7      A    No, none.  I'm sorry.  Say that again from the

8  beginning.

9      Q    Sure.  Has there been any complaint relating to

10  either a customer's or employee's physical safety at store

11  797 between January 1st of 2012 and December 29th of 2016?

12     A    No, not to my knowledge.

13     Q    All right.  I'm going to move on to topic number

14  nine, which is Bryan Reed's role on the premises on

15  December 29th, 2016, including but not limited to whether

16  he should have been equipped with a button belt alarm, he

17  had any role in monitoring the interior or exterior of the

18  subject QuikTrip, and he had any role in store security or

19  crime deterrence.  What was Bryan Reed's role on the

20  premises on December 29th of 2016?

21     A    He was a QA, and his role was to clean

22  equipment.

23     Q    And can you explain to me what QA stands for?

24     A    Quality assurance, kind of a quality assurance

25  tech.  They clean the equipment in terms of coffee pots,



1   the different equipment to make sure that we've got a

2   regular routine maintenance of it.

3       Q    Is he part of the facility systems team?

4       A    Yes.

5       Q    Should he have been equipped with a button belt

6   alarm?

7       A    No.

8       Q    Did he have any role in monitoring the interior

9   of the subject QuikTrip?

10      A    Of course, if he had seen anything, we would

11  expect him to say something.

12      Q    Would he have had any role for monitoring the

13  exterior of the subject QuikTrip?

14      A    The same.  If he'd seen something, we would

15  expect him to say something.

16      Q    And I think you've answered it by what you just

17  said.  But what was his role as it relates to store

18  security and crime deterrence that night?

19      A    His role?

20      Q    His role, if any, relating to store security and

21  crime deterrence?

22      A    He was there just to work on equipment.  And,

23  again, if he had seen something or observed something, we

24  would expect him to make -- make us aware.

25      Q    And how would he be able to make you aware?



1     A     He -- actually, he has access -- if there had

2  been anything in the back of the store house, there's

3  security buttons back there that he could have pressed or

4  he could have made the assistant on duty aware.

5     **Q     Okay.  So if he had seen something that**

6  **concerned him that he thought he should make QuikTrip**

7  **aware of, he had access where he could have pushed a panic**

8  **button?**

9     A     Yes.

10    **Q     And he, obviously, could have told the other**

11 **store employees, correct?**

12    A     Yes.

13    **Q     And if he saw something that concerned him, you**

14 **would expect that he would do that, correct?**

15    A     Yes, if he was concerned.

16    **Q     All right.  Moving on to topic number ten,**

17 **whether any changes to security at the subject QuikTrip**

18 **had been implemented or proposed as a result of criminal**

19 **-- of a criminal occurrence on the premises or the .5**

20 **miles surrounding the subject premises between January 1st**

21 **of 2012 and December 29th of 2016.  This includes what**

22 **changes were made or proposed, why the change was made or**

23 **proposed, and the persons involved in making or proposing**

24 **the change.  Has QuikTrip ever made a change as a result**

25 **of a criminal occurrence at store 797 between January 1,**



1    2012 and December 29th of 2016?

2        A    No.

3        Q    Has QuikTrip ever made a change at store 797 in

4    response to a criminal incident occurring within .5 miles

5    of the subject premises between January 1, 2012 and

6    December 29th of 2016?

7        A    No.  If I can, going back, I don't know if

8    you're excluding or including Tony's request because

9    that's within that time frame.  So I don't know if -- if

10   that's the same because only reason I haven't stated that

11   is because it just seemed like it would be being

12   redundant.  So I don't know if I need to say something or

13   point that out every time the question is asked, so I'm

14   asking.

15       Q    Yes, I would appreciate it if you could respond

16   fully to each topic as we go through them.

17       A    Okay.  So each time, I need to point out?

18       Q    Yes, please.  I appreciate you asking for the

19   clarification so that we're clear on the record.  And so

20   I'll ask it again now that we have that understanding --

21       A    Okay.

22       Q    -- so that the record is clear.  Has QuikTrip

23   ever implemented any change at store 797 as a result of a

24   criminal occurrence on the premises between January 1st of

25   2012 and December 29th of 2016?



1      A      The Tony Bolling request, which partly crowd --

2    was mostly being driven by crowd control, but we did have

3    an incident during the same time.

4      **Q      Was that security guard added as a result of the**

5    **incident?**

6      A      The security guard was added as a result of the

7    request from Tony for crowd control.

8      **Q      Did Tony express any concerns about his personal**

9    **safety?**

10     A      No.

11     **Q      Is that the only change to the security at store**

12   **797 that has been made as a result of a criminal**

13   **occurrence occurring on the premises?**

14     A      It's wasn't because of a criminal occurrence,

15   but, yes, that's the only change in security.

16     **Q      And I think you asked -- answered it, but I'm**

17   **going to ask it again because we went through the whole**

18   **thing about whether you're fully answering the question.**

19   **So I'm just going to just ask it again.  Has QuikTrip ever**

20   **made a change to the security at store 797 as a result of**

21   **a criminal occurrence occurring within .5 miles**

22   **surrounding store 797 between January 1, 2012 and**

23   **December 29th of 2016?**

24     A      No.

25     **Q      Has any change to the security at store 797 ever**



1    been proposed but not implemented as a result of a

2    criminal occurrence at store 797 between January 1, 2012

3    and December 29, 2016?

4        A    No, not to my knowledge.

5        Q    Has any change to security been proposed but not

6    implemented at store 797 as a result of a criminal

7    occurrence occurring within .5 miles surrounding the

8    subject premises between January 1, 2012 and December 29th

9    of 2016?

10       A    No.  Is that not the same question?

11       Q    I'm asking about whether a criminal incident not

12   occurring on QuikTrip's premises but occurring within

13   .5 miles of that premises, if any criminal incident has

14   led to a proposed security change at store 797 that was

15   not implemented?

16       A    No.

17       Q    Is it fair to say that between January 1, 2012

18   and December 29, 2016, the only proposed change to the

19   security that you're aware of is the addition of the

20   security guard in 2014?

21           MS. LEET:  I'm going to object to the form of

22   the question as it exceeds the scope of this notice.

23   Topic ten specifically asks about changes to security as a

24   result or proposed changes to security as a result of the

25   criminal occurrence.  And I will just note for the record,



1  to the extent there were changes in security already

2  discussed by Mr. Tennison yesterday that were a part of

3  regularly scheduled upgrades, I don't want those to be

4  excluded, and I don't think they're part of the notice for

5  his topics.

6       Q    (BY MS. ROSE)  And I'll ask this question to

7  wrap up this topic.  Is it fair to say that other than the

8  addition of one security guard in 2014, QuikTrip has never

9  made a change to its security for store 797 between

10 January 1, 2012 and December 29th of 2016 as a result of

11 any criminal incident?

12      A    In terms of security, no.  I'm not sure if you

13 would entail the new security systems, the up -- the up --

14 just for clarity, also we revised our security system, but

15 that was in every store.  That wasn't to -- and I can't

16 remember what year that was exactly, but I think it falls

17 in this time frame.  But it had nothing to do with

18 criminal activity.

19      Q    Sure.  And that's a fair clarification.  So

20 it's -- I just want to be clear that QuikTrip has never

21 made, other than adding one security guard in 2014, a

22 change to its security at store 797 between January 1st of

23 2012 and December 29th of 2016 as a direct result of a

24 criminal incident?

25      A    No.  That was a mouthful, but -- but I -- I



1    think I got it all.

2          Q    I'll ask it in a simpler way.

3          A    No.

4          Q    Has QuikTrip made any changes to the security in

5    store 797 in response to a criminal incident?

6          A    And so you're speaking directly about security

7    guards, not --

8          Q    I'm speaking about any security feature at the

9    store that has been changed as a direct result of a

10   criminal incident?

11         A    No, not as a direct result.  I'm sorry.

12              MS. ROSE:  No, you're okay.  All right.  Let's

13   take a break, and then we'll see if we can wrap it up.

14              MS. LEET:  Okay.

15              THE VIDEOGRAPHER:  We are off the record.  The

16   time is 1:13.

17              (Break taken.)

18              THE VIDEOGRAPHER:  We are on the record.  The

19   time is 1:16.

20         Q    (BY MS. ROSE)  Going back to topic two.

21   QuikTrip's policies, procedures, and practices concerning

22   its efforts, if any, to evaluate the security needs for

23   the subject premises, the risk of criminal activity to

24   customers, crimes occurring on the premises, and the crime

25   and security risk in the .5 miles surrounding the subject



1  **premises between January 1st of 2012 and December 29th of**

2  **2016, did you consult anyone at QuikTrip in order to**

3  **obtain information to respond to this topic today?**

4      A    No.

5      **Q    Did you look at any documents in order to**

6  **respond to this topic today?**

7      A    In terms of just this specific item?  No.

8      **Q    This is all information that you knew off the**

9  **top of your head?**

10     A    Oh, I'm sorry.  When you're talking about

11  security, are you talking about did I refer back to

12  policies and procedures, did I --

13     **Q    Yeah, I'm asking --**

14     A    -- look up -- oh, yeah.  I'm sorry.  To what I

15  said earlier, the things that I review, yeah, being

16  policies and procedures, the things I had at my disposal.

17     **Q    Which policies and procedures do you recall**

18  **looking at?**

19     A    It was the ones pertaining to the safety,

20  security, just orientation, just those items.

21     **Q    All right.  I'm going to hand you really quickly**

22  **Exhibits -- Plaintiff's Exhibits 27, 28, 29, 30, 31, 32,**

23  **33, 34, 35, 73, and 74.  I know it's a lot, but I'd just**

24  **like you to review these and tell me, did you look at any**

25  **policies and procedures other than those I have just**



1   handed you?

2       A    Okay.  Security guard, I looked at this.  I'm

3   sorry.  Are you wanting me to --

4       Q    Sure.

5       A    -- say --

6       Q    Why don't you tell me -- tell me -- say the

7   exhibit number, and then tell me if you looked at it.

8       A    Exhibit Number 27, I looked at it.  Exhibit 28,

9   I looked at it.  Exhibit 29, looked at it.  Exhibit 30, I

10  looked at it.  Exhibit 31, I looked at it.  Exhibit 32, I

11  looked at this.  Exhibit 33, I looked at this.  34, I

12  looked at this.  35, I looked at this.  73, I did not -- I

13  don't recall looking at the shoplifting.  And 74, I looked

14  at it.

15      Q    Are there any policies and procedures in

16  addition to those that were just shown?

17      A    No.  I think you have everything pertaining to

18  the policies and procedures.

19          MS. ROSE:  And let's go off the record just a

20  sec.

21          THE VIDEOGRAPHER:  We are off the record.  The

22  time is 1:20.

23          (Break taken.)

24          THE VIDEOGRAPHER:  We are on the record.  The

25  time is 1:20.



1      Q    (BY MS. ROSE)  And I'm going to ask you about

2   plaintiff's topic one, which is QuikTrip's policies,

3   procedures, and practices concerning physical security,

4   loitering, verbal and physical fights or alterations,

5   crime deterrence or crime in QuikTrip's parking lots in

6   effect on December 29, 2016.  This includes any training

7   provided to QuikTrip employees regarding these matters.

8   And I want to specifically just ask you about the training

9   aspect of this.

10      A    Okay.

11      Q    What does -- what are QuikTrip's policies,

12   procedures, and practices for training store-level

13   employees on physical security?

14      A    The training that they receive is in

15   orientation, we go through these policies and procedures

16   here, along with when they're going -- when they're in

17   training, they go through the same policies and

18   procedures.  We also have additional training when you go

19   from RA, NA to 2A.

20      Q    Can you explain to me what those terms are?

21      A    I'm sorry.  RA and NA.  RA's a relief assistant.

22   NA is a night assistant.  Those are the two entry level

23   positions.  And so you get additional training also when

24   you become 2A, which is a second assistant, and that's the

25   position two -- two levels from becoming a store manager,



1    and then again when you become store manager.  Okay.  So

2    those are the levels that you get training and go through

3    all of your policies and procedure over again.

4          We also have monthly manager meetings where they

5    meet with their store employees, and that's a part of

6    their agenda.  Quarterly assistant meetings, that's where

7    the supervisors meet with all of their assistants

8    quarterly in the meeting and they recap and refresh on

9    those topics as well.

10    **Q    Does QuikTrip provide any policies, procedures,**

11    **or practices concerning loitering other than those**

12    **contained in those documents in front of you?**

13    A    No.  This is what we provide.

14    **Q    Does QuikTrip have any policies, procedures, or**

15    **practices relating to verbal or physical fights or**

16    **altercations occurring on the premises other than those**

17    **documents that are in front of you right now?**

18    A    No.  Just --

19    **Q    Does QuikTrip have any policies, procedures, or**

20    **practices concerning crime deterrence?**

21    A    These -- this would be what we have.

22    **Q    Okay.  And what training is provided to**

23    **employees relating to crime deterrence, if any?**

24    A    If any, when you talk about crime deterrence,

25    our employees, we try to make them -- make sure that they



1  are greeting people.  That we -- we report if we have any

2  light out because we -- you know, we really want bright

3  facilities.  Make sure there's not obstructions in the

4  window.  Do the best you can and monitor things.  And when

5  I say monitor things, I probably should say watch out for

6  things, you know, and just try to be aware.  There isn't

7  any -- because that's so broad when you talk about trying

8  to deter.  There's so many various situations and I don't

9  know if you can capsulate all that.

10      **Q    Sure.  Is part of the training for a QuikTrip**

11  **employee to be aware and monitor as best they can both the**

12  **inside and the outside of the store?**

13      A    As part of their training, we ask them, you

14  know, to pay attention.

15      **Q    And that's for both the inside and the outside**

16  **of the store, correct?**

17      A    If they can.

18      **Q    Is there any policy, procedure, or practice for**

19  **reporting crime that occurs in a QuikTrip store or in the**

20  **parking lot?**

21      A    Yes.  The use of the security system and the

22  alarm, as well as communicating in a shift change if -- if

23  there is anything that they're aware of.

24      **Q    Are you aware of any policies, procedures, or**

25  **practices that QuikTrip has, other than those sitting in**



1  **front of you, relating to when an employee should hit the**

2  **panic alarm?**

3      A    I think it had in here when to.  I just want to

4  make sure --

5      **Q    Sure.**

6      A    -- when you ask that because we have a deal to

7  tell them when they should be hitting it.  Yeah, it's in

8  here.

9      **Q    Okay.  Are there any other policies, procedures,**

10 **or practices --**

11     A    No.

12     **Q    -- that are given to employees as part of their**

13 **training?**

14     A    No.

15     **Q    For topic three, which was QuikTrip's decision**

16 **to employ armed security guards at the subject QuikTrip,**

17 **where did you obtain the information in order to respond**

18 **to this topic?**

19     A    Jason White.  Jason White is the personnel

20 manager, and so to try to get some of the information and

21 the dates, he's -- he's the only one that has access for

22 some of that information being the personnel manager, just

23 trying to get the dates and the people who would have been

24 there at that point.  And when you talk about the security

25 pieces, like the guard, like I said, I used to have notes.



1  Some of it I had to refer back to just from memory, but I

2  had to contact Jason to get most of that info.

3      Q    Okay.  Did you have any notes from when you were

4  division manager that you referred to?

5      A    No.

6      Q    It's all off the top of your head or from Jason

7  White to get that information?

8      A    No.  Well, off the top of my head, I had an idea

9  of who may have been there, but I had to get -- everything

10 that I got was verified and validated.  But yeah, I had to

11 go through Jason.

12     Q    Right.  And I'm asking is there any other source

13 that you obtained that information from?

14     A    No.

15     Q    Okay.

16     A    I was getting rid of everything.

17     Q    Topic six was QuikTrip's knowledge of crimes

18 occurring on the subject premises and in the .5 miles

19 surrounding the subject QuikTrip between January 1, 2012

20 and December 29, 2016.  What did you refer to in order to

21 answer that topic?

22     A    I'm sorry.  What was it again?  I thought she

23 was about to pass it to me.

24     MS. LEET:  I'm sorry.  Do you want to read it?

25 It's number six.



1    A    Okay.  What was your question again?

2    Q    (BY MS. ROSE)  What documents or information did

3  you look at in order to respond to topic six?

4    A    I didn't look at any.  We hadn't pulled any data

5  pertaining to crimes around the store in the .5 miles

6  because that's not something that -- that we did.

7    Q    Did you look at the incident reports that

8  QuikTrip generated?

9    A    The ones that I had seen from talking with my

10  attorney.

11    Q    Did you speak with anyone else in order -- other

12  than your attorney, in order to obtain the information for

13  topic six?

14    A    No.  I don't think I had to get with Jason on

15  anything out of six, no.

16    Q    Topic eight was the complaints, recommendations,

17  or requests relating to security, security measures,

18  crime, and/or crime deterrence at the subject QuikTrip

19  between January 1, 2012 and December 29, 2016.  What

20  documents, if any, did you look at or review in order to

21  respond to topic eight?

22    A    Just, again, looking back through what we had in

23  terms of what she provided me.  Those were the things that

24  we looked at, that I looked at.

25    Q    You looked at no documents that had been -- you



1 **looked at only documents that had been labeled as exhibits**

2 **in this case?**

3     A    No.  I went back and I had already gone through,

4 actually, the policies and procedures and just so happened

5 to align with what the documents were that you have here.

6 And then, of course, when we talked, it was because I knew

7 I was having this deposition and I wanted to make sure

8 that I was up to speed on everything.

9     **Q    Sure.  So what documents did you look at to**

10 **determine whether there were any complaints,**

11 **recommendations, or requests relating to security at the**

12 **subject QuikTrip, if any?**

13     A    Well, it's one of those that I -- again, I

14 looked at the incident, and based on me being there at the

15 point, I knew that we had not -- I had not received

16 anything pertaining to complaints or requesting security

17 because I was a division manager there at that point.

18     **Q    Did you speak with Marc Mileurn in order to find**

19 **out if he's had any complaints, recommendations, or**

20 **requests relating to security?**

21     A    No, I didn't.  I knew that he potentially was

22 getting deposed too, and I just thought we were not

23 supposed to have any communication in regards to -- to

24 this case.

25         MS. ROSE:  Nichole, I may ask to leave that



1    topic open to the extent that during the time that Marc

2    Mileurn has been the division manager, whether he's had

3    any complaints, recommendations, or requests since he --

4          MS. LEET:  I can agree to that.

5    **Q    (BY MS. ROSE)  Okay.  For topic nine, which was**

6    **Bryan Reed's role on the premises on December 29, 2016,**

7    **did you look at any sort of documents in order to respond**

8    **to that topic?**

9    A    No.

10   **Q    Did you speak with anyone in order to respond to**

11   **that topic other than your attorney?**

12   A    No, and just knowing who Bryan was.

13   **Q    Okay.  You -- he worked there while you were**

14   **division manager?**

15   A    No.  As a matter -- as a matter -- I can't say

16   when he started because I don't recall that, but, you

17   know, the fact that he was a QA and knowing what his

18   responsibilities were.

19   **Q    Did you review any documents that list out the**

20   **responsibilities of the QA?**

21   A    No.

22   **Q    Are there any documents?**

23   A    That, I don't know.  I'm sure they've got

24   procedures for cleaning equipment, you know.

25   **Q    Sure.  And I'll limit it to his role in the**



1    security system at QuikTrip.  Is there any document, other

2    than those that are sitting in front of you right now,

3    that would apply to him?

4        A    No.

5        Q    And topic ten is whether there have been any

6    changes to security at the subject QuikTrip in response to

7    a criminal occurrence.  What documents, if any, did you

8    look at in order to respond to that topic?

9        A    Whether there's been any changes, and just

10   getting with Jason White and saying, hey, has there been

11   any changes in security, can you look at time records to

12   see if anything's changed?  And, again, the answer to that

13   was -- was no.

14            MS. ROSE:  Let's take just a five minute break,

15   and then I think we'll wrap it up.

16            THE VIDEOGRAPHER:  We are off the record.  The

17   time is 1:32.

18            (Break taken.)

19            THE VIDEOGRAPHER:  We are on the record.  The

20   time is 1:36.

21        Q    (BY MS. ROSE)  I want to go back to training

22   just for one second.  Do clerks have any training in

23   deterring third-party crime, store clerks?

24        A    Deterring third-party crimes?  Explain that to

25   me a little better, if you don't mind.



1      Q     Do store-level clerks have any training in how

2   to deter a third-party from committing a crime on a

3   QuikTrip premises?

4      A     All of our clerks -- all of our employees are

5   trained on the same policies and procedures in the

6   process.

7      Q     Okay.  Does any of that training have to do with

8   deterring third-party crime?

9      A     If you're considering greeting and lighting and

10  cleaning the facility, all the things that we spoke about

11  earlier as -- if you classify those as deterrents, then

12  yes, they are.

13     Q     Is there anything else other than greeting and

14  noting when lights are out that deals with deterring

15  third-party crime that employees are trained on?

16           MS. LEET:  I'm going to object to the form to

17  the extent it mischaracterizes prior testimony.

18           You can answer.

19     A     Okay.  Again, it's one of those that all the

20  training for safety is the same in terms of just being

21  aware, read people, make sure lighting, there's no

22  obstruction in terms, of, you know, product.  It's all the

23  same training for all the employees.

24     Q     (BY MS. ROSE)  Is any of that training, other

25  than greeting customers and noting when lights are out,



1   training for deterring third-party crime?

2          MS. LEET:  I'm going to object to the form.  It

3   mischaracterizes prior testimony.

4      A    Yeah, I guess -- I guess that's the same

5   question I just answered, isn't it?

6      Q    (BY MS. ROSE)  Well, I guess I'm just confused

7   because, I mean, I'm looking at a transcript of a

8   deposition you gave.  You were sworn in to testify under

9   oath in the Hatib Mbowe case versus QuikTrip Corporation,

10  and it's case 16A60446, in State Court of DeKalb County,

11  State of Georgia, and you were asked, "So your clerks do

12  not have any training in deterring third-party crime,

13  right?"  And you responded, "No, outside of, you know,

14  just awareness and greeting and just making sure we're

15  observing."  Is that an accurate statement?

16     A    That's close to what I just said, the awareness,

17  greeting.  And, again, the one thing I have learned and --

18  I've asked you, exactly what you mean by third-party

19  crimes, you know.  It's --

20     Q    Okay.  So at the time you gave this deposition,

21  did you not understand what --

22     A    No, that's --

23     Q    -- third-party crime meant?

24     A    Doing these has helped me understand that I need

25  to ask when I don't understand and not assume.  That's why



1  I keep asking you for clarity because then when you hear

2  or see something on something later on, it's like, well,

3  that's not what I meant.  So that's why I'm -- and, again,

4  like I said to you earlier, I'm not trying to be

5  difficult.  I just want to make sure I understand so I

6  answer correctly.

7      **Q    Sure.  And I appreciate that.  And then I'm just**

8  **going to ask you, when you gave the deposition in the**

9  **Mbowe case on February 10th of 2017, did you not have an**

10  **understanding of what third-party crime meant?**

11      A    No.  That's exactly -- and that's why I asked

12  you, because what does that mean?  And I asked you that

13  earlier I think for clarity.

14      **Q    Okay.  Do you agree with the statement, however,**

15  **that outside of just awareness and greeting and making**

16  **sure we're observing and the lighting thing that you**

17  **mentioned, that there's no additional training for**

18  **deterring third-party crime?**

19      A    Do I agree with?

20      **Q    Do you agree that there's no additional training**

21  **concerning third-party crime?**

22      A    No, outside of what we currently have in our

23  policies and procedures, that's what we provide.

24      **Q    Does QuikTrip have any training for store**

25  **employees on how to evaluate whether a store needs a**



1    security guard?

2          MS. LEET:  I'm going to object to the form.  Are

3    you asking as a corporate representative?

4          MS. ROSE:  Yes.

5    A    Okay.  Can you repeat the question?

6    Q    (BY MS. ROSE)  Yes.  Does QuikTrip have any

7    policies and procedures for store-level employees to

8    determine when a security guard may be needed?

9    A    No.  Other than them letting us know if they

10   don't feel safe, if they have any issues or concerns, then

11   -- that would be our measuring stick.  So saying no is we

12   don't have anything other than that, if you want to -- I

13   don't know if you consider that one of the -- the tools or

14   not.

15   Q    Is it fair to say that QuikTrip is fully reliant

16   on store-level employees to request security guards?

17   A    Yes.

18         MS. LEET:  Object to the form.

19         THE WITNESS:  Oh, I'm sorry.

20   Q    (BY MS. ROSE)  And if no store-level employee

21   requests a security guard, no security guard will be

22   placed, correct?

23   A    I would say that would probably -- not unless,

24   you know -- a store manager or supervisor could if he had

25   a reason, you know, but, of course, it's going to come



 1    from the store level in just about all the cases.

 2        Q    And when a security guard is placed in a store,

 3    is that approved by the division manager?

 4        A    Yes.

 5        Q    Is it approved by anyone above the division

 6    manager?

 7        A    No.

 8             MS. LEET:  Object to the form, already asked.

 9        Q    (BY MS. ROSE)  Have you had a chance to answer

10    all my questions here today?

11        A    I'm sure as I think through it, the answer will

12    be no as with the other ones, but right now I believe I

13    have.

14        Q    Is there anything that you want to add to any of

15    the questions that I've asked you today as you sit here

16    right now?

17        A    No.

18             MS. ROSE:  All right.  Thank you very much.

19             THE VIDEOGRAPHER:  We are off the record.  The

20    time is 1:43.

21             (DEPOSITION CONCLUDED AT 1:43 P.M.)

22

23

24

25

1                           ERRATA SHEET

2        YVETTE ADELLE SANDERS, et al. vs. QUIKTRIP CORPORATION

3                     DEPOSITION OF KEVIN THORNTON

4                  REPORTED BY: KARLI PIANALTO, CSR

5              DATE DEPOSITION TAKEN: FEBRUARY 22, 2018

6                         JOB NO. 127916

7    PAGE  LINE  IS                      SHOULD BE

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____



1                          JURAT

2     YVETTE ADELLE SANDERS, et al. vs. QUIKTRIP CORPORATION

3              I, Kevin Thornton, do hereby state under oath

4     that I have read the above and foregoing deposition in its

5     entirety and that the same is a full, true and correct

6     transcription of my testimony so given at said time and

7     place.

8

9

10            _____

11            Signature of Witness

12

13

14            Subscribed and sworn to before me, the

15     undersigned Notary Public in and for the State of Arkansas

16     by said witness, Kevin Thornton, on this _____day

17     of_____, 2018.

18

19

20

21            _____

22            NOTARY PUBLIC

23            MY COMMISSION EXPIRES:_____

24            JOB NO. 127916

25



```
 1                    C E R T I F I C A T E

 2          I, Karli Pianalto, Certified Shorthand Reporter,

 3   do hereby certify that the above-named Kevin Thornton was

 4   by me first duly sworn to testify the truth, the whole

 5   truth, and nothing but the truth, in the case aforesaid;

 6   that the above and foregoing deposition was by me taken

 7   and transcribed pursuant to agreement, and under the

 8   stipulations hereinbefore set out; and that I am not an

 9   attorney for nor relative of any of said parties or

10   otherwise interested in the event of said action.

11          IN WITNESS WHEREOF, I have hereunto set my hand

12   and official seal this 1st day of March, 2018.

13

14

15

16

17

18

19

20

21

22

23

24

25             KARLI PIANALTO, CSR
```



**WORD INDEX**

**< 0 >**
**04**   2:8
**08**   2:8

**< 1 >**
**1**   6:8   16:13
31:17, 25   32:9, 14
33:2, 20   34:1
36:25   37:5   38:22
39:2, 8, 17   40:10
48:19   49:19
**1:13**   41:16
**1:16**   41:19
**1:17-CV-02341-WS
D**   1:4   3:4
**1:20**   43:22, 25
**1:32**   52:17
**1:36**   52:20
**1:43**   57:20, 21
**10**   11:12   13:3
**10:00**   13:3, 20, 22
**10:30**   11:12   13:3
14:4
**10th**   55:9
**11**   2:9   11:10
12:16   13:18
**11:00**   11:9   12:17
**12**   2:8
**12:17**   1:12   3:6
**127916**   58:6   59:24
**12th**   25:11, 15
**13**   11:5, 5   12:8
**13th**   11:10   12:2
25:24
**14**   11:5, 5, 9   12:8
**14-02925**   2:6
**14th**   11:10
**15**   2:9
**16A60446**   54:10
**16th**   11:11, 11
**1700**   1:22
**19th**   24:19
**1st**   18:8   28:21
31:5   32:3   33:13
34:5, 11   36:20
37:24   40:22   42:1

**60:12**

**< 2 >**
**2005**   10:24
**2007**   10:25   11:21
15:14
**2012**   6:8   16:14
29:13   31:5, 18, 25
32:3, 9, 14   33:2,
13, 20   34:1, 5, 11
36:21   37:1, 5, 25
38:22   39:2, 8, 17
40:10, 23   42:1
48:19   49:19
**2013**   28:21
**2014**   12:2, 14, 16
19:15   20:23
22:22, 23, 24
23:18   24:4   27:17
39:20   40:8, 21
**2015**   25:24   26:19
27:4   30:15
**2016**   6:8   13:4, 25
14:5, 19   15:24
16:7, 14   18:8
24:20   25:12, 15
31:6, 18, 25   32:4,
10, 14   33:2, 14, 21
34:1, 6, 11, 15, 20
36:21   37:1, 6, 25
38:23   39:3, 9, 18
40:10, 23   42:2
44:6   48:20   49:19
51:6
**2017**   55:9
**2018**   1:12   2:16
3:5   58:5   59:17
60:12
**21**   2:9
**21st**   30:15
**22**   1:12   2:16   3:5
58:5
**24th**   27:17
**27**   2:6   42:22
43:8
**28**   2:7   42:22
43:8
**29**   2:8   6:8   15:23
16:7, 14   31:18

**32:14   33:2   39:3,
18   42:22   43:9
44:6   48:20   49:19
51:6
**29th**   31:6, 25
32:4, 10   33:14, 21
34:1, 5, 11, 15, 20
36:21   37:1, 6, 25
38:23   39:8   40:10,
23   42:1
**2A**   44:19, 24

**< 3 >**
**3**   2:3
**30**   2:9   3:3, 14
4:9, 10   14:3, 3
21:11   23:11
42:22   43:9
**30308**   1:17
**30326**   1:23
**31**   42:22   43:10
**31st**   23:17
**32**   42:22   43:10
**33**   42:23   43:11
**34**   42:23   43:11
**35**   42:23   43:12
**38**   17:23   18:4
**39**   17:23   19:11

**< 4 >**
**4**   11:5, 5   12:8
**40**   17:24   20:22
**404**   1:18
**4050**   6:13   25:16
26:20   27:19
**41**   17:24   23:8, 17
**42**   17:24   24:3
**44**   25:9
**45**   25:23
**47**   26:18
**4th**   29:13

**< 5 >**
**5**   6:7   9:16   11:10,
11, 12   12:16, 17
13:3, 3, 18   16:12,
17, 24   17:12, 16
36:19   37:4   38:21

**39:7, 13   41:25
48:18   49:5
**5:30**   11:12   13:3
14:4
**55**   2:7   28:12, 16,
20
**563**   1:17
**57**   2:8   29:9, 12
**5th**   26:19

**< 6 >**
**6**   3:3, 14   4:9, 10
21:11   23:11
**69**   27:3
**6th**   11:9   24:4

**< 7 >**
**73**   42:23   43:12
**74**   42:23   43:13
**75**   24:15
**76**   2:6   10:11
27:10, 11, 12
**77**   2:9   30:14, 16
**797**   5:9   6:13   7:1,
16, 17   9:11, 17
10:24   12:2   31:10,
13, 24   32:3   33:25
34:11   36:25   37:3,
23   38:12, 20, 22,
25   39:2, 6, 14
40:9, 22   41:5
**7th**   27:4

**< 8 >**
**814-5700**   1:18

**< 9 >**
**9:21**   18:10
**950**   1:22
**9th**   19:15   20:23

**< A >**
**a.m**   11:10, 12
12:17   13:3, 18, 18
**able**   12:22   35:25
**above-named**   60:3
**access**   36:1, 7
47:21
**accurate**   54:15

**Professional Reporters**
800.376.1006
www.proreporters.com

**Action** 3:*4* 28:*3* 60:*10*

**activity** 6:*5* 8:*13*, *18* 9:*11* 40:*18* 41:*23*

**add** 15:*15* 57:*14*

**added** 11:*4* 12:*4*, *7* 24:*11* 33:*3*, *5* 38:*4*, *6*

**adding** 33:*17* 40:*21*

**addition** 39:*19* 40:*8* 43:*16*

**additional** 4:*21* 20:*13*, *15* 31:*8* 44:*18*, *23* 55:*17*, *20*

**ADELLE** 1:*2*, *4* 58:*2* 59:*2*

**Administratrix** 1:*4*

**aforesaid** 60:*5*

**agenda** 45:*6*

**agree** 21:*8* 30:*5* 51:*4* 55:*14*, *19*, *20*

**agreeable** 3:*19*

**Agreed** 3:*20*

**agreement** 2:*14* 3:*16* 60:*7*

**ahead** 10:*10* 13:*12*

**aided** 10:*6*

**air** 22:*16* 23:*1*, *3*

**al** 58:*2* 59:*2*

**alarm** 28:*3* 34:*16* 35:*6* 46:*22* 47:*2*

**alarms** 7:*11*, *11* 9:*3*

**align** 50:*5*

**allow** 13:*9*, *19*

**allowed** 13:*8*

**alterations** 44:*4*

**altercation** 26:*22*

**altercations** 5:*22* 45:*16*

**altered** 10:*3*

**AMAND** 1:*21*

**ANDREW** 1:*4*

**another,** 29:*16*

**answer** 3:*18* 5:*5* 16:*20* 21:*11*, *13*

**answered** 35:*16* 38:*16* 54:*5*

**answering** 23:*11* 38:*18*

**anything's** 52:*12*

**anyway** 21:*4*

**apologize** 32:*23*

**apparently** 14:*2* 21:*6*

**APPEARANCES** 1:*14*

**apply** 52:*3*

**appreciate** 9:*5* 37:*15*, *18* 55:*7*

**approval** 8:*10*

**approved** 57:*3*, *5*

**April** 11:*9*, *10* 12:*2* 19:*14* 24:*4* 27:*17*

**area** 7:*14* 11:*24* 17:*5*

**Arkansas** 59:*15*

**armed** 9:*22* 47:*16*

**arrested** 28:*25* 29:*4*

**arrival** 29:*19*

**arrived** 27:*21* 28:*24*

**aside** 24:*2*

**asked** 17:*7* 37:*13* 38:*16* 54:*11*, *18* 55:*11*, *12* 57:*8*, *15*

**asking** 8:*19*, *21* 9:*9* 15:*6* 20:*15* 22:*19*, *24* 37:*14*, *18* 39:*11* 42:*13* 48:*12* 55:*1* 56:*3*

**asks** 4:*17* 39:*23*

**aspect** 44:*9*

**assaulted** 30:*20*

**assistant** 36:*4* 44:*21*, *22*, *24* 45:*6*

**assistants** 45:*7*

**assume** 54:*25*

**assuming** 9:*4*

**assumption** 15:*1*

**assurance** 34:*24*, *24*

**ATLANTA** 1:*2*, *17*, *22*, *23* 6:*14*

**attempting** 19:*1*

**attention** 21:*5* 46:*14*

**attorney** 49:*10*, *12* 51:*11* 60:*9*

**August** 11:*11* 13:*2*, *4* 29:*13*

**availability** 13:*11* 14:*4*

**aware** 6:*24* 7:*15*, *24* 30:*11* 32:*12*, *25* 35:*24*, *25* 36:*4*, *7* 39:*19* 46:*6*, *11*, *23*, *24* 53:*21*

**awareness** 54:*14*, *16* 55:*15*

**< B >**

**back** 23:*9*, *10*, *11* 24:*16* 25:*7* 29:*3*, *18* 36:*2*, *3* 37:*7* 41:*20* 42:*11* 48:*1* 49:*22* 50:*3* 52:*21*

**backup** 25:*17*

**based** 50:*14*

**Basically** 8:*3*

**becoming** 44:*25*

**BEGINNING** 1:*12* 34:*8*

**BEHALF** 1:*11*, *15*, *20* 3:*10*, *12* 4:*6* 23:*11*

**believe** 21:*5* 57:*12*

**belt** 34:*16* 35:*5*

**best** 46:*4*, *11*

**better** 52:*25*

**Bill** 10:*25* 15:*16*, *19*

**bit** 5:*1* 6:*9* 20:*4*

**black** 27:*22*

**blue** 18:*9*

**Bolling** 11:*7* 38:*1*

**break** 6:*9* 41:*13*, *17* 43:*23* 52:*14*, *18*

**briefly** 18:*1*

**BRIESKE** 1:*21*

**bright** 46:*2*

**bring** 8:*9*

**broad** 46:*7*

**broken** 27:*6*

**brought** 4:*21* 21:*5*

**Bryan** 34:*14*, *19* 51:*6*, *12*

**Buford** 6:*13* 25:*16* 26:*20* 27:*19*

**building** 7:*18*

**businesses** 17:*4*

**button** 28:*7* 34:*16* 35:*5* 36:*8*

**buttons** 36:*3*

**< C >**

**cab** 18:*25*

**call** 21:*18* 27:*4*

**calling** 19:*2* 25:*17*

**camera** 7:*12*, *14*

**cameras** 7:*10* 9:*3*

**capacity** 4:*4* 10:*19* 21:*11*, *14*, *15* 22:*5*, *10*, *21*, *25*

**capsulate** 46:*9*

**car** 27:*5*

**carrying** 21:*7*

**case** 3:*3* 50:*2*, *24* 54:*9*, *10* 55:*9* 60:*5*

**cases** 57:*1*

**catch** 21:*1*

**category** 16:*15* 33:*23*

**caveat** 31:*16*

**center** 29:*21*

**certain** 4:*9* 7:*10* 30:*1*

**certainly** 15:*2*

**Certified** 60:*2*

**certify** 60:*3*

**chain** 8:*7*

**chance** 57:*9*

change 13:6
  36:22, 24, 24  37:3,
  23  38:11, 15, 20,
  25  39:5, 14, 18
  40:9, 22  46:22
changed 12:5
  13:1, 24  41:9
  52:12
changes 11:13
  36:17, 22  39:23,
  24  40:1  41:4
  52:6, 9, 11
changing 13:7
Charles 7:8, 15
Cindi 11:5
Civil 2:15  3:3
clarification 37:19
  40:19
clarity 15:4  40:14
  55:1, 13
classify 53:11
clean 34:21, 25
cleaning 51:24
  53:10
cleanliness 9:2
clear 6:11  7:2
  11:20  16:20
  31:22  37:19, 22
  40:20
clerks 52:22, 23
  53:1, 4  54:11
clock 13:9, 10, 12,
  19
close 54:16
club 11:2, 7  15:13
clubbing 15:10
clubs 11:23  14:24
  15:11
coffee 34:25
combat 26:4
come 13:9, 10, 16
  14:3  15:7, 10
  56:25
coming 13:13
COMMISSION
  59:23
committing 53:2
communicating
  46:22

communication
  50:23
companies 10:4
complaint 34:3, 9
complaints 31:2, 7,
  9, 12, 23  32:2, 6, 8,
  17  49:16  50:10,
  16, 19  51:3
concern 21:24
  23:2
concerned 21:22
  22:14  36:6, 13, 15
concerning 5:20
  6:3, 17  7:2  8:12
  9:15  41:21  44:3
  45:11, 20  55:21
concerns 38:8
  56:10
CONCLUDED
  57:21
conducting 7:7, 16
confines 17:8
confused 20:7, 11
  23:14  54:6
confusing 23:13
consider 17:11
  56:13
considering 53:9
consult 42:2
contact 48:2
contained 45:12
control 27:20
  28:8  38:2, 7
copies 28:15
copy 4:10
corporate 10:20
  16:22  17:19  22:6
  56:3
CORPORATION
  1:4  3:13, 15  4:4
  54:9  58:2  59:2
correct 4:6  6:14
  17:19  18:11  20:2
  23:18  24:4, 8, 20,
  23  25:5, 6, 12, 18
  27:6, 17  28:22
  29:1, 5, 13, 16, 23
  30:15, 20  31:18,

19  36:11, 14
  46:16  56:22  59:5
correctly 55:6
correspondence
  4:18  5:3
corresponding
  26:15
corresponds 26:11
counsel 3:7
County 11:14
  14:15, 17, 20
  25:17  54:10
course 35:10  50:6
  56:25
COURT 1:1  3:8
  54:10
covered 17:10
create 10:18
created 30:23
creation 10:18
credentials 21:7
crime 6:6  9:16
  31:4, 4, 13, 24
  32:3, 5, 8  33:14,
  19, 19, 25  34:19
  35:18, 21  41:24
  44:5, 5  45:20, 23,
  24  46:19  49:18,
  18  52:23  53:2, 8,
  15  54:1, 12, 23
  55:10, 18, 21
crimes 6:5  16:12,
  16, 23  41:24
  48:17  49:5  52:24
  54:19
criminal 6:5  8:13,
  18  9:11  17:11
  27:16  36:18, 19,
  25  37:4, 24  38:12,
  14, 21  39:2, 6, 11,
  13, 25  40:11, 18,
  24  41:5, 10, 23
  52:7
crowd 15:12
  29:20, 21  30:7
  38:1, 2, 7
CSR 1:13  2:16
  58:4  60:25

currently 55:22
Curry 25:15
customer 11:2, 7,
  23  21:5  28:5
  30:19  34:4
customers 6:5
  8:13, 18  9:2  15:5
  27:21  28:6  41:24
  53:25
customer's 34:10

< D >
data 49:4
date 3:5  58:5
dated 19:15
  20:23  23:17  24:4,
  19, 19  25:11, 23
  26:19  27:3  29:13
dates 10:1  47:21,
  23
day 59:16  60:12
deal 47:6
deals 53:14
dealt 24:1
deceased 1:4
December 6:8
  11:11  13:2, 2, 25
  15:23  16:7, 14
  24:19  25:24  31:6,
  18, 25  32:4, 10, 14
  33:2, 14, 21  34:1,
  5, 11, 15, 20  36:21
  37:1, 6, 25  38:23
  39:3, 8, 18  40:10,
  23  42:1  44:6
  48:20  49:19  51:6
decided 13:16
decision 9:22
  10:6, 25  11:5
  15:15, 22  47:15
Defendant 1:4, 20
Define 21:19
definitive 15:1
DeKalb 11:14
  14:15, 17, 17, 19
  25:17  54:10
Department 2:6
depend 7:24

deployment 10:2
deposed 50:22
deposes 3:23
DEPOSITION
 1:11  2:13  3:2, 14,
 19  4:3  5:8  10:14,
 16  24:18  50:7
 54:8, 20  55:8
 57:21  58:3, 5
 59:4  60:6
deputies 11:15
 14:18
deputy 25:17  30:9
Description 2:5
designated 5:25
details 22:16, 17
 23:7
deter 46:8  53:2
determinations
 10:7
determine 16:3
 50:10  56:8
determining 7:5
 9:10  17:13
deterrence 31:4
 32:3, 5, 8  33:14,
 20  34:19  35:18,
 21  44:5  45:20, 23,
 24  49:18
deterrents 53:11
deterring 52:23,
 24  53:8, 14  54:1,
 12  55:18
different 7:13
 35:1
difficult 55:5
Direct 2:3  3:25
 40:23  41:9, 11
directly 41:6
Discharge 29:15
discharge 11:8
discharged 11:8
discussed 14:22
 24:10  40:2
discussing 6:12
dispatched 27:5
disposal 42:16
distribution 19:18
DISTRICT 1:1, 1

DIVISION 1:2
 8:9  22:22  48:4
 50:17  51:2, 14
 57:3, 5
document 52:1
documents 4:17,
 21  5:2  42:5
 45:12, 17  49:2, 20,
 25  50:1, 5, 9  51:7,
 19, 22  52:7
doing 17:8  54:24
door 15:6
driven 38:2
driver 18:9
drivers 18:25
driving 18:9
drugs 24:22  25:2
 28:25  29:4
duly 3:23  60:4
duty 11:14  33:6,
 18  36:4

< E >
earlier 5:7, 13
 13:14, 16  24:11,
 17  42:15  53:11
 55:4, 13
early 13:9, 9, 11
 14:9, 14
East 1:22
effect 44:6
efforts 6:3, 18
 7:21  8:12  9:15
 41:22
eight 4:14  31:2, 2
 49:16, 21
either 34:10
eliminate 16:15
Elizabeth 1:16
elizabeth@lawmora
 n.com 1:18
e-mail 19:17
e-mailed 18:13
e-mails 4:18  5:3
employ 9:22
 15:22  47:16
employed 10:2
 15:19

employee 5:8
 16:8, 10, 21, 21, 23
 20:1  22:3  34:4
 46:11  47:1  56:20
employees 6:21
 7:24  8:2, 3  15:3,
 9  16:4  28:7
 36:11  44:7, 13
 45:5, 23, 25  47:12
 53:4, 15, 23  55:25
 56:7, 16
employee's 34:10
engaging 26:4
ensuring 7:10
entail 5:9  40:13
entirety 59:5
entrance 27:22, 23
entry 44:22
equipment 34:22,
 25  35:1, 22  51:24
equipped 34:16
 35:5
ERRATA 58:1
Estate 1:4
et 58:2  59:2
evaluate 6:4, 18
 7:21, 23  8:13
 9:16  33:25  41:22
 55:25
evaluated 8:8
evaluating 6:25
 7:2, 3, 4
evaluation 7:7, 16
 8:15
event 60:10
events 17:11
evidence 10:18, 19
 28:13
exactly 40:16
 54:18  55:11
Examination 2:3
 3:25
exceeds 39:22
excluded 40:4
excluding 37:8
Excuse 12:14
Exhibit 10:11, 13
 17:23, 23, 24, 24
 18:4  19:11  20:22

23:8, 17  24:3, 15
 25:9, 23  26:18
 27:3, 10, 11, 12
 28:12, 16, 20  29:9,
 12  30:14, 16  43:7,
 8, 8, 9, 9, 10, 10, 11
EXHIBITS 2:4
 42:22, 22  50:1
expect 28:7  35:11,
 15, 24  36:14
EXPIRES: 59:23
explain 8:1  34:23
 44:20  52:24
express 38:8
extent 22:4  30:1
 31:16  32:17  40:1
 51:1  53:17
exterior 34:17
 35:13
extra 14:5, 8
 24:11

< F >
facilities 46:3
facility 35:3  53:10
fact 51:17
fair 16:6  18:19
 19:22  26:14
 30:23  32:21
 39:17  40:7, 19
 56:15
fairly 6:10
falls 33:23  40:16
fare 18:23
fast 12:21
feature 7:13, 17
 8:6, 7  41:8
FEBRUARY 1:12
 2:16  3:5  55:9
 58:5
Federal 2:15
feel 7:25  56:10
felt 15:3, 9
female 26:3
Ferry 1:22
fight 29:21  30:7
fights 5:21  44:4
 45:15

File  3:*4*
find  19:*4*, *5*  50:*18*
fine  5:*1*, *13*
firearm  11:*8*
firearms  21:*6*, *7*
  29:*15*
fired  20:*2*, *3*, *8*
  22:*15*  23:*1*, *3*
  24:*7*  29:*23*  30:*8*
fired,  25:*18*
firing  21:*23*
first  3:*18*, *23*  4:*16*
  5:*19*  6:*11*, *16*
  9:*25*  11:*21*  18:*1*,
  *8*  27:*14*  60:*4*
five  52:*14*
focus  17:*7*
follow  19:*2*
followed  19:*1*
follows  3:*24*
footprints  7:*19*
forces  10:*4*
foregoing  59:*4*
  60:*6*
form  3:*17*  12:*3*
  21:*10*  29:*25*
  31:*15*  32:*16*
  39:*21*  53:*16*  54:*2*
  56:*2*, *18*  57:*8*
formal  7:*23*  8:*19*
found  22:*25*  27:*22*
four  4:*14*  15:*22*
frame  37:*9*  40:*17*
Friday  11:*2*, *9*, *10*,
  *11*, *12*  12:*18*
front  29:*20*  45:*12*,
  *17*  47:*1*  52:*2*
full  59:*5*
fully  37:*16*  38:*18*
  56:*15*

< G >
GA  1:*17*, *23*
gas  29:*20*
Geigerich  10:*25*
generate  28:*2*
generated  49:*8*
GEORGIA  1:*1*
  6:*14*  54:*11*

getting  48:*16*
  50:*22*  52:*10*
Giegerich  15:*16*

G-I-E-G-E-R-I-C-H
  15:*18*
give  4:*5*  16:*20*
  17:*25*  22:*17*
given  3:*15*  6:*21*
  47:*12*  59:*6*
go  5:*24*  8:*7*
  10:*10*  13:*12*
  17:*25*  20:*22*
  23:*10*  37:*16*
  43:*19*  44:*15*, *17*,
  *18*  45:*2*  48:*11*
  52:*21*
going  4:*15*  5:*18*,
  *24*  6:*9*  9:*21*
  10:*10*, *12*, *21*
  11:*16*  15:*21*
  16:*14*  17:*18*, *21*
  19:*1*, *10*  21:*10*
  22:*4*  23:*7*, *10*
  24:*3*, *14*  25:*8*, *22*
  26:*17*  27:*2*, *10*
  29:*25*  30:*13*  31:*1*,
  *15*  32:*16*, *21*
  33:*24*  34:*13*  37:*7*
  38:*17*, *19*  39:*21*
  41:*20*  42:*21*  44:*1*,
  *16*  53:*16*  54:*2*
  55:*8*  56:*2*, *25*
Good  21:*1*, *1*
  28:*18*
GRAY  1:*21*
greeting  9:*2*  46:*1*
  53:*9*, *13*, *25*  54:*14*,
  *17*  55:*15*
Gretchen  11:*6*
  33:*4*
Gruber  11:*6*
guard  7:*22*  8:*5*, *8*
  10:*24*  14:*1*  15:*23*,
  *24*  16:*1*, *7*  21:*20*
  23:*25*  24:*12*  33:*6*,
  *15*, *18*  38:*4*, *6*
  39:*20*  40:*8*, *21*

43:*2*  47:*25*  56:*1*,
  *8*, *21*, *21*  57:*2*
guards  9:*23*, *25*
  10:*1*, *3*, *6*  11:*20*
  12:*6*  13:*1*, *8*, *13*
  14:*5*, *23*  15:*15*
  41:*7*  47:*16*  56:*16*
guess  16:*20*  23:*2*
  54:*4*, *4*, *6*
gun  18:*11*
guns  21:*9*, *19*, *23*
gunshots  30:*7*, *10*
guy  21:*3*  28:*4*
guys  13:*19*  24:*11*

< H >
hand  17:*21*  18:*17*
  25:*8*, *22*  26:*17*
  27:*2*, *11*  42:*21*
  60:*11*
handed  43:*1*
handicapped  26:*22*
happened  17:*16*
  24:*11*  50:*4*
Hatib  54:*9*
head  42:*9*  48:*6*, *8*
head,  18:*11*
hear  55:*1*
Heard  24:*7*  30:*10*
he'd  35:*14*
helped  54:*24*
hereinbefore  60:*8*
hereunto  60:*11*
hey  52:*10*
Highway  6:*13*
  25:*16*  26:*21*
  27:*19*
hit  47:*1*
hitting  47:*7*
Hold  27:*14*
holding  18:*17*
hoping  9:*1*
hour  14:*6*, *9*
hours  9:*24*  13:*6*,
  *18*
house  36:*2*

< I >
idea  48:*8*

identification
  27:*13*  28:*17*
  29:*10*  30:*17*
identified  4:*8*, *13*
  29:*21*
identify  3:*7*
identity  10:*6*
implement  31:*8*
implemented
  36:*18*  37:*23*  39:*1*,
  *6*, *15*
Incident  2:*6*, *9*
  5:*9*, *16*  17:*15*, *22*
  18:*7*, *15*, *16*, *20*, *21*,
  *21*  19:*11*, *21*  20:*1*,
  *5*, *22*, *24*  23:*17*, *20*,
  *22*  24:*4*, *10*, *18*
  25:*11*  26:*11*, *15*,
  *20*  27:*8*  28:*2*, *3*,
  *21*, *24*  30:*6*, *14*, *19*,
  *24*, *24*  37:*4*  38:*3*,
  *5*  39:*11*, *13*  40:*11*,
  *24*  41:*5*, *10*  49:*7*
  50:*14*
incidents  17:*3*
  21:*8*, *9*, *17*  26:*14*
includes  31:*6*
  36:*21*  44:*6*
including  9:*24*
  34:*15*  37:*8*
INDEX  2:*1*
indicates  29:*19*
individual  24:*18*
  27:*20*
Individually  1:*2*
info  48:*2*
information  19:*6*
  20:*13*, *16*  42:*3*, *8*
  47:*17*, *20*, *22*  48:*7*,
  *13*  49:*2*, *12*
informed  16:*4*
initial  6:*22*
inside  28:*5*  46:*12*,
  *15*
interested  60:*10*
interior  34:*17*
  35:*8*
involved  15:*15*

30:7  36:23
involves  24:22
involving  21:8
  24:6
Irakli  11:1
issue  24:1
issues  56:10
item  42:7
items  4:19  5:4
  42:20
its  6:3, 17  8:12
  12:2  16:17, 18
  17:12  40:9, 22
  41:22  59:4

< J >
January  16:13
  27:4  31:5, 17, 25
  32:3, 9, 14  33:2,
  13, 20  34:1, 5, 11
  36:20, 25  37:5, 24
  38:22  39:2, 8, 17
  40:10, 22  42:1
  48:19  49:19
Jason  47:19, 19
  48:2, 6, 11  49:14
  52:10
Jim  1:25
job  17:8  58:6
  59:24
jump  5:18
June  6:8
JURAT  59:1

< K >
KARLI  1:13
  2:16  58:4  60:2,
  25
keep  55:1
KEVIN  1:11
  2:13  3:2, 15, 22
  10:25  11:6  19:20
  58:3  59:3, 16
  60:3
Kilasonia  11:1
kind  4:19  22:16
  34:24
knew  18:19
  19:24  21:2  25:20

26:9, 25  27:25
29:7  30:24  42:8
50:6, 15, 21
know  6:19, 20
  15:12  16:21
  17:19  18:2  20:5
  21:18, 20, 20
  22:12  23:14  25:5
  26:10  27:8  28:9,
  10  31:23  32:5, 5
  37:7, 9, 12  42:23
  46:2, 6, 9, 14
  51:17, 23, 24
  53:22  54:13, 19
  56:9, 13, 24, 25
knowing  51:12, 17
knowledge  9:20
  14:21  16:11, 16,
  22, 23  20:20
  23:24  32:1, 11
  33:22  34:2, 12
  39:4  48:17
knows  26:15

< L >
labeled  17:22
  29:11  50:1
Langolis  1:25
large  6:10  29:20
  30:7
LAW  1:16
learned  54:17
leave  14:3  50:25
leaving  14:24
led  39:14
Leet  1:21  3:12,
  12, 20  10:12, 17
  12:3  21:10  22:4,
  9, 12  23:9, 13
  26:1  27:14  28:18
  29:25  31:15, 20
  32:16, 19, 23
  39:21  41:14
  48:24  51:4  53:16
  54:2  56:2, 18
  57:8
left  15:11
length  10:1
letting  56:9

level  28:9  44:22
  57:1
levels  33:25
  44:25  45:2
light  10:22  32:24
  46:2
lighting  8:25  9:1
  53:9, 21  55:16
lights  53:14, 25
limit  51:25
limited  9:24  31:6
  34:15
LINE  58:7
list  19:18  51:19
little  6:9  7:13
  20:4  52:25
LLP  1:21
located  6:13
location  11:14
locations  7:12
loitering  5:21
  28:25  29:2, 4
  44:4  45:11
look  19:17  26:19
  42:5, 14, 24  49:3,
  4, 7, 20  50:9  51:7
  52:8, 11
looked  24:17
  43:2, 7, 8, 9, 9, 10,
  10, 11, 11, 12, 12,
  13  49:24, 24, 25
  50:1, 14
looking  7:4  9:9
  23:16  42:18
  43:13  49:22  54:7
looks  7:9  23:25
lot  20:2, 6, 9
  21:24  22:17  23:1
  42:23  46:20
lots  44:5
Lou  18:22

< M >
maintaining  17:8
maintenance  35:2
maker  10:25
makers  10:6  11:5

making  10:7
  36:23  54:14
  55:15
male  27:22
males  29:22
management  16:10
manager  5:8  8:3,
  10  11:1  22:22
  44:25  45:1, 4
  47:20, 22  48:4
  50:17  51:2, 14
  56:24  57:3, 6
managers  7:24
  8:2
Marc  50:18  51:1
March  25:11, 15
  26:19  60:12
mark  10:10  30:13
marked  10:13
  24:15  25:8, 22
  26:17  27:2, 12
  28:11, 13, 16, 20
  29:9  30:16
marking  27:11
matter  13:7, 10
  51:15, 15
matters  44:7
Matthew  18:22
Mbowe  54:9  55:9
mean  7:4  54:7,
  18  55:12
meant  54:23  55:3,
  10
measures  31:4, 8
  32:13  33:19
  49:17
measuring  56:11
media  19:7, 9
meet  45:5, 7
meeting  45:8
meetings  45:4, 6
memory  48:1
mentioned  55:17
met  4:2
middle  10:16
miles  6:7  9:16
  16:13, 18, 24
  17:12, 16  36:20
  37:4  38:21  39:7,

13 41:25 48:18
49:5
**Mileurn** 50:18
51:2
**mind** 32:19 52:25
**minute** 52:14
**minutes** 14:3, 3
**mischaracterizes**
53:17 54:3
**missing** 5:12
**mitigates** 8:24
**MOFFETT** 1:21
**monitor** 46:4, 5, 11
**monitoring** 34:17
35:8, 12
**monthly** 45:4
**MORAN** 1:16
**morning** 11:3
12:11, 12
**mouthful** 40:25
**move** 6:23 9:21
15:21 23:8 24:3
31:1 34:13
**moved** 13:2
**Moving** 36:16
**mutual** 26:4

< N >
**name** 18:22, 23
**narrative** 24:25
29:19 30:6
**necessarily** 17:17
**need** 7:21, 25 8:8
15:25 16:2, 3
24:16 37:12, 17
54:24
**needed** 8:7 14:2,
3 56:8
**needs** 6:4, 18 7:1,
2, 6 12:2 16:5
17:13 41:22
55:25
**never** 17:7 32:19
40:8, 20
**new** 40:13
**news** 19:8
**Nichole** 1:21 3:12
50:25

**night** 11:2, 4, 8
12:7, 10, 11 24:12
33:4, 5, 18 35:18
44:22
**nights** 9:23 12:19
**nine** 4:14 34:14
51:5
**nleet@grsmb.com**
1:23
**normally** 7:9
**NORTHERN** 1:1
**Notary** 59:15, 22
**note** 39:25
**notes** 4:24, 25
10:8, 12, 17 11:18
47:25 48:3
**notice** 3:16 4:9,
10, 16, 16, 17
21:12 31:18
39:22 40:4
**noting** 53:14, 25
**November** 19:15
22:22, 24 30:15
**Number** 2:5 3:4
9:21 15:21 16:11
29:22 34:13
36:16 43:7, 8
48:25
**numbers** 28:14

< O >
**oath** 54:9 59:3
**object** 10:12 12:3
21:10 22:4 29:25
31:15 32:16
39:21 53:16 54:2
56:2, 18 57:8
**objection** 10:22
**objections** 3:16
32:24
**observed** 26:3
29:19 35:23
**observing** 54:15
55:16
**obstruction** 53:22
**obstructions** 46:3
**obtain** 42:3 47:17
49:12

**obtained** 10:19
48:13
**obviously** 36:10
**occurred** 22:1, 3
**occurrence** 36:19,
25 37:24 38:13,
14, 21 39:2, 7, 25
52:7
**occurring** 6:6
9:11 16:12, 17, 23
17:4, 12 18:7
26:20 27:17
28:21 31:24 37:4
38:13, 21 39:7, 12,
12 41:24 45:16
48:18
**occurs** 46:19
**October** 18:8
20:23
**Office** 14:16
**officer** 24:1 25:15
30:9
**official** 60:12
**oh** 5:22 12:23
20:14 28:18
42:10, 14 56:19
**Okay** 4:12 5:18
6:1, 15, 16 8:11
9:7, 14, 19 10:10
11:19 12:13, 24
13:13, 17, 17, 24
14:13 15:21
16:11 18:3, 4, 7
19:8, 22, 23 20:14,
17 21:13 23:6, 8,
15, 23 24:14 25:1,
4, 7, 22 26:12, 17
27:2 28:11, 18
30:4, 13, 23 31:1,
20 32:21, 25 36:5
37:17, 21 41:12,
14 43:2 44:10
45:1, 22 47:9
48:3, 15 49:1
51:5, 13 53:7, 19
54:20 55:14 56:5
**OKLAHOMA**
1:12
**once** 18:1

**ones** 42:19 49:9
57:12
**open** 51:1
**opened** 10:24
**operations** 18:14
**order** 42:2, 5
47:17 48:20 49:3,
11, 12, 20 50:18
51:7, 10 52:8
**orientation** 42:20
44:15
**originated** 18:22
**outside** 24:7
46:12, 15 54:13
55:15, 22
**overflow** 11:2, 7,
23 14:23 15:12

< P >
**P.M** 1:12 3:6
11:9, 12 12:17
13:3, 3, 20 18:10
57:21
**p.m.** 13:22
**Paces** 1:22
**Page** 2:2, 5 25:14
26:2, 20 29:3
58:7
**panic** 28:7 36:7
47:2
**paper** 10:23
**paragraph** 18:9
**parent** 1:4
**parking** 20:2, 6, 9
21:23 23:1 26:22
44:5 46:20
**part** 4:15, 16
21:12 35:3 40:2,
4 45:5 46:10, 13
47:12
**particular** 9:23, 23
**parties** 3:8 60:9
**partly** 38:1
**pass** 48:23
**pay** 46:14
**people** 14:23
15:9 46:1 47:23
53:21

period 31:*17*
permit 30:*21*
person 29:*4*
personal 4:*3, 23,*
*25* 21:*14, 15* 22:*5,*
*9, 19, 21, 25* 38:*8*
Personally 22:*13*
personnel 47:*19,*
*22*
persons 36:*23*
pertaining 42:*19*
*43:17* 49:*5* 50:*16*
photographs 4:*18*
*5:3*
physical 5:*21, 21*
*7:8* 9:*3* 31:*7*
*34:4, 10* 44:*3, 4,*
*13* 45:*15*
PIANALTO 1:*13*
*2:16* 58:*4* 60:*2,*
*25*
picked 18:*23*
pieces 47:*25*
place 32:*9* 59:*7*
placed 56:*22* 57:*2*
places 7:*12*
plaintiff 26:*18*
Plaintiffs 1:*4, 11,*
*15* 3:*11*
Plaintiff's 17:*23,*
*23, 24, 24* 18:*4*
*19:11* 23:*8, 16*
*24:3, 15* 25:*8, 23*
*26:18* 27:*3, 11*
*28:12, 20* 29:*12*
*30:13* 42:*22* 44:*2*
Plaza 1:*22*
please 10:*23*
*23:14* 24:*2* 37:*18*
point 29:*23* 37:*13,*
*17* 47:*24* 50:*15, 17*
pointed 18:*11*
Police 2:*6, 7, 8*
*10:4* 11:*14* 14:*17,*
*20* 19:*2* 24:*19*
*25:23* 27:*3, 4*
*28:21, 24* 29:*13*
policies 5:*6, 7, 20*
*6:2, 17, 20, 24* 7:*6,*

*20* 8:*11, 21* 9:*10,*
*14* 41:*21* 42:*12,*
*16, 17, 25* 43:*15,*
*18* 44:*2, 11, 15, 17*
*45:3, 10, 14, 19*
*46:24* 47:*9* 50:*4*
*53:5* 55:*23* 56:*7*
policy 46:*18*
position 44:*25*
positions 6:*23, 23*
*7:10* 44:*23*
possession 24:*24*
potential 24:*22*
*29:21*
potentially 15:*13*
*50:21*
pots 34:*25*
practice 46:*18*
practices 5:*20*
*6:3, 17* 7:*21* 8:*12,*
*22* 9:*10, 15* 41:*21*
*44:3, 12* 45:*11, 15,*
*20* 46:*25* 47:*10*
premises 6:*4, 6, 7,*
*12, 19* 7:*22* 8:*14*
*9:12, 24, 25* 10:*2*
*11:21* 15:*23*
*16:12, 17, 18, 24*
*17:12, 13, 17, 17*
*23:4* 24:*23* 31:*8,*
*24* 34:*14, 20*
*36:19, 20* 37:*5, 24*
*38:13* 39:*8, 12, 13*
*41:23, 24* 42:*1*
*45:16* 48:*18* 51:*6*
*53:3*
preparation 5:*4*
press 28:*7*
pressed 36:*3*
previously 4:*20*
*28:11*
prior 11:*8* 53:*17*
*54:3*
Prius 18:*10*
probably 20:*6*
*46:5* 56:*23*
Procedure 2:*15*
*45:3* 46:*18*

procedures 5:*7, 20*
*6:3, 17, 21, 24* 7:*6,*
*20* 8:*12, 21* 9:*10,*
*15* 41:*21* 42:*12,*
*16, 17, 25* 43:*15,*
*18* 44:*3, 12, 15, 18*
*45:10, 14, 19*
*46:24* 47:*9* 50:*4*
*51:24* 53:*5* 55:*23*
*56:7*
process 8:*19* 53:*6*
produced 4:*20, 22*
product 53:*22*
production 4:*16,*
*17*
property 18:*10*
*21:9* 29:*15*
proposed 36:*18,*
*22, 23* 39:*1, 5, 14,*
*18, 24*
proposing 36:*23*
propounded 3:*24*
provide 45:*10, 13*
*55:23*
provided 4:*10*
*44:7* 45:*22* 49:*23*
Public 59:*15, 22*
pull 18:*24*
pulled 49:*4*
pumps 29:*20*
purpose 6:*25*
*11:23*
pursuant 2:*14*
*3:15* 60:*7*
pushed 36:*7*
pushing 29:*22*
put 28:*12*

**< Q >**
QA 34:*21, 23*
*51:17, 20*
Quality 34:*24, 24*
Quarterly 45:*6, 8*
question 3:*17*
*28:10* 31:*21*
*32:22* 37:*13*
*38:18* 39:*10, 22*
*40:6* 49:*1* 54:*5*
*56:5*

questions 3:*24*
*5:5* 11:*17* 31:*16*
*57:10, 15*
quickly 42:*21*
QUIKTRIP 1:*4*
*2:9* 3:*3, 12, 15*
*4:4, 6, 20* 7:*16*
*9:9, 14* 12:*1*
*14:12* 15:*10, 19*
*16:7, 13, 16, 19, 22,*
*25* 17:*9, 11, 19, 22*
*18:19* 19:*24* 20:*6,*
*20* 21:*2* 23:*12, 23*
*25:4, 16, 20* 26:*9,*
*15, 21, 25* 27:*5, 8,*
*8, 20, 25* 28:*5* 29:*7*
*30:11, 14, 23* 31:*5,*
*23* 32:*2, 5, 9, 12,*
*15, 25* 33:*1, 13, 15,*
*20* 34:*5, 18* 35:*9,*
*13* 36:*6, 17, 24*
*37:3, 22* 38:*19*
*40:8, 20* 41:*4*
*42:2* 44:*7* 45:*10,*
*14, 19* 46:*10, 19,*
*25* 47:*16* 48:*19*
*49:8, 18* 50:*12*
*52:1, 6* 53:*3* 54:*9*
*55:24* 56:*6, 15*
*58:2* 59:*2*
QuikTrip's 5:*20*
*6:2, 16* 8:*11* 9:*22*
*15:22* 16:*11* 21:*9*
*23:3* 24:*23* 39:*12*
*41:21* 44:*2, 5, 11*
*47:15* 48:*17*
quite 9:*6*

**< R >**
RA 44:*19, 21*
RA's 44:*21*
read 10:*22* 18:*1,*
*3* 28:*3* 30:*21*
*32:22* 48:*24*
*53:21* 59:*4*
reading 11:*16*
*12:25* 18:*8* 32:*20*
Really 13:*7, 11, 18*

28:2  42:21  46:2

**reask**  31:21

**Reason**  11:1, 7
14:8  16:6  37:10
56:25

**reasons**  10:5
14:22

**recall**  19:16, 21
20:3  23:21  42:17
43:13  51:16

**recalling**  18:25

**recap**  45:8

**receive**  44:14

**received**  50:15

**recitation**  30:2

**recognize**  19:11
20:18, 23  23:20, 21

**recognized**  21:21

**recommendation**
33:8, 10, 12, 24

**recommendations**
31:3  32:12, 25
49:16  50:11, 19
51:3

**record**  3:1  4:12
6:11  31:22  37:19,
22  39:25  41:15,
18  43:19, 21, 24
52:16, 19  57:19

**records**  4:17, 19
5:2, 4  52:11

**redundant**  37:12

**Reed's**  34:14, 19
51:6

**refer**  4:15  6:12
42:11  48:1, 20

**reference**  25:16
27:5, 20

**referencing**  31:17

**referred**  48:4

**referring**  11:18

**refresh**  45:8

**regard**  4:8

**regarding**  27:4
44:7

**regards**  22:14
50:23

**regular**  35:2

**regularly**  40:3

**related**  4:19
32:17  33:11

**relates**  35:17

**relating**  8:22
31:3, 7, 9, 12, 23
32:2, 13  33:1, 14,
17, 19  34:3, 9
35:20  45:15, 23
47:1  49:17  50:11,
20

**relative**  60:9

**reliant**  56:15

**relief**  44:21

**relying**  10:15

**remember**  40:16

**removed**  30:1

**repeat**  30:4  32:7
56:5

**reply**  3:24

**Report**  2:6, 7, 8, 9
8:2  16:25  17:3
18:15, 16  19:12
20:23, 24  23:17,
20, 22  24:4, 19, 19
25:11, 15, 23  26:3,
11, 15, 18  27:3
28:21  29:13  30:6,
14, 24  46:1

**REPORTED**  1:13
20:1  58:4

**reporter**  3:9  60:2

**reporting**  46:19

**reports**  5:9  17:16,
22  19:7, 9  49:7

**represent**  3:8

**representative**  4:4,
13  10:20  21:12
22:6  56:3

**request**  8:4  14:13
15:25  32:17  33:3,
17, 25  37:8  38:1,
7  56:16

**requested**  13:13,
15  14:11, 12  16:8,
10  24:13

**requester**  11:1, 6

**requesting**  50:16

**requests**  11:13
31:3, 7  33:19

49:17  50:11, 20
51:3  56:21

**reserve**  3:16

**residences**  17:4

**respond**  37:15
42:3, 6  47:17
49:3, 21  51:7, 10
52:8

**responded**  25:16
27:19  54:13

**response**  9:5  37:4
41:5  52:6

**responsibilities**
51:18, 20

**responsible**  7:9

**responsiveness**
3:18

**rest**  28:4

**result**  36:18, 24
37:23  38:4, 6, 12,
20  39:1, 6, 24, 24
40:10, 23  41:9, 11

**review**  17:25
42:15, 24  49:20
51:19

**reviewed**  5:4, 6, 7

**revised**  40:14

**revisited**  12:1

**rid**  48:16

**right**  4:2  5:18, 19
9:21  14:10, 14
15:8, 8  17:15, 21
19:10, 19, 21  20:9,
19  22:3, 22  23:19,
24  24:7, 11, 13, 21
25:2, 7  27:10
28:19  29:18  31:1
34:13  36:16
41:12  42:21
45:17  48:12  52:2
54:13  57:12, 16, 18

**risk**  6:5, 7  8:13,
15, 18, 24  9:11, 16
41:23, 25

**Road**  1:22

**role**  34:14, 17, 18,
19, 21  35:8, 12, 17,
19, 20  51:6, 25

**Rose**  1:16  2:3
3:10, 10, 14  4:1
10:15, 21  12:5
21:13  22:7, 18
23:10, 16  26:2
27:16  28:11, 19
30:5  31:19, 21
32:18, 21, 24  40:6
41:12, 20  43:19
44:1  49:2  50:25
51:5  52:14, 21
53:24  54:6  56:4,
6, 20  57:9, 18

**routine**  35:2

**Rules**  2:15

**Runion**  11:6

**RUST**  1:21

**< S >**

**safe**  56:10

**safety**  31:7  34:4,
10  38:9  42:19
53:20

**sale**  24:22, 24

**SANDERS**  1:2, 4
3:3  58:2  59:2

**Saturday**  11:2, 8,
10, 11, 12  12:9, 11,
19

**saw**  18:25  19:8
36:13

**saying**  12:4  15:2,
5  19:21  52:10
56:11

**says**  3:23  18:9
19:20  20:8, 9, 10
24:7, 24  25:2, 3,
15  26:3, 20, 21
27:19  29:2, 3, 15,
24

**schedule**  10:3
14:1

**scheduled**  13:16
40:3

**Schedules**  11:9

**scope**  39:22

**Scratch**  5:22
33:11

seal 60:*12*
sec 43:*20*
second 5:*24* 11:*4*
*12:7 17:25 25:14*
*32:18 33:3, 5*
*44:24 52:22*
security 5:*6, 21*
*6:4, 6, 18, 25 7:2,*
*5, 22, 25 8:5, 5, 8*
*9:3, 16, 23, 25*
*10:1, 3, 4, 5, 5, 24*
*11:4, 13, 20 12:2,*
*6, 7 13:1, 8, 13, 24*
*14:23 15:15, 23,*
*24, 25 16:7 17:13*
*21:3, 4, 20 23:25*
*24:12 31:3, 4, 8, 9*
*32:13 33:1, 6, 15,*
*18, 19 34:18*
*35:18, 20 36:3, 17*
*38:4, 6, 11, 15, 20,*
*25 39:5, 14, 19, 20,*
*23, 24 40:1, 8, 9,*
*12, 13, 14, 21, 22*
*41:4, 6, 8, 22, 25*
*42:11, 20 43:2*
*44:3, 13 46:21*
*47:16, 24 49:17,*
*17 50:11, 16, 20*
*52:1, 6, 11 56:1, 8,*
*16, 21, 21 57:2*
see 26:*4, 22* 27:*14,*
*23* 41:*13* 52:*12*
*55:2*
seen 18:*4* 35:*10,*
*14, 23* 36:*5* 49:*9*
selling 25:*2*
sentences 30:*1*
serious 21:*9, 16,*
*19, 19*
set 24:*2* 60:*8, 11*
sex 28:*25* 29:*2, 4*
sheet 10:*23* 58:*1*
sheriff 11:*14*
*14:17*
sheriffs 14:*20*
Sheriff's 14:*16*
shift 14:*9* 46:*22*

shooting 22:*15, 16*
shoplifting 43:*13*
Shorthand 60:*2*
shot 25:*17*
shots 20:*2, 3, 5, 8*
*22:15* 23:*1, 3*
*24:7*
shots, 29:*23*
show 14:*14* 17:*18*
*24:14*
showed 13:*22*
*14:9*
shown 28:*19*
*43:16*
sic 13:*18*
sideways 32:*20*
Signature 59:*11*
similar 29:*11*
simpler 41:*2*
sit 57:*15*
sitting 46:*25* 52:*2*
situations 46:*8*
six 4:*14* 16:*11*
*48:17, 25* 49:*3, 13,*
*15*
skipped 28:*13*
somebody 21:*21,*
*25*
sorry 5:*17* 11:*5*
*12:17, 23* 20:*17,*
*21, 25* 22:*8, 19*
*25:25* 26:*7* 30:*4*
*32:7, 19* 33:*4*
*34:7* 41:*11* 42:*10,*
*14* 43:*3* 44:*21*
*48:22, 24* 56:*19*
sort 7:*7* 51:*7*
source 48:*12*
space 26:*22*
speak 49:*11*
*50:18* 51:*10*
speaking 4:*23*
*12:21* 16:*19* 41:*6,*
*8*
specific 7:*4* 9:*11*
*42:7*
specifically 39:*23*
*44:8*

speed 50:*8*
spell 15:*17*
SPENCER 1:*4*
spoke 53:*10*
Springs 1:*17*
ST 1:*21*
stack 17:*15*
standard 7:*18*
standing 15:*6*
*27:22*
stands 34:*23*
start 16:*14* 33:*11*
started 10:*25*
*51:16*
state 4:*12* 54:*10,*
*11* 59:*3, 15*
stated 4:*19* 5:*5*
*37:10*
statement 54:*15*
*55:14*
STATES 1:*1*
stick 56:*11*
stipulated 2:*13*
STIPULATIONS
*2:12* 60:*8*
store 5:*8* 6:*13*
*7:1, 5, 12, 16, 18*
*8:4* 9:*1, 2, 11, 17*
*10:24* 12:*2* 18:*24*
*24:8* 29:*20* 30:*20*
*31:10, 13, 24* 32:*3*
*33:25* 34:*10, 18*
*35:17, 20* 36:*2, 11,*
*25* 37:*3, 23* 38:*11,*
*20, 22, 25* 39:*2, 6,*
*14* 40:*9, 15, 22*
*41:5, 9* 44:*25*
*45:1, 5* 46:*12, 16,*
*19* 49:*5* 52:*23*
*55:24, 25* 56:*24*
*57:1, 2*
store-level 44:*12*
*53:1* 56:*7, 16, 20*
Street 1:*17*
subject 6:*4, 7, 12,*
*19, 19* 7:*22* 8:*14,*
*22* 9:*24* 10:*13*
*15:23* 16:*12, 13*
*31:5, 24* 32:*9, 14*

33:*1, 11, 13, 15, 20*
*34:4, 18* 35:*9, 13*
*36:17, 20* 37:*5*
*39:8* 41:*23, 25*
*47:16* 48:*18, 19*
*49:18* 50:*12* 52:*6*
subjects 26:*3*
Subscribed 59:*14*
suggest 8:*4*
Sunday 12:*9, 11,*
*12*
supervisor 8:*4, 9*
*56:24*
supervisors 45:*7*
supposed 16:*25*
*50:23*
Sure 4:*25* 5:*11,*
*12* 7:*13* 9:*6, 8*
*15:5, 6* 20:*5, 11,*
*12* 22:*7, 18* 24:*2,*
*14, 17* 30:*5* 34:*9*
*35:1* 40:*12, 19*
*43:4* 45:*25* 46:*3,*
*10* 47:*4, 5* 50:*7, 9*
*51:23, 25* 53:*21*
*54:14* 55:*5, 7, 16*
*57:11*
surrounding 6:*7*
*9:17* 16:*13* 36:*20*
*38:22* 39:*7* 41:*25*
*48:19*
surviving 1:*2*
swear 3:*9*
sworn 3:*23* 54:*8*
*59:14* 60:*4*
system 6:*23* 7:*23*
*8:1* 9:*3* 40:*14*
*46:21* 52:*1*
systems 35:*3*
*40:13*

< T >
take 25:*7* 30:*21*
*41:13* 52:*14*
TAKEN 1:*11*
*2:14* 41:*17* 43:*23*
*52:18* 58:*5* 60:*6*
talk 6:*16* 45:*24*

46:7  47:24
talked  17:10  50:6
talking  7:8  8:5,
25  9:4  28:1
42:10, 11  49:9
Taxi  18:9, 25
team  35:3
tech  34:25
tell  5:2  8:23
42:24  43:6, 6, 7
47:7
telling  17:18
ten  4:14  36:16
39:23  52:5
Tennison  7:9, 15
40:2
terms  34:25
40:12  42:7  44:20
49:23  53:20, 22
testify  10:17  54:8
60:4
testifying  22:5
testimony  4:5
53:17  54:3  59:6
text  18:8
Thank  11:16
24:17  25:10
57:18
Thanks  27:15
thing  8:25  9:4
19:3  38:18  54:17
55:16
things  17:16
42:15, 16  46:4, 5,
6  49:23  53:10
think  5:9, 11, 13
8:24  10:15  11:17
16:9  17:10  18:22
19:13  21:16
33:23  35:16
38:16  40:4, 16
41:1  43:17  47:3
49:14  52:15
55:13  57:11
third-party  52:23,
24  53:2, 8, 15
54:1, 12, 18, 23
55:10, 18, 21
THOMAS  1:4

THORNTON
1:11  2:14  3:2, 15,
22  4:2  11:1, 6
19:20  58:3  59:3,
16  60:3
thought  8:6  36:6
48:22  50:22
three  4:14  9:22
47:15
time  3:5, 7, 19
10:1  12:1, 4, 5, 24,
25  13:14  24:13
30:21  31:17  37:9,
13, 17  38:3  40:17
41:16, 19  43:22,
25  51:1  52:11, 17,
20  54:20  57:20
59:6
times  12:14
today  4:22  42:3,
6  57:10, 15
Today's  3:5
told  5:13  36:10
Tony  11:7  22:3
24:6  33:4  38:1, 7,
8
Tony's  37:8
tools  56:13
top  19:17  42:9
48:6, 8
topic  5:19, 22, 24
6:2, 10  9:21
15:21  16:11
17:11  31:1, 2
34:13  36:16
37:16  39:23  40:7
41:20  42:3, 6
44:2  47:15, 18
48:17, 21  49:3, 13,
16, 21  51:1, 5, 8,
11  52:5, 8
topics  4:9, 13, 20
5:5, 19  21:12
40:5  45:9
to-wit  3:24
Toyota  18:10
trained  6:21  53:5,
15

training  6:22
44:6, 8, 12, 14, 17,
18, 23  45:2, 22
46:10, 13  47:13
52:21, 22  53:1, 7,
20, 23, 24  54:1, 12
55:17, 20, 24
transcribed  60:7
transcript  54:7
transcription  59:6
trespass  27:16
trial  3:19
true  59:5
truth  60:4, 5, 5
try  45:25  46:6
47:20
trying  26:10  46:7
47:23  55:4
TULSA  1:12
turn  19:10  24:25
25:14  26:2  29:3,
18
two  4:14  17:11
21:6  26:3  29:23
30:7, 10  41:20
44:22, 25, 25

< U >
Uh-huh  20:25
26:6  29:6
undersigned  59:15
understand  4:5
10:7  54:21, 24, 25
55:5
understanding  9:8
37:20  55:10
unfolded  19:3
unique  7:5, 13, 17
UNITED  1:1
upgrades  40:3
use  3:18  29:12
46:21

< V >
validated  48:10
various  6:23  46:8
verbal  5:21  26:21
44:4  45:15

verbatim  10:22
verified  48:10
verses  3:3
versus  54:9
victim's  18:23
video  3:2  5:14, 17
VIDEOGRAPHER
1:25  3:1  41:15,
18  43:21, 24
52:16, 19  57:19
videos  4:18  5:3
VIDEOTAPED
1:11
VP  18:14
vs  1:4  58:2  59:2

< W >
walked  27:21
want  11:20  13:9
16:20  20:4, 7, 10
23:7  28:15  40:3,
20  44:8  46:2
47:3  48:24  52:21
55:5  56:12  57:14
wanted  50:7
wanting  43:3
watch  5:14  46:5
way  6:22  15:1, 4
23:2  41:2
week  11:4
weekend  12:8
Well  9:5  20:4
22:2  45:9  46:22
48:8  50:13  54:6
55:2
went  38:17  50:3
we're  6:12  8:5,
25  9:4  23:10
27:10  37:19
54:14  55:16
we've  4:2  7:14
17:7  35:1
WHEREOF  60:11
White  47:19, 19
48:7  52:10
window  46:4
Withdraw  32:19
witness  3:9  5:25
21:25  22:8, 11

23:*15*   56:*19*
59:*11, 16*   60:*11*
**witnessed**   22:*2*
**word**   32:*18*
**words**   30:*1*
**work**   35:*22*
**worked**   21:*4*
51:*13*
**working**   12:*15*
14:*5, 8*
**works**   8:*1*
**wrap**   40:*7*   41:*13*
52:*15*
**write**   12:*22*
**written**   10:*23*

**< Y >**
**Yeah**   5:*6, 15*   12:*5*
16:*9*   19:*9, 15*
20:*10, 12*   21:*16*
22:*11*   23:*13*
42:*13, 14, 15*   47:*7*
48:*10*   54:*4*
**year**   40:*16*
**yelling**   27:*21*
28:*4, 6*
**yesterday**   40:*2*
**YVETTE**   1:*2, 4*
58:*2*   59:*2*

